UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
NIKOLAOS KOTSOPOULOS,

                    Petitioner,

       - against -

SUPERINTENDENT, GREEN HAVEN
CORRECTIONAL FACILITY,

                    Respondent.
----------------------------------------------------------x

**MEMORANDUM OF**
**DECISION AND ORDER**

07 CV 4531 (ADS)

**A P P E A R A N C E S :**

    **STEVEN R. KARTAGENER**
    Attorney for the Petitioner
    225 Broadway, Suite 2700
    New York, NY 10007
    By:    Steven R. Kartagener, Esq.
           Jason Yang, Esq., of Counsel

    **CARRO, CARRO & MITCHELL, LLP**
    Attorneys for the Petitioner
    475 Park Avenue South, 16th Floor
    New York, NY 10016
    By:    John Carro, Esq., of Counsel

    **KATHLEEN M. RICE**
    District Attorney of Nassau County
    Attorneys for the Respondent
    262 Old Country Road
    Mineola, NY 11501
    By:    Michael Walsh, Assistant District Attorney
           Michael P. Canty, Assistant District Attorney
           Tammy J. Smiley, Assistant District Attorney
           Ilisa T. Fleischer, Assistant District Attorney

**SPATT, District Judge.**

On July 25, 2007, Nikolaos Kotsopoulos ("the Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder in the second degree, on the ground that he was denied his Sixth Amendment right to the effective assistance of counsel.

## I. <u>BACKGROUND</u>

The petition related that on May 21, 2003 the Petitioner was convicted, following a jury trial, of murder in the second degree (Penal Law § 125.25 [23] and assault in the third degree (Penal Law § 120.00 [13]). The Petitioner was sentenced to an indeterminate term of from 25 years to life imprisonment to run concurrently with a one year prison sentence for the third degree assault conviction. The jury had acquitted the Petitioner of intentional murder but convicted him of depraved indifference murder. The jury was not asked to consider any lesser included offense such as reckless manslaughter or criminally negligent homicide because, according to the Petitioner, his trial attorney, Jacob R. Evseroff, Esq., ("Evseroff") "refused to seek a jury charge on a lesser included offense."

On May 23, 2005, the conviction was affirmed by the Appellate Division, Second Department. See *People v. Kotsopolous,* 18 A.D.3d 781, 794 N.Y.S.2d 917 (2d Dept. 2005). Leave to appeal to the New York Court of Appeals was denied. See *People v. Kotsopoulos*, 5 N.Y.3d 807, 803 N.Y.S.2d 36 (2005). Now represented by Steven Kartagener, Esq., on or about October 19, 2006, the Petitioner filed a motion to vacate the conviction pursuant to New York CPL § 440.10, alleging

that he had been denied effective assistance of counsel at the trial. In a decision dated March 9, 2007, the County Court, Nassau County (Brown, J.), denied the motion in its entirety. In his decision, Judge Brown stated:

> The trial transcript, the affirmation by Frank Schroeder, the Assistant District Attorney who tried this matter dated December 13, 2006, the affirmation by Jacob R. Evseroff, dated November 21, 2006, and the affidavit by William T. Higgins sworn to December 29, 2006, submitted in opposition to defendant's motion, counter the argument that the defendant failed to receive effective assistance of counsel. Defendant has failed to demonstrate that there was any conflict of interest in defendant's representation.

> To sustain a claim of ineffective assistance of counsel, New York courts examine the trial as a whole to determine whether defendant was afforded meaningful representation. *People v. Benevento*, 91 NY2d 708, 713, 1998). In any event, applying the state and federal tests to the facts in this case, the Court finds that the defendant received effective assistance of counsel *People v. Baldi*, *supra*; *Strickland v. Washington*, 466 U.S. 668).

> Accordingly, the defendant's motion is denied in its entirety.

Thereafter, on July 5, 2007, the Appellate Division, Second Department denied the Petitioner's motion for leave to appeal from the denial of his motion to vacate the judgment of conviction.

## II. <u>AS TO WHETHER THE PETITION IS TIMELY</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year period for petitioners seeking federal habeas corpus relief from a state conviction. 28 U.S.C. § 2244(d); *Lawrence v. Florida*, 549 U.S. 327, 127 S. Ct. 1079, 166 L. Ed. 2d 924 (2007). The Second Circuit has held that the limitations period set forth in Section 2244(d)(1)(A) "does not begin to run until the

completion of direct appellate review in the state court system and either the completion of certain proceedings in the United States Supreme Court, or-if the prisoner elects not to file a petition for certiorari-the time to seek direct review via certiorari has expired." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001). In addition, section 2244(d)(2) provides that AEDPA's limitations period is tolled while a state prisoner seeks postconviction relief in state court. *Lawrence*, 127 S. Ct. at 1082.

Initially, the Respondent argues that the petition should be dismissed as untimely. The Petitioner's habeas petition was filed in the office of the Clerk of the Eastern District of New York on August 3, 2007. The Respondent contends that the Petitioner originally had until November 7, 2006 to file, which was the date that his time to file a writ of certiorari to the Supreme Court expired. However, on October 17, 2006, twenty-one days before his time to file a habeas petition would have expired, the Petitioner filed a CPL § 440.10 motion to vacate his conviction, in the County Court, Nassau County. Pursuant to the provisions of 28 U.S.C. § 2244(d)(2), the Petitioner's 440.10 motion tolled the AEDPA limitations period. On March 9, 2007, the County Court of Nassau County denied the Petitioner's motion to vacate his conviction. On July 5, 2007, the Appellate Division, Second Department denied leave to appeal from the lower court's denial of the Petitioner's motion to vacate his conviction. During the pendency of this motion, the one-year statute of limitations was tolled; namely, for a total of 259 days. This would extend the date that the petition had to be filed to July 26, 2007.

What occurred on July 25, 2007 and July 26, 2007 is the source of contention with respect to the timeliness issue. The Petitioner's counsel, Steven Kartagener, Esq. ("Kartagener") affirms that he placed the petition in the mail from his office at 225 Broadway in lower Manhattan on July 25, 2007, and the Clerk's Office in the Southern District of New York received the petition the following day, on July 26, 2007, the final filing date. In his June 9, 2009 submission, Kartagener explained why he believed that the Southern District Clerk's office actually received the petition the day after he mailed it on July 25, 2007:

> As we have pointed out in our initial papers, the Petition in this case was completed and posted to the Court by regular mail on July 25, 2007. . . . I mailed the Petition by regular mail on the evening of July 25th, knowing that it would arrive at the Southern District's Clerk's Office by July 26th, since my office and the District Court House are in the same 10007 Zip Code, and mailed items always get to the Court House and vice versa, by the following day. *See* Kartagener Affirmation paragraphs 8-11.

According to Kartagener, on August 2, 2007, he arrived at his office to find that the Clerk's Office had returned the petition because he failed to provide his original signature on all of the copies and did not include an original and two copies of the required Southern District "civil cover sheets." The following day, Kartagener returned to the Clerk's Office and re-filed the petition. The petition was accepted and received a time stamp indicating that the filing date was August 3, 2007.

The Respondent contends that this time stamp reflects that Kotsopoulos failed to comply with the AEDPA limitation period. The Respondent asserts that,

despite the belief by Kartagener that the petition was actually received by the Clerk on July 26, 2007, "it is simply impossible to prove that this in fact occurred. In the absence of any such proof, Petitioner cannot simply choose a date and ask this Court to deem it the filing date." (Respondent's response dated May 26, 2009 at p. 3).

Kartagener counters that Rule 3(b) of the "Rules Governing Section 2254 Cases in the United States District Court," compels the conclusion that the petition should have been marked filed on July 26, 2007. The Court agrees.

Rule 3(b) provides only that "[t]he clerk must file the petition and enter it on the docket." However, the Advisory Committee notes to the 2007 amendments to Rule 3(b) clearly suggest that where, as here, a petition is filed with a technical defect, the clerk should accept the petition on the date it is filed and require the petitioner to cure the defects. According to the Advisory Committee:

> Revised Rule 3(b) is new and is intended to parallel Federal Rule of Civil Procedure 5(e), which provides that the clerk may not refuse to accept a filing solely for the reason that it fails to comply with these rules or local rules. Before the adoption of a one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the petitioner suffered no penalty, other than delay, if the petition was deemed insufficient. That Act, however, added a one-year statute of limitations to petitions filed under § 2254, see 28 U.S.C. § 2244(d)(1). Thus, a court's dismissal of a defective petition may pose a significant penalty for a petitioner who may not be able to file a corrected petition within the one-year limitations period. The Committee believed that the better procedure was to accept the defective petition and require the petitioner to submit a corrected petition that confirms to Rule 2. Thus, revised Rule 3(b) requires the clerk to file a petition, even though it may otherwise fail to comply with Rule 2. The rule, however, is not limited to those instances where the petition is defective only in form; the clerk would also be required, for example, to file the petition even though it lacked the requisite filing fee or an in forma pauperis form.

28 U.S.C. § 2254, Advisory Committee Notes.  Rule 3(b) clearly states that the Clerk's Office in the Southern District of New York should have accepted Kotsopoulos's petition when it was received on July 26, 2007.  Thus, the Court will construe the petition to have been filed on July 26, 2007; Kotsopoulos's final day to do so under AEDPA.  Having determined that Kotsopoulos's petition was timely, the Court now turns to the merits of the petition.

### III. <u>THE CONTENTIONS OF THE PETITIONER</u>

In this habeas case, the Petitioner contends that he was denied his constitutional right to the effective assistance of counsel.  In that regard, he claims that Evseroff, his trial counsel, represented him on a contingent fee basis; namely, that Evseroff was to receive a $100,000 bonus over and above his $400,000 fee already paid, if the Petitioner was acquitted of the murder charges after trial.  Amplifying this contention, the Petitioner asserts that this contingent fee - bonus arrangement created a conflict of interest.  As a result of this alleged conflict of interest, Evseroff "refused to explore the possibility of a mid-trial guilty plea after [p]etitioner's son provided devastating testimony against him, and . . . later refused to ask for a jury charge that would have provided the jury with the option of convicting [p]etitioner on lesser included homicide offenses," and that he was "severely prejudiced" by Evseroff's refusal to consider these options (Petition at ¶7).

In sum, the Petitioner asserts that he was afforded ineffective assistance of counsel by Evseroff because of the alleged "contingent fee" agreement; namely that Evseroff would get an additional fee of $100,000, if the Petitioner was acquitted by

7

the jury. According to the Petitioner, this alleged "contingent fee" agreement caused Evseroff to fail to perform his obligation as Petitioner's counsel in two respects: (1) that he failed to seek a plea and (2) that he failed to request the trial judge to charge lesser-included offenses in addition to the Murder charges. The Petitioner asserts that all of these acts on the part of Evseroff was to obtain a complete acquittal – and the additional $100,000.

## IV. <u>THE CRIMINAL TRIAL</u>

At the trial, the Petitioner was represented by Evseroff and Anastasios Sarikas, Esq. The Petitioner's son George, who was 12 years of age at the time of his mother's murder, testified that on the evening of May 4, 2002, he was in the kitchen with his parents. During an argument, he saw the Petitioner punch his wife Carolyn in the back of the head. Then, after getting a gun, the Petitioner struck Carolyn in the head, causing her to bleed from her head or nose. A few minutes later, as George watched from a seat at the kitchen table, the Petitioner shot Carolyn. The Petitioner then telephoned 911 and reported that an intruder had shot his wife. He then warned his son that if he did not tell the police that an intruder murdered their mother, he and his brother would be sent to an orphanage.

The Petitioner took the stand in his own behalf at the trial. He testified that both of his sons were in the basement at the time of the shooting. That he found an armed, gloved and masked intruder inside the back door of his house moments after hearing what sounded like a gunshot. The Petitioner further testified that he disarmed this masked man, who then fled leaving his weapon behind. He then

telephoned 911 and reported that an intruder had shot his wife. The Petitioner repeated this version to the detective who later responded and to police officers at the hospital later that evening. The jury acquitted the Petitioner of intentional murder and convicted him of both depraved indifference murder and assault in the third degree.

## V. THE HABEAS HEARING

### A.    The Petitioner's Case

#### 1.    Christina Kotsopoulos

Christina Kotsopoulos is the Petitioner's mother. She is 73 years of age, lives in Athens, Greece and does not speak English. The Petitioner is her younger son.   The Petitioner has two sons, George, born in 1990 and Nikolaos, born in 1992. In 2002, at the time of the events at issue, George was 12 years of age. May 4, 2002, the date of this murder, was Holy Saturday before Easter. That day, Mrs. Kotsopoulos called from Greece and spoke to her son and to Carol regarding the food that Carol was preparing for Greek Easter. Thereafter, she learned that "something had happened to Carol on May 4, 2002. "They" hit Carol. She also learned that her son was arrested and charged with her death. Mrs. Kotsopoulos came to the United States and moved in with Jonna Bellis in Astoria, Queens. She then met Georgia Apostolidis, the daughter of Ms. Bellis.

Mrs. Kotsopoulos tried to help her son by finding an attorney to represent him. Initially, she gave a real estate lawyer a $10,000 fee. She then "hired" a firm called Sandback and Birnbaum. No longer satisfied with the Birnbaum firm, she

changed to another attorney, Jacob Evseroff. The Kotsopoulos family were referred to Evseroff by one Anthony Lioumis. He told them that Eversoff was a "very good attorney." Lioumis told them that Evseroff's fee was $400,000 with an initial retainer of $50,000.

Mrs. Kotsopoulos met Evseroff for the first time at his office in Brooklyn. She was with Lioumis, who acted as her interpreter. Lioumis told her that Evseroff's fee was $400,000, "and we accepted that." She gave Evseroff part of the fee, consisting of an Astoria Federal Savings Bank check in the sum of $41,000, to the order of Paul Evseroff, which was the name they were told to place on the check. They also paid Evseroff the sum of $9,000 in cash, for a total of $50,000 initially paid to him. At a second or third meeting with Evseroff he told them, "[y]ou have to give me $400,000 and another $100,000 because this is peanuts." At a later meeting he also told them he wanted the fee in cash, "he wants everything in green." Mrs. Kotsopoulos testified that they agreed on the fee, "what else could we do."

After the first meeting with Evseroff, they returned to his office to make additional payments. He told them that before he went into the courtroom he had to have the entire $400,000. Mrs. Kotsopoulos asked for receipts for the cash payment, but Evseroff said "No." She never received any receipts.

Two weeks before the trial, the total fee of $400,000 had been paid. Mrs. Kotsopoulos went to Evseroff's office with Georgia Apostolidis. Also present was attorney Anastasios Sarikas, who has working on her son's case with Evseroff. During that meeting, Evseroff asked Sarikas "to get out of the office for a little

while." With Sarikas out of the office, Mrs. Kotsopoulos talked to Evseroff with Apostolidis as her interpreter. Evseroff said to her, "$400,000 is not enough" and he needs another $100,000. She testified that her understanding of these conversations was that if her son was not acquitted, she would not have to pay the additional $100,000. In this meeting, she said she would pay the additional $100,000 if her son was acquitted, "and he agreed." (Tr. at 33). However, according to her testimony, she was the person who offered the proposition that she would pay the extra $100,000 only if the Petitioner was acquitted.

> Q    After Mr. Sarikas left, did you have a conversation with Mr. Evseroff through Ms. Apostolidis' interpretation?
>
> A.    Yes. Yes.
>
> Q    What did Mr. Eversoff say to you at that point in time?
>
> A    That time he told us that the $400,000 that he got it's not enough even for peanuts, and he needs another hundred thousand dollars.
>
> Q    In response to being told that Mr. Evseroff needed a hundred thousand dollars, what did you say to him if anything?
>
> A    I told him - - yes, I told him that if you acquit my son because he has a job as a butcher and there's a lot of money that the customers owe to him, so in case you acquit my son, then I will collect the money, I will give you that hundred thousand, and he agreed.
>
> Q    What was your understanding about whether you would have to pay Mr. Eversoff if you son was not acquitted?
>
> A    I told him that if you acquit our son, he is going to collect the money and give you the money that you need, because we didn't have no money.
>
> Q    And if Mr. Evseroff did not acquit your son, would you be paying him

the money, the $100,000?

A        Not, of course not.

(Tr. at 33-34).[*]

On cross-examination, there were portions of the testimony of Mrs. Kotsopoulos that tended to show that she was not entirely credible.  She testified that she did not know that her son may get a new trial if he prevailed at this hearing.  In the telephone calls to Greece that preceded her trip to New York she stated that her son didn't tell her that Carol was killed and yet she and her husband immediately came to the United States.  They just got on a plane and hurriedly came.  In addition, she thought a burglar "hit" Carol.  Her son never told her that, either by accident or on purpose, he shot Carol.

As to the crucial discussion in Evseroff's office a few weeks prior to the trial, Mrs. Kotsopoulos testified that Evseroff wanted more money, and she said if her son was acquitted, she would come up with the money.  She further stated that she made the statement to give Evseroff a bonus if he got her son out of jail.  Although Mrs. Kotsopoulos later denied that she initiated the $100,000 "if acquitted" proposition, she was shown an affidavit signed by her before a notary public on January 3, 2006.  Initially, she said it didn't look like her signature and then she said "maybe it is."  The attorneys stipulated that she signed the affidavit in the presence of the Petitioner's attorney, Steven R. Kartagener, Esq.  In this affidavit she stated that "I

_____

* Tr. refers to the Hearing Transcript.

had Ms. Apostolidis tell Mr. Evseroff that if he was able to get defendant out of jail by winning the trial, Nick would come up with the money from monies that were owed to him." She further stated that Evseroff agreed to this arrangement as to the additional $100,000 (see Respondent's Ex. A). However, it is clear from her testimony that she offered the "$100,000 if acquitted" arrangement to Evseroff and not the reverse.

Mrs. Kotsopoulos attended her son's trial almost everyday. She heard her son testify that he didn't shoot and kill his wife. He testified that an armed intruder broke into the house and killed his wife. She knew that her son called 911 and told police that an armed intruder shot his wife and he told the police the same version. In relating this testimony, the Court noted that she was, again, an evasive witness.

During the trial, Mrs. Kotsopoulos heard her grandson George testify that he saw his father, the Petitioner, shoot his mother. In this regard, she gave Evseroff notes her grandson made. In these notes, her grandson wrote that his father was innocent and that an intruder killed his mother. Evseroff used these notes at the trial to cross-examine George.

Mrs. Kotsopoulos and her husband had also hired attorney Sarikas because he spoke Greek. She paid him $10,000 or $15,000. She testified that Sarikas told her that the trial judge, "Judge Belfi felt that Mr. Evseroff was not doing the right thing by your son because he was objecting to any lesser offense being submitted to the jury." (Tr. at 62). The Court doubts that Judge Belfi would have stated that he "felt that Mr. Evseroff was not doing the right thing" by "objecting to any lesser

offense being submitted to the jury." Sarikas also told her that Evseroff told him that if he mentioned anything about lesser included offenses or plea bargaining, he would kick him off the case.

### 2. __Georgia Apostolidis__

Georgia Apostolidis testified that she was a citizen of Greece and a green card resident of the United States. She has a BA in English literature; is married; and her parents own two restaurants. She knows the Petitioner, who provided meat for her parents' two restaurants. Her mother brought the Petitioner's parents to her home. She played a role in retaining counsel for the Petitioner. Apostolidis was present at every meeting of the parents with Evseroff except the first meeting. She talked to Evseroff about receipts for the fees paid to him. Evseroff said "no receipts." He said if he gave receipts he would ask for more money. Evseroff said he needed a fee of $400,000 only in cash. She was present on many visits to Evseroff's office when the parents paid him.

Approximately two weeks prior to the trial, she was present at a meeting in Evseroff's office with the Petitioner's parents and Sarikas. At the meeting Evseroff asked Sarikas to step out of the room. Evseroff then told them that for the amount of work he did and his time and effort, the money charged was peanuts and he needed another $100,000. In response, Mrs. Kotsopoulos was very upset. She said that although she did not have the money, the Petitioner could pay him when he was released. According to Apostolidis, "if Nick was out, he [Evseroff] would receive another $100,000. If not, there was no way for him to get the hundred thousand."

(Tr. at 92).

During the trial, she translated for the Petitioner's mother and father. Also, during the trial Sarikas told her, that Evseroff was not representing the Petitioner, "the right way and if he said anything he would be thrown out of the case."

At the trial, the Petitioner testified that an intruder broke into the house and killed his wife. He told 911 and the police the same story. She knew that was the Petitioners defense. Articles in the United States and Greek newspapers related the same story; that an intruder killed his wife. She believed this was what happened and that the boys were tied up by an intruder. Apostolidis also testified that the Petitioner's mother also knew that his defense was that an intruder killed his wife.

However, at the trial, Apostolidis heard the Petitioner's son George testify that he saw the Petitioner take out a weapon, pistol whip and then shoot his mother. She was surprised to hear this testimony, because George had also told the police about an intruder. Apostolidis testified that the Petitioner consistently contended that an intruder had shot Carol. At the end of the trial, Sarikas told her that the judge didn't think Evseroff "did the right thing for the Petitioner" in that he didn't ask the judge to charge the jury as to lesser-included offenses.

In her affidavit in support of the petition, Apostolidis stated that Sarikas told her that "the trial judge seemed to feel that Mr. Evseroff was not doing the right thing for the defendant when Mr. Evseroff objected to any charges with lesser sentence being submitted to the jury." (Resp. Ex. B). Assistant District Attorney Canty tried to question Apostolidis as to how a lesser-included offense would be

appropriate at the trial, as follows:

Q  They felt that the theory that the defendant put forward first of an intruder that would be a good defense for their son, right?

A  I don't know if they thought it was a good defense or not. I can't.

Q  You had conversation with, conversations with Ms. Kotsopoulos, right?

A  Yes.

Q  And her, like you stated, believed that it was an intruder that killed Carol?

A  Yes.

Q  So I'm just trying to understand, you would agree with me that if it were an intruder, the jury would have to make a determination either it was a intruder or it was Nick, correct?

A  I don't understand?

Q  Well - -

A  I don't think I'm able to answer that question, sir.

Q  Well, Nick, the defendant, Mr. Kotsopoulos, stated it wasn't him, right?

A  Yes, he did.

Q  So a jury would have to either believe it wasn't him or they'd have to believe it was him, right, based upon his testimony?

A  Yes.

(Tr. at 109-110).

Apostolidis was questioned about the key meeting with Evseroff about two

weeks before the trial.  She testified that it was the idea of Mrs. Kotsopoulos to pay

Evseroff another $100,000 if the Petitioner was acquitted.  Significantly, Apostolidis

testified that Evseroff said he wanted the extra $100,000 without any strings

attached, as follows:

> Q      Well, back up.
> Mr. Evseroff says I need more money?
>
> A      Yes.
>
> Q      I can't do this for what you pay me, I need another hundred
> thousand?
>
> A      Yes.
>
> Q      Mrs. Kotsopoulos says I don't have another hundred thousand?
>
> A      Yes.
>
> Q      He says I need the money.  Mrs. Kotsopoulos comes up with
> an idea that we'll pay you a hundred thousand dollars on money that's
> owed to Nikolaos if and when he's acquitted?
>
> A      Yes.
>
> Q      So that idea of paying after Nikolaos was acquitted is there
> would be access to money was Mrs. Kotsopoulos' idea?
>
> A      Yes.  Yes.
>
> Q      I'm not trying to trick you.
>
> A      No.
>
> Q      That's a fair statement, correct?
>
> A      Yes.

* * * * * *

Q       Fair to say that Mr. Evseroff was insistent that he wanted the extra money flat, he didn't want any strings attached. He says I want my hundred thousand dollars?

A       Yes, sir.

Q       That was your testimony, right?

A       Yes, sir.

(Tr. at 114-115, 118).

On cross-examination, Apostolidis testified that Sarikas never said that the Petitioner or his family should fire Evseroff because "he's not doing right by him." Also, she never heard anyone say that the Petitioner is now claiming that he accidentally shot his wife. That the Petitioner may be claiming this new and different defense was a "shock" to her.

Q       And fair to say you had a very close relationship with Mr. and Mrs. Kotsopoulos?

A       Yes, sir.

Q       They confided in you?

A       Yes, sir.

Q       They never told you hey listen, keep us in your prayers because Nikolaos told us he shot his wife?

A       Never.

Q       Never, right?

A       No.

Q       They never indicated to you that they even - - that thought even crossed their mind?

A        Never.

Q        The defense they had discussed with Mr. Evseroff and Mr. Sarikas always was to the bitter end what their son had told people privately and publicly that it was an intruder, correct?

A        Yes.

(Tr. at 118-119).

### 3.        **Anastasios Sarikas**

Anastasios Sarikas, is an attorney in New York since 1984.  In his first position in New York he was, for four years, an assistant district attorney in Bronx County.  He now practices primarily criminal defense law.  He is on the 19(b) panel representing indigent criminal defendants.  As a prosecutor and as a criminal defense lawyer, he has tried approximately one hundred felony jury trials.

In March 2003, he was retained by the Kotsopoulos family, in a pending Family Court matter in Nassau County, pertaining to their visitation rights as grandparents to their two grandsons, George and Nikolaos, Jr.  They introduced Sarikas to Jack Evseroff.  Subsequently, he became involved in the defense of the criminal case.  For both the Family Court matter and the criminal case he was paid legal fees of between $21,000 and $24,000.  These fees were paid by Christina Kotsopoulos.

As an intern in the Bronx District Attorney's office Sarikas had met Evseroff briefly when he was representing a defendant in a notorious criminal case.  When he was offered the opportunity to work with Evseroff in the Kotsopoulos defense he was "elated" and "ecstatic."  In this defense, Sarikas was the "law man," in that he

prepared the memoranda, made motions and reviewed the discovery material. Evseroff was the lead counsel; and Sarikas had no authority to make independent decisions concerning the trial without Evseroff's approval. Evseroff never discussed with Sarikas his fee arrangement with the Kotsopoulos family.

The two top counts in the indictment against the Petitioner were intentional murder and depraved indifference murder. He described the difference between intentional murder and depraved indifference murder.

> Q    Now, let's move for a moment to the charges in this case. Do you remember the charges that were in the indictment or the most serious charges that were in the indictment against Mr. Kotsopoulos.
>
> A    I remember the two top counts, there were just two top counts, that was it. It was intentional murder and depraved indifference murder.
>
> Q    And as you understand the law of the State of New York with respect to what you refer to as being depraved indifference murder, is the culpable mental state one of acting recklessly under circumstances evincing a depraved indifference to human life?
>
> A    Yes.
>
> Q    So the difference as you understand it between intentional murder and depraved indifference murder, is that with respect to the first there's an intent to call [sic], with respect to the second there's a reckless killing under, as I said a few moments ago, circumstances of depraved indifference.
>
> A    Absolutely, shooting a gun in a crowd, that situation.

(Tr. at 129).

Both charges went to the jury. In its verdict, the jury found the Petitioner not guilty of intentional murder and guilty of depraved indifference murder.

Immediately after the trial, Sarikas accompanied Evseroff to the Nassau County jail to visit the Petitioner. In the attorney visiting room, Sarikas related a conversation between Evseroff and the Petitioner.

Q       Do you recall any conversation that Mr. Evseroff had with the defendant on that occasion?

A       Oh, yes.

Q       Would you please tell the Court what that conversation was that you heard Mr. Evseroff having?

A       When we entered, we were in the attorney visiting room before Mr. Kotsopoulos was there. When he entered, Mr. Kotsopoulos appeared very, very angry, and Mr. Kotsopoulos I don't remember exactly what Mr. Kotsopoulos said to Mr. Evseroff, not to me, but to Mr. Evseroff, he told him how angry he was at him and how disappointed he was at him. And then Mr. Evseroff responded. And Mr. Evseroff responded words to the effect of what are you talking about? You think I'm not angry? I just lost a hundred thousand dollars. Remember I was supposed to get a hundred thousand dollars extra if we beat all the charges. Words to that effect.

Q       What was your reaction to hearing this comment?

A       I was like a duck who had been hit on the head with a rock. I was stunned.

Q       Did you discuss this conversation – being as stunned as you were, did you discuss this conversation with Mr. Evseroff?

A       Not immediately, not that day, no.

Q       Why not?

A       I wanted to digest what had happened. It seemed so extraordinary that I wanted to make sure that what I understood was what I thought I understood. And I didn't think that it was an appropriate moment in that room to discuss that particular subject. I waited for another time.

Q      Did you incidentally [subsequently?] have a conversation with him about that conversation?

A      I did.  It was days later, yes.

Q      And what did Mr. Evseroff tell you during that conversation?

A      Mr. Evseroff's attitude was that there was nothing wrong with it, there was nothing wrong with a bonus type of arrangement, and I said Jack, this is a contingency fee arrangement, you can call it what you like, but to my mind it's not lawful.  And besides, I think – that's what I said to him.

(Tr. at 130-132).

Returning to the subject of the trial, Sarikas testified that the defense was at all times the Dr. Richard Kimble/Sam Shepherd defense, namely, that an unknown intruder killed the wife.  Sarikas testified that Evseroff pursued this defense despite the fact that a surprise witness, George Kotsopoulos, the Petitioner's 12 year old son, gave testimony that contradicted the Petitioner's version of the crime.  He described George's testimony as follows:

Q      And was he the first witness called by the prosecution as you recall?

A      Yes.

Q      And what did George Kotsopoulos tell the jury?

A      He told the jury that his parents were having an argument, that his father went up to his bedroom, went underneath his bed, opened the box that he had his gun in, brought down the gun from upstairs, hit his mother across the head with it. I believe the back of the head, and then after his mother went out to the porch and then came back, his father who was then standing by the island in the kitchen shot her in her face.

        That was his testimony.

Q      And George was about how old at this point in time?

A      12 years old.

Q      Prior to George's relating that testimony to the jury, had the prosecution ever put you on notice prior to Mr. Evseroff's opening that he would be testifying?

A      No.

(Tr. at 133-134).

Even though Evseroff cross-examined George, in Sarikas' opinion, his testimony "devastated" the defense theory in the case.  In fact, Sarikas stated that "the defense theory ceased to exist" after George's testimony.  (Tr. at 135).  Sarikas called Evseroff the next day, which was on Saturday, April 26, 2003 and told him in view of George's testimony, the intruder defense "would not fly . . . and you should change our position dramatically."  (Tr. at 136).  Further, Sarikas told Evseroff in that telephone conversation "that there was a very distinct, serious possibility that this was an accidental shooting . . . he was waving a gun, a loaded gun, in the face of his wife."  (Tr. at 136).  Further, Sarikas noted that George testified that when the shot went off, his father yelled at Carol, put the gun on the table and grabbed his head.  According to Sarikas, that indicated the "serious possibility that he didn't intend to fire the shot."  (Tr. at 136).  The Court notes that, as the hearing progressed, the new "story" of the Petitioner did not include waving the gun in the face of his wife, as relied upon by Sarikas in describing his theory of an accidental discharge.  To the contrary, the Petitioner testified at the hearing that he was at a table removing the bullets, when the gun fired.

According to Sarikas, when he explained to Evseroff that "we should change position based on that testimony," Evseroff asked him if he told anyone else about the theory. After Sarikas said that he had not told anyone else, Evseroff told him "if you say this to anybody, you're off the case." (Tr. at 137).

Sarikas then related that the Petitioner took the stand and "stood by his story" of an intruder, as follows:

> Q     Now, did there come a time in the trial when Mr. Evseroff put Mr. Kotsopoulos on the stand to testify?
>
> A     Yes, he did.
>
> Q     What did he at that point in time tell the jury in his testimony?
>
> A     Mr. Kotsopoulos?
>
> Q     Yes.
>
> A     Mr. Kotsopoulos stood by the story that he was lying at the living room couch watching television when he heard a shot, he turns around and he sees this masked man and that he rises up suddenly and he grabs this masked man and they struggle at the glass door leading out to the back yard and that the masked man dropped the gun and ran away, and it was only then that he realized that his wife Carol had been shot and was lying in a pool of blood by the sink of the kitchen.

(Tr. at 137).

Sarikas testified that he had no knowledge of the financial arrangement between Evseroff and the Petitioner's family and he was never present when the fee was discussed. However, subsequent to the trial, Evseroff did discuss with Sarikas the amount of money he received in the Kotsopoulos case. Evseroff told him that he "received a fee of $400,000, the vast bulk of which was in cash, for his

24

representation of Kotsopoulos." (Tr. at 148). Evseroff also told him that "he should have gotten more." (Tr. at 148).

Sarikas then described the first day of the trial on April 25, 2003. Evseroff opened to the jury and described the "Sam Shepherd" defense: that the Petitioner's wife was killed by an intruder. The prosecution opened with a surprise witness, the Petitioner's twelve year old son George, who told a completely different account of his mother's murder. The son told the jury that the night before the Greek Easter, his father and mother were arguing, mostly by his father. Then his father hit his mother, "went upstairs, went to his bedroom, went underneath his bed and retrieved a pistol, came down with the pistol and then hit Mrs. Kotsopoulos across the head with the pistol. Then they argued some more and then he shot her in the face. That was his testimony." (Tr. at 1150).

According to Sarikas, the son was a compelling witness in the eyes of the jury, and "it showed the defense theory for what it was: Fiction." (Tr. at 151). The next day, on Saturday, April 26, 2003, he called Evseroff at his home and explained to him that his "theory of defense would not fly and that it was a disservice to the client to pursue this." (Tr. at 151). Sarikas told Evseroff that "it would behoove us to change the strategy entirely . . . and put the man on the stand and get him to admit shooting his wife." (Tr. at 151). Namely, Sarikas indicated that, based on the son's testimony and the defendant's reaction upon the shooting, "that in and of itself evinced a type of accidental shooting. Either he didn't know there was a round chambered in that semi-automatic weapon or he didn't know that it was locked and

as a result the trigger weight would have been less.  But the conduct, the boy's testimony of the father's conduct, tended to show that it was something less than murder."  (Tr. at 152).

When Sarikas made this suggestion to Evseroff in a telephone conversation, he responded by stating, "If you say this to anyone else, you're off the case."  (Tr. at 155).  Subsequently there was no change in the defense strategy.  Eversoff called the Petitioner as a witness in his own defense.  As already stated, the Petitioner testified that an intruder came in, and shot his wife in the kitchen.  He grappled with the intruder who dropped his gun and escaped out of the back door leaving his wife lying bleeding on the floor of the kitchen.  Sarikas also noted that there was testimony that the case for the weapon was in the safe of the Kotsopoulos house.  Sarikas described this strategy as "criminal suicide" and "absolutely stupid."  (Tr. at 156).

Sarikas testified that there was no request made by Evseroff for a lesser-included charge.  Sarikas spoke to Evseroff about an alternate theory of manslaughter or criminally negligent homicide, even though the Petitioner testified about an intruder.  There was a bench conference before Judge Belfi where this was discussed and Evseroff told the Judge that there would be no lesser included.  The next day at a charge conference in the Judge's chambers, the Judge allegedly said to Sarikas, "Tom, you want a lesser-included?"  Sarikas said, "Yes, I did."  Judge Belfi then said, "You wouldn't have tried the case this way, would you," and Sarikas answered, "No, I would not," and he explained to the Judge how he would have tried

it.  (Tr. at 158-159).

Sarikas then related his view of the law involving lesser-included offenses. First, he opined that you cannot have committed the higher offense without having committed the lesser offense.  Second, he noted that there has to be a reasonable view of the evidence that supports a jury finding that the defendant committed the lesser but not the greater offense.  As an experienced trial lawyer, he believed that there was a valid basis for the lesser-included offense to "go to the jury."  (Tr. at 160).  However, Evseroff completely disregarded his suggestion on this point and did a so-called "rolling of the dice" with respect to the Petitioner's case.

On cross-examination, Sarikas was questioned about the post-conviction visit to the Petitioner at the Nassau County Correctional Facility, where Evseroff was alleged to have stated, "I just lost $100,000."  He was reminded that he was asked to leave the room every time financial matters were discussed with the Petitioner or his family, but on this occasion in the Nassau County Jail, Evseroff alluded to the contingent fee in his presence.  Sarikas said he was shocked to hear this statement by Evseroff but never made a motion to the trial judge claiming an ineffective assistance of counsel.  Nor did he make a CPL 440.10 motion after the Petitioner's sentence claiming ineffective assistance of counsel on the part of Evseroff in light of the unethical contingent fee agreement.  Nor did Sarikas ever report Evseroff's alleged conduct to the Grievance Committee; even though he was upset, angry and disturbed at what he had heard, and even though he believed an injustice was done to the client.  Notwithstanding the alleged injustice and unethical conduct, Sarikas

continued to do business with Evseroff; continued to maintain a business relationship with him; and continued to maintain his friendship with Evseroff.

Sarikas maintained that business relationship with Evseroff until July 27, 2006, a period of more than three years after the conviction. Indeed, Sarikas never repeated the ineffective assistance allegation until he signed an affidavit in connection with this petition, on September 11, 2006. Sarikas testified that a contingent fee agreement in a criminal trial is unethical; and, further, that his client, the Petitioner, was "severely harmed" by it, and that he may have had a duty to report it to the Grievance Committee, but he never did.

On July 27, 2006, Sarikas terminated his relationship with Evseroff, in part over a financial disagreement. At that time Sarikas wrote a letter to Evseroff in which he called him "greedy" and "money hungry." Within two months of writing this letter, on September 11, 2006, he signed an affidavit "essentially accusing Jack Evseroff of ineffective assistance of counsel based upon this supposed contingency fee agreement." (Tr. at 172).

This was not the first time Sarikas accused Evseroff of ineffective assistance of counsel. He made the same accusation in *United States v. Philip Frank (05 CR 40)*. This was a healthcare fraud case tried in the Eastern District before the Hon. John Gleeson. Sarikas worked on the *Frank* case with Evseroff. The defendant in *Frank* was convicted in June 2006. In *Frank*, Sarikas made a similar accusation against Evseroff regarding an additional $100,000 fee, necessitating a hearing held before Judge Gleeson. On cross examination, the Respondent's counsel asked

Sarikas about the *Frank* hearing:

Q        And in that case, *United States v. Philip Frank*, you accused him, similar to this particular case, of trying to squeeze an additional $100,000 out of his client at the last minute.

A        Yes, he did.

Q        A hearing was held before Judge Gleeson, an evidentiary hearing much like this one.

A        That's right.

Q        In connection with that ineffective assistance of counsel claim in the Philip Frank case.  Correct?

A        That is correct.

Q        That hearing, I believe, occurred in December of 2006?  If you know.

A        I'm guessing, but I remember that it was the winter.  I would accept your assertion.

Q        Okay.  Fair enough.

          You testified at that evidentiary hearing?

A        I was called to testify, yes.

Q        Jack Everoff testified in that evidentiary hearing.  Correct?

A        Yes, he did.

Q        And following that hearing, Judge Gleeson issued a written decision on that hearing.  Correct.

A        I believe he did.

Q        A written decision crediting in that case, in that hearing, the testimony of Jack Everoff.  Correct.

A        Correct.

Q    And indicating in that written decision that he did not credit your testimony.

A    I believe that's correct.

Q    Judge Gleeson found, in that hearing, you not to be credible, or your testimony not to have been credible. Correct?

A    That's what Judge Gleeson wrote.

(Tr. at 175-177).

In fact, Judge Gleeson apparently referred to his "emotional testimony" about a relationship with Evseroff that contained what he described as reflecting considerable baggage.

Of importance, Sarikas testified that the Kotsopoulos defense was that the defendant did not shoot and kill his wife and that an armed intruder shot and killed Carol Kotsopoulos. This is what the Petitioner said from the time he called 911 after his wife was shot to the very end of the trial. During the summation of prosecutor Frank Schroeder, the Petitioner stood up, interrupted his summation, and started yelling at Schroeder "to play the tapes, that he was hiding the truth." These tapes were not admitted in evidence and would have supported the defense of the armed intruder. In fact, Sarikas actually made the argument in court seeking to admit the tapes which supported the Petitioner's claim that an armed intruder killed his wife. Significantly, in a habeas context, Sarikas also conceded that trial lawyers can disagree on what a reasonable trial strategy should be, "as long as their motivations are clean." (Tr. at 189).

With some difficulty, Sarikas finally conceded that there was evidence to

support the armed intruder defense.

Q        During Frank Schroeder's summation, the defendant even got up at one time and started yelling at Schroeder, interrupted his summation, telling Schroeder to play the tapes, that he was hiding the truth, the tapes that were not permitted into evidence which would have supported this defense of an armed intruder.  Is that fair?

A        Give me a second.

Q        Sure.

A        I don't remember his standing up and yelling at Frank.  I don't remember what he referred to.  It may have been certain tapes that Judge Belfi excluded from a prior break-in, if I recall correctly.  And I'm trying to recall.

        But I think there was an allegation that there had been a prior break-in and that there were certain police tapes with respect to that prior break-in that were not allowed.  Judge Belfi ruled them inadmissible.

Q        If I'm not mistaken, you actually made the argument that the tapes should come in?

A        Yes.

Q        And these were the tapes that the defendant was referring to when he got up and interrupted Frank Schroeder's summation, accusing him of hiding the truth.

A        I'm pretty sure you are right now.  Yes.

                    *    *    *    *

Q        The defendant, immediately after his wife was shot and killed, called 9-1-1.

A        Right.

Q        Correct?

A        Right.

Q     And told the police immediately after the shooting –

A     By the way, I withdraw that.  You said immediately?

Q     Within minutes.

A     Within minutes, yes.  After he spoke to his children.

*     *     *     *

Q     My question deals with evidence that there was to support the defense.

A     Yes, I know.

Q     That an armed intruder – certainly, one piece of that evidence would be the defendant's call to the police indicating, within minutes of the shooting, that an armed intruder had just shot his wife.

A     It was his call to the police putting forth his story.

Q     There were also, there was also evidence of the fact that the defendant, shortly after the shooting, made statements to the police, to Detective O'Leary and other members of the police department, claiming that the armed intruder had shot and killed his wife. Correct?

A     Yes.

Q     When the children George Kotsopoulos and I believe the other son's name is Nicholas.

A     Correct.

Q     When they spoke to the police, they backed up the defendant's version that an armed intruder had shot and killed his wife?

A     Somewhat.  Somewhat.

Q     There were also, there was also, Mr. Sarikas, a prior home invasion, home invasion robbery, that had been perpetrated at the Kotsopoulos' house, perpetrated by armed intruders, where the family

was tied up and held at gunpoint.  Correct?

A        Correct.

Q        That evidence was available to support the defendant's claim that it was an armed intruder who committed this crime.  Correct?

A        It is a matter of – yes.  Yes.

Q        There was evidence that the police had been called to the Kotsopoulos house prior to Carol Kotsopoulos having been shot, that the police were called to the house on numerous occasions to respond to calls regarding prowlers at the house.  Aren't there?

A        Yes.

Q        The Kotsopoulos family, there was evidence that the Kotsopoulos family was so concerned about armed intruders, prowlers, that they went and got a German Shepherd for protection. Correct?

A        Yes.  Who didn't bark on the night of the murder.

Q        I didn't ask you what his demeanor was.

A        I know you didn't ask me.

Q        The question I asked you –

A        The answer is yes.

Q        The answer is yes?  Yes, they bought a German Shepherd for protection as a result of these prowlers and calls to the police?

A        I don't know whether that was the prime motivating force, but it would seem reasonable.

Q        How about the dummy security cameras that Mr. Kotsopoulos had installed in his house to protect he –

                    *      *      *      *

Q        The question – I will ask a question, Mr. Sarikas.

33

Did the defendant have dummy security cameras installed at the house prior to the murder of Carol Kotsopoulos?

A     I believe he did.

Q     And that was in response to the fact that there had been prowlers at the house and this home invasion robbery that had occurred at the house. Is that correct?

A     It probably was.

Q     And you also, in addition to this evidence that I'm talking to you about now that we have just gone through, there was also the defendant's own testimony at trial in which he told the jury under oath that armed intruders had shot his wife. Correct.

A     That is what he testified to. Correct.

Q     He, the defendant, insisted from the beginning that he was innocent.

A     That is correct.

Q     Completely innocent. Correct?

A     Correct.

Q     That an armed intruder had done this.

A     Correct.

(Tr. at 179-184).

In addition, Sarikas agreed that "reasonable lawyers can have differences of opinion on what the correct trial strategy should be in any particular case." (Tr. at 186). However, Sarikas testified that after the Petitioner's son testified the defense theory was destroyed. "It had become a heap of rubble." (Tr. at 187). Sarikas testified that he would have put the Petitioner on the stand and got him to admit that he shot his wife. In this regard, however, Sarikas testified that he was retained by

the Kotsopoulos family and not Evseroff.  Therefore, the Court notes that he had an independent duty to tell the family his view of the trial strategy, which he did not do.  So that, even though he was independently retained trial counsel for the Petitioner, he failed to change the defense, as he now relates should have been done.  Questioned about this possible dramatic and extreme change of the defense, Sarikas stated that it was possible to pursue this change in strategy.

> Q	Let me get back to what I had begun to ask you before.  We kind of got sidetracked here.

> Throughout the case the defense theory was this armed intruder theory.  Correct.

> A	That is correct.

> Q	And I'm talking about the trial from start to finish.  Correct?

> A	Right.

> Now, so at the end of the case, when this charge conference occurred with Judge Belfi, essentially all of the evidence presented by the defense and argued by the defense was toward this armed intruder theory.  With the exception of your cross-examination of the gun expert.

> A	Yes.

> Q	So in that case, given that fact, I will ask you again, wouldn't it have been difficult for Mr. Evseroff to get up, look at that jury, and sum up to them and tell the jury: This defendant is innocent.  He did not shoot and kill his wife.  It was an armed intruder who committed this crime.  But in case you don't buy that, it was an accident; convict him of manslaughter?

> A	It could have been handled very gingerly and very intelligently.

> Would it have been easy?  No, it would not have been easy.  But it could have been handled well.  Because ultimately no one, no

one in that room was present at the time of the murder. And that's what a trial is, a reconstruction of an event that happens outside of the courtroom. And one could present alternative theories to a jury in a noninsulting way.

Q      In certain cases. Right?

A      In certain cases.

(Tr. at 194-195).

In addition, on direct examination, Sarikas referred to the son George's testimony as credible and "devastating." Even though Sarikas testified that George's testimony destroyed the defense, he seemed to ignore Evseroff's aggressive cross-examination of George. This cross-examination produced the following damaging inconsistencies in George's testimony: George initially gave statements to the police corroborating his father's account that an intruder had shot his mother; George testified under oath before the Grand Jury that an intruder shot his mother; George wrote a "myriad" of notes indicating that his father was innocent and did not commit this crime; George previously told Evseroff himself and his investigator that an intruder and not the defendant committed this crime. In addition, it was brought out in Evseroff's cross-examination of George that his Aunt June, who is Carol's sister, who George was living with, actually manipulated his testimony. George's cross-examination also suggested that Detective O'Leary and Assistant District Attorney Schroeder, in many visits to George, may also have influenced his testimony. Sarikas conceded that the cross-examination of George was aggressive by a "master of cross-examination" and "an outstanding, skilled, experienced trial lawyer."

It is interesting to note that Sarikas took it upon himself to speak to the parents of the Petitioner on the Greek Easter Sunday. He explained to them that "the case was going very, very, very badly. That it would be prudent to change our direction in this case." Significantly, the Petitioner's parents declined to accept this advice and in fact, Sarikas testified that "they shot me down." (Tr. at 211).

Sarikas testified that, during a charge conference with all counsel present, Judge Belfi expressed to him surprise that the defense was not asking for a less-included offense charge. Sarikas stated that at that time, he told the judge that "I would have done it different." (Tr. at 210). Also, Sarikas testified that Judge Belfi said to him, "You know, Tom, that may have worked." (Tr. at 213). Notably, none of these alleged charge conference statements were on the record. So there was no record of any kind where the judge allegedly discussed a lesser-included offense charge or where Sarikas recommended such a charge.

The Court notes that Sarikas was of the opinion that a lesser-included charge of manslaughter was an option even though the case is rampant with the Petitioner's continued and unswayed statement that an intruder killed his wife. Also, even if the Petitioner changed his story in mid-trial or prior to verdict, the evidence tends to contradict any manslaughter charge. The son's testimony was that the Petitioner argued with his wife prior to the shooting; he punched her and went upstairs to get the gun; he goes underneath the bed, opens a box with a gun in it; brings the gun downstairs into the kitchen; hit his wife over the head with the gun causing bleeding in her nose; points the gun at her face and shoots her in the face. The Court wonders

how the Petitioner could have argued, at this late stage, instead of the intruder defense, that this was an accidental shooting. This is so, especially in view of the Petitioner's present story, namely, that he was at a table removing the bullets, when the gun accidentally discharged. Certainly a reasonable trial lawyer could determine that a jury would not believe a theory of an accidental shooting in this case.

On redirect examination, Sarikas explained that shortly after the sentence in this case, he explained to Attorney Kartagener, who previously was his Bureau Chief in the Bronx District Attorney's office, about the alleged contingent fee arrangement. However, for three years he continued to do business with Evseroff. Also, he had a personal relationship with Evseroff, in that "he was kind of like a father to me." (Tr. at 225). He also had a financial incentive to continue doing business with Evseroff. However, on July 27, 2006, he wrote a letter to Evseroff, in which, in part, he stated "Your insatiable thirst for money has, in my opinion, profoundly hurt at least two of your clients . . ." (Pet's Ex. 2). One of these clients was the Petitioner.

### 4. __Nikolaos Kotsopoulos__

The final witness in the Petitioner's case was Nikolaos Kotsopoulos himself. The Petitioner testified that he is 47 years of age, a citizen of Greece, holding a green card. He came to the United States in 1980. He was in the beef distribution business and lived in Manhasset in Nassau County. He married Carol, his second wife, in 1986. They had two boys. In 2002, George was twelve years of age and Nicholas was ten years old.

In the highlight of his testimony, the Petitioner admitted that on May 4, 2002,

he killed his wife.  However, he stated that he did not intend to kill her.  This was a Saturday, the day before the Greek Easter.  He came home that day and nobody was home.  Carol returned home with the kids and no food was prepared.  He was upset. He smelled alcohol on Carol's breath and this made him even angrier.  They started arguing.  The Petitioner went upstairs to get a gun.  He then explained what he said occurred:

> So this upset me and we started arguing.  And after that we keep arguing and arguing.

> And I went upstairs, I take the gun and, you know, I tried to scare her.  I trying to, you know, I wave the gun, you know, in her face and then.

Q       Had you ever done this in the past?

> Had you ever waved a gun in your wife's face in the past to scare her?

A       Yes.  Just – yes.  You know, something – yes, I did it.  I did it.

Q       Had you ever prior to this date hit your wife?

A       Yes.

Q       Did she ever hit you?

A       Yes.  We have a, you know.

Q       So you would get into it with her sometimes physically.  Is that what you are saying?

A       Both of us.  Yes.  Correct.  Yes.

Q       But on this date you say you went upstairs and got your gun.

A       Yes.

Q        What happened next?

A        We started arguing.  And I take the bullets out of the, on the table, on the little table by the kitchen, and suddenly, you know, it went off.  Boom!

        Just, you know, looked over the counter, over the table, and I see my wife down.

        I just run over there, you know.  I say: Honey, you all right?  You know.  And I started seeing her bleeding.

        I went right away to call 9-1-1.

Q        Now, you were trying to scare her with the weapon on that day.  Right?

A        Yes.  Yes.  That's why I bring him out –

Q        You pointed – I'm sorry.  I thought you were finished you.  Finish your statement.

A        Yes.  That's why I bring him down.

Q        So you admit you pointed –

A        Yes.

Q        – at your wife the loaded firearm.  Correct?

A        Yes.

Q        And you then say what happened?  With the gun, what were you doing with the gun?

A        I just sit it on the table, on the little table, and I ejected the bullets out.

Q        You said you ejected the bullets out.  Is that what I heard you say?

A        Yes, sir.  I ejected the bullets.  The time I ejected the bullets, it went off accidentally.

Q      Why did you eject the bullets?

A      That's like a, I don't know, a nervous habit or whatever, you know, that I'm taking, you know, I just, you know, keep doing that, you know, taking the bullets out of the gun.

Q      So in the past, when you have had the gun in your hand and you have been agitated, you have ejected the bullets as a nervous gesture.

Is that what you just said?

A      Yes.  Just, you know, taking the bullets out of the, you know, out of the, you know, gun.

Q      When you were taking the bullets out, what happened?

A      And all of a sudden the gun went off.

Q      Did you pull the trigger?

A      No.  I don't know.  I don't know what happened.  The gun went off.

I just looked in the gun, you know, the bullets came out and the gun went off and, you know, I look over, you know, I hear the boom, you know.

(Tr. at 240-242).

Initially, after the shooting, he covered up the fact that he shot his wife.  He asked his son George to lie about what happened.  His son did lie to help him until the trial, when he was called as the first witness.  The Petitioner stated that his son's presence as a witness surprised both him and Evseroff.

After Evseroff was retained, the Petitioner lied to him and told him it was an intruder who came in the house and shot his wife.  Evseroff visited the Petitioner every week or two weeks.  In the beginning, Evseroff brought with him an

investigator named Higgins.  The Petitioner kept telling them both, it was an intruder.  However, the Petitioner testified that two or three weeks prior to the trial, he told Evseroff the truth, namely, that he was trying to scare his wife with the gun, "ejecting the bullets on the table and, you know, it went off."  (Tr. at 248).  According to the Petitioner, Evseroff then replied ". . . the way we started, the same way we going to finish and we going to acquit the charges.  Just don't mention that to anybody else."  (Tr. at 248).

Shortly before the trial, his family came to see him and told him that Evseroff was asking for an additional $100,000.  Also, before the trial, Evseroff himself came to him and told him, "I need additional, you know, $100,000."  He understood that the "deal" was that the $100,000 would be given to him if he was acquitted, and if he was not acquitted, he would not get the $100,000.

At the trial, the Petitioner was surprised that the first witness against him was his son.  This was on a Friday.  On Sunday, the Petitioner had a conversation with Evseroff about his son's testimony.  He told Evseroff that, after his son's testimony, "it doesn't look too good . . . what's the next move?  Can we do something to cop out or something less included charges."  (Tr. at 252).  Evseroff responded by saying, to have trust in him, nothing to worry about, the way we started we are going to finish and "we going to acquit . . . like positive 100 percent . . ."  (Tr. at 253).  The Petitioner testified at the trial and repeated the intruder story, as instructed by Evseroff.

On cross-examination, it was brought out vividly that the Petitioner

persistently lied prior to and at the trial; sometimes under oath.  He lied about not hitting or abusing his wife; when he told the jury he didn't know that his wife left the home on a number of occasions because he physically abused her; when he told the jury that he didn't know that his wife went to live in a battered women's shelter in Colorado; and when she came back home, she again left and went to a battered women's shelter in Hempstead.  In addition, he now admitted, here, under oath, at this hearing, that he struck his wife before he shot her in the face causing her to have bruises on her face and a black eye.  At the trial he testified that the intruder did these things.

The lies by the Petitioner continued.  From the moment his wife was shot in the face, his mind started creating a story to protect himself, including repeated lies to the police.  He lied about obtaining the gun from upstairs and about his son not being present.  Also, on cross-examination, he said, for the first time, that he struck Carol with the gun, causing her to bleed.  The Petitioner testified that he waived the gun "in her face" (Tr. at 276) while still arguing with her.  Then he took the butt or the side of the gun and struck her in the face with the gun causing her face to bleed.  He hit her hard enough "with some serious force" to cause her to bleed.  The Court notes that on direct examination the Petitioner failed to previously mention this disturbing fact.  The Petitioner again stated that at the island he started taking the bullets out of the gun.  He pulled the gun back and the bullets started ejecting and "rolled down" onto the table.  The Petitioner was asked why he was ejecting the bullets at that time.

> Q      You thought this was a good time, in front of your son, let's start popping out bullets?
>
> A      I used to do that all the time. Like, you know, how can I call them? Nervous tick or whatever you call it.

(Tr. at 284).

The Petitioner further testified that while at the table, a bullet discharged from that gun and happened to strike his wife right in the face, when his wife was only "a foot from the table, from the island."

The Petitioner conceded that when he called 911 and told the police that an intruder had shot his wife, Jacob Evseroff was nowhere in the picture. This was his idea and his idea alone. Also, when the Petitioner told a detective from the Sixth Squad of the Nassau County Police Department that it was an intruder, Evseroff was not around. He went to great lengths, including harassing his son, to create this intruder story. This lie that he created was "well thought out."

The Petitioner tried to prevent his son George from telling the truth. In fact, he encouraged and even threatened him to lie and tell the intruder story. Actually, George saw it all:

> Q      And I asked you this morning if you'd do anything for your sons. Do you remember that?
>
> A      Yes.
>
> Q      So here is your son, whose mother has been shot in the face, correct?
>
> A      Yes.
>
> Q      Who watched as his father punched and pistol-whipped his

mother before her – she was shot in the face.  Correct.

A       Yes.

Q       George saw that.  All that.

A       Okay.

Q       And then George was encouraged by you to go along with the story of an intruder.  Correct.

A       Okay.

Q       He was ripped out of his school.  Correct?

A       Yes.

Q       He was put in foster care.  Correct?

A       Yes.

Q       He was intimidated by his older cousin, but you claim that was just between the two of them.  Correct?

A       Yes.

Q       And now here he is, your son, your flesh and blood, is taking the stand and there is one person in the courtroom that has the ability to prevent him from going through that experience.  That would be you, correct, sir?

A       Yes.

(Tr. at 293-294).

        The theory advanced by the Petitioner that a lesser-included offense should

have been requested, is diminished by his actions during the trial.  First, during his

son's testimony he yelled at his son to tell the truth; namely, that an intruder shot and

killed his mother.

Q       Well, you had a choice.

A       You –

Q       I'm going to tell you.  During the trial, you had a choice not to yell at your son in Greek to tell the truth, didn't you?

A       Just, you know, yes.

Q       But you did that.

A       Yes.

Q       You got up in open court and you yelled at your son to tell the truth when you in fact knew he was telling the truth, didn't you?

A       Uh-huh.

Q       You traumatized your son to the point where he had to look straight ahead and cover his ears to avoid listening to you yelling at him.  Correct?  Yes?

A       Yes.

Q       And you are telling this court that that was you simply going along with the program that Mr. Evseroff was forcing on you?

        Is that what you want us to believe?

A       Yes.  That's the truth.

Q       You are a pretty good actor then if you got up and did all that, wouldn't you say?  Yes?

A       I don't know.

(Tr. at 295-296).

        Also, when Assistant District Attorney Schroeder was giving his summation disputing the intruder theory, the Petitioner yelled at him in order to bolster his intruder testimony.  This conduct was not conducive to pursuing a lesser-included

charge.

> Q    Let's talk about the closing arguments then.  Let's talk about when Mr. Schroder got up and discussed your guilt to a jury and you got up out of your chair as he was finishing up and said, yelled at the jury, let them hear the tapes, why are you hiding the truth from them.
>
> Do you remember doing that?
>
> A    Uh-huh.
>
> Q    You yelled there, didn't you?
>
> A    Uh-huh.
>
> Q    Again, you just going along with the program with Mr. Evseroff?
>
> A    Yes.

(Tr. at 296-297).

The "tapes" referred to by the Petitioner, support the intruder theory; not a

lesser-included offense.

Significantly, the Petitioner's son George did not substantiate the newly

advanced "bullet removing accidental discharge" theory.

> Q    You heard your son George testify.  Correct?
>
> A    Yes.
>
> Q    And we heard about, we heard you say that George finally told the truth at the trial.  Correct.
>
> A    Yes.
>
> Q    You never heard George once say anything about you stripping the bullets out of that weapon, did you?
>
> A    I didn't hear him say.

Q       George never testified to that.  Right?

A       Yes.

Q       George testified that you punched your [sic] mother.  Correct?

A       Um-hmm.

                    *    *    *    *

Q       Now, sir, your son never testifies about anything even closely
resembling seeing you take the bullets out of that gun.  Right?

A       That's exactly what he say I was on the end of the island and
I'm taking the bullets out.

Q       Non, no, no.  That's not what your son testified to, sir.

A       You just read it.  I was on the end of the island.

                    *    *    *    *

Q       Sir, just listen carefully to my questions.

A       Okay.

Q       Okay?  Nowhere in your son's testimony did he ever say my
dad was taking the bullets out of the weapon.  Correct?

A       Yes.

Q       He never said that?

A       Okay.

(Tr. at 298-301).

        The Petitioner's story about an intruder continued.  A few days before the

trial, a reporter from Channel 2 asked him for an interview so he could explain his

side of the story, on the news.  He told her the same lies about the intruder.  The

Petitioner testified that, the previous July, his home was invaded by intruders, who broke into his home, tied up his children at gunpoint, and demanded money. He gave them $25,000 or $35,000. The Petitioner offered this testimony to bolster his claim that an intruder had murdered his wife. During the trial he screamed that the 911 tapes about the prior intruders entering the house were not admitted in evidence. Also, during the trial, the Petitioner testified that he had "$35,000 and change" at home on May 4, 2002. Obviously this fact "fit nicely" into his story that an intruder broke into his house to steal his money.

Interestingly, although the Petitioner claims that two weeks before the trial he told Evseroff about the "accidental" shooting, he never mentioned that to attorney Anastasios Sarikas, an apparent confidante.

The Petitioner testified that Jacob Evseroff didn't advise him to tell the intruder lie to the police or Detectives Urban and O'Leary; Evseroff didn't tell him to lie to his children, or to the newspaper reporter. Evseroff didn't tell him "to get up and scream and yell" at his son, when he was telling the truth. Nor did Evseroff tell him to "jump up" during prosecutor Schroeder's closing argument and say "let them see the tapes."

In sum, it is clear, and he repeatedly conceded, that the Petitioner's trial testimony was riddled with lies and perjury. In part, this is his pertinent testimony at the trial:

Question: What happened at 7:30?

Answer: I walked to go back to sit down, you know, just to

kill some time, you know, we were expecting some people to fix the lamb and my wife was trying to get ready, you know, for the lamb, you know, have to put on the stick and tie them up because we had to put it on the skew.

Question: During that time did you ever hit your wife?

Answer: No.

* * * *

Q      Then you were asked: Did you go upstairs to get a gun?

Answer: No.

* * * *

Q      Question: Did you come down and hit her with the gun on the head or anywhere else?

Answer: No.

* * * *

Question: I want you to tell this court and jury exactly what happened from 7:30 that night until 8 o'clock. In your own words tell us.

Answer: You know, after I sit down on the couch –

I just, you know, watching TV, reading a book and, you know, eating a little bit, you know, watching TV. And my wife, I see her after, you know going back and forth, back and forth with the knife, you know, cutting. And after 10, 15 minutes, you know, I hear some boom, you know, like a gun shot. I jump over. I ran over there and I saw, you know, at the time I jumped over a guy with a mask, black gloves, blue shirt, blue pants, dark pants. I ran over there. I grabbed his hand. From my left hand, I grabbed over here between the sleeve and the glove and another hand on, you know, on the arm. And I pushed him like that. He doesn't, the way I see him, he isn't going to, because he look at me the way I'm running, he isn't going to deal with me. He looked for the door to run out. He's got a gun, but I'm holding his hand against the door and, you know, he hit boom the

knife, I mean the gun, and he just fell down and the guy, you know, gone.

*   *   *   *

Q        Question: After that, what's the next thing that happened?

Answer: After that I grabbed the gun.  I put it on the island.  I went to my wife.  I say honey, you know, what happened?

I see my wife down and bleeding.  Honey, what happened? Are you all right?

The kids in the meantime, you know, they're going crazy up and down, up and down.  They are praying and all these things.

I went to call 9-1-1.  I called 9-1-1.  I tell them, you know, I don't even, three times I call, you know, as a matter of fact, you know, I keep screaming, you know, into the phone.

*   *   *   *

Question: The gun, did you ever see that gun before you picked that gun up as you have described to us?

Answer: No.

Question: Was that your gun?

Answer: No.

(Tr. at 321-325).

Now, back to the present hearing where the Petitioner was reminded of his

inconsistent testimony:

Q        So we can go on and on.

It is fair to say that your testimony at that trial is riddled with lies and perjured testimony.  Correct?

A        That's correct.

*     *     *     *

Q    Sir, you took an oath to tell the truth and you testified to benefit yourself by telling lies and giving perjured testimony. Correct?

A.    Yes.

Q    Because you believed if a jury bought your story about an intruder you would be acquitted.  Correct?

A    Yes.

Q    And you tried to bolster that story by telling them stories of a prior home invasion.  Correct?

A    Yes.

*     *     *     *

Q    The arguments that Mr. Evseroff made to a jury during his opening statements and during his closing arguments, all of those statements came from the lies that you told, that you made up immediately after shooting your wife in the face.  Correct?

A    Yes.

Q    That was the story that you consistently told to everybody involved in this case right until the bitter end, except for your one claim where you said you mentioned it to Mr. Evseroff.  Isn't that right?

A    Yes.

(Tr. at 326-328).

On redirect, the Petitioner again related that two or three weeks before the trial, he mentioned what happened to Evseroff who told him to "forget about, the way we started . . . the same way we going to finish and we going to acquit . . ." (Tr. at 330).  He stated that he was lying on the advice of Evseroff.  He conceded,

however, that Evseroff didn't tell him to lie to the police, to the reporter, or to everyone else prior to and during the trial.

With the conclusion of the Petitioner's testimony, he rested.

**B.    The Respondent's Case**

**1.    Jacob Evseroff**

The Respondent's case consisted of one witness, Jacob R. Evseroff, who is an experienced criminal defense lawyer.  After service in the Armed Forces, he graduated from St. John's Law School.  Evseroff was a criminal law investigator, a junior district attorney and full assistant district attorney in the Office of the Kings County District Attorney for ten years.  He then opened his law office in Brooklyn.  His practice was primarily criminal defense work.  Evseroff testified that he tried "thousands" of cases and he participated in "about 50 homicide cases over the years, both prosecution and defense."  (Tr. at 342).

Evseroff was retained to represent the Petitioner in "around June 2002" by his parents.  They were brought to him by a man he had previously represented who apparently knew them from Greece.  He described his fee arrangement, as follows:

Q       What was the fee that you quoted the Kotsopoulos family?

A       Well, I got a fee of $40,000.  And the reason I only got $40,000 is because they had given some $90,000, $95,000 to some lawyers who had been in the case before me and they couldn't get their money back and they claimed that they didn't have any money. The money was tied up in safe deposit boxes and in real estate.

(Tr. at 343).

Evseroff denied that he requested any additional payment, or bonus, or award

53

over and above the $40,000 fee he previously described in the event he was able to

win an acquittal for the Petitioner after the trial.  However, because he was not happy

about the comparatively low fee, he testified that they offered him another $100,000

at the conclusion of the case, "not conditioned on winning the case but when the case

was over."  However, Evseroff testified that he did not take the offer of an additional

$100,000 seriously because he thought they didn't have the money.  He based this

assumption on the fact that they paid $90,000 or $95,000 to the lawyer retained

before him and to do so had to sell property.  He had been putting in a "tremendous

amount of time and effort" in connection with the preparation of this case.  He had

been to see the Petitioner in the jail in Nassau County "at least fifty times."  He

worked with an investigator, and interviewed witnesses and visited the scene.

Interestingly, in October 2002, in addition, he conducted an interview of the

Petitioner's son George in the office of an attorney, appointed by the Court to

represent him.

Evseroff testified that this $100,000 offer from the Kotsopoulos family did

not affect his representation of the defendant.  Of importance in this case, he

explained the reason for his trial strategy in detail.

Q       All right.  Let me get back to this bonus or reward that you
had indicated was offered by Mr. Kotsopoulos's family.

Did that off from the Kotsopoulos family in any way affect
your representation of the defendant?

A       No.

Q       Did it in any way affect your trial strategy in this case?

A      Not at all.

Q      I'm going to ask you about what your trial strategy was; what your defense was in this case.

Can you explain to the court essentially what the defense was in this case.

A      Sure.

If your Honor please, the defense in this case was one of an individual who was wrongfully charged with a homicide that he did not commit; that this was a case where the homicide was committed by an intruder.

And I think that I would like, if I may, to explain the facts of the case as I understood them at that time, if I may, with the court's permission.

Q      I would like you to basically tell the court at this time what the defense was based on.

A      It was based on the fact that, No. 1, the defendant at all times, start to finish, denied that he ever shot or killed his wife.  No. 1.

No. 2, it was based upon the fact that his son George had stated to the police, two or three different policemen, right after the occurrence, and to neighbors, that there was an intruder who did this.

No. 3, it was based on the fact that the defendant and his wife and his children some eight months before this murder had been held up at gunpoint in their home.  They had been tied up, his safe had been rifled, and some $48,000, as best I remember the amount, was taken from the safe.

And that after this occurrence, from the time of that robbery to the time of the homicide, which was, as best I can recall, in May or so of '02, from the summer of '01 to '02 there had been some 20 or 25 prowlers seen in his backyard which the police had been notified about, to a point where immediately before the homicide, a few days before, there had been a prowler right close to the house when a 9-1-1 call was made by the defendant and his wife speaking to the police in fear that there was a prowler trying to break in.

The defense also was based upon the fact that although a gun case was found in the safe of his house, his fingerprints were not on the gun case.

It was also based on the fact that the gun that was recovered here had his fingerprints on the barrel where he claimed he picked up the gun after it left there, but on the handle of the gun, his fingerprints were not there. And when DNA samples were taken, the first set of DNA seemed to indicate the presence of some unknown male, which is corrected later on in the second and third DNA test.

THE COURT: Excuse me one moment. You say that prior to this occurrence, the murder, that the petitioner and his wife are held up at gunpoint?

THE WITNESS: Absolutely.

THE COURT: When is that?

THE WITNESS: In the summer of '01, as best I can recall, your Honor. They were held up. They were tied up.

(Tr. at 346-349).

Evseroff also related that the Kotsopoulos family installed security cameras around the house because they had been previously "held up, tied up, the police there, they were freed of $48,000 . . ." (Tr. at 350). Also, as an explanation of his trial strategy, Evseroff explained that shortly after the Petitioner's wife had been shot and killed, he gave statements to the police advising them an "intruder did this" and his son backed him up with the police officers and to a neighbor.

Further, and also of importance, Evseroff testified that he repeatedly discussed the intruder defense strategy with the Petitioner, and he never expressed any reservation about pursuing this defense.

Q        Now, Mr. Evseroff, did you discuss this defense strategy with

Mr. Kotsopoulos, the defendant?

A    Only about 50 times.

Q    Did Mr. Kotsopoulos approve of this defense strategy?

A    Absolutely.

Q    Did he ever express any reservation about pursuing that defense strategy?

A    No.

Q    Did he participate in the defense of his case?

A    Sure, he did.

Q    How so?

A    Well, as this case was going on and I went to see the evidence in the case – that's another thing we did here.

I went to the DA's office, and Mr. Schroeder, who was the assistant assigned, showed us the evidence in this case.  And I got to speaking to Mr. Schroeder and we made the applicable motions; A, for bail three times, everything else, and motion to inspect the grand jury minutes and to dismiss once.

But in speaking to Mr. Schroeder, after speaking to the defendant, I tried to get a lie detector test given to the defendant because he wanted to take one, and I tried to make a deal with the DA that if he took the lie detector test, irrespective of the results, they would be admitted in evidence, even though that is not the law in New York, your Honor.

Mr. Schroeder did not want to go along with it, but the defendant was all in favor of taking the lie detector test.

Also, during the course of the trial, immediately before he testified he wanted to make a statement to the public.  And I agreed with it.  And I set it up.

And CBS-TV, Jennifer McLogan, came to the Nassau County

jail, and this is immediately before he testified, and he made a
statement in which he exculpated himself.

Q     What did he say to Jennifer McLogan from CBS News?

A     He said that this had to be committed by an intruder and it
wasn't he who committed the murder.

      I'm capsulizing it now.  The interview took about 45 minutes.

Q     This was how long before he actually testified in his own
defense?

A     Best I can recall, it was a few days before he took the stand
during the trial.

Q     Did the defendant Mr. Kotsopoulos ever object or express any
reservations about giving this interview to CBS-TV?

A     Not at all.  He encouraged me to do it.  And he spoke to them
in the jail.

(Tr. at 351-353).

      During his son's testimony, the Petitioner had an "outburst."  He jumped up

and he screamed at the son, in words or substance: Why don't you tell the truth?

Evseroff added "Now this is the same son who had exculpated him previously all

over the place."  (Tr. at 354).

      Again, of importance in this hearing, Evseroff emphatically testified that the

Petitioner never told him or admitted to him that he had shot his wife.

Q     All right.  At any time, Mr. Evseroff, during your
representation of Mr. Kotsopoulos, did he ever tell you or admit to
you that he in fact had shot his wife?

A     Never.

Q     Either intentionally or accidentally.

> A       He never said to me in words or substance that he ever shot his wife.  At all times he denied shooting his wife and claimed that it was done by some intruder.
>
> Q       When you say at all times, that is both before and during the course of his trial?
>
> A       That's correct.
>
> Q       And after trial?
>
> A       And after the trial as well.

(Tr. at 355).

In addition, on a material subject, Evseroff testified that the Petitioner was

never offered a plea in this case.

> Q       Were you ever offered, Mr. Evseroff, a plea in this case?
>
> A       Never.
>
> Q       Or an offer from the District Attorneys office of a sentence recommendation if the defendant were to plead guilty?
>
> A       Never.
>
> Q       Did you ever ask for a plea, of the District Attorneys office?
>
> A       No, I did not.
>
> I had a client who claimed he was innocent, and all the facts as we developed them seemed to indicate that he was.

(Tr. at 355-356).

Evseroff testified that son George's testimony not only was a surprise to him,

it was what he characterized as "trial by ambush."  He was not given any discovery

material with respect to the son's statements.  All they had was the exculpatory

statements that George made to the police right after the shooting; his own one-hour interview with George in which he confirmed the intruder story; and George's exculpatory statement to the Grand Jury.

Questioned about why he did not explore the possibility of a plea after George's testimony, Evseroff responded, as follows:

> Q     Wasn't George's testimony a significant blow to the defense, to the defense strategy?
>
> A     It was.  But I saw George's testimony in the nature of a recent fabrication, because in addition to all the prior statements that George had made inculpating his father – that is, the grand jury, the interview I had with him, the statements made to the police around the time of the occurrence, and statements made to a neighbor – in addition to all of that, which had been turned over to us during the pendency of the case, George had been put into the custody of his aunt, the mother's sister.  And during that period of time, he had been visited by the defendant's family, defendant's mother, his father, brother, his nephew.  And George had been writing notes to these people exculpating his father, wishing him well.  And those notes had been turned over to me and I had used those during the cross-examination of George.

(Tr. at 357-358).

Evseroff extensively cross-examined George concerning all the exculpatory statements he made supporting the intruder defense, including some ten notes written in George's own handwriting.  Evseroff opined that the jury may well have found that George's testimony was "in the nature of a recent fabrication."  Evseroff attributed the conviction to restrictions that the trial judge placed on the Petitioner's testimony.  The Petitioner was repeatedly instructed by the judge to "[j]ust answer yes or no, yes or no, yes or no."  (Tr. at 359).

As to his involvement with attorney Anastasios Sarikas, Evseroff testified that he met him for the first time in this case. Sarikas told Evseroff that he was retained by the Kotsopoulos family for a Family Court matter. Sarikas assisted him in the trial and made motions. In Evseroff's words, Sarikas was "a very competent motion guy." (Tr. at 361). After George testified, Sarikas never indicated to Evseroff that he needed to change his defense strategy. Similarly, the Petitioner continued to maintain his innocence, and that an intruder had murdered his wife.

During a "rather short" charge conference, at the bench, Evseroff never requested a lesser included offense charge; nor did Sarikas. Both he and Sarikas believed that, because their client at all times claimed he was innocent, that this should be an "all or nothing" situation. Evseroff was of the opinion that there was no reasonable view of the evidence that would have supported the submission of any lesser-included offense, such as manslaughter in the first degree, manslaughter in the second degree or criminally negligent homicide. As it happened, the jury convicted the defendant of depraved indifference murder and acquitted the Petitioner of intentional murder.

After the conviction, Evseroff visited Kotsopoulos several times at the Nassau County Correctional Facility. One of these visits was with Sarikas. The Petitioner was "tremendously upset. How could I be convicted. I'm not guilty. I didn't do anything." (Tr. at 364). He advised the Petitioner that he had a "viable appeal with a lot of issues." Evseroff denied that he ever said to the Petitioner anything about losing $100,000, as follows:

Q        Did you ever say to the defendant in substance the words:

         Well, how do I think I feel?  Do you think I'm happy?  I just
lost $100,000.  And don't you remember, I was supposed to get
another hundred thousand dollars if I beat all the charges?

A        Never said anything like that.  Never.

(Tr. at 365).

After the trial, Evseroff continued to have a professional and personal

relationship with Sarikas.  For the next five years, he referred at least ten different

civil and criminal cases to Sarikas in which he made fees.  He worked on cases

together with Sarikas.  The last case he worked on with Sarikas was *United States v.*

*Frank*, (no citation available).  In that case, he paid Sarikas $10,000 to make the

motions.  The case was tried in the Eastern District of New York before Judge John

Gleeson.  According to Evseroff, when the case was over and the defendant was

convicted, Sarikas "managed to take those people and to have them turn against me

and make motions against me."  (Tr. at 368).  This was in 2006.  Following this

*Frank* trial, there was a motion to set aside the verdict, attacking Evseroff.  The

defendant in that case was also represented by Steven Kartagener.  There was an

evidentiary hearing held in connection with that case, similar to the present hearing.

In a footnote, Judge Gleeson referred to "emotional testimony" by Sarikas with

regard to his relationship with Evseroff.  In addition, Judge Gleeson stated that: "I

specifically credit Evseroff's testimony in this regard.  To the extent the testimony of

Anastasios Sarikas is inconsistent with the foregoing finding, I do not credit Sarikas'

testimony."

From the time the defendant was convicted in 2003 until the year 2006, Sarikas never expressed any displeasure or any reservations about the way Evseroff handled the Kotsopoulos case. Sarikas did not criticize his trial strategy; or the fact that he didn't seek a plea bargain; or that he should have pursued a lesser-included offense charge.

In the summer of 2006, Evseroff's business relationship with Sarikas ended. At that time, Sarikas wrote Evseroff a nasty letter, attacking him. After receiving this letter, Evseroff had no further relationship with Sarikas.

On cross-examination, Evseroff testified that he never took hourly fees in his sixty years in practice. He took a "fixed fee." The Kotsopoulos family offered him a $100,000 fee through Mr. Lioumis, the man who referred the case to him. He asserted that he never solicited a contingent fee, and that he never received the $100,000. Evseroff testified that he did all this work on the case, including between 50 to 75 visits to Kotsopoulos at the Nassau County Correctional Facility, about thirty visits with the Kotsopoulos family, and the trial, which lasted at least three weeks, – all for a $41,000 fee. In fact, Evseroff stated that "I would have done it for nothing because I thought he was innocent." (Tr. at 378).

Evseroff was not aware of an affidavit by Lioumis that stated that he originally requested a $500,000 fee, and when the Kotsopoulos family couldn't pay this amount, he said he "would be willing to take $400,000 in cash." He denied making this statement. Evseroff remembers Georgia Apostolidis. She interpreted for the Kotsopoulos family on at least ten occasions. On other occasions, Lioumis

acted as the interpreter. When advised that both Apostolidis and the Petitioner's mother testified that he asked for and received a fee of $400,000 in cash and declined to give any receipts, Evseroff said that their testimony in this regard was untrue. He continued to state that the fee was $40,000 plus $1,000 in disbursement fees for a total of $41,000. This fee was paid by a check made to the order of his son, who is not a lawyer.

Evseroff accepted this retention in the year 2002. He never gave the Kotsopoulos family a written retainer agreement. He was not aware that, in May of 2002, in a criminal case, an attorney was obligated to create either a letter of engagement or a retainer agreement. In his sixty years of practice, Evseroff does not recall ever having a written retainer agreement. Evseroff denied having an incentive not to show his income in 2002 and 2003, even though he was involved in "very intense litigation with the Internal Revenue Services." Evseroff's troubles with the IRS was outlined, as follows:

> Q    Now, back in 2002, 2003, you had a pretty good incentive not to show income. Isn't that true?
>
> A    No.
>
> Q    Well, weren't you having a lot of problems back in 2002, 2003? Financial problems?
>
> A    No.
>
> Q    Well, let me ask you a question.
>
> Starting back in 1999 and extending into 2001, 2002, 2003, isn't it true that you were involved in very, very intense litigation with the Internal Revenue Service?

A       Yes.  Having to do with a tax shelter.

Q       And isn't it a fact that the Internal Revenue Service, prior to June of 2002, had already seized bank accounts of yours and had already filed liens against the property you owned in Florida and also filed liens against the house that you owned in Manhattan Beach?

A       Yes.

\*       \*       \*       \*

Q       Now, you were aware that if you took cash in excess of $10,000, you would have been required to file something called an 8300 form.  Correct.

A       Of course.

Q       You didn't file any 8300 forms in these cases, did you?

A       No.  I never got cash.

Q       But – all right.  But had you gotten cash and not filed the 8300 form, you would be admitting to a crime, correct?

If you said that you had gotten cash and didn't file the form. Right?

A       I guess so, yes.

(Tr. at 386-388).

The final offer in evidence by the Respondent was the deposition of Francis X. Schroeder, the assistant district attorney who conducted the Kotsopoulos trial in the County Court.  Schroeder was deposed on February 2, 2009.  He is presently a partner in the law firm of Congdon, Flaherty and O'Callaghan.

On May 4, 2002, he was on duty as a homicide assistant and received a call to respond to the Kotsopoulos home in Manhasset.  Several days later, the victim's

husband, Nikolaos Kotsopoulos, the Petitioner, was arrested for the murder. His initial attorney was one Oscar Michelin. Then, ultimately, Jack Evseroff and Tom Sarikas were his counsel. Throughout the preliminary proceedings leading up to the trial, the attorneys' position was that Carol was murdered by an intruder and that her husband had nothing to do with her death. He first heard this version on May 4, 2002, the very night of the murder. The Petitioner gave this intruder story to the investigating detective, prior to any attorney involvement, as follows:

> Q       I would like to talk to you about that theory. When was the first time you had heard that the defendant was claiming that an intruder had shot and killed his wife?
>
> A       When I was at the scene on May 4, as soon as I arrived at the scene the evening hours of May 4, 2002. I was apprised by Lieutenant Farrell who was the commanding officer of the homicide bureau, he was actually at the scene as well.
>
> That detective Michael O'Leary was interviewing Nikolaos Kotsopoulos over at the hospital and this had been prior to any attorneys being involved and at that point I was advised that Nikolaos Kotsopoulos had advised that he was sitting in his living room and his wife was preparing Greek Easter dinner and he heard a pop and he looked up from his living room into his kitchen and he saw an armed intruder in his kitchen going towards the back door and Mr. Kotsopoulos indicated that he then pursued this intruder, wrestled with him in the back door and was able to wrestle the gun away from the intruder who then ran out the back door exiting the house.

(Dep. at 8-9).

Schroeder also related the other information that supported the Petitioner's intruder version, namely, the 911 call; that six months prior to the murder there had been a home invasion of the Kotsopoulos home where armed intruders held up the family at gunpoint and stole money; and that both sons, George and Niko stated that

they saw their father wrestling with an armed intruder.

The Nassau District Attorney's office never offered a plea in this case. No plea was offered because of the nature of the murder in front of the Petitioner's children; his threat to place his children in foster care if they told the truth; the history of domestic violence and physical abuse against his wife; the history of his wife leaving him and fleeing to a shelter in Colorado; the diary of Carol in which she described being beaten by her husband; and the autopsy report which indicated that she had been beaten and sustained head trauma and had been bleeding prior to being shot. Further, neither Evseroff nor Sarikas ever sought a plea. Their position was consistent throughout that the Petitioner was innocent and that an intruder committed the murder. Nor did they seek a reduced charge for that reason.

In addition, during the trial, the Petitioner engaged in behavior supporting his "intruder claim." He testified at length describing the intruder's involvement. Under cross-examination for a few days "he was adamant that he had nothing to do with his wife's death. And that contention persisted until the final syllable of my summation." (Tr. at 16). In fact, during Schroeder's summation "the defendant had to be restrained by court officers and by his attorney." He "jumped out of his chair and started yelling at me to allow other tapes in that had been precluded from evidence," and that the jury should hear about "these intruders." Schroeder also related the incident in which the Petitioner began to yell to his son in Greek.

During the charge conference before Judge Belfi neither he nor defense counsel requested a lesser-included charge. He felt there was no reasonable view of

the evidence that a lesser-included charge such as an accidental shooting would be appropriate, based on the testimony of the prosecution witnesses as well as the Petitioner's insistence during his own testimony that an intruder committed the crime.

Towards the end of the trial, after the proof was completed, Sarikas indicated that he would have sought a lesser-included charge, but he never actually asked for such a charge. In Evseroff's absence, Schroeder and Sarikas had a conversation with Judge Belfi in his chambers about the issue of lesser-included offenses. Sarikas indicated that he would have sought a lesser-included charge. He responded "based on what," and Sarikas apparently didn't have an answer.

> Q        Okay.
>
> A        And that my recollection is that Mr. Sarikas indicated that he would have sought a lesser included tried to seek a lesser included charge in that conversation, and there was a discussion you know, I spoke and I said based on what, and he didn't really have an answer. I said, your client just testified for three days that he didn't do it. Somebody else said that he, that there was a witness, the son said he saw his father go get a gun and shoot his mother in the head and based on what's the theory of a lesser included charge? And he never really answered it.

(Dep. at 46).

Schroeder testified that Judge Belfi "did not offer an opinion that he thought that the evidence somehow supported some other theory." (Dep. at 48).

Both sides rested.

## VI.  <u>FINDINGS OF FACT</u>

After a review of the Hearing testimony and the parties' memoranda, the

Court makes the following Findings of Fact, as to the material factual issues in this habeas ineffective assistance of counsel case.

1.      The fee initially charged by attorney Jacob R. Evseroff was $400,000, not $40,000. Further, at Evseroff's request, the fee was to be paid, and <u>was</u> paid in cash. Also, Evseroff declined to give receipts for the cash payments.

2.      Approximately two weeks before the trial, Evseroff requested an additional fee of $100,000.

3.      After this request by Evseroff, Mrs. Christina Kotsopoulos, the Petitioner's mother, was the person who stated the proposition that she would pay the additional $100,000 only if her son was acquitted.

4.      Jacob R. Evseroff never accepted this contingent fee proposition by Mrs. Kotsopoulos. The Court finds that he asked for the additional $100,000 but did not agree to be paid only in the event of an acquittal. He wanted the additional $100,000 "without any strings attached."

5.      The Court does not find that Judge Belfi, the trial judge, in a charge conference, stated, in words or substance, to the attorneys, that there should be a lesser-included charge to the jury.

6.      The attorney Anastasios Sarikas had a bias against Evseroff that stemmed from their strained business relationship.

7.      Attorney Sarikas was retained by the Kotsopoulos family independent of Evseroff, and, as such, had a duty to act on behalf of the Petitioner, as counsel in his own right.

8.     At the criminal trial, the cross-examination of son George by Evseroff was "aggressive by a master of cross-examination" by "an outstanding, skilled, experienced trial lawyer." (Tr. at 209).

9.     The Petitioner Nikolaos Kotsopoulos struck his wife Carol in the face with a gun and then shot her in the face and killed her. The Court does not credit the Petitioner's testimony that the gun discharged accidentally while he was ejecting bullets onto the table.

10.     The Court does not credit the Petitioner's testimony that two or three weeks prior to the trial, he told Evseroff "the truth," namely, that he accidentally shot Carol while "ejecting the bullets on the table." On the contrary, the Court finds that the Petitioner never told Evseroff, Investigator Higgins or Sarikas of the so-called accidental shooting while removing bullets at a table.

The Court finds that at all times, right through the trial, until his conviction and afterward, the Petitioner adamantly insisted that an intruder shot and killed his wife, and never ever hinted that he accidentally shot his wife.

11.     The Court does not credit the Petitioner's testimony that, after his son's testimony, he stated to Evseroff, "can we do something to cop out or something less included charge." As stated above, the Court finds that the Petitioner adhered to his "intruder story" all the way past his conviction and sentence.

12.     The testimony of son George did not corroborate the "bullet removing-accidental shooting" theory.

13.     The defense in the criminal case, throughout the trial, with the

unswerving initiative and support of the Petitioner himself was that of an individual

wrongfully charged with a homicide committed by an intruder.

14.     Under the facts in this case, including the prior history of prowlers

and being held up at gunpoint, this "intruder defense" was a viable and appropriate

defense, and was properly raised by counsel in this case.

15.     The Petitioner was never offered a plea in this case.

16.     The Petitioner was never offered a reduced sentence recommendation.

17.     Attorney Sarikas never indicated to Evseroff that he needed to change

his defense strategy.

18.     Neither Evseroff nor Sarikas requested a lesser-included charge.

## VII.  DISCUSSION

### A.     Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996, codified at 28

U.S.C. § 2254, sets the foundation for the basic law confronting a state inmate in

custody, and applying for habeas relief:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district
> court shall entertain an application for a writ of habeas corpus in
> behalf of a person in custody pursuant to the judgment of a State court
> only on the ground that he is in custody in violation of the
> Constitution or laws of the United States.

The AEDPA goes on to provide that a federal court may grant habeas relief

to state prisoners with respect to any claim that was adjudicated on the merits in state

court proceedings only if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an

> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see also Jones v. West*, 555 F.3d 90, 95 (2d Cir. 2009);

*DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (discussing the federal habeas

review standard set forth in Section 2254).  It is well-settled that a state court's

findings of fact are entitled to a "presumption of correctness" that the petitioner in

question must rebut by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

"A state-court decision is 'contrary' to clearly established federal law within

the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in

character or nature' to, or 'mutually opposed' to the relevant Supreme Court

precedent."  *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (quoting *Williams v.

Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)) (internal

quotation marks omitted).  "A state court decision involves 'an unreasonable

application' of clearly established Federal law if the state court applies Federal law

to the facts of the case in an objectively unreasonable manner."  *Brisco v. Phillips*,

376 F. Supp. 2d 306, 311 (E.D.N.Y. 2005); *see also Brown v. Payton*, 544 U.S. 133,

125 S. Ct. 1432, 1439, 161 L. Ed. 2d 334 (2005) (citing *Williams*, 529 U.S. at 405,

120 S. Ct. 1494, 146 L. Ed. 2d 389); *Serrano v. Fischer*, 412 F.3d 292, 296 (2d Cir.

2005) (citations omitted).  "[I]t is well-established in [this] Circuit that the

'objectively unreasonable' standard of § 2254(d)(1) means that [a] petitioner must

identify some increment of incorrectness beyond error in order to obtain habeas relief." *Rosa v. McCray*, 396 F.3d 210, 219 (2d Cir. 2005) (citing *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003)).

Under the AEDPA, a court does not decide "whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time." *Brown v. Greiner*, 409 F.3d 523, 533 (2d Cir. 2005); *see also Williams*, 529 U.S. at 405, 120 S. Ct. at 1495.

It is well-settled that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). As stated above, "[I]t is well-established in this Circuit that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007). In this regard, the United States Supreme Court has indicated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 478, 116 L. Ed. 2d 385 (1991). On the contrary, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68, 112 S. Ct. 478 (citations omitted).

**B.** **The Contentions**

The Petitioner's position is straightforward. He contends that he was denied the effective assistance of counsel in violation of his constitutional rights under the

Sixth and Fourteenth Amendments to the United States Constitution. This claim is based on the Petitioner's assertion that (1) Petitioner's trial counsel Jacob R. Evseroff "entered into an illicit and illegal contingency fee arrangement with Petitioner and his family . . ." (Petitioner's post-hearing letter dated April 20, 2009 at p. 1), (2) as a result of this contingent fee agreement, Evseroff embarked on an "all or nothing" defense that was doomed to failure after his son's testimony, and, (3) as a result of this financial incentive to seek a complete acquittal, Evseroff did not consider a plea, and he did not request a lesser-included homicide charge.

On the other hand, the Respondent contends that the Petitioner received effective assistance of counsel. Initially, he contends that the Petitioner failed to establish that his counsel ever entered into a contingent fee arrangement with him or his parents. He asserts that Evseroff never agreed to such a contingent fee arrangement. In this regard, the Respondent's counsel questions the credibility of the Petitioner's mother and Attorney Sarikas. The Respondent contends that Sarikas has a personal animus and bias toward Evseroff. In addition, the Respondent contends that even assuming there was a conflict of interest, the defense afforded by Evseroff was not affected by such a conflict. In particular, the Respondent points out that no plea was ever offered and, with reasonable certainty, no lesser charge would have been given by the trial judge.

### C. <u>As to the Claim of Ineffective Assistance of Trial Counsel</u>

#### (1) <u>The General Rule</u>

The general rule governing ineffective assistance of counsel claims is set

forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, the petitioner must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington, id.* at 687. In applying the above two-prong test, "judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id.* at 696. "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 696-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674).

The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Indeed, as the Supreme Court has noted, "there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

With respect to the second prong, the petitioner can only establish actual prejudice if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009).

### (2) The Conflict of Interest-Ineffective Assistance of Counsel Rule

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005) (quoting from *United States v. Schwartz*, 283 F.3d 76, 90 (2d Cir. 2002); *see also United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 101 S. Ct. 1097, 1103, 67 L. Ed. 2d 220 (1981)) (stating that the Sixth Amendment "right to counsel includes a 'correlative right to representation that is free from conflict of interest'").

Under *Strickland*, if the Petitioner establishes that his attorney had a potential conflict of interest, in order to prove that the conflict resulted in a violation of his Sixth Amendment right to effective assistance of counsel, he must demonstrate prejudice. However, prejudice is presumed when the petitioner establishes that his attorney had an actual conflict of interest that adversely affected the attorney's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980); *United States v. Jones*, 900 F.2d 512, 519 (2d Cir. 1990), *cert. denied*, 498 U.S. 846, 112 L. Ed. 2d 99, 111 S. Ct. 131 (1990).

In *Winkler v. Keane*, 7 F.3d 304 (2d Cir. 2003), the issue presented was whether a contingent fee agreement created a conflict of interest resulting in a

violation of the petitioner's Sixth Amendment right to effect assistance of counsel.

In *Winkler*, there was a written contingent fee agreement providing that in the event Winkler was acquitted, he would pay "an additional legal fee, the sum of $15,000.00." This sum was later increased to $25,000. The Second Circuit held that the existence of a contingent fee agreement in a criminal case did not constitute a *per se* violation of Winkler's Sixth Amendment rights. A *per se* violation occurs in only two limited circumstances: where counsel was unlicensed and when counsel engaged in the defendant's crimes. *See Bellamy v. Cogdell*, 974 F.2d 302, 303 (2d Cir. 1992) (en banc), *cert. denied*, 122 L. Ed. 2d 759, 113 S. Ct. 1383 (1993); *see also United States v. Novak*, 903 F.2d 883, 890 (2d Cir. 1990) ("unlicensed" counsel); *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) (counsel implicated in crimes); *Solina*, 709 F.2d at 168-69 (unlicensed counsel).

However, in *Winkler*, the Court determined that such a contingent fee arrangement created an actual conflict of interest.

> Winkler argued that the contingency fee created an actual conflict of interest for trial counsel because Winkler's interests in effective representation were pitted against trial counsel's monetary interest. We agree. The contingency fee agreement in this case provided trial counsel with an extra $25,000 only if Winkler was acquitted or otherwise not found guilty. Thus, trial counsel had a [*308] disincentive to seek a plea agreement, or to put forth mitigating defenses that would result in conviction of a lesser included offense. Plainly the contingency fee agreement created an actual conflict of interest.

In order to demonstrate a violation of his Sixth amendment rights, a petitioner must establish that this actual conflict of interest adversely affected his

lawyer's performance.  *Cuyler v. Sullivan*, 446 U.S. at 348; *Tueros v. Greiner*, 373

F.3d 587, 591 (2d Cir. 2003); *United States v. Jones*, 900 F.2d 512, 519 (2d Cir.

1990).  To demonstrate an "adverse effect," a petitioner must establish that an

"actual lapse in representation" resulted from the conflict.  *Cuyler*, 446 U.S. at 336.

In *Winkler*, the Second Circuit cited, with approval, a "helpful test" to prove an

"adverse effect" adopted by the Third Circuit in *United States v. Gambino*, 864 F.2d

1064, 1071 (3d Cir. 1988), *cert. denied* 492 U.S. 906, 106 L. Ed. 2d 566, 109 S. Ct.

3215 (1989), as follows:

> [a defendant first] must demonstrate that some plausible alternative
> defense strategy or tactic might [**15] have been pursued.  He need
> not show that the defense would necessarily have been successful if it
> had been used, but that it possessed sufficient substance to be a viable
> alternative.  Second, he must establish that the alternative defense was
> inherently in conflict with or not undertaken due to the attorney's
> other loyalties or interests.

In accordance with this test, if the Court determined that Eversoff had agreed

to a contingent fee causing an actual conflict of interest, then, following the test in

*Gambino*, the Court would have to consider whether either of the two defense

strategies that Kotsopoulos argues his counsel failed to take, were viable alternatives,

and whether counsel chose not to undertake them because of his conflict.

In this case, the claim of ineffective assistance of counsel is based on the

Petitioner's contention that Jacob Evseroff was involved in an actual conflict of

interest as a result of an illegal, unethical contingent fee arrangement.  There is no

doubt that if the Petitioner proved that Evseroff agreed that if he obtained an

acquittal he would receive an additional $100,000, that would be an actual conflict of

interest.  The New York Code of Professional Responsibility, DR 2-106(C) states:

> C.  A lawyer shall not enter into an arrangement for, charge or collect:
>    1.  A contingent fee for representing a defendant in a criminal case.

However, the Court has already made findings of fact in which it determined that there was no contingent fee arrangement, and no actual conflict of interest created in the Evseroff-Christina Kotsopoulos exchange.  The Court determined that although Evseroff requested an additional fee of $100,000 and Christina Kotsopoulos stated that she would pay the additional money only if her son was acquitted, Evseroff did not agree to this condition.  In this regard, as stated above, the Court made the following finding of fact:

> 4.  Jacob R. Evseroff never accepted this contingent proposition by Mrs. Kotsopoulos.  The Court finds that he asked for the additional $100,000 but did not agree to be paid only in the event of an acquittal. He wanted the additional $100,000 "without any strings attached."

Accordingly, the Court failed to find a conflict of interest in the representation by Jacob Evseroff in this murder trial.  However, to complete the record, the Court will go further and assume, for the sake of this discussion, that Petitioner did prove that Evseroff agreed to the contingent fee and, therefore, there was an actual conflict of interest.  Nevertheless, even under this hypothesis, the Court finds that, under the facts of this case, the Petitioner failed to prove that this alleged conflict of interest had an "adverse effect" on Evseroff's performance as trial counsel.

### (a) <u>As to the Alleged Failure to Explore a Plea</u>

There is no evidence that a plea was offered at any time during the prosecution and trial of this case. Sarikas, who certainly was not a favorable witness for the Respondent, never testified to any plea being offered, nor, apparently, did he ever suggest that there be plea negotiations. The Petitioner himself was silent regarding a plea. Assistant District Attorney Schroeder, who conducted the Kotsopoulos trial, testified by deposition that the Nassau District Attorney never offered a plea in this case. It is clear that no plea was offered by the People, nor was any plea ever contemplated by the district attorney's office. As Schroeder testified:

> Q       Okay. During the investigation stage from the time of arrest up until trial, were there any, were there ever any plea discussions with either Mr. Everoff or Mr. Sarikas, were any plea negotiations, either you making a plea or them asking for a plea?
>
> A       Our, the Nassau County District Attorney's office, we did not offer a plea in this case.
>
> Q       Why not?
>
> A       Based on a lot of factors including the heinous nature of the crime. That is that Nikolaos Kotsopoulos shot his wife to death while his children were home. When we – a plea negotiation might take place during a homicide case. Usually in instances where there is some indication that maybe there was self-defense or in vehicular crimes or perhaps an intoxication defense for vehicular crimes, that it wasn't necessarily an intentional crime.
>
> But we also in this particular case we looked, there were no mitigating factors but there were several aggravating factors, including that it came to light that the defendant involved his children in the coverup of the murder, that is, that as I indicated on the 911 call you could hear him telling his children how they should describe the intruder to the police.
>
> In fact, it came to light even during the trial that he had told his children, if you don't say an intruder did it, you are going to wind

up in an orphanage. And in fact within days of their mother's death and their father's arrest they wound up in foster care out in Bay Shore. So he involved his children in this coverup.

There were also other aggravating factors during our investigation. There was a history of domestic violence between Nikolaos Kotsopoulos and his wife. We were able to uncover that Mr. Kotsopoulos had physically abused and beaten his wife previously. She had left him at one point during their marriage and fled to a shelter in Colorado. She also sought help from a domestic violence shelter here in Nassau County.

Also during the investigation we found the diary of Carol Kotsopoulos in which she described being beaten at the hands of her husband. And as another aggravating factor why we wouldn't offer a plea bargain in this case there was strong evidence that the defendant had beaten his wife on the day of the murder prior to shooting her. The autopsy results indicated that she had been beaten and sustained head trauma. We had also found blood out on the deck; Carol Kotsopoulos was shot and found inside her kitchen. However, there was blood evidence at the crime scene that she had been out on the deck bleeding and we had concluded that she certainly didn't get shot and then walk out on the deck, that the bleeding out on the deck had preceded the shooting.

Q      Let's start with Mr. Sarikas first. At any time during the pendency of this case did Mr. Sarikas seek you out and ask you to engage in or to consider giving his client a plea?

A      No. No. Not – neither Mr. Sarikas nor Mr. Evseroff sought a plea. Their position was consistent throughout that the defendant was innocent, that an intruder committed the murder.

Q      Did either of them, either Mr. Sarikas or Mr. Evseroff at any time either aloud or discuss with you any alternative theory as to what might have occurred at the Kotsopoulos home on the night of the murder?

A      No. Again, their position that they took was that the defendant did not commit the crime and an intruder did and I would also note they, neither Mr. Sarikas nor Mr. Evseroff ever sought any type of renegotiation or reduced sentence from the judge, who in this case was Judge Belfi, Donald Belfi.

(Deposition of Francis X. Schroeder, pp 12-16).

All of the evidence of the events prior to the trial and throughout the trial reveals that it was the unequivocal position of the Petitioner that an intruder shot and killed his wife. Beginning moments after the shooting, on May 4, 2002, when the Petitioner telephoned 911 to the time of this habeas petition, four years after the trial, the Petitioner steadfastly blamed an intruder for his wife's murder. The Court finds that he never told Evseroff that it was he who shot his wife. Under the circumstances, Evseroff had the duty and obligation, as Petitioner's trial counsel, to advise him to repeat that version at the trial. Evseroff had no reason to advise an unrepentant and insistent client to plead guilty or to endeavor to obtain a plea agreement on his behalf. Only at this hearing, almost six years after his wife's murder, did the Petitioner finally admit that he killed her; albeit only at a habeas hearing, when his confession was offered for his own benefit.

The Petitioner, at all times firmly stated that he was totally innocent and that a masked intruder committed the crime. Even if there was an actual conflict of interest in Eversoff's representation, it did not adversely affect his performance with regard to the failure to negotiate a plea.

In addition, "the Supreme Court has indicated that the failure to obtain a plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered." *Eiseman v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005), citing *Burger v. Kemp*, 483 U.S. 776, 785, 86, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)). As in *Eiseman* and in *Burger*, "the notion that the

prosecutor would have been receptive to a plea bargain is completely unsupported in the record." *Id*. at 705. Also, as stated in *Eiseman*, "although a defendant need not show that the negotiation of a plea bargain would have been successful, the strategy must nevertheless 'possessed sufficient substance to be a viable alternative.'" *Eiseman, 401 F.3d* at 110 (citing *Winkler, 7 F.3d* at 309.) In this case, pursuit of a plea bargain for Kotsopoulos "was not remotely a plausible defense strategy." *Id*. at 110.

### (b) As to the Failure to Seek a Lesser-Included Charge

Even assuming there was an actual conflict of interest in this case, the failure to seek a lesser-included charge did not adversely affect Evseroff's performance. The evidence at this trial was crystal clear. There were two witnesses who testified concerning the murder. In the People's case, the Petitioner's 12 year old son George testified that during an argument he saw his father get a gun and shoot his mother in the head. This was evidence of an intentional killing. The son did not testify to any "accidental shooting." On the other hand, the Petitioner testified that a masked intruder entered and shot and killed his wife. No one said anything about an accidental shooting. Only at this habeas hearing did the Court hear, for the first time, the Petitioner's implausible account of the shooting, namely, the story about, "I take the bullets out of the, on the table, on the little table by the kitchen, and suddenly, you know, it went off. Boom! . . . the time I ejected the bullets it went off accidentally . . . [it was] a nervous habit . . . taking the bullets out of the gun." (Tr. at 240-242).

Under New York State law, a lesser-included offense is authorized when (1) "it is impossible to commit the greater crime without concomitantly committing the lesser offense by the same conduct," and (2) "there is a reasonable view of the evidence to support a finding that the defendant committed the lesser offense but not the greater." *People v. Van Nostrand*, 85 N.Y.2d 131, 135, 623 N.Y.S.2d 767, 770 (1995). *See also People v. Barney*, 99 N.Y.2d 367, 371, 756 N.Y.S.2d 132, 135 (1995); *People v. Henderson*, 41 N.Y.2d 233, 235, 391 N.Y.S.2d 563, 565-66 (1976); *People v. Hernandez*, 42 A.D.3d 657, 839 N.Y.S.2d 592 (3d Dept 2007). Here, the jury was confronted with a choice of an intentional murder, depraved indifference murder or not guilty. There was no evidence of manslaughter or criminally negligent homicide presented at this trial. With reasonable certainty, no such lesser-included charge would have been given. Here, at the criminal trial, there was no reasonable view of the evidence that would support a finding that Kotsopoulos committed any lesser offense, but not murder. *See People v. Negron*, 91 N.Y.2d 788, 676 N.Y.S.2d 520, 523 (1998) ("There was no reasonable basis upon which the jury could have simultaneously credited the testimony necessary to establish the lesser offense of simple possession and rejected the very same testimony as it established the greater offense of possession with intent to sell").

Accordingly, even if the conflict of interest alleged by the Petitioner existed, the Court finds that he has failed to prove that the representation by trial counsel Jacob R. Everoff was adversely affected by the conflict of interest. Thus, the Petitioner's Sixth Amendment right to counsel was not violated.

## VIII.  **CONCLUSION**

Based on the foregoing decision, it is hereby

ORDERED, that the petition by Nikolaos Kotsopoulos for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, is DENIED, and it is further

ORDERED, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      July 24, 2009

_____*/s/ Arthur D. Spatt*_____
Arthur D. Spatt
United States District Judge