141

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
                         :
NIKOLAOS KOTSOPOULOS,          07-CV-4531
                         :
            Petitioner,

                              US Courthouse
      -against-          :    Central Islip, NY

SUPERINTENDENT,

                Respondent.:  March 26, 2009
                              9:25 a.m.
- - - - - - - - - - - - - X

        TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE ARTHUR D. SPATT
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Petitioner:  STEVEN R. KARTAGENER, ESQ.
                     JOHN CARRO, ESQ.
                     JASON YANG, ESQ.
                     225 Broadway, Suite 21700
                     New York, New York 10007

For the Respondent:  NASSAU COUNTY DISTRICT ATTORNEY
                     262 Old Country Road
                     Mineola, New York 11501
                     BY:  MICHAEL WALSH, ESQ.
                          MICHAEL P. CANTY, ESQ.
                          ILISA FLEISCHER, ESQ.

Court Reporter:      Dominick M. Tursi, CM, CSR
                     US District Courthouse
                     1180 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6108 Fax:  712-6124
                     DomTursi@email.com

        Proceedings recorded by mechanical stenography.
        Transcript produced by computer.

142

1          (Call to Order of the Court.)

2          THE COURT:  We are proceeding with the

3    petitioner's case.

4          I think that Mr. Sarikas was still on the stand,

5    was he not?

6          MR. KARTAGENER:  Mr. Sarikas was still on the

7    stand.

8          THE COURT:  Is he here?

9          MR. KARTAGENER:  He is here.

10         But before we proceed, may I address one issue

11   that came up at our most recent meeting?  Before we

12   proceed.

13         THE COURT:  Yes.

14         MR. KARTAGENER:  Recently, your Honor, we had a

15   conference with the court in which you provided both sides

16   with information concerning your daughter's employment by

17   the Nassau County DA's office.  At that point in time I

18   indicated to you preliminarily that I had no question

19   about your being completely independent and that it

20   wouldn't affect you, et cetera.  But I did say -- and I

21   think your Honor agreed 100 percent -- that, of course, I

22   would have to discuss the matters with Mr. Kotsopoulos

23   before a final decision was made.

24         I would like to inform the court for the record

25   that, consistent with my advice to him, and I'm convinced

143

1   he has a full understanding of all the issues,

2   Mr. Kotsopoulos says that he has absolutely no problem

3   proceeding before your Honor.

4           THE COURT:  I appreciate that.  And it will have

5   nothing to do with my decision, as you know.

6           MR. KARTAGENER:  We are all sure of that, judge.

7           THE COURT:  All right.

8           MR. KARTAGENER:  One other very quick thing,

9   your Honor, if I may.

10          THE COURT:  Yes.

11          MR. KARTAGENER:  I imagine that during the

12  course of today's questioning, probably when Mr. Evseroff

13  is on the stand, there will be some use made of

14  Plaintiff's Exhibit 1.

15          This is a new Plaintiff's Exhibit 1 because I

16  inadvertently left the copy with the evidence stamp on it,

17  or the exhibit stamp on it last time, I left it back in my

18  office inadvertently, in the box relating to this case.

19          I spoke to my colleagues this morning and they

20  had no objection to taking another copy of the same

21  document.

22          THE COURT:  That's the bank check?

23          MR. KARTAGENER:  That is the bank check.  And

24  that would be Plaintiff's Exhibit 1, judge.

25          MR. WALSH:  That's correct, your Honor.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

144

1      THE COURT:  Okay.  We will substitute that then.

2      Anything else at this time?

3      MR. KARTAGENER:  No, your Honor.  We are

4  prepared to proceed.

5      THE COURT:  All right.  Where is Mr. Sarikas?

6      MR. SARIKAS:  Right here, your Honor.

7

8  **ANASTASIOS SARIKAS**

9      called by the Petitioner, having been first duly

10     sworn/affirmed, was examined and testified as

11     follows:

12     THE COURT:  You may proceed.

13     MR. KARTAGENER:  Thank you, your Honor.

14     Judge, I hope you will indulge me.  I didn't

15  mark the exact question we finished with last time, so

16  there might a brief recap.

17     We will keep it short.

18     THE COURT:  Surely.

19

20  DIRECT EXAMINATION

21  BY MR. KARTAGENER:

22  Q.   Mr. Sarikas, when you were previously on the stand in

23  our last meeting before the court, you testified that you

24  are an attorney.  Correct?

25  A.   That is correct.

**Sarikas - for the Petitioner - Direct/Mr. Kartagener**

145

1  Q.    And that you are formerly an assistant district

2  attorney in The Bronx County DA's office.  Correct?

3  A.    Correct.

4  Q.    And that you entered private practice in what year?

5  A.    1988.

6  Q.    And there came a time after you entered private

7  practice that you worked on this case, the Kotsopoulos

8  case, with Mr. Evseroff.  Is that correct?

9  A.    That is correct.

10  Q.    And about when -- and you were present during the

11  trial of this case.  Is that correct?

12  A.    Yes, I was.

13  Q.    By the way, prior to trial or during trial of this

14  case, the Kotsopoulos murder case in Nassau County, did

15  you have any understanding of Mr. Evseroff's financial

16  arrangements with the Kotsopoulos family?

17  A.    Before and during the trial, no, I did not.

18  Q.    Okay.  Now, were you present at meetings in

19  Mr. Evseroff's office that occurred between

20  Mrs. Kotsopoulos, a woman by the name of Georgia

21  Apostolidis; were you present at any meetings in

22  Mr. Evseroff's office where he met with Mrs. Kotsopoulos,

23  the petitioner's mother, and Miss Apostolidis?

24  A.    Yes.

25  Q.    And when you were at his office in those, when those

Sarikas - for the Petitioner - Direct/Mr. Kartagener

146

1    meetings occurred, did Mr. Evseroff ever discuss financial

2    matters that he had with them in front of you?

3    A.    Never.

4    Q.    Okay.  Now, this case went to trial in, when was it?

5    April of 2003?

6    A.    Yes.  I believe so.

7    Q.    And what were the two charges that you recall that

8    were in the indictment, or the two top charges, concerning

9    Mr. Kotsopoulos?

10   A.    The top charge was intentional murder.

11              There were two top charges actually of equal

12   weight.  The other one was depraved reckless murder.

13   Depraved indifference murder.

14   Q.    That would be a theory of having engaged in reckless

15   conduct under circumstances evincing a depraved

16   indifference to human life.  Is that right?

17   A.    That is correct.  That is correct.

18   Q.    Were there lesser-included homicide offenses

19   contained in the indictment?

20   A.    No, there were not.

21   Q.    Okay.  Now, what charges went to the jury in this

22   case?

23              Of those two top charges, did both of them go to

24   the jury?

25   A.    Yes.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

147

1    Q.    What did the jury, as you recall, find with respect

2    to intentional murder?

3    A.    Not guilty.

4    Q.    And what did they find with respect to the reckless

5    deprived indifference murder?

6    A.    Guilty.

7    Q.    Now, immediately after the trial was over, was there

8    an occasion when you accompanied Mr. Evseroff to visit

9    Mr. Kotsopoulos in the Nassau County jail?

10   A.    Yes, there was.

11          It was just a few days after the verdict was

12   rendered by the jury.

13   Q.    Do you have a recollection of the conversation that

14   Mr. Evseroff had with Mr. Kotsopoulos at that meeting?

15   A.    Yes, I do.

16   Q.    Would you please tell the court what that

17   conversation was.

18   A.    The crucial part of the conversation that stands out

19   in my mind was that Mr. Kotsopoulos was angry and used

20   some rather belligerent language toward Mr. Evseroff.

21          And at one point Mr. Evseroff said to him more

22   or less: *What? You think I'm not upset? You think I'm*

23   *not angry? I just lost $100,000. Remember, you were*

24   *supposed to give me another $100,000 if I beat all the*

25   *charges.*

Sarikas - for the Petitioner - Direct/Mr. Kartagener

148

1    Or words to that effect.  I'm not quoting him

2  exactly, but that was the gist of it.

3  Q.    What was your reaction to hearing that conversation?

4  A.    At that time, that moment, I wasn't quite sure that I

5  heard what I heard, but I heard what I heard.

6    I didn't say anything and I didn't do anything

7  at that particular moment.

8  Q.    Now, did there come a time, subsequent to the trial

9  now, the trial's over, were there ever occasions on which

10  Mr. Evseroff discussed with you the amount of money that

11  he had made on the Kotsopoulos case?

12  A.    Yes.

13  Q.    And as you recall, what did Mr. Evseroff say about

14  how much he made on the Kotsopoulos trial?

15  A.    Mr. Evseroff received a fee of $400,000, the vast

16  bulk of which was in cash, for his representation of

17  Mr. Kotsopoulos.

18  Q.    And was that what he told you or is that something

19  you know from a different source?

20  A.    That is what he told me.  Because he would complain

21  to me on occasions, after we became closer to one another,

22  that he should have gotten more.

23  Q.    Now let's go back to the beginning of the murder

24  trial against Mr. Kotsopoulos, or the murder trial

25  concerning Mr. Kotsopoulos.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

149

1    Did Mr. Evseroff open to the jury or did you

2  open to the jury?

3  A.    Mr. Evseroff did.

4  Q.    And did he announce in his opening a defense

5  strategy?

6  A.    Yes, he did.

7  Q.    Or the defense theory of the case?

8  A.    Yes, he did.

9  Q.    What did he tell the jury, as you recall?

10  A.    The defense that Mr. Evseroff put forth was a Sam

11  Shepard type of defense; that the wife was killed by an

12  intruder.

13    For those of us old enough to remember, it was

14  kind of *The Fugitive - Dr. Richard Kimble* kind of defense;

15  the *One-Armed Man Did It*.

16    That was in essence the defense that he put

17  forth to the jury.

18  Q.    Now, early in the trial, at the very beginning of the

19  trial, was there a surprise prosecution witness?

20  A.    Yes.

21  Q.    And who was that witness?

22  A.    The very first witness who testified for the

23  prosecution was at the time 12-year-old George

24  Kotsopoulos, the eldest son of the accused.

25  Q.    And George provided testimony to the jury in that

Sarikas - for the Petitioner - Direct/Mr. Kartagener

150

1    case.   Correct?

2    A.    Yes, he did.

3    Q.    And was his testimony consistent or inconsistent with

4    what Mr. Evseroff had opened to the jury on?

5    A.    Totally inconsistent.

6    Q.    What did he tell the jury, essentially?

7    A.    He told the jury that on the night before Greek

8    Easter, his father and his mother were arguing, primarily

9    it was his father who was doing the arguing, and that his

10   father hit his mother, then went upstairs, went to his

11   bedroom, went underneath his bed and retrieved a pistol,

12   came down with the pistol and then hit Mrs. Kotsopoulos

13   across the head with the pistol.   Then they argued some

14   more and then he shot her in the face.

15          That was his testimony.

16   Q.    Now, he was cross-examined, I take it, by

17   Mr. Evseroff.   Correct?

18   A.    Yes, he was.

19   Q.    In your opinion, and with all of the experience you

20   have had as a trial lawyer, did George, in your opinion,

21   come across as a credible witness in the eyes of the jury?

22   A.    I would use the word *compelling*.   He was a compelling

23   witness in the eyes of the jury.

24   Q.    And if he was such a compelling witness, in your

25   mind, in your opinion, what impact did George's testimony

151

1   have upon the stated defense theory of the case?

2   A.   In my opinion it showed the defense theory for what

3   it was:  Fiction.  Nothing more than fiction.

4   Q.   Now, what if anything did you do after George

5   testified?

6           And I'm going to direct your attention to

7   Saturday, April 26, 2003.  Did something occur on that

8   day?

9   A.   Yes.

10  Q.   What happened?

11  A.   George testified the day before.  It was a Friday

12  when the case opened.  He testified on Friday, the 25th of

13  April.

14          On Saturday, at about 7:15, 7:20 in the morning,

15  I called Jack Evseroff at his home and I explained to him

16  in great detail why his theory of defense would not fly,

17  and that it was a disservice to the client to pursue this,

18  to be boxed into this kind of defense.

19          That after the testimony of George, and based as

20  a matter of fact on his testimony, it would behoove us to

21  change the strategy entirely in this case and put the man

22  on the stand and get him to admit to shooting his wife.

23  At which point, forgive my language, all hell broke loose.

24  Q.   Well, when you say it was your suggestion that he

25  take the stand and admit killing his wife, was it your

Sarikas - for the Petitioner - Direct/Mr. Kartagener

152

1    intent that he should just stand up and admit to the crime

2    of murder?

3    A.    No.

4    Q.    What was your theory that you proffered to

5    Mr. Evseroff?

6    A.    Just based alone on the testimony of the son, the

7    details of the testimony and the testimony of the son in

8    relation to the defendant's reaction upon the shooting,

9    that in and of itself evinced a type of accidental

10   shooting.  Either he didn't know that there was a round

11   chambered in that semiautomatic weapon, or he didn't know

12   that it was cocked and as a result the trigger weight

13   would have been less.

14          But the conduct, the boy's testimony of the

15   father's conduct, tended to show that it was something

16   less than murder.

17   Q.    In making the suggestion to Mr. Evseroff that you

18   were making, by that time were you already an experienced

19   trial lawyer in the criminal area?

20   A.    Oh, yes.

21   Q.    And had you had any, apart from the theory that you

22   were proffering, had you had any recent practical

23   experience in presenting a similar defense in a case

24   similar to this?

25   A.    Yes.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

153

1    Q.    What was that experience?

2    A.    I was not the lead counsel in this case.  I assisted

3    my then partner Mr. Dana Hanna in a trial in front of,

4    recently as a matter of fact deceased Judge Tejada in

5    Manhattan.

6         He and I were trying a homicide case in

7    Manhattan Supreme Court in front of Judge Tejada.  As a

8    matter of fact, Judge Tejada recently passed away.  He was

9    in his early 60s.  Very sad.

10        THE COURT:  Where was this?  In New York County?

11        THE WITNESS:  Yes, sir.

12        For the life of me, I can't remember the name of

13   the defendant, which is strange, but I can't remember the

14   name.

15        But it was a case where the defendant was

16   accused of shooting his wife with one shot.  Killed her.

17   Perforated her spinal column in the throat.

18        He was arrested about two weeks later.  He

19   signed an eight-page single-space detailed confession

20   where the word *accident* never appeared, and yet we were

21   able to get the jury to find him not guilty with respect

22   to intentional murder, to depraved indifference murder, to

23   manslaughter, and he was found guilty of criminally

24   negligent homicide in a case where I strongly believe from

25   a prosecution standpoint was a stronger case than that

Sarikas - for the Petitioner - Direct/Mr. Kartagener

154

1   against Nick Kotsopoulos.

2   BY MR. KARTAGENER:

3   Q.   Now, by the way, you say this fellow you can't

4   remember the name of was convicted of criminally negligent

5   homicide?

6   A.   Correct.

7   Q.   Was that criminally negligent homicide charge in the

8   original indictment or was it submitted to the jury as a

9   lesser-included offense?

10  A.   It was submitted as a lesser-included offense.

11  Q.   Okay.  And just so that the record is clear, this

12  occurred prior to the Kotsopoulos trial.  Is that correct?

13  A.   Yes.  It was.  I believe it was in 1996.

14        At the time I was trying to get on the homicide

15  path and I second-sat my then partner because that was my

16  goal to get on the homicide panel.  And I assisted him

17  with several cases and that was one of them.

18        As a matter of fact, I presented the defense in

19  that case specifically.

20  Q.   So getting back to the Kotsopoulos trial.  When you

21  made this recommendation or suggestion to Mr. Evseroff, if

22  I understand your testimony, you were basing it upon your

23  understanding of the law as well as practical experience

24  that you had had in a similar situation.  Is that correct?

25  A.   Yes, that is correct.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

155

1  Q.    Okay.  So you tell this to Mr. Evseroff.

2         What was Mr. Evseroff's response to you in that

3  telephone conversation that occurred on the morning of

4  April 26, 2003?

5  A.    The first words out of his mouth, because I spoke for

6  quite a long time, the first words were a question.  He

7  asked me if I had said this to anybody else.  And I said

8  no.  And then he said immediately if I -- I'm going to

9  quote him:  *If you say this to anyone else, you're off the*

10 *case.*

11 Q.    And subsequently was there a change in the defense

12 strategy in the case of People versus Kotsopoulos?

13 A.    None.

14 Q.    Did Mr. Evseroff put the defendant Nick Kotsopoulos

15 on the stand to testify?

16 A.    Yes, he did.

17 Q.    And what was the substance of his testimony?

18 A.    That an intruder came in.  I was sitting on the

19 couch.  An intruder came in, shoots my wife in the

20 kitchen.  I get up, I grapple with him, he drops the gun,

21 he escapes out the back door, and my wife is lying,

22 bleeding on the floor of the kitchen.

23        That was the testimony.

24 Q.    So in order for the jury, if I understand what you

25 are saying, in order for the jury to have accepted

156

1    Mr. Kotsopoulos's version of events, they would have had

2    to have found that 12-year-old George had been lying to

3    them.  Practically.

4    A.   That is absolutely correct.

5           And one more thing.  That the police department,

6    that Detective O'Leary, quote-unquote, flaked

7    Mr. Kotsopoulos by placing the case for that specific

8    weapon, the case for that specific weapon, in the safe of

9    Mr. Kotsopoulos's house.

10          They would have to believe that.  And George

11   Kotsopoulos was lying.  And that Detective O'Leary and the

12   Nassau Police Department had nothing better to do than to

13   flake poor Nick Kotsopoulos.

14   Q.   And what did you think of this, adhering to this

15   strategy, after George's testimony?

16   A.   Communal suicide.  Just stupid.  Absolutely stupid.

17   Q.   Now, in this case you have already testified that the

18   two top charges, the two top murder charges under

19   different theories, went to the jury.  Correct?

20   A.   Correct.

21   Q.   Were there any requests in this case for, by the

22   defense for a charge down to lesser homicide charges that

23   would be viewed as lesser-included offenses?

24   A.   Mr. Evseroff said no.

25   Q.   I'm sorry?

Sarikas - for the Petitioner - Direct/Mr. Kartagener

157

1   A.    No lesser-included offenses.

2   Q.    Well, you said Mr. Evseroff said no.

3         At the time that the case was getting ready to

4   go to the jury, did you have a conversation with

5   Mr. Evseroff about whether the defense should be seeking

6   lesser-included offenses?

7   A.    Yes.

8   Q.    What was that conversation, as you recall?

9   A.    I told him that, just based on George's testimony,

10  even though Nick testified the way he did, there was still

11  an alternative theory and that we should ask for a charge

12  down.  Manslaughter that involved recklessness but not

13  depraved recklessness or criminally negligent homicide.

14        And we had a bench conference, as a matter of

15  fact, where that was preliminarily discussed in front of

16  Judge Donald Belfi.  And Mr. Evseroff told Judge Belfi

17  that there would be no lesser included, and I kind of

18  reacted at that point in time at the bench.

19        And the next day, which I believe it was a

20  Thursday, I went to a charge conference in front of Judge

21  Belfi in his chambers and we discussed what had happened

22  at the bench.

23  Q.    And during that conversation that you had with Judge

24  Belfi on the following day about what had happened at the

25  bench, what was that conversation?

Sarikas - for the Petitioner - Direct/Mr. Kartagener

158

1   A.   As I was walking into the judge's chambers, even

2   before I could see the judge or the judge could see me, I

3   heard him say to me, he said:  *Tom, you wanted lesser*

4   *includeds.*

5        And as I came -- it just took a second.  As I

6   indicated, there was a small corridor leading to his

7   chambers.  As I went into his chambers.  Frank was already

8   there, Frank Schroeder, the prosecutor, he was sitting in

9   a chair right across from Judge Belfi's desk.  And as I

10  walked in, after I heard the judge ask me that, I said:

11  *Yes, judge, I did want lesser-included offenses.*

12       And the judge said yes, because I saw your

13  reaction, the way you rolled your eyes.  And he said that

14  in front of Frank.

15       THE COURT:  Just one minute.  You say as you

16  went into the chambers, the judge said Tom?

17       THE WITNESS:  Yes.  He referred to me as Tom.

18       THE COURT:  Oh, he was talking to you?

19       THE WITNESS:  Yes.  My name is Anastasios but

20  the diminutive form I've been going by, Tom, for many,

21  many years.

22       THE COURT:  He said to you:  Tom, you want a

23  lesser included?

24       THE WITNESS:  That's right.  He addressed me

25  quite in a friendly manner.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

159

1      And I said to him when I did see him, when he

2   came into my eyesight, I said, yes, judge, I did.

3      And at that point Judge Belfi said:  *You*

4   *wouldn't have tried the case this way, would you?*

5      And I said:  *No, I would not.*

6      And he asked me how I would try it, and I

7   explained to the judge how I would have tried it.

8      That's what happened in chambers.

9   BY MR. KARTAGENER:

10  Q.   Now, are you familiar, as an experienced trial

11  lawyer, with the rules governing, in New York State

12  courts, the question of whether a lesser-included offense

13  will be given to the jury?

14  A.   I'm fairly familiar with it, yes.

15  Q.   I know Judge Spatt has previously sat in the state

16  court, but would you please state for the record your

17  understanding of what the governing principles are, as to

18  whether a lesser-included offense will be given to the

19  issue.

20  A.   The rule with respect to lesser-included offenses are

21  found in two seminal cases.  One is People *v Greene* and

22  the other one is *People v Glover*.

23      The basic rule is that you cannot have committed

24  the higher offense without having committed the lesser

25  offense.  That is the first part of the rule.

Sarikas - for the Petitioner - Direct/Mr. Kartagener

160

1    And there has to be a reasonable view of the

2    evidence in a light most favorable to the defendant that

3    supports a jury finding that the defendant committed the

4    lesser but not the greater.

5    And a judge when making that decision can look

6    at any of the evidence presented during the course of the

7    trial, whether it was presented by the prosecution or the

8    defense, in making a determination whether he or she

9    should submit that lesser-included to the jury.

10   Q.   And in your opinion as an experienced trial lawyer,

11   do you believe that in the Kotsopoulos case there was a

12   valid basis in the law and facts for the lesser includeds,

13   that you had mentioned before, to go to the jury in this

14   case?

15   A.   Yes, sir, I did.

16   Q.   And instead, is it fair to say that Mr. Evseroff

17   completely disregarded your suggestions on this point?

18   A.   That is correct.

19   Q.   Is it fair to say that in your estimation he did a

20   so-called rolling of the dice in this case with respect to

21   Mr. Kotsopoulos?

22   A.   Yes, sir, he did.

23   MR. KARTAGENER:  I have no further questions of

24   this witness, your Honor.

25   THE COURT:  Cross-examination.

Sarikas - for the Petitioner - Cross/Mr. Walsh

161

1      MR. WALSH:  Yes, your Honor.  Thank you.

2

3  CROSS-EXAMINATION

4  BY MR. WALSH:

5  Q.    Mr. Sarikas, you testified and you claim that you

6  believe it was within days of the defendant's conviction

7  of murder that you and Mr. Evseroff went to the Nassau

8  County jail to visit the defendant.  Correct?

9  A.    Yes, sir.

10  Q.    And I believe you testified that the defendant was

11  upset when you and Mr. Evseroff got there.

12  A.    Yes.

13  Q.    Correct?

14          He made some unpleasant comments toward

15  Mr. Evseroff when the both of you arrived at the jail to

16  see him.

17  A.    That is correct.

18  Q.    And you claim that Mr. Evseroff responded by saying,

19  in substance:

20          *How do you think I feel?  Do you think I'm*

21  *happy?  I just lost $100,000.  Remember that I was*

22  *supposed to get another $100,000 if I beat all of the*

23  *charges?*

24          Is that a fair summary of your recollections of

25  what you claim Mr. Evseroff said?

162

1  A.    Yes, it is.

2  Q.    Now, Mr. Everoff said this right in front of you,

3  out loud.

4  A.    Yes, sir, he did.

5  Q.    You had testified this morning that in meetings that

6  you had had at Mr. Everoff's office with the defendant's

7  mother and Georgia Apostolidis, that Mr. Everoff never

8  discussed financial matters in your presence.  Correct?

9  A.    That is correct.

10  Q.    Money never changed hands between the defendant's

11  family and Mr. Everoff in your presence.  Correct?

12  A.    That is correct.

13  Q.    In fact any time -- let me withdraw that.

14        In fact there were instances where you would

15  have meetings at Mr. Everoff's office where Mr. Everoff

16  would ask you to leave the room when he spoke with either

17  the defendant's mother or other members of his family.

18  Correct?

19  A.    That is correct.

20  Q.    And that was when he was discussing financial matters

21  with the family.

22  A.    I didn't know what he was discussing when I wasn't

23  there.

24  Q.    In any event, there were times when he asked you to

25  leave the room, and you complied with his request to leave

163

1  the room during those meetings.  Correct?

2  A.   Yes, I did.

3  Q.   Now, the same guy who never spoke about financial

4  matters with you -- and when I say financial matters, I

5  mean any financial arrangement that Mr. Evseroff had with

6  the family -- and the same guy who never discussed his fee

7  arrangement with you prior to the trial or during the

8  trial, all of a sudden, out loud, at the Nassau County

9  jail disclosed right in front of you, out loud, the terms

10 of what would be, if true, an unethical contingency fee

11 agreement?

12 A.   Yes, he did.

13 Q.   Now, when you heard these words from Mr. Evseroff, I

14 think you said in your testimony the last time we were

15 here that you were shocked.  Correct?

16 A.   I think I used another expression.

17 Q.   Something about a duck being hit in the head with a

18 rock?

19 A.   Yes.  That's a phrase that Abraham Lincoln used in

20 relation to a union general.

21 Q.   After you heard these comments by Mr. Evseroff and

22 had a chance to think about what you had heard and sort of

23 processed the information, did you make the 330 motion,

24 Mr. Sarikas, to the trial judge on behalf of your client

25 Mr. Kotsopoulos claiming ineffective assistance of

Sarikas - for the Petitioner - Cross/Mr. Walsh

164

1  counsel?

2  A.  No, I did not.

3  Q.  Ever?

4  A.  No, I did not.  Certainly can't do it after a

5  sentencing.

6      You are saying prior to sentencing.

7  Q.  Prior to sentencing, yes.

8      Did you make a 330 motion to the trial court,

9  arguing ineffective assistance of counsel on the part of

10 Mr. Evseroff due to this contingency agreement?

11 A.  The answer is no.

12 Q.  After the defendant's sentence, did you make a 440

13 motion to the court claiming ineffective assistance of

14 counsel on the part of Jack Evseroff due to his taking

15 this unethical contingency fee agreement?

16 A.  Someone else did.

17 Q.  Someone else made a 440 motion, Mr. Sarikas?

18 A.  Right.

19 Q.  But not -- when did that occur?

20 A.  I think it was in 2006.

21 Q.  In 2006?

22 A.  Correct.

23 Q.  And the defendant's conviction, if I'm not mistaken,

24 occurred in May of 2003.

25 A.  That is correct.

Sarikas - for the Petitioner - Cross/Mr. Walsh

165

1  Q.    Did you report Mr. Evseroff's conduct to the

2  grievance committee?

3  A.    Unfortunately, no.

4  Q.    Never.  Correct?

5  A.    I did not.

6  Q.    Weren't you upset and angry by what you had heard

7  come out of the mouth of Jack Evseroff?

8  A.    Eventually, yes.

9  Q.    You were disturbed by what you had heard.

10  A.    That's correct.

11  Q.    Because what you had heard would essentially be,

12  would amount to an unethical contingency fee agreement.

13  Correct?

14  A.    That is correct.

15  Q.    Yet, despite your being disturbed at this, and it is

16  fair to say at what you believe to be an injustice done as

17  a result of it to your client?

18  A.    By his lawyer.

19  Q.    Is that fair?

20  A.    Yes.  Not by the people of the State of New York.

21  Q.    I understand.

22  A.    Not by the detectives.  Not by your office.

23  Q.    I understand completely.  And my question refers

24  directly to what you claim to be the conduct of

25  Mr. Evseroff.

Sarikas - for the Petitioner - Cross/Mr. Walsh

166

1  A.    Yes.

2  Q.    Despite this injustice that you felt that

3  Mr. Evseroff did to the defendant, despite his unethical

4  conduct, in your estimation, you continued to do business

5  with Jack Evseroff, didn't you?

6  A.    More than that.

7  Q.    He continued to, on occasion, refer cases to you.

8  A.    I worked on cases with him.  He referred cases to me.

9  I continued to be his friend.

10  Q.    You maintained your friendship with Mr. Evseroff.

11  Correct?

12  A.    That is right.

13  Q.    You continued to maintain a business relationship

14  with Mr. Evseroff.  Correct?

15  A.    Until July 27, 2006.

16  Q.    And until that time, July 27 of 2006, you continued

17  to work on cases together.  Correct?

18  A.    The answer is yes.

19  Q.    You continued to try cases together.

20  A.    Try cases together.

21        I have to say no to that, the trial part.  I

22  assisted him, but I was, if you can be more specific in

23  relation to which case you are referring, I would be very

24  happy to be more specific in answering.

25  Q.    Was there a case that you handled together with

167

1   Mr. Evseroff in Nassau County, it was a sex-abuse case,

2   regarding accusations --

3           THE COURT:  What case is that?

4           MR. WALSH:  I'm sorry.  A sex-abuse case, in

5   Nassau County, involving allegations against either a

6   doctor or a dentist.

7   A.    No.  It wasn't sex abuse, sir.  It wasn't sex abuse.

8           It was a Medicaid fraud case.  It was a Medicaid

9   fraud case.  And it was an -- I'm trying to remember the

10  name of the doctor.  That case was never, ever tried.

11          It culminated in a plea in front of Judge

12  Jeffrey Rounds, as a matter of fact.  And on the Queens

13  side of things.  Because, unfortunately, this young

14  dentist picked up a case as a result of being misguided by

15  Mr. Evseroff.  But that's another story.

16  BY MR. WALSH:

17  Q.    I'm sorry.  Misguided by Mr. Evseroff?

18  A.    Yes.

19  Q.    So we have another instance now of Mr. Evseroff

20  misguiding or acting ineffective with respect to a client.

21  A.    You know, we lawyers make mistakes that are not, that

22  are not immoral and that are not unethical.  Sometimes we

23  just make mistakes with respect to our appreciation of the

24  law.

25          In this particular instance, I am not accusing

168

1   Jack of having acted unethically.  I just think that he

2   should have taken the time to look at the law before he

3   told his client to do a certain something which wound up

4   getting him indicted in another county.

5   Q.    Let me ask you about another case that you handled

6   with Jack Evseroff after you claim he disclosed to you at

7   the jail this contingency fee agreement with the

8   defendant's family.

9            Did you work on a case together with

10  Mr. Evseroff entitled *United States v Philip Frank*?

11  A.    Yes.

12  Q.    And that was a healthcare fraud case.

13  A.    Correct.

14  Q.    Is that correct?

15  A.    Correct.

16  Q.    Now, the defendant, I believe we agreed, was

17  convicted of murder in May of 2003.

18  A.    That is correct.

19  Q.    The rest of 2003 went by and you made no ineffective

20  assistance of counsel claim with respect to Mr. Evseroff

21  in connection with this case.  Correct?

22  A.    That is correct.

23  Q.    In fact, the year 2004 went by and you made no claim

24  of ineffective assistance of counsel on the part of Jack

25  Evseroff with respect to his representation of this

169

1   defendant.

2   A.   To whom?  I made no claim to whom?  To a judicial

3   body?

4   Q.   Yes.

5   A.   To the world?

6   Q.   To a judge --

7   A.   To other bodies?

8   Q.   To a judicial body.

9   A.   No.  Because it was handed off to other lawyers who

10  were going to do that.

11  Q.   And in -- while you were still working with Jack

12  Evseroff and trying cases together with him?

13  A.   I didn't try any other cases with him.

14  Q.   I will withdraw it.

15         While you were still working on cases with Jack

16  Evseroff and while you maintained what you said was a

17  personal friendship with Jack Evseroff, you handed off

18  this claim to other attorneys so that they could pursue --

19  A.   Right.

20  Q.   -- his ineffective assistance of counsel?

21  A.   That is correct.

22  Q.   2005 went by and still no ineffective assistance of

23  counsel claim was made on behalf of Mr. Kotsopoulos to any

24  judicial body.  Correct?

25  A.   Not by me.

Sarikas - for the Petitioner - Cross/Mr. Walsh

170

1    Q.   Half of 2006 went by and still there had been no

2    ineffective assistance of counsel claim to any judicial

3    body on behalf of this defendant?

4    A.   No ineffective assistance of counsel claim was made

5    by me to a judicial body between his conviction and

6    September 11, 2006, the day that I signed an affidavit.

7    An affidavit.

8    Q.   So, Mr. Sarikas, over three years went by between the

9    defendant's conviction for murder and any ineffective

10   assistance of counsel claim being made to any judicial

11   body.  Correct?

12   A.   That is correct.

13   Q.   Now, you are aware, based upon your experience as a

14   trial lawyer, that contingency agreements in criminal

15   cases are unethical.

16   A.   Yes.

17        The case is *People v Richard Winkler*, a homicide

18   from Westchester County, as a matter of fact.

19   Q.   And in this case, Mr. Sarikas, you are claiming that

20   not only was there an unethical contingency fee agreement,

21   but that your client Mr. Kotsopoulos was severely harmed

22   by it.  Correct?

23   A.   That is correct.

24   Q.   Now, you certainly have a responsibility to your

25   client to zealously represent him.  Is that correct?

Sarikas - for the Petitioner - Cross/Mr. Walsh

171

1   A.   Yes, I did.

2   Q.   If a contingency fee agreement existed that harmed

3   your client and you found out about it, don't you have a

4   duty to report it?

5   A.   I may have a duty, yes.

6   Q.   Did you ever report it to the grievance committee?

7   A.   To the disciplinary committee?

8   Q.   Yes.

9   A.   No, I did not.

10  Q.   Something happened in July of 2006, however, with

11  respect to your relationship with Jack Evseroff.  Correct?

12  A.   Yes.

13  Q.   In July of 2006, and I think you even mentioned the

14  date specifically July 27 of 2006, you terminated your

15  relationship with Jack Evseroff.

16  A.   That is correct.

17  Q.   You terminated your relationship with Jack Evseroff

18  essentially over a financial disagreement.  Or in part.

19  A.   In part, yes.

20  Q.   You wrote him what could fairly be characterized as a

21  nasty letter?

22  A.   I refer to it as the over-and-out letter.

23  Q.   I will ask the question again.

24        Was it a nasty letter?  Whether it was an

25  over-and-out letter, or however you refer to it, was it a

172

1    nasty letter that you had written to Mr. Evseroff?

2    A.    In my opinion, no, it was not.  It was a truthful

3    letter.  100 percent truthful letter.

4    Q.    You called him greedy?

5    A.    Yes.

6    Q.    You called him money hungry?

7    A.    Absolutely.

8    Q.    You told him that your personal and professional

9    relationship was over.

10   A.    Yes.

11         Why don't you introduce that entire letter?

12   That would be nice.

13   Q.    Why don't you let me ask the questions.

14   A.    I'm sorry, sir.

15   Q.    This letter that you wrote to Jack Evseroff in July

16   of 2006 was written over three years after the defendant's

17   conviction?

18   A.    That is correct.

19   Q.    Correct?

20   A.    That is correct.

21   Q.    And within two months of writing this letter to Jack

22   Evseroff terminating your relationship with him on

23   September 11, 2006, that's when you sign an affidavit

24   essentially accusing Jack Evseroff of ineffective

25   assistance of counsel based upon this supposed contingency

173

1   fee agreement.

2   A.   That is when the affidavit was presented to me.  I

3   would have signed it a year-and-a-half, two years earlier

4   if it had been presented to me at that time.

5           THE COURT:  Mr. Sarikas, on cross-examination,

6   as you know, you are going to be asked questions that call

7   for a yes-or-a-no answer.

8           THE WITNESS:  You are right.

9           THE COURT:  Please adhere to that.  If you can't

10  answer the question yes or no, please say so.

11          THE WITNESS:  I apologize to the court.

12          THE COURT:  Don't make explanations when it is

13  not called for.

14          THE WITNESS:  I apologize to the court and to

15  counsel.  I'm sorry.  I am.

16  BY MR. WALSH:

17  Q.   My question, Mr. Sarikas, is that you did not sign

18  any affidavit in connection with this claim until

19  September 11 of 2006.

20  A.   That is correct.

21  Q.   Two months after you had written that letter to Jack

22  Evseroff?

23  A.   That is also correct.

24  Q.   And over three years after the defendant was

25  convicted of murder?

174

1    A.    Correct again.

2    Q.    This isn't the first time you have accused Jack

3    Evseroff of ineffective assistance of counsel, is it, Mr.

4    Sarikas?

5    A.    No, it is not.

6    Q.    In fact, in that case that I asked you about a few

7    minutes ago, *United States v Philip Frank*, you made the

8    same accusation, ineffective assistance of counsel.

9    Correct?

10   A.    Did I make that accusation?

11   Q.    Yes.

12   A.    I supplied testimony.  I answered questions.

13   Mr. Evseroff supplied the ineffective assistance.

14   Q.    Let's talk about that.

15   A.    Okay.

16   Q.    US versus Philip Frank was a case that was tried

17   before Judge Gleeson, if I'm not mistaken?

18   A.    Yes, John Gleeson.

19   Q.    A healthcare fraud case?

20   A.    Correct.

21   Q.    And you participated in the trying of that case with

22   Mr. Evseroff.  Is that fair?

23   A.    I prepared the legal documents, the motions.  They

24   were pretty extensive motions in that case.

25              I was actually going to try Dr. Frank's wife's

Sarikas - for the Petitioner - Cross/Mr. Walsh

175

1    case, but since Dr. Frank's case was being tried ahead of

2    his wife's case, I thought it behooved me to be present

3    during the trial to see and hear the testimony because it

4    would be useful in my defense of Mrs. Frank.

5    Q.    Let me ask it this way.  You worked on the case with

6    Mr. Evseroff?

7    A.    Yes.

8    Q.    The defendant was convicted of healthcare fraud?

9    A.    Yes, he was.

10   Q.    That conviction of Philip Frank for healthcare fraud

11   happened in June of 2006.  Correct?

12   A.    I believe you are right.

13   Q.    And again, this is over three years after

14   Mr. Kotsopoulos's convictions.

15   A.    I think we have established that.  Yes.

16   Q.    And -- let me withdraw that.

17         Philip Frank is convicted in June of 2006.

18   A.    I believe so.

19   Q.    You terminated your relationship with Jack Evseroff

20   in July of 2006.

21   A.    That's right.

22   Q.    And in that case, *United States v Philip Frank*, you

23   accused him, similar to this particular case, of trying to

24   squeeze an additional $100,000 out of his client at the

25   last minute.

Sarikas - for the Petitioner - Cross/Mr. Walsh

176

1   A.   Yes, he did.

2   Q.   A hearing was held before Judge Gleeson, an

3   evidentiary hearing much like this one.

4   A.   That's right.

5   Q.   In connection with that ineffective assistance of

6   counsel claim in the Philip Frank case.  Correct?

7   A.   That is correct.

8   Q.   That hearing, I believe, occurred in December of

9   2006?  If you know.

10  A.   I'm guessing, but I remember that it was the winter.

11  I would accept your assertion.

12  Q.   Okay.  Fair enough.

13        You testified at that evidentiary hearing?

14  A.   I was called to testify, yes.

15  Q.   Jack Evseroff testified in that evidentiary hearing.

16  Correct?

17  A.   Yes, he did.

18  Q.   And following that hearing, Judge Gleeson issued a

19  written decision on that hearing.  Correct?

20  A.   I believe he did.

21  Q.   A written decision crediting in that case, in that

22  hearing, the testimony of Jack Evseroff.  Correct?

23  A.   Correct.

24  Q.   And indicating in that written decision that he did

25  not credit your testimony.

177

1    A.    I believe that's correct.

2    Q.    Judge Gleeson found, in that hearing, you not to be

3    credible, or your testimony not to have been credible.

4    Correct?

5    A.    That's what Judge Gleeson wrote.

6    Q.    He talked in his written decision about your having

7    given emotional testimony about a relationship with

8    Evseroff that contained what he described as considerable

9    baggage.

10   A.    I don't remember that.

11         But unfortunately, I was not born a Swede, I was

12   born a Greek.  And unfortunately I am somewhat emotional.

13   That does not diminish my ability to tell the truth.

14   Q.    I didn't ask you if it diminished your ability to

15   tell the truth --

16   A.    The implication --

17   Q.    -- or your background.

18   A.    I beg your pardon.

19   Q.    I merely asked you, Mr. Sarikas, if in that decision

20   Judge Gleeson indicated that you gave emotional testimony

21   about your professional relationship with Evseroff that

22   contained considerable baggage.

23   A.    I don't remember that phrase.

24         I haven't looked at that decision from the time

25   that it was rendered.  Whatever the decision says is what

Sarikas - for the Petitioner - Cross/Mr. Walsh

178

1   the decision says.

2   Q.   Your defense -- and when I say your defense, I am

3   talking about you and Mr. Evseroff -- in this case, in the

4   Kotsopoulos case, from the very beginning was that this

5   defendant was completely innocent?

6   A.   That was not my defense, sir.  That was never my

7   defense.

8          I was the tail of the dog.  He wagged the tail.

9   I didn't wag the dog.

10  Q.   We will talk about who wagged the dog or the tail or

11  whatever --

12  A.   I'm not trying to joust with you.  I want to be

13  accurate.

14  Q.   The defense in this Kotsopoulos case, Mr. Sarikas,

15  was that this defendant did not shoot and kill his wife.

16  A.   That was Mr. Evseroff's defense.  Correct.

17  Q.   In a case that you participated in.  Correct?

18  A.   Correct.

19  Q.   In a trial that you participated in.  Correct?

20  A.   That is correct.

21  Q.   The defense in that case, whoever's defense you claim

22  it to be, was that an armed intruder shot Carol

23  Kotsopoulos, the defendant's wife.

24  A.   That was the defense of that case.

25  Q.   It was, that defense was essentially what the

179

1    defendant, Mr. Kotsopoulos, claimed from the very

2    beginning.  Right?

3    A.    That is true.

4    Q.    And continued to claim until the very end.  I'm

5    talking about Mr. Kotsopoulos continued to maintain to the

6    very end that an armed intruder had shot and killed his

7    wife.

8    A.    That's what he testified to.

9    Q.    And that is what he said right from the time that he

10   called 9-1-1 after his wife had been shot.  Right?

11   A.    I think we have said that already.  Yes.

12   Q.    The defendant even I think it was days before he gave

13   testimony in this case, the defendant even went on

14   television with a news reporter from CBS, Jennifer McLogan

15   and professed his innocence, didn't he?

16   A.    I have no idea.  I have no idea.

17   Q.    During Mr. Schroeder -- who handled the trial of this

18   case; the prosecutor?

19   A.    The prosecutor.  Frank.  Yes.

20   Q.    During Frank Schroeder's summation, the defendant

21   even got up at one time and started yelling at Schroeder,

22   interrupted his summation, telling Schroeder to play the

23   tapes, that he was hiding the truth, the tapes that were

24   not permitted into evidence which would have supported

25   this defense of an armed intruder.  Is that fair?

Sarikas - for the Petitioner - Cross/Mr. Walsh

180

1   A.   Give me a second.

2   Q.   Sure.

3   A.   I remember him standing up and yelling at Frank.  I

4   don't remember what he referred to.  It may have been

5   certain tapes that Judge Belfi excluded from a prior

6   break-in, if I recall correctly.  And I'm trying to

7   recall.

8        But I think there was an allegation that there

9   had been a prior break-in and that there were certain

10  police tapes with respect to that prior break-in that were

11  not allowed.  Judge Belfi ruled them inadmissible.

12  Q.   If I'm not mistaken, you had actually made the

13  argument that the tapes should come in?

14  A.   Yes.

15  Q.   And these were the tapes that the defendant was

16  referring to when he got up and interrupted Frank

17  Schroeder's summation, accusing him of hiding the truth.

18  A.   I'm pretty sure you are right now.  Yes.

19  Q.   Now, this defense that an armed intruder had shot and

20  killed Carol Kotsopoulos, there was plenty of evidence to

21  back up that defense, wasn't there?

22  A.   Truly, with all due respect, that's just garbage.

23  Q.   Okay.  Let's talk about the --

24  A.   That's garbage.

25  Q.   Let's talk about the garbage.

Sarikas - for the Petitioner - Cross/Mr. Walsh

181

1    A.    Okay.

2    Q.    The defendant, immediately after his wife was shot

3    and killed, called 9-1-1.

4    A.    Right.

5    Q.    Correct?

6    A.    Right.

7    Q.    And told the police immediately after the shooting --

8    A.    By the way, I withdraw that.  You said immediately?

9    Q.    Within minutes.

10   A.    Within minutes, yes.  After he spoke to his children.

11   Q.    Yes.  But he called 9-1-1, spoke to the police, and

12   told the police that an armed intruder had come in and

13   shot and killed his wife.

14   A.    And left the phone off the hook.

15         The answer to your question is yes.  And left

16   the phone off the hook and continued talking to his

17   children.

18         And that's on tape.  That's on tape.  And nobody

19   except Frank at the very, very end picked up on it, where

20   he was giving them the description to recite to the

21   police.

22   Q.    My question deals with evidence that there was to

23   support the defense.

24   A.    Yes, I know.

25   Q.    That an armed intruder -- certainly, one piece of

182

1   that evidence would be the defendant's call to the police

2   indicating, within minutes of the shooting, that an armed

3   intruder had just shot his wife.

4   A.   It was his call to the police putting forth his

5   story.

6   Q.   There were also, there was also evidence of the fact

7   that the defendant, shortly after the shooting, made

8   statements to the police, to Detective O'Leary and other

9   members of the police department, claiming that the armed

10  intruder had shot and killed his wife.  Correct?

11  A.   Yes.

12  Q.   When the children, George Kotsopoulos and I believe

13  the other son's name is Nicholas.

14  A.   Correct.

15  Q.   When they spoke to the police, they backed up the

16  defendant's version that an armed intruder had shot and

17  killed his wife?

18  A.   Somewhat.  Somewhat.

19  Q.   There were also, there was also, Mr. Sarikas, a prior

20  home invasion, home invasion robbery, that had been

21  perpetrated at the Kotsopoulos' house, perpetrated by

22  armed intruders, where the family was tied up and held at

23  gunpoint.  Correct?

24  A.   Correct.

25  Q.   That evidence was available to support the

183

1  defendant's claim that it was an armed intruder who

2  committed this crime.  Correct?

3  A.    It is a matter of -- yes.  Yes.

4  Q.    There was evidence that the police had been called to

5  the Kotsopoulos house prior to Carol Kotsopoulos having

6  been shot, that the police were called to the house on

7  numerous occasions to respond to calls regarding prowlers

8  at the house.  Aren't there?

9  A.    Yes.

10  Q.    The Kotsopoulos family, there was evidence that the

11  Kotsopoulos family was so concerned about armed intruders,

12  prowlers, that they went and got a German Shepherd for

13  protection.  Correct?

14  A.    Yes.  Who didn't bark on the night of the murder.

15  Q.    I didn't ask you what his demeanor was.

16  A.    I know you didn't ask me.

17  Q.    The question I asked you --

18  A.    The answer is yes.

19  Q.    The answer is yes?  Yes, they bought a German

20  Shepherd for protection as a result of these prowlers and

21  calls to the police?

22  A.    I don't know whether that was the prime motivating

23  force, but it would seem reasonable.

24  Q.    How about the dummy security cameras that

25  Mr. Kotsopoulos had installed in his house to protect he

Sarikas - for the Petitioner - Cross/Mr. Walsh

184

1  and his family from these prowlers and intruders that were

2  claimed in support of his defense?

3  A.    I'm sorry.  Is there a question there?

4  Q.    The question -- I will ask a question, Mr. Sarikas.

5            Did the defendant have dummy security cameras

6  installed at the house prior to the murder of Carol

7  Kotsopoulos?

8  A.    I believe he did.

9  Q.    And that was in response to the fact that there had

10  been prowlers at the house and this home invasion robbery

11  that had occurred at the house.  Is that correct?

12  A.    It probably was.

13  Q.    And you also, in addition to this evidence that I'm

14  talking to you about now that we have just gone through,

15  there was also the defendant's own testimony at trial in

16  which he told the jury under oath that armed intruders had

17  shot his wife.  Correct?

18  A.    That is what he testified to.  Correct.

19  Q.    He, the defendant, insisted from the beginning that

20  he was innocent.

21  A.    That is correct.

22  Q.    Completely innocent.  Correct?

23  A.    Correct.

24  Q.    That an armed intruder had done this.

25  A.    Correct.

185

1  Q.    Correct?

2          And he maintained that defense from the

3  beginning of the case right up until the end when he got

4  up and interrupted Frank Schroeder's summation?

5  A.    I got on this case about three months before the

6  trial.  What he did in the beginning I know through other

7  people telling me.  Through hearsay.

8          I got on this case, I got involved in this case,

9  about three months before the trial.  So I can tell you

10  what I know from being involved in this case.

11          I don't know what sort of conversations that he

12  and Mr. Evseroff may have had in the beginning of this

13  case when Mr. Evseroff first got on the case.  I don't

14  know.  I honestly don't know.  What I do know is what

15  happened after I became involved, which was two or three

16  months prior to the trial.

17  Q.    And in that two or three-month period that you became

18  involved prior to the trial, from the point that you

19  became involved until the time this defendant got up and

20  interrupted Frank Schroeder in his summations, his

21  defense, his claim all along was that an armed intruder

22  had committed this offense.

23  A.    That's right.

24  Q.    Doesn't that sound like an all-or-nothing defense to

25  you, Mr. Sarikas?

Sarikas - for the Petitioner - Cross/Mr. Walsh

186

1    A.    I'm sorry?

2    Q.    I'm going to withdraw that.

3          Do you agree that reasonable legal minds can

4    differ on legal issues?

5    A.    On legal issues?

6    Q.    On, let's say, issues of trial strategy.

7          Reasonable lawyers can have differences of

8    opinion on what the correct trial strategy should be in

9    any particular case.

10   A.    A short answer is yes.

11         THE COURT:  Would you hold it a minute, please.

12         (There was a pause in the proceedings.)

13         THE COURT:  You may proceed.

14         MR. WALSH:  Thank you, your Honor.

15   BY MR. WALSH:

16   Q.    Before I get into the trial strategy, Mr. Sarikas.

17         You had indicated that after the testimony of

18   George Kotsopoulos, the defense I think your words this

19   morning were turned to garbage.  Is that correct?

20   A.    Absolutely.

21         THE COURT:  I'm sorry.  I didn't hear your

22   question.

23         MR. WALSH:  I'm sorry, your Honor.

24   BY MR. WALSH:

25   Q.    You had indicated that in your opinion that  the

Sarikas - for the Petitioner - Cross/Mr. Walsh

187

1  defense, after the testimony of 12-year-old George

2  Kotsopoulos, turned to garbage.

3  A.    The defense theory was destroyed.  It had become a

4  heap of rubble.

5  Q.    Now, before we get into that.

6          I had just asked you about whether or not, from

7  the time that you got into the case until the time that

8  the case was submitted to the jury, whether or not the

9  defendant continued to maintain that an armed intruder had

10  committed this crime.  And you I believe testified the

11  answer to that was yes, that was his claim.  Correct?

12  A.    Correct.

13  Q.    Yet, you said something this morning on direct

14  examination about your belief that you should put him on

15  the stand and get him to admit that he shot his wife?

16  A.    Mr. Kotsopoulos took the road that he found support

17  in taking by Mr. Evseroff.

18  Q.    In your opinion.

19  A.    He would have done anything that Mr. Evseroff told

20  him.  In my opinion, he would have done anything that

21  Mr. Evseroff told him.

22  Q.    And this man, who continued to claim and assert that

23  an armed intruder had killed his wife, you felt that you

24  should get him to admit, in your words, that he shot his

25  wife?

188

1  A.   I wanted to get him to admit the truth.

2  Q.   In your opinion.

3  A.   In my very, very humble and realistic opinion.

4        I wanted to get him to tell the truth.  Nobody

5  has come up with an explanation for that gun case.  That

6  gun case that fit the gun perfectly that was made for the

7  murder weapon that was in his safe.  Nobody has even dared

8  to venture an opinion as to how we could have dealt with

9  that, even without the testimony of George.

10  Q.   Actually, Mr. Evseroff did make argument in

11  connection with that?

12  A.   Yes, sir.  Detective O'Leary planted it.  Detective

13  O'Leary had nothing else to do.

14  Q.   Mr. Sarikas?

15  A.   I'm sorry.

16        See?  I'm being emotional again, which is what

17  Judge John Gleeson didn't like.

18        You see, it is better that I should, that I

19  should clip these neurons in my brain where I'm reliving

20  this travesty.  And I'm not supposed to have any emotion.

21  And because I have emotions, I'm not supposed --

22              THE COURT:  Mr. Sarikas --

23              THE WITNESS:  I'm sorry, sir.

24              THE COURT:  -- it is better that you listen to

25  the question and answer it responsively.

Sarikas - for the Petitioner - Cross/Mr. Walsh

189

1      You, as an experienced trial lawyer, above all

2 should know to do that.

3      Listen to the questions and answer them.

4      THE WITNESS:  This is the second time.  I

5 apologize to the court, to counsel.  It will not happen

6 again.

7 BY MR. WALSH:

8 Q.   I believe you just talked about how you couldn't, you

9 know, live with what had happened, or words to that

10 effect.  Yet, you did for three years, didn't you?

11 A.   Yes.

12 Q.   Three years in which you continued to work and

13 maintain a friendship with the man that you claim harmed

14 your client Mr. Kotsopoulos.

15 A.   Not only him.

16 Q.   You are an experienced trial lawyer, as you have

17 already testified.  Correct?

18 A.   I believe I am.

19 Q.   I had asked you whether or not, in terms of trial

20 strategy decisions, that in certain cases -- and I'm not

21 specifically talking about this one; I know what your

22 opinion is here; but in certain cases, trial lawyers can

23 disagree on what a reasonable trial strategy should be.

24 A.   As long as their motivations are clean, yes.  When

25 their motivations are not, it is not a question of just

Sarikas - for the Petitioner - Cross/Mr. Walsh

190

1    disagreeing on trial strategy.

2    Q.    And I think you said it has been over a hundred cases

3    that you have tried as a lawyer?

4    A.    I believe that's accurate.  I truly believe that's

5    accurate.  Both as a prosecutor and as a defense attorney,

6    both in New York and in Nebraska, which is where, I

7    practiced law there also.

8    Q.    I understand.

9    A.    Okay.

10   Q.    This isn't the first time that you have seen a lawyer

11   take an all-or-nothing approach in a criminal case.

12          Mr. Kartagener referred to it as basically

13   rolling the dice, but it is not the first time you have

14   seen a lawyer not ask for lesser-included offenses in a

15   particular case.

16   A.    I would have to search my memory.

17          To be perfectly frank, if there is any

18   reasonable view, that is not a strategy, that is not a

19   decision that a defendant makes.  That is a decision the

20   trial attorney makes.

21          And I'm trying to think of such a situation, and

22   to be honest with you, I can't.  It may have happened in

23   the past.

24   Q.    You wouldn't disagree, though, that in certain cases

25   it is perfectly appropriate and sometimes the best

191

1   strategy to try a case all or nothing?

2   A.   I don't know.  I don't know how to answer that.  I'm

3   sorry.

4   Q.   Wouldn't it be a little difficult -- and I'm talking

5   to you again as an experienced trial lawyer, wouldn't it

6   be a little difficult to argue to the jury on the one hand

7   that my client is innocent, he didn't do it, an armed

8   intruder committed this murder; but, on the other hand, if

9   you don't believe that, you should just convict him of

10   manslaughter because it was an accident, he didn't really

11   mean it?

12   A.   That would not be the way to do that.  There would be

13   a different way to do that effectively.

14   Q.   Because if you did that, you would risk losing

15   credibility with the jury?

16   A.   That's one possibility.  Yes.

17   Q.   Now, you testified that you believed that

18   Mr. Evseroff should have asked that lesser-included

19   offenses be submitted to the jury.  Correct?

20   A.   I did.  And I think so did Judge Belfi.

21   Q.   But throughout the case, up until that point where

22   this charge conference occurred, whether you liked it or

23   not, this case was tried with an all-or-nothing approach?

24   A.   It was tried by Mr. Evseroff.

25           I tried to get off that particular path when I

192

1  cross-examined the gun expert.  Okay?  And I was -- I was

2  kind of stopped by Mr. Evseroff because he realized where

3  I was going.  The type of gun involved.  And the fact that

4  it had an internal hammer where you couldn't see if the

5  gun was cocked, this particular model, this 9-millimeter

6  Taurus; when a round is chambered and the gun is cocked,

7  you can't tell if it is cocked.  Like, most

8  semi-automatics that have an outside hammer, you can see

9  that.

10  Q.  I understand.

11  A.  In this particular weapon, you couldn't.  And I was

12  trying to move in that direction, when I was called over

13  to the defense table by Mr. Evseroff and told to get off

14  that line.

15  Q.  When you were told to get off that line.

16  A.  Well, he doesn't talk that way.  He is -- he is a

17  Damon Runyon kind of character.  He said knock it off.

18  Q.  Except, Mr. Sarikas, you weren't hired to represent

19  the defendant by Jack Evseroff, were you?

20  A.  I'm sorry.  I didn't hear.

21  Q.  You weren't hired to represent Mr. Kotsopoulos by

22  Jack Evseroff, were you?

23  A.  Jacks is the one who recommended to the parents to

24  hire me.

25  Q.  But the family of Mr. Kotsopoulos hired you to

193

1   represent them.  Correct?

2   A.    Yes.  That's correct.

3   Q.    You were not hired by Jack Everoff.  Correct?

4   A.    That is correct.  I was hired to help Jack,

5   quote-unquote.

6   Q.    Your obligation in this case was not to Jack Everoff

7   but it was to Mr. Kotsopoulos.

8   A.    Yes, it was.

9   Q.    Correct?

10  A.    And I'm afraid I failed.

11  Q.    You are a lawyer who has tried, again you're

12  estimating, a hundred cases or so?

13  A.    A lot of case.  A lot of cases.  Countless to me.

14  Q.    And you are telling the court that because Jack

15  Everoff told you to knock it off, or whatever the term

16  was he used, that you just decided to move on, against

17  your better judgment as a trial lawyer representing this

18  defendant?

19  A.    A short answer is yes.

20          Jack Everoff is somebody I looked up to.  He is

21  a living legend.  I couldn't believe that I was working

22  with him, quite frankly.

23          Even when I was working as a summer intern in

24  the DA's office in The Bronx when he was doing the Buddy

25  Jacobson case and I was with him in an elevator, he was

Sarikas - for the Petitioner - Cross/Mr. Walsh

194

1   someone that, you know, I looked up to.

2           I figured he knew better than I did.  Truly, I

3   figured he knew better than I did.  He's Jack Evseroff and

4   I'm not.

5   Q.   Let me get back to what I had begun to ask you

6   before.  We kind of got sidetracked here.

7           Throughout the case the defense theory was this

8   armed intruder theory.  Correct?

9   A.   That is correct.

10  Q.   And I'm talking about the trial from start to finish.

11  Correct?

12  A.   Right.

13  Q.   Now, so at the end of the case, when this charge

14  conference occurred with Judge Belfi, essentially all of

15  the evidence presented by the defense and argued by the

16  defense was toward this armed intruder theory.  With the

17  exception of your cross-examination of the gun expert.

18  A.   Yes.

19  Q.   So in that case, given that fact, I will ask you

20  again, wouldn't it have been difficult for Mr. Evseroff to

21  get up, look at that jury, and sum up to them and tell the

22  jury:  *This defendant is innocent.  He did not shoot and*

23  *kill his wife.  It was an armed intruder who committed*

24  *this crime.  But in case you don't buy that, it was an*

25  *accident; convict him of manslaughter?*

Sarikas - for the Petitioner - Cross/Mr. Walsh

195

1   A.   It could have been handled very gingerly and very

2   intelligently.

3        Would it have been easy?  No, it would not have

4   been easy.  But it could have been handled well.  Because

5   ultimately no one, no one in that room was present at the

6   time of the murder.  And that's what a trial is, a

7   reconstruction of an event that happens outside of the

8   courtroom.  And one could present alternative theories to

9   a jury in a noninsulting way.

10  Q.   In certain cases.  Right?

11  A.   In certain cases.

12  Q.   Not in every case?

13  A.   When there is a will to do so and there isn't a

14  $100,000 bonus hanging over your head.

15       MR. WALSH:  Judge, I'm going to ask that that

16  last portion of the answer be stricken.

17       THE COURT:  That motion is granted.  The last

18  portion of the answer is stricken.

19       Again, I am advising you -- as I do almost every

20  witness, but I'm surprised I have to do it to you --

21  listen to the questions.

22       On cross-examination, they are going to call,

23  most of the time, for a yes-or-no answer.  Just as you

24  have done hundreds of times, correct?

25       THE WITNESS:  Correct.  Correct.

Sarikas - for the Petitioner - Cross/Mr. Walsh

196

1          THE COURT:  If you can't answer yes or no, say

2     so.

3          THE WITNESS:  Thank you.

4          THE COURT:  Mr. Kartagener is listening.  If he

5     thinks you have not been permitted to fully answer, he

6     will have another opportunity to ask you about what you

7     were not permitted to say.

8          You know that, right?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Okay.

11         MR. WALSH:  May I, your Honor?

12         THE COURT:  Yes.

13    BY MR. WALSH:

14    Q.   Mr. Sarikas, I want to ask you about the testimony of

15    George Kotsopoulos, the defendant's then 12-year-old son.

16    All right?

17    A.   Yes, sir.

18    Q.   This morning you described his testimony before the

19    jury as compelling.

20    A.   Yes.

21    Q.   I think the last time we were here Mr. Kartagener was

22    starting to get into that area and you testified that

23    George's testimony utterly destroyed the defense theory

24    that an intruder had done this.  That was your opinion.

25    A.   I believe so.

Sarikas - for the Petitioner - Cross/Mr. Walsh

197

1   Q.   And that the defense theory, in your opinion, ceased

2   to exist.  I think this morning your term was it had

3   turned to rubble.  Correct?

4   A.   Yes.

5   Q.   A fair characterization of your testimony?

6   A.   Yes, sir.

7   Q.   You believed George Kotsopoulos to be a credible

8   witness?

9   A.   Yes.

10  Q.   Believable?

11  A.   Yes.

12  Q.   Credible?

13  A.   Yes.

14  Q.   Competent?

15  A.   Yes.

16  Q.   Truthful?

17  A.   Yes.

18  Q.   How about psychotic?

19  A.   No.  Not George.

20       THE COURT:  What was that?  *Psychotic*?

21       MR. WALSH:  Psychotic.  Yes.

22  BY MR. WALSH:

23  Q.   Would you use the term *psychotic* to describe George

24  Kotsopoulos and his testimony?

25  A.   No.

198

1  Q.   Haven't you on a prior occasion referred to George

2  Kotsopoulos as the defendant's psychotic son?

3  A.   I don't recall saying that.  And if I did, it was

4  probably to some newspaper reporter sticking a microphone

5  in my mouth, or something.

6        I don't know where that's coming from.  I don't

7  remember saying that to anybody.  It's possible, but I

8  don't remember.

9  Q.   Let me see if I can refresh your recollection as to

10  where it is coming from.

11        After the defendant's conviction for murder, you

12  sent Jack Evseroff a three-page summary of potential, what

13  you believed to be, appellate points in the Kotsopoulos

14  case.

15        Do you remember that?

16  A.   No.  But I defer to you on this.  I don't remember,

17  but I'm sure it is correct.

18  Q.   Do you remember suggesting to Mr. Evseroff in a

19  summary that one of the issues that you should focus on in

20  your appellate points was a Molineaux application that had

21  been made by the people.

22  A.   I don't remember.  I believe you, but I don't

23  remember.

24  Q.   I will ask you some questions to see if it refreshes

25  your recollection.  T.

Sarikas - for the Petitioner - Cross/Mr. Walsh

199

1      He people made a Molineaux application regarding

2   other conduct that the defendant committed; violent

3   conduct that he had committed toward his wife.

4   A.    Right.

5   Q.    Prior to the murder.

6   A.    Right.

7   Q.    And you had indicated, I believe, in this summary

8   that the Molineaux application was made, but the people

9   had represented at the time that their case was

10  circumstantial and that they therefore needed this

11  evidence to help prove their case.  Right?

12  A.    Okay.

13  Q.    And then you indicated as well that that wasn't

14  entirely true because in actuality the people had a

15  witness?

16  A.    Right.

17  Q.    George Kotsopoulos?

18  A.    Which took it out of a type of case being wholly

19  circumstantial and requiring --

20         THE COURT:  Would you hold it, please.  There

21  are some people coming in.  Let them get settled.

22         (There was a pause in the proceedings.)

23         THE COURT:  You may proceed.

24         MR. WALSH:  Thank you, your Honor.

25  BY MR. WALSH:

Sarikas - for the Petitioner - Cross/Mr. Walsh

200

1   Q.   In discussing, Mr. Sarikas, this Molineaux issue, did

2   you indicate in your list of potential appellate points to

3   Mr. Evseroff that the Molineaux application or decision

4   prejudiced the life of the defendant by corroborating

5   parts of his psychotic son's account?

6   A.   If I wrote that, I wrote it.

7   Q.   This morning you called George Kotsopoulos truthful.

8   Credible.  Compelling.  Correct?

9   A.   Correct.

10  Q.   Not psychotic.  Right?

11  A.   That is correct.

12  Q.   Yet, in your list of appellate points that you

13  submitted to Jack Evseroff that you felt you should argue,

14  you described 12-year-old George Kotsopoulos as the

15  defendant's psychotic son.  Didn't you?

16  A.   Apparently, I did.  I think it is called rhetorical

17  flourish.

18  Q.   Flourish.  Hyperbole.  Exaggeration.  Would that be

19  accurate as well?

20  A.   I don't know what motivated me at the time to write

21  that word.

22  Q.   How about simply not true?

23  A.   I'm sorry.  Which part?

24  Q.   That 12-year-old George Kotsopoulos was the

25  defendant's psychotic son.

Sarikas - for the Petitioner - Cross/Mr. Walsh

201

1    A.   Well, he certainly wasn't a psychotic son.  He --

2    Q.   Was not?

3    A.   He was absolutely not.  His testimony was very

4    measured.  Very real.  Palpably real.

5         The boy spoke the truth.  He had no reason at

6    all to frame his father.  He loved his father.

7    Q.   Yet, that is not what you indicated in this list of

8    appellate points you sent to Jack Everoff that you were

9    planning to argue in connection with this defendant's

10   appeal.  Is it?

11   A.   Well, I think, to be perfectly frank, I think that

12   perhaps I was using a term, I don't remember, but perhaps

13   I was using a term that Jack, himself, used repeatedly and

14   I was merely mirroring Jack.  I don't remember.

15   Q.   You are blaming Jack Everoff for what you wrote in

16   this list of appellate points now?

17   A.   I'm not blaming him at all.

18   Q.   These are your words.

19   A.   I'm simply -- I certainly wrote that.  If I wrote

20   that, I wrote that.  But, for example, he would refer to

21   various individuals, including the sister of the deceased,

22   in rather florid terms.  I may have picked up a term.

23        I'm not blaming anybody.  I'm responsible for my

24   own mis -- for my own failings.

25   Q.   So we shouldn't be blaming Jack Everoff for your

Sarikas - for the Petitioner - Cross/Mr. Walsh

202

1   writing?

2   A.   Sir, I wrote what I wrote.  If I wrote that, I didn't

3   mean it.

4         And the fact of the matter is, I truly don't

5   feel, and I never truly felt, that that young boy was

6   psychotic.  I think he was a very hurt boy.  He saw his

7   mother being shot to death by his father in front of his

8   eyes.  And I certainly think that that would create a

9   psychological damage.  But *psychotic* is a very harsh word,

10  and I apologize for even having written it.

11  Q.   You also discussed, in this list of appellate points

12  that you submitted to Mr. Evseroff, the potential argument

13  to be made in connection with excessive sentence should

14  the defendant receive a sentence of 25 to life, which

15  would have been the maximum.

16  A.   Yes.

17  Q.   Right?  And one of the arguments you suggested be

18  made on behalf of the defendant in connection with an

19  excessive sentence claim was that this defendant built a

20  fortune from nothing, was a hard-working family man, who

21  supplied his family with substantial material comforts

22  despite being stuck with a neurotic, flaky, moody drunk.

23  A.   That unfortunately was true.  Unfortunately.

24  Q.   Carol Kotsopoulos was a neurotic, flaky, moody drunk.

25  A.   I think anybody who -- a short answer is yes.

Sarikas - for the Petitioner - Cross/Mr. Walsh

203

1   Q.   And would you explain to the court, if you can, how

2   Carol Kotsopoulos being, in your opinion, a neurotic,

3   flaky, moody drunk would in any way mitigate this

4   defendant's behavior in shooting her in the face?

5         MR. KARTAGENER:  I object to the relevance of

6   this particular line, judge.

7         THE COURT:  Overruled.

8   A.   It wouldn't.

9   BY MR. WALSH:

10  Q.   It would not?

11  A.   It would not.

12  Q.   It wouldn't matter whether or not Carol Kotsopoulos

13  was a moody drunk or a well-adjusted sober person.  It

14  would have nothing to do with this defendant's conduct and

15  shooting her in the face?

16  A.   It wouldn't.  Nothing could justify waiving a gun, a

17  loaded gun, in the face of your wife.  Nothing.

18  Q.   Or shooting her.

19  A.   Or shooting her.

20  Q.   In the face.

21  A.   And killing her in front of his children.

22         There is no justification as far as what Carol

23  was.  And Carol was unfortunately an alcoholic.  And my

24  choice of language was bad throughout that.  And I

25  apologize now to the deceased.

204

1          But she unfortunately was an alcoholic.  And,

2    incidentally, that was borne out by the level of blood

3    alcohol at the time of her death.  She, I think, was over

4    point 2 something, if I recall correctly.  Carol drank a

5    lot every day of her life.  A lot.

6    Q.   But the toxicology report had nothing to do with the

7    other statements you made about being flaky, moody,

8    neurotic; somebody you had never met before.

9    A.   You know, this was in the form of almost a private

10   letter.  And I regret writing that, very, very, very much.

11   The second part, though, about Carol, unfortunately, is

12   true.

13   Q.   All right, Mr. Sarikas, let's move on.

14          To say that young George Kotsopoulos's testimony

15   utterly destroyed the defense, as you described, ignores

16   Jack Evseroff's cross-examination of the boy at trial.

17          Do you agree with that?

18   A.   No, I don't agree with that.

19   Q.   Well, Mr. Evseroff at trial.  I believe

20   Mr. Kartagener asked you some questions about it.

21          Mr. Evseroff cross-examined George Kotsopoulos.

22   A.   He did.

23   Q.   Correct?

24   A.   He did, indeed.

25   Q.   He aggressively cross-examined George Kotsopoulos.

Sarikas - for the Petitioner - Cross/Mr. Walsh

205

1  A.    He reduced the boy to tears.

2  Q.    He cross-examined George Kotsopoulos with many

3  inconsistent statements that he had made.

4  A.    Written.

5  Q.    From his testimony at trial.

6  A.    Written prior inconsistent statements.  Many.  Done

7  on the napkins and place mats of restaurants.

8  Q.    So in order to discredit George Kotsopoulos's

9  testimony and support Jack Evseroff's defense, he

10  aggressively cross-examined George with inconsistent

11  statements that George had made to the police.  Correct?

12        That is a yes?

13  A.    With statements -- I don't remember with respect to

14  statements made to the police.

15        I remember that Jack *aggressively*, to use your

16  term, and it is an appropriate term, cross-examined George

17  with these notes that he had written that were meant to be

18  delivered to his father.

19  Q.    Okay.  Let's hold off on that.  I'm going to get to

20  that in a minute.

21        Didn't George Kotsopoulos initially give

22  statements to the police corroborating his father's

23  account that an intruder had shot his mother?

24  A.    Initially, yes.

25  Q.    And Mr. Evseroff used those prior inconsistent

Sarikas - for the Petitioner - Cross/Mr. Walsh

206

1    statements of George Kotsopoulos, corroborating his

2    father's defense, to cross-examine him at trial.

3    A.    He did, indeed.

4    Q.    And those statements were in direct contrast,

5    completely inconsistent with George's testimony at trial

6    that it was the defendant who shot and killed his mother.

7    A.    That is correct.

8    Q.    Not only did he use those prior inconsistent

9    statements, he cross-examined young George on testimony he

10   had given to the grand jury under oath in connection with

11   the shooting of Carol, the murder of Carol Kotsopoulos.

12   Correct?

13   A.    I believe that's correct.  Yes.

14   Q.    George had testified in the grand jury that a

15   intruder had done this to his mother.  Correct?

16   A.    He had.

17   Q.    Under oath?

18   A.    That's the only way you can testify.

19   Q.    Okay.  Completely inconsistent with his testimony at

20   trial that it was his father?

21   A.    Yes.

22   Q.    Who shot his mother?

23   A.    That's correct.

24   Q.    And Mr. Evseroff used that grand jury testimony to

25   cross-examine George with and support this defense?

Sarikas - for the Petitioner - Cross/Mr. Walsh

207

1   A.   Yes.

2   Q.   The notes that you had talked about.  There were, and

3   I think the term you had used at one point in time, there

4   were a myriad of notes that George Kotsopoulos, himself,

5   had written to his father, I believe, basically supporting

6   his father, indicating that his father was innocent and

7   that he knows that his father didn't committed this crime.

8           Is that a fair characterization of this myriad

9   of notes?

10  A.   There were about a half a dozen.

11  Q.   Okay.

12  A.   Yes.

13  Q.   All of them inconsistent with what George Kotsopoulos

14  testified to at trial.

15  A.   That is correct.

16  Q.   And Mr. Evseroff used every single one of those notes

17  written by George Kotsopoulos to cross-examine the boy

18  with at trial.

19  A.   Yes.

20  Q.   Even cross-examined him about the fact that George

21  had previously told his own investigator as well as

22  himself, Mr. Evseroff, that an intruder and not the

23  defendant had committed this crime.

24  A.   That's right.

25  Q.   All of his cross-examination was inconsistent with

Sarikas - for the Petitioner - Cross/Mr. Walsh

208

1   George's trial testimony.  Correct?

2   A.   That is correct.

3   Q.   In fact, going beyond that, Mr. Evseroff was even

4   able to suggest, through his cross-examination of George,

5   that George had actually been manipulated by his Aunt

6   June, I believe it was?

7   A.   June Crilly.

8   Q.   And June Crilly was, if I'm not mistaken, Carol

9   Kotsopoulos's sister?

10  A.   That's right.  I'm sorry.  Ask the question again.

11  Q.   Mr. Evseroff suggested, through his cross-examination

12  of George, that his testimony was actually manipulated or

13  had been manipulated by his Aunt June, who was Carol

14  Kotsopoulos' sister?

15  A.   Yes.

16  Q.   Who George had been living with upstate before the

17  trial had commenced.

18  A.   Yes.

19  Q.   Mr. Evseroff was able to bring out the fact that June

20  Crilly, the aunt of George, didn't like the defendant.

21  Correct?  That there was bad blood between them?

22  A.   Through which witness?

23  Q.   Through George.

24  A.   I don't recall that.

25  Q.   Okay.  He certainly suggests through George that

Sarikas - for the Petitioner - Cross/Mr. Walsh

209

1  because of the many, many visits that Detective O'Leary

2  and Mr. Schroeder, back here, had made to George

3  throughout the pendency of the case, that George's

4  testimony had been manipulated by either Detective O'Leary

5  or Mr. Schroeder.

6  A.    I believe that suggestion was made.  Yes.

7  Q.    There was, I think as we agreed, an aggressive

8  cross-examination of this boy.  Correct?

9  A.    It was quite aggressive.  Yes.

10 Q.    And it was done by somebody who -- and I think you

11 used the term -- was a legend?

12 A.    He was a master of cross-examination.  A master.

13 Q.    An outstanding, skilled, experienced trial lawyer.

14 A.    Yes, indeed.  That was what I believed him to be at

15 the time.

16        MR. WALSH:  May I just have one minute, please,

17 your Honor?  I just want to review something.

18        THE COURT:  Surely.

19        MR. WALSH:  Thank you.

20 BY MR. WALSH:

21 Q.    Mr. Sarikas, I just want to go back to a point in

22 time where you say that discussions were had regarding

23 potential lesser-included offenses being submitted to the

24 jury.

25        You had a disagreement -- let me withdraw that.

Sarikas - for the Petitioner - Cross/Mr. Walsh

210

1          You testified that Jack Evseroff was opposed to

2     any lesser-included offenses being submitted to the jury.

3     Correct?

4     A.    He was.  That's correct.

5     Q.    You felt otherwise?

6     A.    That is correct.

7     Q.    And you talked about a meeting that you had during a

8     charge conference with Judge Belfi.  I assume

9     Mr. Schroeder was there as well?

10    A.    Yes, he was.  Mr. Schroeder was there before I

11    entered the room.

12    Q.    And you said that Judge Belfi expressed to you

13    surprise that the defense was not asking for a

14    lesser-included offense.

15    A.    Yes, he did.

16    Q.    And felt that you might have done differently?  Or

17    wanted something different?

18    A.    I would have done it different, and I told that to

19    the judge.

20    Q.    Did you ever go to the defendant or his family prior

21    to the submission of the case to the jury and say to them:

22    In my opinion, in my legal opinion, I think we should go

23    for a lesser-included offense?

24    A.    Yes, I did.

25    Q.    You did?

211

1    A.    I did.

2    Q.    When did you do that, please?

3    A.    To the parents on Greek Easter Sunday, literally one

4    year and one day after the murder.  On Greek Easter Sunday

5    in the year 2000 -- no, it doesn't appear in my affidavit.

6    Q.    Don't assume what I'm doing.

7    A.    I'm sorry, but you asked me a question and I would --

8    would you like me to finish it?

9    Q.    Sure.

10   A.    The first people that I spoke to were the mother and

11   the father.  I explained to them that the case was going

12   very, very, very badly.  That it would be prudent to

13   change our direction in the case.

14          And the fact of the matter is that they, to use

15   the phrase, they shot me down.

16   Q.    You had already indicated when I picked this up that

17   that is not in your affidavit, what you just testified to.

18   A.    I was guessing.

19   Q.    Is that correct?

20   A.    That is correct.

21   Q.    But what is in your affidavit is that at some point

22   in time when you spoke to Jack Evseroff he told you that

23   if you say anything else or if you say anything to anybody

24   else about what you had said to him you are off the case.

25   A.    Yes.

Sarikas - for the Petitioner - Cross/Mr. Walsh

212

1      That was April 26, Saturday, at about 7:20 in

2   the morning, when I called him from my home to his home

3   phone.  And we were on the phone for a good half hour.

4   Q.   And you say in your affidavit that the tone of his

5   voice made it had clear that he was very serious?

6   A.   Oh, yes.

7   Q.   Right?  And that, since he was lead counsel, that you

8   did as you were told?

9   A.   That is correct.

10  Q.   Despite the fact that what I just asked you about is

11  not in your affidavit, you are claiming now that you went

12  to the family and spoke to them about the fact that you

13  believed that lesser-included offenses should be charged

14  to the jury?

15  A.   Yes, I did.  Yes, I did.

16  Q.   Despite the fact that you say in your affidavit that

17  you did as you were told?

18  A.   Initially, I did as I was told.  Is there a word

19  there or am I mistaken?

20  Q.   Yes, I believe there is.

21  A.   Why did you leave that out?

22  Q.   Why don't you let me ask the questions, Mr. Sarikas?

23  Okay?

24  A.   That's right.

25  Q.   After you spoke with the family and told them what

Sarikas - for the Petitioner - Cross/Mr. Walsh

213

1    your opinion was about lesser-included offenses, did you

2    go back to Judge Belfi and indicate to the judge that you

3    wanted lesser-included offenses submitted to the jury?

4    A.   I believe in the judge's chambers, when Frank was

5    there, I told the judge what I would do and that I would

6    have gone with the lesser-included offenses.

7            And if I recall correctly, and it's been a while

8    now, I kind of summarized as to why thought

9    lesser-included offenses would have worked.

10           And I remember Judge Belfi, may God rest his

11   soul, said to me: *You know, Tom?  That may have worked.*

12   I remember that phrase.

13   Q.   Did you confront Mr. Everoff with the fact that you

14   wanted lesser-included offenses to be submitted?

15   A.   I told Jack that it would be a good idea to have

16   lesser-included offenses and why.  And he told me

17   absolutely not.  No lesser included offenses.

18   Q.   Did you tell him that you had gone to the family?

19   A.   No, I did not.

20   Q.   Without him present?

21   A.   No, I did not.

22   Q.   And tell the family that lesser-included offenses

23   should be submitted?

24   A.   I didn't tell that to Jack Everoff.  No.

25   Q.   By the way, when you claim that Mr. Everoff told you

Sarikas - for the Petitioner - Cross/Mr. Walsh

214

1   to basically keep quiet or you were off the case, what

2   authority did Jack Evseroff have to kick you off the case?

3   A.    Jack had tremendous power and sway over the

4   Kotsopoulos family.  They viewed him as a kind of God.

5   That is one of the reasons that I was, to use that phrase

6   once again, shot down when I told them what was going on

7   and what I thought should be the direction that the case

8   takes.  Because they are not going to listen to little old

9   me; they are going to listen to Jack Evseroff, who they

10  paid a great deal of money to.

11  Q.    They hired little old you to represent them.  Right?

12  A.    They hired me to represent them in the family court

13  case, and then at Jack's request they hired me to act as a

14  kind of liaison between them and Jack and to assist Jack.

15  Q.    And they paid little old you about $25,000 to

16  represent them?

17  A.    Actually, it was less.  It was 23,000 I got paid,

18  both for the family case and for the trial.  And I worked

19  on that case for several months.  I did everything, all

20  the written material except the omnibus motion.  And made

21  $23,000.  Yes, I did.

22  Q.    You, again, were hired by the Kotsopoulos family, not

23  by Mr. Evseroff.  Correct?

24  A.    Yes, I was.

25  Q.    I'm going to ask you the same question I just asked

215

1   you a few minutes ago and I ask you to please answer my

2   question.

3          What authority did Jack Evseroff have to kick

4   you off the case?

5   A.   Authority, none.  Power, yes.

6   Q.   So the answer to my question is none.  Correct?

7   A.   You know something?  I don't know.  The bottom line

8   is, I really don't know what he could have done.

9   Q.   Regarding your what you claim to be this conversation

10  that was had with Judge Belfi in his chambers, none of

11  that was on the record, I take it.

12  A.   No, it wasn't.

13  Q.   Is there anything, Mr. Sarikas, on the record where

14  you request the submission to the jury of lesser-included

15  offenses?

16  A.   No, there isn't.

17          THE COURT:  How much more do you have?

18          MR. WALSH:  I'm almost done, your Honor.

19          As a matter of fact, I may be done.

20          There is just one more area I want to get into,

21  judge.  I should have about ten more minutes.

22  BY MR. WALSH:

23  Q.   I want to ask you about something you testified about

24  this morning, and it is when you testified about your

25  belief that the evidence would have supported the

Sarikas - for the Petitioner - Cross/Mr. Walsh

216

1    submission of a lesser-included offense to the jury.

2    A.    That is correct.  Yes.

3    Q.    I believe, in support of what you claim would have

4    been a reasonable view of the evidence to support that

5    charge, you had indicated that based upon the defendant's

6    reaction after the shooting, that you could have argued

7    that the shooting was accidental and not intentional.

8    Correct?

9    A.    Yes.

10   Q.    And that would have been, you believe the defendant's

11   reaction to the shooting would have formed the basis of

12   the court submitting a lesser-included offense to the

13   jury.

14   A.    The reaction, coupled with a couple of other items.

15   Q.    Now, you spoke about the defendant's reaction after

16   the shooting.

17          I want to ask you about what the defendant did

18   before the shooting.  Okay?

19   A.    Yes.

20   Q.    And you already testified to some of this, but the

21   defendant, before the shooting, argued with his wife.

22   Correct?

23   A.    Yes.

24   Q.    In the kitchen?

25   A.    Correct.

Sarikas - for the Petitioner - Cross/Mr. Walsh

217

1   Q.   After arguing with his wife -- and I think even

2   hitting her during that argument?

3   A.   I'm trying to recall.

4        I think the testimony of the son was that at

5   first he punched her and then he went up and got the gun.

6   Q.   So after arguing with Carol Kotsopoulos and punching

7   Carol Kotsopoulos, the defendant leaves the kitchen and

8   goes upstairs to his bedroom.  Right?

9   A.   Yes.

10  Q.   Goes underneath the bed once he gets to his bedroom.

11  Correct?

12  A.   Yes.

13  Q.   Opened a box that had been kept underneath the bed

14  with a gun in it.  Right?

15  A.   Yes.

16  Q.   Took the gun out of the box.  Brought the gun

17  downstairs.  And back into the kitchen.  Correct?

18  A.   That was George's testimony.

19  Q.   So the defendant, prior to the shooting, went up to

20  his bedroom to specifically retrieve a gun to bring back

21  down to the kitchen.  Correct?

22  A.   That was George's testimony.

23  Q.   He didn't go upstairs to get a bat or a club or any

24  other kind of weapon?

25  A.   There was no testimony otherwise.

Sarikas - for the Petitioner - Cross/Mr. Walsh

218

1    Q.    He went upstairs to get a gun.

2          And, Mr. Sarikas, this may be obvious, but what

3    are guns used for?

4    A.    To shoot people.

5    Q.    That is what they are designed to do.  Correct?

6    A.    Usually, yes.

7    Q.    And that is what this defendant went upstairs to do,

8    to get a gun?

9    A.    A gun can also scare someone.  Just the showing of a

10   gun is an extremely intimidating thing.

11         Are they designed to shoot?  Yes.

12   Q.    He got back down to the kitchen, and the first thing

13   he did, according to George, was to hit his mother over

14   the head with the gun.  Basically, to pistol-whip her?

15   A.    Yes.

16   Q.    All right.

17   A.    Yes.

18   Q.    She goes outside to the porch.  Comes back inside.

19   A.    Yes.

20   Q.    Is that correct?

21   A.    Yes.  Yes.

22         She's bleeding through the nose at that point I

23   believe.

24   Q.    Now, I asked you what the defendant went upstairs to

25   retrieve.

Sarikas - for the Petitioner - Cross/Mr. Walsh

219

1          In order to hit Carol Kotsopoulos or scare her,

2     he didn't grab a utensil from the kitchen, a rolling pin

3     or anything like that, to use to assault his wife, did he?

4     A.    No, he did not.

5     Q.    So he goes upstairs, gets the gun, brings it

6     downstairs.  Hits his wife in the head with it.  She goes

7     outside and then comes back in the kitchen.  Correct?

8     A.    Correct.

9     Q.    And then, after she comes back into the kitchen,

10    according to George, the defendant takes the gun that he

11    had retrieved from his bedroom in the box, and points it

12    at his wife.  Right?

13    A.    I believe so.

14    Q.    Pointed it at her head.  Her face.  Correct?

15    A.    I would have to presume that by virtue of where the

16    bullet struck.

17          The answer is yes.

18    Q.    He would have to have pointed it at her face.  Right?

19    A.    Yes.

20    Q.    And, as George Kotsopoulos testified, he took the gun

21    that he had gone upstairs to retrieve and shot her in the

22    face with it.

23    A.    Yes.

24    Q.    Those were the defendant's actions prior to and

25    leading up to and during the shooting of Carol

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

220

1   Kotsopoulos.

2   A.    Yes.

3   Q.    Correct?

4   A.    Yes.

5            MR. WALSH:  All right, Mr. Sarikas.  Thank you.

6            THE WITNESS:  Thank you.

7            THE COURT:  We're going to take a 15-minute

8   recess.

9            (Recess taken from 11:20 am until 11:40 a.m.)

10

11   REDIRECT EXAMINATION

12   BY MR. KARTAGENER:

13   Q.    Mr. Sarikas, on cross-examination you were asked

14   repeatedly whether you took action independent of

15   Mr. Evseroff with respect to this issue concerning

16   lesser-included offenses.

17   A.    Yes, I was.

18   Q.    What was your role with respect to Mr. Evseroff in

19   the Kotsopoulos case?

20            Were you equal cocounsel or was there a chief

21   counsel in the case or chief trial counsel?

22   A.    Mr. Evseroff was chief counsel.  He was, perhaps to

23   borrow a phrase, he was the captain of the ship, not I.

24   Q.    And what was your role?

25   A.    My role was to do what Mr. Evseroff asked me to do:

221

1  To do some research, to prepare a memo, to do a brief, to

2  do a motion to set aside the verdict, to read through

3  discovery material, to collate that material, to ferret

4  out areas of cross-examination.  Those things.

5  Q.   You heard on cross-examination many questions about

6  whether you took any action in the years following the

7  verdict between 2003 and 2006; whether you took any action

8  with respect to this issue of ineffective assistance of

9  counsel based upon a contingency fee and no

10  lesser-included offenses.

11       Did you shortly after the verdict and sentence

12  in this case try to take action to assist Mr. Kotsopoulos

13  in dealing with this issue that you now saw was in the

14  case?

15  A.   Yes, I did.

16  Q.   What did you do?

17       Did you have a conversation with anybody about

18  that specific issue?

19  A.   Yes.

20  Q.   Who was that person?

21  A.   You.

22  Q.   How long after the conviction did you have that

23  conversation with me?

24  A.   A matter of a couple of days.

25  Q.   And in that conversation did you disclose entirely

222

1   the conversations about $100,000 and about the additional

2   $400,000 in cash?

3        Did you tell me about those things?

4   A.   Yes, I did.

5   Q.   And did you tell me about the threats that

6   Mr. Evseroff made to you after you called him on that

7   Saturday morning after George's testimony and talked about

8   pursuing a different strategy?

9   A.   Yes, I did.

10   Q.   Now, you say you came to me.

11        Did we have, prior to the Kotsopoulos case did

12   you and I have any type of professional relationship in

13   the past?

14   A.   Yes.

15        When I was serving in The Bronx District

16   Attorneys office in the appeals bureau, you were my bureau

17   chief.  You taught me how to research cases and how to

18   write briefs and how to argue briefs.

19   Q.   And have we, prior to -- subsequent to your being an

20   assistant district attorney under my supervision but prior

21   to Kotsopoulos' trial, did we do any business together in

22   a professional sense after I had left the office?

23   A.   I don't believe so.

24   Q.   So after years of being out of the district attorneys

25   office, you came to me and told me there was a difficult

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

223

1    problem in a particular case.

2                Is that fair to say?

3    A.    That is correct.

4    Q.    And that was the Kotsopoulos case.  Right?

5    A.    That is correct.

6    Q.    Now, as a result of your behind-the-scenes

7    intervention, did the Kotsopoulos family retain somebody

8    to handle the appeal and post-judgement issues concerning

9    Mr. Kotsopoulos?

10   A.    Yes.

11   Q.    Who was that?

12   A.    You and a Barry -- I forget his name.  He also passed

13   away.  I forget Barry.

14   Q.    Barry Falick?

15   A.    Barry Falick.

16   Q.    Let's see if we can get the timing correct.

17                You spoke to me, I think you said in your

18   testimony a few moments ago, shortly after the sentence.

19   Correct?

20   A.    Correct.

21   Q.    And then subsequent to that I was retained by the

22   Kotsopoulos family.  Correct?

23   A.    That is correct.

24   Q.    Would it be fair to say that there passed a

25   substantial, a period of time, and then family brought in

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

224

1  an additional counsel, Mr. Falick, Barry Falick?

2  A.   Yes.   That's exactly what happened.

3  Q.   And he was brought in to be, as you understood it,

4  chief counsel in the appellate matter.   Is that correct?

5  A.   That is correct.

6  Q.   And subsequently, subsequently, did you learn whether

7  a 440 was brought first or the judgment appeal was brought

8  first with respect to Mr. Kotsopoulos?

9  A.   The first action that took place was a direct appeal.

10  And it was only after the end of the direct appeal that

11  the 440 was brought.

12  Q.   And do you have any awareness whether it was -- who

13  it was that decided that the judgment appeal should go

14  before the 440 motion?

15  A.   No.   I would have to guess.

16  Q.   I'm not asking you to guess.

17       Do you have any independent awareness as to

18  whether it was me or Mr. Falick and his firm that decided

19  to go with the judgment appeal before raising the

20  ineffectiveness issue on a 440?

21  A.   I have no knowledge.   No direct knowledge.

22  Q.   But is it your testimony that you were fully prepared

23  to lend assistance to any 440 any time right after the

24  sentencing of Mr. Kotsopoulos?

25  A.   Yes.

225

1    Q.    And so let's see if I can get this right.

2          You came to me, according to your testimony, and

3    had a conversation with me about what Jack had done to

4    Mr. Kotsopoulos' case, in your eyes, that was wrong.

5    Correct?

6    A.    That is correct.

7    Q.    But for three years you continued to do business with

8    Mr. Everoff after that.  Right?

9    A.    That's correct.

10   Q.    Yes?

11   A.    Yes.

12   Q.    Okay.  Let's be candid to the court and tell the

13   judge why you continued to work with Jack Everoff after

14   you had come to me confidentially and told me about this

15   problem in the Kotsopoulos case.

16   A.    There were a couple of reasons.

17         One is that on a personal level he was kind of

18   like a father to me.  I developed a personal relationship.

19   He is a very, very, very, very, very interesting

20   character.  Very likeable character.

21         And, frankly, he also gave my opportunities that

22   nobody else ever gave me.  He gave me an opportunity to

23   get out of doing 18(b) street crime cases, and do some

24   Medicaid fraud cases, and go to federal court.

25         So yes, he did give me some opportunities.  I

226

1   would be remiss in not saying that he did.

2           But I had a lot of affection for Jack despite

3   all of this, a lot of personal affection, and it is very

4   difficult to -- that affected unfortunately my rationale

5   for not running to the disciplinary committee.

6           Those are the reasons.

7   Q.   Did you also have, to some extent, a financial

8   incentive as well?

9   A.   Well, yes.

10          You know, I didn't work on cases for free.  I

11  made some money, not a lot of money, but I made some money

12  from working on those few opportunities that he did throw

13  my way.

14  Q.   But even though you liked Jack, as you have just

15  testified, you were prepared, whenever called upon to do

16  so, to execute an affidavit concerning the contingency fee

17  issue in the case.  Is that correct?

18  A.   Yes.  And I would have told him, I would have told

19  him as such: *Jack, I'm sorry, but I've got to do this.*

20  Q.   Did you have any control over whether that 440 was

21  going to be made the week after he was sentenced or three

22  years later?

23  A.   No, I did not.  I had no control over that.

24  Q.   The case was by then was in the hands of other

25  lawyers, me being one of them.  Is that correct?

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

227

1   A.   That is correct, sir.

2   Q.   Now, there was some reference to a letter that you

3   penned on July 27, 2006, to Mr. Evseroff.

4            May I approach the witness, your Honor?

5            THE COURT:  At any time.  Yes.

6            MR. KARTAGENER:  Thank you, judge.

7   BY MR. KARTAGENER:

8   Q.   I'm going to show you what has been marked for

9   identification as Plaintiff's Exhibit 2 and ask you if you

10  recognize this copy of a letter.

11  A.   Yes, I do.

12  Q.   Whose signature is at the bottom of that letter?

13  A.   That is my signature.

14  Q.   Is this a true and accurate and complete version of

15  the letter as you originally penned it?

16  A.   Yes.

17           MR. KARTAGENER:  Judge, I would like to offer

18  this document into evidence.

19           THE COURT:  Show it to counsel.

20           MR. KARTAGENER:  I will.  I obtained it from

21  counsel.

22           MR. WALSH:  I have seen it, your Honor.  I don't

23  have any objection.

24           THE COURT:  Plaintiff's Exhibit 2 in evidence.

25           (Plaintiff Exhibit 2 in evidence.)

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

228

1      THE COURT:  Now, it is a letter from Mr. Sarikas

2  to?

3      MR. KARTAGENER:  This is a letter from

4  Mr. Sarikas to Mr. Evseroff, dated July 27, 2006.

5  BY MR. KARTAGENER:

6  Q.   Now, you were asked about certain language in this

7  letter.  I'm going to ask you about a different sentence

8  in this letter.

9      In this letter you write to Mr. Evseroff:

10      *"Your insatiable thirst for money has, in my*

11  *opinion, profoundly hurt at least two of your clients, but*

12  *that is another story."*

13      To whom were you referring when you made

14  reference to at least two of his clients that he had

15  wronged?

16  A.   I was referring to Nicholas Kotsopoulos and to

17  Dr. Edward Levy.

18  Q.   Now, Mr. Walsh established on cross-examination that

19  George Kotsopoulos, I believe he was 13 years old at the

20  time; perhaps 12?

21  A.   I believe so.

22  Q.   That he provided, made statements in written form

23  that were inconsistent with the notion that his father was

24  guilty of this crime.  Correct?

25  A.   Correct.

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

229

1   Q.   And he also testified to the grand jury, I'm

2   referring to young George, in an exculpatory fashion.   Is

3   that correct?

4   A.   That's correct.

5   Q.   Did George, when confronted with this at trial by

6   Mr. Evseroff, give any explanation as to why he had

7   provided statements prior to trial that were supportive of

8   a claim of innocence by his father?

9   A.   Yes.

10  Q.   What happened?  And what did he tell the jury?

11  A.   He claimed that his cousin from Greece who had come

12  to America to be with his father's parents and whom

13  George, the witness, referred to, it was, the term he used

14  was big, big, big, really big George, or words to that

15  effect.  His cousin's name is also George.  Because at

16  meetings that, at supervised meetings that the Kotsopoulos

17  family had with George Kotsopoulos, the witness, at

18  upstate diners or restaurants, that big, big George, his

19  cousin, would follow him into the bathroom or would

20  indicate to him that he wanted to talk to him privately in

21  the bathroom.

22       And at those points in time he would, quite

23  literally with tears in his eyes, beg him to write out

24  statements to George's father saying:  *Dad, I miss you.*

25  *Dad, I know you're innocent.  Dad, I know that that man*

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

230

1    *dressed in black did it.*

2           The boy, the son of the defendant, did those

3    things at the request of his cousin who begged him to do

4    it.  And that was the young man's explanation at the time

5    of trial.

6    Q.   You made reference on cross-examination to a tape of

7    a telephone call that was in the prosecution's possession

8    at trial that concerns what was going on immediately after

9    the shooting of Mrs. Kotsopoulos and the calling of the

10   emergency services people.  Correct?

11   A.   Yes.

12   Q.   And what was the substance or what was contained on

13   that tape that you are making reference to?

14   A.   Well, besides the actual call to the 9-1-1, what

15   happened was that the phone was not hung up properly and

16   the tape continued, the 9-1-1 tape, the 9-1-1 tape

17   continued to run.

18           And in that tape, if one ever took the time to

19   listen to it carefully -- and to his credit,

20   Mr. Schroeder, the prosecutor, did listen to it carefully

21   and mentioned what I'm about to mention at the time of the

22   sentencing; but in the tape, you can hear, even with a

23   slight effort you can hear Nick Kotsopoulos instructing

24   his children with respect to the descriptions that they

25   ought to give regarding this intruder.

Sarikas - for the Petitioner - Redirect/Mr. Kartagener

231

1    Q.    This supposed intruder.  Correct?

2    A.    This supposed intruder.  Yes, sir.

3    Q.    Now I want to take you to one other issue.

4          As you understand it, under New York law, can,

5    as a matter under the law of New York, can inconsistent

6    defenses go to a jury?

7    A.    Yes.

8    Q.    There can be an argument to the jury in what is

9    referred to as an all-or-nothing defense.  Correct?

10   A.    Yes.

11   Q.    But there can also be a request for a lesser-included

12   offense to go to the jury so that the jury, if it chooses

13   to, can make a decision other than top count or nothing.

14   Correct?

15   A.    Absolutely.  It is done quite a lot.

16   Q.    And was it your belief that it should have been done

17   in this case?

18   A.    Yes.  At the crossroads that we were at, yes.

19         MR. KARTAGENER:  Excuse me for one second,

20   judge.  May I have just a moment?

21         THE COURT:  Sure.

22         MR. KARTAGENER:  Judge, I have no further

23   questions of Mr. Sarikas.

24         MR. WALSH:  Just a few, your Honor, please.

25         THE COURT:  Yes.

232

1

2  RECROSS-EXAMINATION

3  BY MR. WALSH:

4  Q.   Mr. Sarikas, just a few questions.

5           Mr. Kartagener read to you a portion of the

6  letter that you had written to Jack Evseroff on July 27,

7  2006, in which you say that in your opinion his actions,

8  or I will use your words:  *Insatiable thirst for money*

9  *has profoundly hurt at least two of his clients."*

10          That is what you said.  Is that correct?

11 A.   Yes, sir.

12 Q.   Yet, despite his profoundly hurting, as you indicate,

13 two of his clients, as you just told Mr. Kartagener, for

14 three years you continued to do business with Jack

15 Evseroff.

16 A.   That is correct.

17 Q.   You continued to maintain a friendship with Jack

18 Evseroff.  Correct?

19 A.   That is true.

20 Q.   And you continued, as you testified a few moment ago,

21 to benefit from your relationship with Jack Evseroff

22 financially.

23 A.   That is true.

24 Q.   All of that changed after July 27 of 2006.

25 A.   Yes, that is true.

Sarikas - for the Plaintiff - Recross/Mr. Walsh

233

1   Q.   Mr. Kartagener asked you if you were fully prepared

2   at any time, if asked, to participate in a 440 motion

3   claiming ineffective assistance of counsel against

4   Mr. Evseroff, and you told Mr. Kartagener that you were

5   fully prepared.  Correct?

6   A.   Yes.

7   Q.   And that I think you added that you would have even

8   gone to Jack Evseroff and told him: *Jack, I have to do*

9   *this.*  Right?

10  A.   Yes.

11  Q.   But the truth is that for three years you never went

12  to Jack Evseroff and told him: *Jack, I have to do this.*

13  A.   That is correct.

14  Q.   Just one other thing, Mr. Sarikas.

15          Am I correct that a conviction of this defendant

16  for any crime -- whether it be murder, manslaughter,

17  criminally negligent homicide -- would likely have

18  resulted in his deportation from this country?

19  A.   I would think, in view of the fact that he is not an

20  American citizen and it is a crime involving moral

21  turpitude, that is an aggravated felony for INS purposes,

22  that at the end, at the end of his incarceration he would,

23  in fact, be deported to the country from whence he came.

24          MR. WALSH:  Very good.  Thank you.

25          THE COURT:  Anything else?

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

234

1        MR. KARTAGENER:  No, your Honor.

2        THE COURT:  You may step down.

3        (The witness was excused.)

4        THE COURT:  Please call your next witness.

5        MR. KARTAGENER:  We call as our next witness the

6   petitioner Nikolaos Kotsopoulos, your Honor.

7

8   **NIKOLAOS KOTSOPOULOS**

9        called by the Petitioner, having been first duly

10       sworn/affirmed, was examined and testified as

11       follows:

12       THE COURT:  You may proceed.

13       MR. KARTAGENER:  Thank you, your Honor.

14

15   DIRECT EXAMINATION

16   BY MR. KARTAGENER:

17   Q.   For a moment I'm going to be repetitive of the judge.

18   I'm going to tell you Mr. Kotsopoulos to listen carefully,

19   to speak loudly, and slowly.  Okay?

20   A.   Okay.

21   Q.   Mr. Kotsopoulos, how old are you?

22   A.   47.

23   Q.   Of what country are you a citizen?

24   A.   Greece.

25   Q.   Are you here in the United States lawfully or

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

235

1    unlawfully?

2    A.    Say that again, please.

3    Q.    Do you have permission to be in the United States as

4    a Greek citizen?

5    A.    Yes.  With a green card.

6    Q.    You had a green card.  Is that what you just said?

7    A.    Yes.

8    Q.    I ask you to keep your voice up a little bit when you

9    answer.

10   A.    Okay.

11   Q.    Now, prior to being incarcerated, what did you do for

12   a living?

13   A.    I used to have a beef distribution.

14   Q.    And where did you distribute beef?  In what part of

15   New York?

16   A.    Five Burroughs.

17   Q.    Where did you live?

18   A.    Long Island.  Manhasset.

19   Q.    How long did you live in Manhasset?

20   A.    From 1993 we bought the house.

21   Q.    Who is we?

22   A.    With my wife.

23   Q.    Your wife's name?

24   A.    Carol.

25   Q.    Was she your first wife?

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

236

1   A.   Second.

2   Q.   To whom were you married before?

3   A.   Sally.

4   Q.   A woman by the name of Sally?

5   A.   Yes.

6   Q.   Did there come a time when you were no longer

7   married?

8   A.   Yes.  After.

9   Q.   Was there a divorce or something?

10  A.   Yes, sir.  After short period of time, we divorced.

11  Q.   So there was a divorce between you and Sally?

12  A.   Yes.

13  Q.   When, in what year, did you marry Carol Kotsopoulos?

14  A.   1986.

15  Q.   I neglected to ask something I meant to ask you at

16  the very beginning, by the way, so forgive me.

17          How far, Mr. Kotsopoulos, did you go in your

18  schooling?

19  A.   I finished high school.

20  Q.   Where did you do that?

21  A.   In Greece.  You know, I don't complete the high

22  school.  Two years before the high school, you know.

23  Q.   You have two years of high school?

24  A.   No.  Two years before finished, so I went four years.

25  Q.   And where was that?

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

237

1   A.   That's in Greece.

2   Q.   In what city or town in Greece?

3   A.   Athens.

4   Q.   Please tell me, in what year did you come to the

5   United States?

6   A.   1980.  The beginning of '80.

7   Q.   Now, you say there was a time when you married Carol

8   Kotsopoulos.  She was your wife.  Correct?

9   A.   Yes.

10  Q.   And did you have children with her?

11  A.   Yes.

12  Q.   How many children?

13  A.   Two boys.

14  Q.   Their names?

15  A.   George and Nicholas.

16  Q.   Back in May of 2002, how old were they?

17  A.   10 and 12.  George was 12 and Nicholas was 10.

18  Q.   Now, I'm going to direct your attention to May 4,

19  2002.

20        On that date did you kill your wife?

21  A.   Yes, I did.

22  Q.   Did you want to kill her on that date?

23  A.   No.

24  Q.   Did you intend to kill her on that date?

25  A.   No.

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

238

1    Q.    What happened?

2          And please go slowly and explain to the judge in

3    your words what occurred on that date.

4    A.    I was outside working.  It was Saturday.  And I came.

5    Q.    Let me interrupt you one second.  It was Saturday,

6    you say?

7    A.    Yes.

8    Q.    Was there any religion significance to that time of

9    the year?

10   A.    It is the day before Easter, Greek Easter.

11   Q.    Okay.

12   A.    So, you know, a lot of preparation, food and, you

13   know, special made food at this day.

14          So I came home and nobody was home.  After a

15   little while, my wife came with the kids.

16   Q.    Before you go further, you said something about

17   preparation of food.

18          Who was supposed to be preparing the food for

19   the Greek Easter?

20   A.    My wife.

21   Q.    Okay.  What did you find when you got home that

22   evening or afternoon, the day before the Greek Easter?

23   A.    Yes.  Nobody was home.  I just came and, you know, I

24   started watching TV and my wife came with the kids.

25   Nothing was, you know, being prepared.  And I wanted, you

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

239

1    know, I say:  What's happening?  How you doing?  And we

2    talking, but --

3    Q.   Well, stop for one moment.  I'm going to interrupt

4    you again.

5          When you say that she was not there preparing

6    the food for people that would perhaps be coming over --

7    A.   Yes.

8    Q.   -- did that put you into any kind of mood?

9          Were you happy?  Sad?

10   A.   Yes, I was kind of, you know, upset a little bit.  I

11   was upset.

12   Q.   A little bit or a lot?

13   A.   I was upset.

14   Q.   Okay.  So then what happened?

15   A.   You know, she came, you know, with the kids.  I went

16   over there, you know, we started talking, and, but, just,

17   you know, smelled, you know, she was drinking.

18   Q.   I know.  Go slowly please and speak slowly and

19   loudly.

20          What did you smell?

21   A.   She was drinking.  She was smell alcohol.

22   Q.   So you smelled alcohol --

23   A.   Yes.

24   Q.   -- on her breath.  Is that what you are saying?

25   A.   Yes.

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

240

1    So this upset me too.  And we started arguing.

2    Because, you know, it was the holiday.  You know, it was

3    nothing to be prepared.  We expecting some people to come

4    on the night and, you know, it was, she was drunk too.

5    So this upset me and we started arguing.  And

6    after that we keep arguing and arguing.

7    And I went upstairs, I take the gun and, you

8    know, I tried to scare her.  I trying to, you know, I wave

9    the gun, you know, in her face and then.

10   Q.   Had you ever done this in the past?

11   Had you ever waved a gun in your wife's face in

12   the past to scare her?

13   A.   Yes.  Just -- yes.  You know, something -- yes, I did

14   it.  I did it.

15   Q.   Had you ever prior to this date hit your wife?

16   A.   Yes.

17   Q.   Did she ever hit you?

18   A.   Yes.  We have a, you know.

19   Q.   So you would get into it with her sometimes

20   physically.  Is that what you are saying?

21   A.   Both of us.  Yes.  Correct.  Yes.

22   Q.   But on this date you say you went upstairs and got

23   your gun.

24   A.   Yes.

25   Q.   What happened next?

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

241

1    A.   We started arguing.  And I take the bullets out of

2    the, on the table, on the little table by the kitchen, and

3    suddenly, you know, it went off.  Boom!

4             Just, you know, looked over the counter, over

5    the table, and I see my wife down.

6             I just run over there, you know.  I say:  Honey,

7    you all right?  You know.  And I started seeing her

8    bleeding.

9             I went right away to call 9-1-1.

10   Q.   Now, you were trying to scare her with the weapon on

11   that day.  Right?

12   A.   Yes.  Yes.  That's why I bring him out --

13   Q.   You pointed -- I'm sorry.  I thought you were

14   finished you.  Finish your statement.

15   A.   Yes.  That's why I bring him down.

16   Q.   So you admit you pointed --

17   A.   Yes.

18   Q.   -- at your wife the loaded firearm.  Correct?

19   A.   Yes.

20   Q.   And you then say what happened?  With the gun,, what

21   were you doing with the gun?

22   A.   I just sit it on the table, on the little table, and

23   I ejected the bullets out.

24   Q.   You said you ejected the bullets out.  Is that what I

25   heard you say?

242

1   A.    Yes, sir.  I ejected the bullets.  The time I ejected

2   the bullets, it went off accidentally.

3   Q.    Why did you eject the bullets?

4   A.    That's like a, I don't know, a nervous habit or

5   whatever, you know, that I'm taking, you know, I just, you

6   know, keep doing that, you know, taking the bullets out of

7   the gun.

8   Q.    So in the past, when you have had the gun in your

9   hand and you have been agitated, you have ejected the

10  bullets as a nervous gesture.

11          Is that what you just said?

12  A.    Yes.  Just, you know, taking the bullets out of the,

13  you know, out of the, you know, gun.

14  Q.    When you were taking the bullets out, what happened?

15  A.    And all of a sudden the gun went off.

16  Q.    Did you pull the trigger?

17  A.    No.  I don't know.  I don't know what happened.  The

18  gun went off.

19          I just looked in the gun, you know, the bullets

20  came out and the gun went off and, you know, I look over,

21  you know, I hear the boom, you know.

22  Q.    After the boom, what happened?  What did your wife

23  do?

24  A.    She dropped down.  And I, you know, I looked over the

25  table and I see that, you know, I see her down.  I left

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

243

1   the gun over there, I went around, and I grabbed her and

2   say, you know, I ask her if she's alive and I went to call

3   9-1-1.  I see her breathing.  I went to call 9-1-1.

4   Q.   Now, you have just been sitting here admitting that

5   you shot your wife.  Correct?

6   A.   Yes.

7   Q.   In the beginning, however, when this occurred, you

8   tried to cover that fact up, didn't you?

9   A.   Yes.

10  Q.   Why did you cover up the fact that you shot your

11  wife?

12  A.   I was -- I was scared.  I didn't want to go to jail.

13  Q.   You were afraid of going to prison.  Is that your

14  testimony?

15  A.   Yes.

16  Q.   Did you ask your son George to lie about what

17  happened?  To tell a lie to protect you?

18  A.   Yes.

19  Q.   And in the beginning did your son lie for you?

20  A.   Yes.

21  Q.   That eventually changed.  Correct?

22  A.   Yes.

23  Q.   There came a time when he decided to stop telling

24  lies for his father.  Is that correct?

25  A.   Yes.

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

244

1    Q.    When did that occur?

2    A.    That's on the testimony he tell at trial.

3    Q.    Was that the first time -- let me take you back a

4    step.

5          When was the first time that you admitted --

6    A.    Oh, I'll -- I thought we were talking about my son.

7    That's why you say that's before the trial.

8    Q.    Maybe I misled you a little bit.  Let's step back.

9    A.    I'm sorry.

10   Q.    Let's talk about your son.

11         You, I believe you testified that you asked your

12   son to lie for you.  Is that correct?

13   A.    Yes.

14   Q.    And he continued to lie for you for a period of time.

15   Correct?

16   A.    Yes, sir.

17   Q.    When did you learn for the first time that your son

18   was no longer willing to lie for you?

19   A.    At the trial.

20   Q.    He was called as the first witness at trial.  Is that

21   correct?

22   A.    Yes.

23   Q.    Did his presence at trial testifying against you

24   surprise you?

25   A.    Yes.

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

245

1    Q.    And did it surprise your lawyer, as best you know?

2    A.    Yes.

3    Q.    Now I want to talk about your lawyer.  Your lawyer,

4    who was your chief counsel -- let me withdraw the

5    question.

6          Who was your chief counsel at trial?

7    A.    Jack Evseroff.

8    Q.    Okay.  In the beginning of this case, did you have

9    conversations with Mr. Evseroff about what happened?  I'm

10   referring in the beginning of the case now.

11   A.    Yes.  On the beginning of the case I told him that it

12   was an intruder, you know, came in the house and did

13   whatever, you know, did.

14   Q.    So in the beginning of the case you lied to

15   Mr. Evseroff, too.  Is that what you are telling us?

16   A.    Yes.

17   Q.    For how long a period of time did you keep up this

18   false story with Mr. Evseroff?

19   A.    Before about two-and-a-half, three weeks, you know,

20   before the trial I was kind of, you know --

21   Q.    Well, before we get to that, two-and-a-half, three

22   weeks before trial.  How long a period of time --

23   A.    It had been almost a year.

24   Q.    Let's makes it clear for the record.  When were

25   you -- when did the killing occur?  Do you recall the

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

246

1   date?

2   A.    May 4.

3   Q.    May 4 of 2002.  Correct?

4   A.    Yes.

5   Q.    About how long were you incarcerated after your

6   arrest and prior to trial?  About how long?

7   A.    Almost a year.  Almost a year.

8   Q.    Now, during that year did Mr. Evseroff come to visit

9   you in the Nassau County jail?

10  A.    Yes.

11  Q.    How frequently?

12  A.    It's once a week.  Maybe once every two weeks.

13  Q.    And you would discuss the case with him.  Is that

14  true?

15  A.    Yes.

16  Q.    Did he ever bring an investigator along with him?  A

17  private investigator?

18  A.    Yes.

19  Q.    Do you remember that man's name?

20  A.    Yes.  Higgins.

21  Q.    Higgins?

22  A.    Yes, I think so.

23  Q.    Did he bring Higgins to speak with you at the

24  beginning of your incarceration, in the middle, near the

25  end?

247

1          When did you first meet Mr. Higgins?

2    A.   The first two, the two first months of the, in the

3    beginning.

4    Q.   How frequently did you meet this Mr. Higgins in the

5    first month or two of your incarceration?

6    A.   Between the two months, probably came like five, six

7    times.

8    Q.   And he would be coming with Mr. Evseroff?

9    A.   Yes.

10   Q.   Did he ever come alone?

11   A.   No.

12   Q.   After that first two-month period, as best you can

13   recall, and let's just, we'll be a little flexible, the

14   first two or three months, let's say, after that did

15   Mr. Higgins come and visit you with Mr. Evseroff?

16   A.   No.  After the two months.

17   Q.   So for the next number of months before trial, you

18   would have regular meetings just with Mr. Evseroff.  Is

19   that what you are telling us?

20   A.   Yes.

21   Q.   And when you would talk about the case during those

22   many meetings, did you tell him the truth about what

23   happened or did you lie to him about what happened?

24   A.   I keep telling him about it was an intruder.

25   Q.   Okay.  Now, you have made reference a few minutes ago

248

1  to something happening about two or three weeks before the

2  commencement of trial.

3  A.    Yes.

4  Q.    What happened?

5  A.    Two or three weeks, you know, I was, I was getting

6  nervous because the trial is ready to start, you know, and

7  I, one day he came, Mr. Evseroff, and I told him:  Listen.

8  I got something to tell you, you know.  And I told him

9  exactly what happened.  I tell him, you know.

10  Q.    Go slowly.  Please slow down and speak clearly.

11  A.    I told him, you know, we have argument, you know, we

12  fight.  I'm trying to scare my wife with the gun, ejecting

13  the bullets on the table and, you know, it went off.

14  Boom!  And, you know, I did that, you know.  And I called

15  9-1-1.

16          And the only thing he tell me if I mention it to

17  anybody else.  You know.  He tell me, you know.  I tell

18  him no.

19          So he tell me, the way we started, that's -- his

20  exactly words; the way we started, the same way we going

21  to finish and we going to acquit the charges.  Just don't

22  mention that to anybody else.

23  Q.    So after you told him what you say is the truth, that

24  you were trying to scare your wife with the pistol, you

25  were ejecting the bullets, the gun went off, he told you,

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

249

1  after he learned that you hadn't told this to anyone else,

2  to stick with your original story.

3       Is that correct?

4  A.  Exactly his words.  The way we started, the same way

5  we going to finish it.  We're going to acquit everything.

6  Q.  Now, did there come a time before trial, shortly

7  before the trial started, when you learned that

8  Mr. Everoff wanted an additional $100,000 from you and

9  your family?

10 A.  Yes.  Yes.

11 Q.  How did you learn this and what did you learn?

12 A.  My family used to come to see me, so they tell me,

13 you know, the lawyer's asked for more money, $100,000,

14 because this is, was peanuts, you know, from the work what

15 he's did, you know, for the trial, the preparation for the

16 trial and everything.  And he, they have addition to give

17 him $100,000 more.

18 Q.  Did you have a conversation with your family?

19 A.  Yes.

20 Q.  Let me finish, please.

21      Did you have a conversation with your family in

22 which you discussed with them the deal that they made with

23 Mr. Everoff concerning the additional $100,000?

24 A.  Yes.  And Everoff too at the time, you know, before

25 the trial, he came and he's telling me, you know, I need

250

1    additional, you know, $100,000.

2    Q.   All right.  You had conversations with your family

3    about the additional 100,000.  Is that what you are

4    telling us?

5    A.   Yes.  And Evseroff.

6    Q.   And you had conversations with Mr. Evseroff?

7    A.   Yes.

8    Q.   Did your family tell you -- now we're just talking

9    about your family.  Did your family tell you what deal, if

10   any, they struck with Mr.  Evseroff concerning the

11   $100,000?

12   A.   Yes.  They was surprised because he takes about four,

13   $400,000, so they was surprised he's asking for additional

14   money.

15   Q.   And when you were surprised by this, or when they

16   were surprised by this, did they tell you whether or not

17   they made a deal with Mr. Evseroff about the $100,000?

18   A.   Yes.  They have to give him, you know, more money.

19   Q.   What was the deal, as you understood it?  Were they

20   going to give him the $100,000?

21             MR. CANTY:  I object.  He's asked the question

22   three times.  The witness has said that they were going to

23   give him the money.

24             THE COURT:  I'm going to let him pursue it.

25             Overruled.

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

251

1   BY MR. KARTAGENER:

2   Q.   As you understood what you were being told, what

3   conditions, what deal, if any, was being made concerning

4   the $100,000?

5   A.   The time, you know, going to acquit the charges and

6   everything and they going to take me outside like the way,

7   you know, he's saying, you know, I'm going to have to take

8   care, you know, I'm going to give him the $100,000.

9   Q.   So you're saying -- I heard you use the word

10  *acquitted* just now?

11  A.   Yes, sir.

12  Q.   That the $100,000 would be given to him if you were

13  acquitted?  Is that your understanding?

14  A.   Acquitted the charges.

15  Q.   What was your understanding, what was your family's

16  understanding, if he didn't acquitted you?  Would he be

17  getting the $100,000?

18  A.   No.

19  Q.   *No.*  Is that what you just said?

20  A.   No.  No.

21  Q.   Now, at trial you came to learn, as you have

22  testified -- I'm not sure you have testified to this

23  but -- let me step back.  Withdrawn.

24          At trial who was the first witness against you?

25  A.   My son.

Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener

252

1    Q.    Okay.  And I believe you said this came as a great

2    surprise to you.  Correct?

3    A.    Yes.

4    Q.    After he testified -- and that was on a Friday, I

5    believe.  Correct?

6    A.    Yes.

7    Q.    Did there come a time when you had a conversation

8    with Mr. Everoff about the fact that your son had

9    testified against you?

10   A.    Yes.

11   Q.    When did that conversation occur?

12   A.    I think it's Sunday.  It was the time, you know, he

13   came to see me.

14            It was devastating.  I told him, you know, I

15   mean, what's, what, how did after the testimony that what

16   my son did, it doesn't look too good.  I mean, you know,

17   what's the next move?  Can we do something to cop out on

18   something less included charges.

19   Q.    Could we do something to what?  To cop out?

20   A.    To cop out in a less included charges.

21   Q.    What did Mr. Everoff tell you when you suggested

22   that?

23   A.    Exactly, you know, basically the same.  Like the way

24   it started, to have a trust on him and, you know, the way

25   we started, you know, nothing to worry, trust him, and we

253

1   going to finish, you know, we going to acquit everything.

2   Like positive 100 percent he was.

3   Q.    I'm sorry.  Did you trust Mr. Everoff?

4   A.    Yes.  I don't have -- what choice I have?

5   Q.    There came a time in the trial when you testified.

6   Correct?

7   A.    Yes.

8   Q.    Did you tell the truth to the jury that you shot your

9   wife, or did you tell the story about the intruder?

10  A.    You know, I don't say the truth.  I was say the story

11  with the intruder.

12  Q.    You told them the story with the intruder?

13  A.    Yes.

14  Q.    And at whose direction, if anyone, did you tell

15  them -- did you tell them that story?

16  A.    Like the way I say I don't have a choice except

17  Mr. -- to listen to Mr. Everoff.  He was the head lawyer.

18  Q.    Did Mr. Everoff suggest that you testify and tell

19  that story?

20  A.    You know, that's the whole deal.  That's his idea.

21  The way we started is the same way we're going to finish

22  and we going acquit everything so.

23  Q.    And did you do as you were told?

24  A.    That's correct.

25  Q.    By the way, when you went to high school in Greece,

**Kotsopoulos - for the Petitioner - Direct/Mr. Kartagener**

254

1  you didn't earn a law degree, did you?

2  A.    No.

3  Q.    And you never got a law degree when you came to the

4  United States.  Right?

5  A.    No.

6  Q.    And here in the United States, English is a second

7  languages to you.  Right?

8  A.    Yes.

9  Q.    And in the United States you never went to court and

10  learned about our judicial system, did you?

11  A.    No.

12  Q.    So you had a lawyer by the name of Jack Evseroff.

13  Correct?

14  A.    Yes.

15  Q.    And your family had paid him $400,000, you said?

16  A.    Yes.

17  Q.    And he told you what to do about -- what you should

18  say when you testified.  Right?

19  A.    Yes.

20  Q.    Did you do as you were told?

21  A.    Yes.

22       MR. KARTAGENER:  I have no further questions of

23  Mr. Kotsopoulos, your Honor.

24       THE COURT:  Cross-examination.

25       MR. CANTY:  May I inquire, your Honor?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

255

1        THE COURT:  Yes.

2

3    CROSS-EXAMINATION

4    BY MR. CANTY:

5    Q.    Good afternoon, Mr. Kotsopoulos.

6    A.    Good afternoon.

7    Q.    You took an oath, about 26 minutes ago, to tell the

8    truth.

9            Do you remember that?

10   A.    Yes.

11   Q.    Judge Spatt asked you to raise your right hand and

12   tell the truth.

13   A.    Yes.

14   Q.    You understand what that means?

15   A.    Yes.

16   Q.    You understand that that means, when your lawyer asks

17   you questions or when I ask you questions or when the

18   judge asks you questions, you are obligated to answer

19   truthfully.

20   A.    Yes.

21   Q.    Okay.  That is not the first time you have taken an

22   oath, is it?

23   A.    No.

24   Q.    You took an oath in your, in the trial in the killing

25   of your wife.  Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

256

1    A.    Yes.

2    Q.    You swore an oath in that trial.

3    A.    Yes.

4    Q.    And again, I know you didn't go to school here in the

5    United States, but you understood that oath.  Correct?

6    A.    Yes.

7    Q.    You understood you had to tell the truth.

8    A.    Yes.

9    Q.    And you understood that you were on trial for murder.

10   Correct?

11   A.    Yes.

12   Q.    That your freedom hung in the balance at that trial.

13   Correct?

14   A.    Yes.

15   Q.    You understood that answers you gave at that trial

16   could either benefit you or hurt you.  Correct?

17   A.    Yes.

18   Q.    And you decided to give untruthful answers under oath

19   to benefit yourself.  Correct?

20   A.    Yes.

21   Q.    You lied.

22   A.    Yes.

23   Q.    And that wasn't the first time you have lied in your

24   life.  Correct?

25   A.    I lied on the trial.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

257

1   Q.    You lied a lot during the pendency of this trial.

2   Correct?

3   A.    Yes.

4   Q.    Let's talk about all the lies you told.  Let's start

5   with from the very beginning.

6            You lied about hitting your wife the day she

7   died.  Correct?

8   A.    Yes.

9   Q.    Let's be very clear.  Your wife died because a gun in

10  your hand shot her in the face.  Correct?

11  A.    Yes.

12  Q.    You lied about that.  Correct?

13  A.    Yes.

14  Q.    All right.  You lied about whether or not you abused

15  your wife.  Correct?

16  A.    Yes.

17  Q.    You told the jury at your trial I never struck my

18  wife, I never hit my wife.

19            You told them that, correct?

20  A.    Yes.

21  Q.    That was a lie?

22  A.    Yes.

23  Q.    You did that because you wanted the jury to believe

24  that somebody else shot your wife in the face.

25  A.    Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

258

1    Q.    Because you wanted to be acquitted.

2    A.    Yes.  And --

3    Q.    Okay.  And then you call 9-1-1.  Correct?

4    A.    Yes.

5    Q.    You pick up the phone after your wife has been shot

6    and you claim you loved your wife?

7    A.    Yes.

8    Q.    And you demonstrated this love by physically abusing

9    her?

10   A.    Yes.

11   Q.    Okay.  That's how you demonstrated your love to her?

12   Yes?

13   A.    Yes.

14   Q.    Okay.  Interesting relationship.

15         You were married to your wife from 1986 until

16   you shot her in the face in 2002.  Correct?

17   A.    Yes.

18   Q.    And during the time you were married to your wife,

19   she in fact left the home on a number of occasions because

20   you had physically abused her.  Correct?

21   A.    Yes.

22   Q.    And during the trial, when you were asked those

23   questions about the physical abuse, you said you knew

24   nothing about it.  She left to go to Colorado to live in a

25   battered women's shelter.  Do you know that?

259

1   A.   Yes.

2   Q.   But you told the jury in the trial you didn't know

3   that it was a battered women's shelter.  Right?

4   A.   Yes.

5   Q.   You lied about that.  Correct?

6   A.   Yes.

7   Q.   When she came back home, she went to a battered

8   women's shelter in Hempstead, New York.  Correct?

9   A.   Yes.

10  Q.   She went there because you were abusing her.

11  A.   Yes.

12  Q.   And you told the jury in your trial I didn't abuse

13  her; I didn't know why she went there.  Correct?

14  A.   Yes.

15  Q.   In fact you went through great pains to paint a

16  picture of a woman that was an alcoholic and unstable and

17  that was making up these allegations of abuse, to benefit

18  yourself.  Correct?

19  A.   Yes.

20  Q.   Now we turn back to May 4.

21       You were upset with your wife because she wasn't

22  performing her duties as a wife on Greek Easter Saturday.

23  Correct?

24  A.   Yes.  Preparation of the food.

25  Q.   Her responsibility as a wife to prepare that.

260

1   Correct?

2   A.   Yes.

3   Q.   And when she didn't prepare, you guys got into a

4   physical argument.  Right?

5   A.   Every year we do that preparation.  Yes.

6   Q.   Okay.  She's responsible for taking care of the

7   preparations?

8   A.   Right.

9   Q.   She didn't do it; you got mad?

10   A.   I was mad, yeah.  I was upset, yes.

11   Q.   But you said you were sort of upset?

12   A.   I was.

13   Q.   But you then admitted to striking her, right?

14        You physically abused her that day.  Correct?

15   A.   We are, we have arguments, we have arguments when

16   we're upset.

17   Q.   Sir, very simple.  You physically struck your wife

18   that Saturday before you shot her in the face.  right?

19   A.   Yes.

20   Q.   All right.  And the bruises that you heard about

21   during your trial, you heard testimony from a medical

22   examiner that she had bruises and she had a black eye on

23   her face.  Correct?

24   A.   Yes.

25   Q.   And those were caused by you.  Yes?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

261

1   A.   Yes.  Yes.

2   Q.   But you went through great pains to try to show that

3   an intruder did those things.  Correct?

4   A.   Yes.

5   Q.   All right.  Then you call 9-1-1.  Right?

6   A.   Yes.

7   Q.   And you say, and I quote:  *"Somebody shot somebody."*

8   Right?

9   A.   Yes.

10  Q.   That somebody was you, though.  You shot your wife.

11  A.   Yes.

12  Q.   And you said you called 9-1-1 right after you had

13  shot your wife in the face.  Correct?

14  A.   Yes.

15  Q.   It is fair to say that from the moment you saw that

16  your wife was shot in the face, your mind started creating

17  a story to protect yourself.

18  A.   Yes.

19  Q.   And that story had to include you lying to the police

20  and to your sons.

21  A.   Yes.

22  Q.   Do you love your children, sir?

23  A.   Yes.

24  Q.   You would do anything for them?

25  A.   Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

262

1   Q.   Yes?  Okay.  We'll get back to that later.

2              When did you first hear --

3              THE COURT:  Wait a minute.  Counsel, do you want

4   to come up please to the sidebar.

5              (Discussion ensued at sidebar as follows.)

6              THE COURT:  I assume you are waiving the

7   appearance of your client at this sidebar.

8              MR. KARTAGENER:  Yes, your Honor, we are waiving

9   the appearance of our client at this time.

10             THE COURT:  What is the time element?

11  Unfortunately, I have a medical appointment this afternoon

12  which I should keep.  What's the situation now?  What

13  about the rest of your case?

14             MR. KARTAGENER:  This is it, judge.

15             THE COURT:  Okay.

16             MR. CANTY:  Judge, my responsibility in this

17  hearing is going to conclude with my cross-examination of

18  the defendant.

19             I'm actually on trial right now.  The judge I'm

20  on trial gave me today off, but I'm back for jury

21  selection tomorrow.  If we have to continue, I would ask

22  that we continue on a different day.  But may I just ask,

23  if you don't mind, what time were you thinking about

24  breaking today?

25             THE COURT:  Well, this is a cardiologist and his

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

263

1   office said to call first.  I had a 3:30 appointment, but

2   since he is always very busy, they allow me to call to see

3   if I can come later, which I'm going to do.  But it is

4   just the annual visit.  I can cancel it and postpone it,

5   if I have to.

6          MR. KARTAGENER:  Your Honor, a cardiologist I

7   think is important, judge.  That they let you come in

8   early shows they have a heart, pardon the pun.

9          I have no problems.  I was just going to say we

10  still have Everoff.

11         THE COURT:  I have time, for example, on Monday

12  to continue.  You'll be on trial, though.

13         MR. CANTY:  I should be able to finish today.

14         MR. WALSH:  Then we can call Mr. Evseroff and

15  have him available for whenever you want to continue.

16         THE COURT:  Monday?

17         MR. KARTAGENER:  Monday I think is a problem.

18         If we put it over for a week or so, it's not

19  going --

20         THE COURT:  I'll put it over to any time you

21  want.  Since I'm causing the delay, I will go out of my

22  way for you.

23         I can do it Monday.  We're picking a jury on

24  Monday, but I'm not selecting it, so I'm available on

25  Monday.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

264

1    MR. CANTY:  Let's see how far we get with this

2  witness.  If I conclude today, then I'll leave it up to

3  you.

4    MR. KARTAGENER:  I'm sorry.  I didn't hear.

5    What time would you be going to your

6  appointment, judge?

7    THE COURT:  I would have to leave somewhere

8  around quarter to 3 unless it is going to be later.  I can

9  probably leave between 3 and 3:30.

10    MR. KARTAGENER:  We can definitely finish him

11  today.

12    THE COURT:  We are definitely going to finish

13  him.  I'm going to stay to finish him if I have to be late

14  for this.

15    It is 12:30.  We're going to break until 1:30.

16    MR. CANTY:  I don't expect to be more than an

17  hour or so.

18    MR. WALSH:  Why don't we finish him up today and

19  then we'll come up another time.

20    THE COURT:  Any time you come up with, I'll be

21  available.

22    We will continue Monday at 9:30.  And we will

23  finish the case Monday.  Is that all right with everybody?

24    I appreciate it.  Thank you very much.

25    (Discussion at sidebar was concluded.)

265

1          THE COURT:  We're gong to recess for lunch until

2     1:15.

3          I want to thank whoever the officers are that

4     brought him.  Where are the officers that brought him?  I

5     appreciate it.  Thank you.  You did a very good job.  You

6     got him here almost exactly on time.  What time did you

7     start?

8          A SPECTATOR:  Six.

9          THE COURT:  Thank you very much.

10         (Lunch recess taken at 12:35 pm.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

266

```
 1              A F T E R N O O N   S E S S I O N

 2                          1:30 pm

 3

 4   NIKOLAOS KOTSOPOULOS

 5         called by the Petitioner, having been previously

 6         duly sworn/affirmed, continued testifying as

 7         follows:

 8              THE COURT:  You may proceed.

 9              MR. CANTY:  Thank you, Judge.

10

11   CROSS-EXAMINATION (Continued)

12   BY MR. CANTY:

13   Q.    Mr. Kotsopoulos, I want to talk to you about your

14   relationship with your two attorneys.  Okay?  Yes?

15   A.    Okay.

16   Q.    Again, I'm just going to ask you to speak loudly

17   enough so I can hear your answers.

18   A.    All right.

19   Q.    You had an attorney named Jack Evseroff.  Correct?

20   A.    Yes.

21   Q.    And you had an attorney named Anastasios Sarikas.

22   A.    Yes.

23   Q.    Mr. Sarikas was Greek.  Correct?

24   A.    Yes.

25   Q.    And you are Greek?
```

267

1   A.    Yes.

2   Q.    And during the pendency of your trial, you had the

3   opportunity to speak to Mr. Sarikas in Greek, because that

4   is your native tongue.  Correct?

5   A.    Yes.

6   Q.    And you felt a certain affinity towards him because

7   you were both natives of Greece.  Correct?

8   A.    Yes.  But I see more Mr. Evseroff instead of

9   Mr. Sarikas.

10  Q.    I'm not asking you who you saw more.  My question to

11  you is --

12  A.    Yes, sir.

13  Q.    -- you felt more comfortable talking to Mr. Sarikas

14  because he was Greek and you were Greek.

15  A.    Not really.

16  Q.    You didn't speak to him --

17  A.    I spoke to him in my language, but my head lawyer was

18  Mr. Evseroff.

19  Q.    Okay.  When you testified at your trial, you decided

20  to tell the jury the lies that you had created just

21  moments after shooting your wife in the face.  Correct?

22  A.    Yes.

23  Q.    And on direct you were asked whether or not you were

24  educated here in the United States, and you stated you

25  were educated in Greece.  Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

268

1    A.    Yes.

2    Q.    Graduated high school?

3    A.    Yes.

4    Q.    You understand what perjury is.  Correct?

5    A.    Yes.

6    Q.    Perjury is when you swear to tell the truth, you

7    raise your right hand, like the judge asked you to do this

8    morning, you answered yes that you will tell the truth,

9    and then you proceed to lies to a jury.

10            You understand that that's perjury?

11   A.    Yes.

12   Q.    And you are a pretty bright guy.  Correct?

13   A.    I hope so.

14   Q.    Well, let's talk a little bit about that.  You came

15   here with basically nothing in 1980.  Correct?

16   A.    Yes.

17   Q.    You worked hard.  Right?

18   A.    Yes.

19   Q.    You consider yourself a shrewd businessman.  Correct?

20   A.    I was in the right time in the right place I can see.

21   Q.    You've got street smarts.  Right?

22   A.    I can't say.  I don't know.  I don't know.

23   Q.    Well, you created, out of nothing you created a beef

24   distribution company through the five Burroughs of New

25   York City.  Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

269

1   A.   Yes.

2   Q.   You accumulated enough wealth to buy a house in one

3   of the most affluent communities in Nassau County, in

4   Manhasset.  Correct?

5   A.   Yes.

6   Q.   You were doing well for yourself?

7   A.   I guess so.  Yes.

8   Q.   I'm not asking you to guess.  You had a Mercedes.

9   Right?

10  A.   Yes.

11  Q.   You had a sport utility vehicle.  You had a house in

12  one of the nicest towns in Nassau County.  Correct?

13  A.   Yes.

14  Q.   So you were pretty good at what you did.  Right?

15  A.   I think so.

16  Q.   You knew how to manage money?

17  A.   I think so.

18  Q.   You think so or you know so?

19  A.   I'm not 100 percent.  I think I can handle it, you

20  know, I think so.

21  Q.   Well, you had accumulated a tremendous amount of

22  wealth.  Right?

23  A.   Okay.

24  Q.   You would agree with me that people measure success

25  in the business world through the amount of wealth that

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

270

1  they create and the amount of business they generate.

2  Right?

3  A.    Okay.

4  Q.    Yes?

5  A.    Yes.

6  Q.    And you had done that?

7  A.    Yes.

8  Q.    And you had done that by making strategic decisions

9  in the business world as to how you were going to run your

10  beef distribution company.  Right?

11  A.    Yes.

12  Q.    So again I'm going to ask you, you are pretty smart

13  at making difficult decisions.  Right?

14  A.    I can't call them smart.  If you, I'm in right time,

15  right place.  I can't call myself smart.

16  Q.    Sir, I'm trying to pay you a compliment here.

17  A.    No.  Thank you.  Thanks.

18  Q.    My point is, you made smart decisions in the business

19  world because you're a pretty bright guy.  Right?

20  A.    I can't call that.

21  Q.    Put it this way.  A stupid person wouldn't be able

22  the run the type of business that you ran in a beef

23  distribution arena.  Correct?

24          You would agree with that?

25  A.    Yes.  All right.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

271

1   Q.   Okay.  And in Greece you understand they have

2   similar, although their criminal justice system is a

3   little bit different, they have laws like perjury.

4   Correct?

5   A.   I'm not familiar.

6   Q.   Well, you can't walk in a court in Greece and then

7   tell a lie.  Right?

8   A.   I'm not familiar with the court system over there or,

9   you know, even over here.

10  Q.   You know here you can't do that.  Right?

11  A.   I'm not familiar with that.

12  Q.   I asked you before you know that when you take an

13  oath to tell the truth?

14  A.   Yes, it --

15  Q.   Go ahead.

16  A.   Go ahead.  You go ahead.

17  Q.   Explain to me what you think it means to take an

18  oath.  It means you have to tell the truth.  Right?

19  A.   Okay.

20  Q.   Yes?

21  A.   Yes.

22  Q.   And you knew that you were committing perjury when

23  you lied at your trial.  Right?

24  A.   Yes.

25  Q.   And it wasn't to benefit your son.  Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

272

1    A.    Yes.

2    Q.    It wasn't to benefit your wife.  Correct?

3    A.    Yes.

4    Q.    It was to benefit you?

5    A.    Yes.

6    Q.    You were looking out for A No. 1.  Correct?

7    Yourself?

8    A.    Yes.

9    Q.    Yes.  Now, I want you to walk me through May 4, 2002.

10         You stated that you got home to your house and

11   an argument started between you and your wife.  Correct?

12   A.    Yes.

13   Q.    What was that argument specifically about?

14   A.    Because for the preparation I was upset and because

15   she came, you know, with the kids driving and she was, you

16   know, drunk.

17   Q.    Okay.  So you believed that she was intoxicated and

18   she hadn't prepared the meal for the next day.  Right?

19   A.    Not only that, because she driving with the kids, you

20   know, and she was drunk.

21   Q.    And she was drunk.

22   A.    Yes.

23   Q.    Okay.  Now, an argument ensued between the two of

24   you, right?

25         Tell me about that.  Did you strike her?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

273

1    A.   Yes.

2    Q.   Where did you hit her on her body?

3    A.   I slapped, you know, I slapped her.

4    Q.   I don't know, so you tell me.

5    A.   Yes, I slapped her on the face.

6    Q.   You slapped her on the face?

7    A.   Yes.

8    Q.   Where else did you hit her?

9    A.   Nowhere else.

10   Q.   Just one time on the cheek?

11   A.   Yes.

12   Q.   Does the argument end at that point?

13   A.   No.

14   Q.   Or does it continue?

15   A.   No, it continues.

16   Q.   Did you hit her again?

17   A.   No.

18   Q.   That's the only time you hit her?

19   A.   Yes, that's the only time.  I went upstairs and I get

20   the gun to scare her.

21   Q.   All right.  So now the argument gets to the point

22   where you want to go get a weapon.  Right?

23   A.   Yes.  To scare her.

24   Q.   To scare her?

25   A.   Yes.

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

274

1   Q.    Did you think that the fact that you smacked her

2   across the face wasn't scaring her enough?

3   A.    No.

4   Q.    That wasn't effective, then.  You needed something a

5   little bit more than you smacking her across the face to

6   scare your wife?

7   A.    Yes.  I assume.  Yes, I think so.  Yes.

8   Q.    So that's why you decided to go get a gun.  Right?

9   A.    Yes.

10  Q.    You didn't use anything in the kitchen, did you?

11  A.    No.

12  Q.    You didn't pick up a plate?

13  A.    I don't have a -- how's can I say it?  To do

14  anything, you know, to continue to take anything to, to

15  just, except to scare her.

16  Q.    You wanted to scare her more?  Or did you believe

17  that she wasn't scared of you at that point?

18  A.    No, I don't want to take any, like the you say it,

19  anything from the kitchen.  I don't want to take anything

20  from the kitchen to do anything.  Just I want to scare her

21  to understand, you know, what we arguing for.

22  Q.    And what did you want her to understand?

23  A.    To don't drink and drive with the kids.  To, you

24  know, stop, you know, drinking.

25  Q.    Or else you would smack her in the face or threaten

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

275

1    her with a gun?

2    A.    To smack her, scare her, yes.

3    Q.    Now, you leave at that point.  You go upstairs.

4    Correct?

5    A.    Yes.

6    Q.    And at that point you go get a gun.  Right?

7    A.    Yes.

8    Q.    Where was the gun that you got?

9    A.    It's under the mattress.  Underneath the mattress.

10   Q.    It was underneath your mattress?

11   A.    Yes, sir.

12   Q.    So that when you testified at trial that somehow that

13   weapon must have come from somewhere else, you were

14   committing perjury.  Correct?

15   A.    Yes.  I was lying.

16   Q.    You were lying?

17   A.    Yes.

18   Q.    And you heard the testimony of your son George.

19   Correct?

20   A.    Yes.

21   Q.    And he testified that you went up and got a gun.

22   Right?

23   A.    Yes.

24   Q.    So obviously George was present when all this

25   occurred between you and your wife.  Right?

276

1    A.    Yes.

2    Q.    He was present when you smacked his mother in the

3    face?

4    A.    Yes.

5    Q.    Correct?  He was present when you went upstairs to go

6    get a gun?

7    A.    Yes.

8    Q.    And he was present when you came back to the kitchen

9    with a gun.  Right?

10   A.    Yes, sir.

11   Q.    So he saw the whole thing?

12   A.    Yes.

13   Q.    We can agree on that now.

14   A.    Yes.

15   Q.    So in front your 12-year-old child you struck your

16   wife.

17   A.    Yes.

18   Q.    Okay.  Now, you get back to the kitchen.  Tell me

19   what you do with the gun.

20   A.    Just wave, you know, in her face.

21   Q.    Show me.

22   A.    I wave her, wave the gun in her face.

23   Q.    Okay.  You just wave it like this.

24         And let the record reflect you're just waving

25   your hand a few feet in front of your body.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

277

1    A.    Yes.

2    Q.    That's all you did?

3    A.    Yes.

4    Q.    Now, did you say anything while you were you waving

5    the gun in her face?

6    A.    We just argue.  That's all.

7    Q.    Well, tell me what you said.  I mean, you're pointing

8    a weapons at your wife.  What did you say to her?

9    A.    I don't remember.

10   Q.    Did you curse at her?

11   A.    I don't remember.  I don't remember what I said.  But

12   we had an argument.  We argued.

13   Q.    Right.  But I just want to make sure we are clear on

14   how this argument is occurring.

15   A.    Yes.

16   Q.    You are calling it an argument, and what you

17   described to me is you pointed a loaded weapon at your

18   wife's face.

19   A.    Yes.

20   Q.    Okay.  So it's your testimony that she is now

21   engaging in further argument with you even though you have

22   now pointed a loaded weapon in her face?

23   A.    Yes.

24   Q.    So obviously the weapon wasn't enough to scare her.

25   Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

278

1   A.   Yes.  You know, after that I stop to waving the gun

2   and I went to the table, I sit down, and I trying to eject

3   the bullets.

4   Q.   Mr. Kotsopoulos, I want to back up because that is

5   not what you just testified to.  You said I was waving the

6   gun in her face and we continued to argue.

7   A.   Yes.

8   Q.   And I asked you if waving the gun was enough to get

9   her to stop arguing, and you said no.  Right?

10  A.   Yes.  We stopped for the minute.  We stopped for the

11  moment.

12  Q.   Isn't it a fact that at that point you took the gun,

13  the butt of the gun, and you smacked your wife in the face

14  with the gun?

15  A.   Yes.

16  Q.   Okay.  So when I asked you before if the only thing

17  you did to your wife was strike her in the face with your

18  hand, that wasn't the whole truth, was it?

19  A.   Yes.

20  Q.   You hit her in the face with the gun?

21  A.   Yes.

22  Q.   You forgot to tell us that before?

23  A.   Yes.  All right.  Yes.  What I went there anyway,

24  yes.

25  Q.   Okay.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

279

1   A.   And I stopped and I went to the table and I eject the

2   bullets.

3   Q.   We'll get to the table in a second.

4   A.   Okay.

5   Q.   Describe for the court how you took the butt of the

6   gun and you struck your wife in the face.  How did you do

7   that?

8   A.   How'd I do that?

9   Q.   Tell me how you did that.

10  A.   Just, you know, I, you know, I just hit her.

11  Q.   I don't know.  I wasn't there.

12  A.   All right.  I just hit her.

13  Q.   With what part of the gun, the handgun, did you

14  strike her in the face?

15           Was it the butt of the gun?

16  A.   No.  No.

17  Q.   Was it the barrel of the gun?

18  A.   The side.

19  Q.   So you take the gun as if pointing outward and you

20  smack her across the face?

21  A.   I didn't do it like that.  We just like that, and I,

22  you know, it was close.  We are close.

23  Q.   Okay.  That caused your wife to bleed.  Correct?

24  A.   Yes.  I think.

25  Q.   Well, let's get back to George because you said in

280

1  your direct and you said again on cross-examination that

2  George, one, decided he was going to finally tell the

3  truth, correct?  So we know that George told the truth at

4  trial.

5  A.   Yes.

6  Q.   And, two, you just testified a few minutes ago that

7  George was present when all this was occurring.  Right?

8  A.   Yes.

9  Q.   George testified that you took the gun and you

10  smacked your wife in the face to the point that she

11  started to bleed.

12        Do you recall that testimony?

13  A.   Yes.

14  Q.   So that in fact did occur?

15  A.   Yes.

16  Q.   So we can agree that you hit her hard enough to cause

17  her to bleed?

18  A.   Yes.  Somewhat.  I know that's the distance, yes.

19  Q.   Okay.  The way you described it you made it sound

20  like it's a light tap with the side of a loaded weapon.  I

21  want to ask you, you hit her hard enough to cause her to

22  bleed?

23  A.   Yes.

24  Q.   Okay.  So it was, you hit her with some serious

25  force.  Yes?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

281

1    A.    Yes.

2    Q.    Okay.  Now, at that point you claim, today you claim

3    your wife just sat down on the, by the island in the

4    kitchen.  Correct?

5    A.    Exactly.

6    Q.    So the argument had now stopped?

7    A.    Yes.

8    Q.    According to you?

9    A.    Yes.

10   Q.    You claim that although pointing the weapon at your

11   wife wasn't enough, the fact that you smacked her in the

12   face with it was enough at that point to get her to stop

13   arguing with you?

14   A.    After that we stopped.  You know, we just, you know,

15   we came down a little bit.

16   Q.    That's what you claim.

17   A.    That's what happened.  I was there and I know.  I

18   mean.

19   Q.    Well, sir, I'm trying to get a grasp on what happened

20   because this is about the fourth version you have told as

21   to what happened and some of those versions have been

22   under oath, correct?  Some of those other versions where

23   you lied, they have been under oath, correct?  About what

24   happened that day.

25   A.    Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

282

1   Q.   Okay.  So I want to make sure we get it straight.

2   You are telling me that's what happened?

3   A.   And that's what --

4   Q.   You said under oath at trial --

5   A.   That's actually what happened.

6   Q.   You said under oath at trial that it was an intruder?

7   A.   Yes.

8   Q.   And you said that under oath.

9   A.   Yes.

10  Q.   Now we agree that's perjury?

11  A.   Yes.

12  Q.   Right?  Lied there.  Now you claim you are telling

13  the truth.

14  A.   Yes.

15  Q.   Okay.  So now you walk over to the island and you

16  claim that you start taking the bullets out of the gun.

17  A.   Yes.

18  Q.   So we can agree that when you were pointing it at

19  your wife it was loaded?

20  A.   Yes.

21  Q.   And when you smacked her in the face it was loaded?

22  A.   Yes.

23  Q.   Describe to me how you took the bullets out of the

24  gun.

25  A.   Just come over here and I start taking them out.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

283

1    MR. CANTY:  Judge, may I interrupt for a second

2    to see what the witness is doing?

3    THE COURT:  Surely.

4    BY MR. CANTY:

5    Q.  Okay.

6    A.  Just pulling the thing back and, you know, the

7    bullets.

8    Q.  So when you are describing it, you have your hand

9    down on --

10   A.  No.  My hand's not down.  I'm holding the gun.

11   Q.  Your hand is on top of the gun?

12   A.  Yes.

13   Q.  And the gun is on the island?

14   A.  I'm holding the gun.

15   Q.  Right.  Close to the island?

16   A.  Yes.

17   Q.  And you are describing that you pull the gun back and

18   the bullets start ejecting?

19   A.  Yes.

20   Q.  Did any of them fall on the floor?

21   A.  I don't remember at the time.

22   Q.  You don't remember that.  But you remember that --

23   A.  I remember they went to the table.

24   Q.  Okay.

25   A.  They rolled down.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

284

1  Q.    You don't know.

2  A.    I don't remember.

3  Q.    And you thought this was a good opportunity now to

4  clear the weapon of its bullets.  Right?

5  A.    To do what?

6  Q.    You thought this was a good time, in front of your

7  son, let's start popping out bullets?

8  A.    I used to do that all the time.  Like, you know, how

9  can I call them?  Nervous tick or whatever you call it.

10  Q.    We'll talk about that in a second, what your nervous

11  habits are.  But what I want to find out is, you claim

12  today that as you are ejecting these bullets the gun goes

13  off and a bullet strikes your wife in the face.

14         Is it fair to say that the gun is being held

15  parallel to the island?  Correct?

16  A.    No.  It was like that.

17  Q.    Outward?

18  A.    Yes.

19  Q.    But if you moved it down a few inches, it would lie

20  flat on the island?

21  A.    Yes.  But it is not flat, so I'm not holding it flat.

22  I'm holding it like that.

23  Q.    Were you holding it up?  Were you holding it down?

24  A.    How my hand looks?  It looks like that or it looks

25  like that?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

285

1   Q.   It looks like, I would like the record to reflect

2   your hand is about two inches --

3   A.   If you are holding a gun, it is pointing this way.

4   Q.   Okay.  And your testimony is, from the level of the

5   island, a bullet is discharged from that gun and happens

6   to strike your wife right in the face.

7   A.   Yes.

8   Q.   Okay.  Now, your wife is quite a distance from you --

9   A.   No, it was not a distance.  It was, you know, a foot

10  from the table, from the island.

11  Q.   She was only a foot from you?

12  A.   Yes.

13  Q.   Well --

14  A.   No.  A foot from the island.

15  Q.   From the island?

16  A.   The island a little bit more wide from here, from

17  this one.

18  Q.   You heard testimony at trial that your wife's body

19  was found closer to the refrigerator --

20  A.   Yes.

21       If you look at my kitchen -- I know the kitchen,

22  I know, I build up the kitchen -- the island's here and

23  the refrigerator is over there.  And the body was there,

24  on the front of the refrigerator.

25  Q.   Okay.  You are in luck because I have a picture of

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

286

1    your refrigerator in your kitchen.

2    A.   Yes.  I know.  I build up the house.  You don't think

3    I know?  Look where the island and look where's the

4    refrigerator.

5            MR. CANTY:  Your Honor, I don't know what

6    exhibit we are up to.  I think we marked 3 for

7    identification on a previous date.  Is that correct?

8            THE COURT:  Well, no.  You are using letters.

9            MR. CANTY:  We have A, B, and C.  Three items.

10           THE COURT:  My unofficial list shows A and B.

11           MR. CANTY:  Okay.  I will defer to your

12   unofficial list, that is correct, so we'll mark this as C.

13   BY MR. CANTY:

14   Q.   Sir, I am going to show you what has been marked as

15   Defendant's Exhibit C.  I will first show it to defense

16   counsel.

17           THE COURT:  We will say for identification for

18   the time being because it is not in evidence.

19           MR. CANTY:  For identification.

20           Judge, I'm going to offer this into evidence.

21           THE COURT:  Any objection?

22           MR. KARTAGENER:  Your Honor, there is no

23   objection.

24           THE COURT:  All right.  Exhibit C.  Is that a

25   photograph?

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

287

1        MR. CANTY:  Correct, judge.  Thank you.

2        THE COURT:  In evidence.

3        (Defense Exhibit C in evidence.)

4    BY MR. CANTY:

5    Q.   Mr. Kotsopoulos, I'm presenting you Defendant's

6    Exhibit C.

7        It's your testimony that the island that is in

8    the bottom of this picture is only a foot from the

9    refrigerator?

10   A.   It's not -- it was -- listen.  The table is wide

11   enough to be, it was a foot after the table.  It was not a

12   foot after me, it was a foot after the table.  The foot is

13   like two-and-a-half, two-and-a-half feet island.

14   Q.   Okay.

15   A.   And a foot after that.

16       MR. CANTY:  I will mark this as Defendant's

17   Exhibit D.  The respondents.  They are marked as

18   Defendant's Exhibits, though.

19       THE COURT:  Any objection?

20       MR. KARTAGENER:  No, your Honor.

21       THE COURT:  Respondent D in evidence.

22       (Defense Exhibit D in evidence.)

23   BY MR. CANTY:

24   Q.   Thank you.  Sir, that blood spattering, correct, that

25   is where your wife, her body, was?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

288

1    A.    Yes.

2    Q.    It is your testimony?

3    A.    Yes.

4    Q.    We don't even see the island in this picture.

5    Correct?

6    A.    Yes.  The island is over here.

7    Q.    No.  We are looking at D, sir.  Show me where that

8    island is in that picture.

9    A.    Over here.

10   Q.    Would you agree with me that the distance between the

11   blood spattering and to the edge of this picture is more

12   than a foot?

13   A.    Yes.  It is more than a foot.

14   Q.    It's probably about four feet.  Right?

15   A.    Hold on a second.  It was, the table, one that

16   finished, it was standing up a foot from the table, from

17   the island.

18            After the boom, it fell back.  I hear the boom

19   and I look at him.  And I left the gun and I went around.

20   So it fell back.  So if somebody fell back, is going to go

21   another two or three feet back.

22   Q.    So you are saying your wife stumbled back?

23   A.    Yes.  It fell back like that.

24   Q.    You heard testimony at trial by a medical examiner

25   that said the shot was so close that it left stippling,

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

289

1    burning marks then on your wife's face.

2              Do you remember that testimony?

3    A.   I don't remember but -- I don't remember that.

4    Q.   I want to talk to you a little bit about, you stated

5    that you are responsible for your wife's death.  Correct?

6    A.   Yes.

7    Q.   Now, you understand what this hearing is here.

8    Correct?  What we are doing here?

9              When did you first find out -- I'm sorry.  I

10   need an answer.  If you can answer yes or no.  You can't

11   nod.

12   A.   Yes.

13   Q.   When did you first find out that a hearing was going

14   to be conducted to determine whether or not you may or may

15   not get a new trial?

16   A.   When I hear that?

17   Q.   Yes.

18   A.   I got a piece of paper, you know, letter from, in the

19   jail.

20   Q.   From a lawyer?

21   A.   I don't remember from my lawyer or from a federal

22   court.

23   Q.   Well, it's been explained to you that if your claim

24   was accurate you will get a new trial.  Right?

25   A.   Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

290

1    Q.    And you know that, also that you have to admit, in

2    order for that to be the case you would have to admit that

3    you accidentally shot your wife.  Right?

4    A.    No, I don't know that.

5    Q.    Well, I want to talk to you because from the very

6    beginning you had a claim that an intruder shot your wife.

7    Correct?

8    A.    Yes.

9    Q.    And then we talked about your relationship with Jack

10   Evseroff and you said Jack said we needed to go with the

11   intruder theory.

12         Do you remember that?

13   A.    Yes.

14   Q.    And Jack just told me, and then you testified at

15   trial and you said I just did what Jack Evseroff told me.

16   Correct?

17   A.    Yes.

18   Q.    Well, when you called 9-1-1 and you told them that an

19   intruder had shot your wife, Jack Evseroff wasn't with you

20   when you made that call, was he?

21   A.    No.

22   Q.    You came up with that idea?

23   A.    I say that.  I came with that idea.  Nobody else tell

24   me that.  I say that and I told them to Jack, you know,

25   what happened.  And he told me don't, just the way we

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

291

1   started, the same way we going to finish.

2   Q.   Sir, just answer my questions.  Okay?  Then a

3   detective from the Sixth Squad of the Nassau County Police

4   Department interviewed you and you tell him it was an

5   intruder?

6   A.   Yes.

7   Q.   And you went through great lengths to create this

8   story.  It wasn't simply it was an intruder.  Right?

9   A.   Yes.

10  Q.   You had details.

11  A.   I have what?

12  Q.   You had details.

13  A.   Yes.

14  Q.   I mean, is it fair to say that this lie that you

15  created was well thought out?  Right?

16  A.   Yes.

17  Q.   You thought it was good enough to go to trial with.

18  Right?

19  A.   As a matter of fact, no, because I admitted to

20  Mr. Evseroff three weeks before, two-and-a-half, three

21  weeks, I told him what happened.

22  Q.   Right.

23  A.   I told him exactly what happened.  He's tell me, you

24  know, forget about that.  Don't mention it to anybody.

25  Q.   That's what you say today.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

292

1   A.    That's what happened.

2   Q.    Okay.  Well, my question to you is, this wasn't a

3   situation where you decided to, you know, toughen up and

4   swallow it and let the trial go on with its theory.  You

5   took an active part in this trial, didn't you?

6   A.    Yes.  Exactly.

7   Q.    In fact, let's talk about George's testimony.

8         We talked about you claim you love your

9   children.  Right?

10  A.    Yes.

11  Q.    And we can now agree that George summoned up the

12  courage to tell the truth.  Right?

13        And he did that in the face of intimidation by

14  your family, correct?

15        Yes?

16  A.    Say that again, please.

17  Q.    Well, your family did not make it easy for George to

18  come forward and testify, did they?

19  A.    My family don't make it easy?

20  Q.    Correct.

21  A.    What's my family have to do with that?

22  Q.    Well, we have, we heard about notes that George had

23  apparently written to you while he was with your family.

24  We now know that those notes were lies, correct?

25  A.    That's between the two kids, that my nephew and my

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

293

1    son.

2    Q.    Right.  So, and your nephew is, what, about 17 years

3    old at the time?

4    A.    At the time 17, 18, something like that.

5    Q.    So somehow a 17-year-old thought it would be smart

6    for him to intimidate your 12-year-old-son to write notes

7    to try to get you acquitted.  That's what you are telling

8    us?

9    A.    I think so.  I mean, I don't know about that.  That's

10   between the two kids.

11   Q.    But to your benefit.

12   A.    Yes, I guess so.  Yes, yes, yes, yes.

13   Q.    It wasn't like his older cousin is saying tell the

14   truth, testify against your father.  Coincidently, this

15   thing that's just between these two kids was going to

16   benefit you?

17   A.    Yes.  Everybody thought it was intruder.

18   Q.    And then George summons up the courage to testify.

19         Do you remember that?

20   A.    Yes.

21   Q.    And I asked you this morning if you'd do anything for

22   your sons.

23         Do you remember that?

24   A.    Yes.

25   Q.    So here is your son, whose mother has been shot in

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

294

1    the face, correct?

2    A.    Yes.

3    Q.    Who watched as his father punched and pistol-whipped

4    his mother before her -- she was shot in the face.

5    Correct?

6    A.    Yes.

7    Q.    George saw that.  All that.

8    A.    Okay.

9    Q.    And then George was encouraged by you to go along

10   with the story of an intruder.  Correct?

11   A.    Okay.

12   Q.    He was ripped out of his school.  Correct?

13   A.    Yes.

14   Q.    He was put in foster care.  Correct?

15   A.    Yes.

16   Q.    He was intimidated by his older cousin, but you claim

17   that was just between the two of them.  Correct?

18   A.    Yes.

19   Q.    And now here he is, your son, your flesh and blood,

20   is taking the stand and there is one person in the

21   courtroom that has the ability to prevent him from going

22   through that experience.  That would be you, correct, sir?

23   A.    Yes.

24   Q.    And you did nothing.  Correct?

25   A.    About what?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

295

1   Q.   About putting your son through that experience.

2   A.   I don't bring my son to that experience.

3   Q.   You certainly did, sir.  You certainly did.  There

4   was one person that had the opportunity to prevent your

5   son from testifying and that was you.  You could have pled

6   guilty, correct?

7   A.   Oh, that.  But I did whatever the court, I explained

8   to you that Mr. Evseroff tell me to, you know, go along

9   with the intruder.  The way we started, the same we going

10   to finish.

11          That's why I explained to him two weeks before

12   the trial.  I explained to him what happened, exactly what

13   happened, with details.  He's telling me don't mention it

14   to anybody.  The same way we started, the same way we

15   going to finish.  So what choice I have?

16   Q.   Well, you had a choice.

17   A.   You --

18   Q.   I'm going to tell you.  During the trial, you had a

19   choice not to yell at your son in Greek to tell the truth,

20   didn't you?

21   A.   Just, you know, yes.

22   Q.   But you did that.

23   A.   Yes.

24   Q.   You got up in open court and you yelled at your son

25   to tell the truth when you in fact knew he was telling the

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

296

1   truth, didn't you?

2   A.   Uh-huh.

3   Q.   You traumatized your son to the point where he had to

4   look straight ahead and cover his ears to avoid listening

5   to you yelling at him.  Correct?  Yes?

6   A.   Yes.

7   Q.   And you are telling this court that that was you

8   simply going along with the program that Mr. Everoff was

9   forcing on you?

10          Is that what you want us to believe?

11  A.   Yes.  That's the truth.

12  Q.   You are a pretty good actor then if you got up and

13  did all that, wouldn't you say?  Yes?

14  A.   I don't know.

15  Q.   Well, you sat there in open court and yelled at your

16  son when he gave damaging testimony against you.  You

17  empowered an attorney --

18  A.   I don't.

19  Q.   -- to cross-examine your son when you knew he was

20  telling the truth.  Did you not?

21  A.   I don't yell at him.  I no yelling, so.

22  Q.   You didn't yell during that trial?

23          Let's talk about the closing arguments then.

24  Let's talk about when Mr. Schroeder got up and discussed

25  your guilt to a jury and you got up out of your chair as

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

297

1   he was finishing up and said, yelled at the jury, let them

2   hear the tapes, why are you hiding the truth from them.

3            Do you remember doing that?

4   A.    Uh-huh.

5   Q.    You yelled there, didn't you?

6   A.    Uh-huh.

7   Q.    Again, you just going along with the program with

8   Mr. Evseroff?

9   A.    Yes.

10  Q.    Again, you must be pretty good at acting because the

11  record clearly indicates you got up and started yelling

12  and screaming and Mr. Schroeder.

13            MR. KARTAGENER:  I'm going to object to this

14  thing about the acting.  I think he's made a point.  He's

15  beating a dead horse.  I object.

16            THE COURT:  Mr. Reporter, can you repeat that

17  question, please.

18            (The record was read.)

19            THE COURT:  Overruled.

20  BY MR. CANTY:

21  Q.    Correct?

22  A.    Yes.

23  Q.    This was all a part of you just taking your lungs and

24  following Evseroff's instructions.  Is that what you want

25  us to believe?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

298

1   A.   That's what happened.

2   Q.   You heard your son George testify.  Correct?

3   A.   Yes.

4   Q.   And we heard about, we heard you say that George

5   finally told the truth at the trial.  Correct?

6   A.   Yes.

7   Q.   You never heard George once say anything about you

8   stripping the bullets out of that weapon, did you?

9   A.   I don't hear him say.

10  Q.   George never testified to that.  Right?

11  A.   Yes.

12  Q.   George testified that you punched your (sic) mother.

13  Correct?

14  A.   Um-hmm.

15  Q.   Let's go through George's testimony.

16       Question, George was asked these series of

17  questions.

18       *My father hit my mother and then he went back to*

19  *where he was standing and they started to argue?*

20       *Mr. Schroeder asks the question:  Then what*

21  *happened?*

22       *Answer:  Then my dad went upstairs and got a gun*

23  *and then came down.*

24       *Question:  Okay.  Continue.*

25       *Answer:  Then he strikes my mother with the butt*

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

299

1   *of the gun in the head and she started to bleed.  She went*

2   *outside on the deck and he brought her back inside.*

3        Do you remember your son testifying to that?

4        He was telling the truth, wasn't he?

5   A.   Yes.

6   Q.   You never told us today anything about you dragging

7   your wife -- sir, let me finish my question.

8   A.   She came in.  She came in.  I don't drag her.  She

9   came in.

10  Q.   So George got that part wrong.

11  A.   I was sitting on the table and I'm taking the bullets

12  out.  That's what I was doing.

13  Q.   So it's your testimony that you threatened your wife

14  with a gun.  You smack her in the head, she starts to

15  bleed and says you know what, I'm gong to go back inside.

16       That's your testimony?

17  A.   Yes.

18  Q.   Okay.  Then the question was asked:  *Just tell us*

19  *what happened.*

20       *Answer:  And then I saw my dad shoot my mom.*

21       *Question:  Tell us about where you were when you*

22  *saw your dad shoot your mom.*

23       *Answer:  At the island where I was sitting.*

24       *Question:  In a safe place?*

25       *Answer:  Uh-huh.*

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

300

1        *Question:  And where was your dad?*

2        *Answer:  My dad, he was around the, like the*

3   *island is curved, so he was like at the front of the*

4   *island, not directly in front.*

5   A.    Yes, yes.

6   Q.    *But like kind of like that way, right, like right*

7   *there.*

8   A.    Yes.  The corner.

9   Q.    Now, sir, your son never testifies about anything

10  even closely resembling seeing you take the bullets out of

11  that gun.  Right?

12  A.    That's exactly what he say I was on the end of the

13  island and I'm taking the bullets out.

14  Q.    No, no, no.  That's not what your son testified to,

15  sir.

16  A.    You just read it.  I was on the end of the island.

17  Q.    Right.

18  A.    That's what I'm doing.  You know something?  One

19  thing.  You have the pictures over there?  Show him the

20  pictures where's the bullets was out.  That's all --

21  Q.    Sir, just listen carefully to my questions.

22  A.    Okay.

23  Q.    Okay?  Nowhere in your son's testimony did he ever

24  say my dad was taking the bullets out of the weapon.

25  Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

301

1   A.   Yes.

2   Q.   He never said that?

3   A.   Okay.

4   Q.   And in fact you come up with an elaborate excuse when

5   the police show up.  Detective O'Leary asks you, and you

6   tell him, again putting into this whole intruder theory, I

7   wanted to get the bullets out of that gun in case the

8   intruder came back.

9        Do you remember telling him that?

10  A.   In case what?

11  Q.   You told Detective O'Leary.  He said well, why were

12  the bullets on the counter?  And you said, well, you know

13  what, let's back up.  Let's get that whole lie that you

14  told to Detective Urban, to Detective O'Leary, to the

15  jury.  I want to make sure we get that whole lie out so we

16  are clear.

17       You told a version of events that went something

18  like this.

19       *I was sitting on the couch in the living room*

20  *when an intruder came in.  I heard some noise.  I heard a*

21  *loud bang and my wife was shot?*

22       Correct?

23  A.   Yes.

24  Q.   That was the lie you told repeatedly?

25  A.   Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

302

1   Q.   And then you said:

2           *I managed to get up and this individual was*

3   *running outside of my kitchen.  I managed to grab his arm*

4   *right before he got out of the door and was able to disarm*

5   *him and the gun fell to the ground.*

6           Then you created quite an elaborate description

7   of this individual, what he was wearing and what he looked

8   like.

9           Do you remember that?

10  A.   Yes.

11  Q.   That was a part of your lie as well.

12  A.   Yes.

13  Q.   And then you said:

14          *I took the gun and I started taking the bullets*

15  *out of the gun because I didn't want the intruder to come*

16  *back and get the gun and shoot me.*

17          Do you remember telling that version of events?

18  A.   I don't remember that.

19  Q.   You don't remember that?

20  A.   I don't remember that, but, you know, probably I say

21  it if they on the records.  I don't remember that.

22  Q.   The lie was pretty big so there are certain dates you

23  forget.  Fair enough?

24  A.   Yes, fair enough.

25  Q.   And of course Detective O'Leary said:  *Well, where*

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

303

1  *did you learn how to take bullets out of a weapon like*

2  *that?*

3          Do you remember him asking you that?

4  A.    No.

5  Q.    And you told him:  *I saw it on an episode of NYPD*

6  *Blue.*

7          Do you remember telling him that?

8  A.    No.

9  Q.    In fact that weapon was yours.  Correct?

10  A.    Yes.

11  Q.    That weapon was in your house?

12  A.    Yes.

13  Q.    And that weapon was underneath your mattress.  Right?

14  A.    Yes.

15  Q.    And a part of your defense was to try to convince the

16  jury that somehow that gun came from outside.  Right?

17  A.    Yes.

18  Q.    And that the -- the case was somehow planted by the

19  police in your house.  Right?

20  A.    Yes.

21  Q.    Because you said the gun's not mine.  Right?

22  A.    Yes.

23  Q.    Okay.  That was another lie.

24  A.    Yes.

25  Q.    And then a few days before your trial a woman from

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

304

1  News Channel 2, here in New York, asks you if you will

2  conduct an interview with her so you can explain your side

3  of the story on the news.

4          Do you remember that?

5  A.   Yes.

6  Q.   Jennifer McLogan.  Correct?

7  A.   I don't remember but I remember somebody came on the

8  Nassau County.

9  Q.   Do you remember a female reporter?

10 A.   I remember something like that.  I don't remember

11 exactly who, but it was.

12 Q.   Do you remember being interviewed by a reporter?

13 A.   Yes, I remember that.

14 Q.   When you spoke to that reporter, you told her this

15 fantastic tale of lies that you told to Detective Urban,

16 to Detective O'Leary, and the one that you continued to

17 tell at trial.  Correct?

18 A.   Yes.

19 Q.   And this was just days before the trial?

20 A.   Yes.

21 Q.   And this was all part of --

22 A.   No, that's not days before the trial.  That's, it

23 was, I don't know exactly when's the reporters they came,

24 but I think it's a little bit, a month ago before the

25 trial or, I don't remember exactly.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

305

1   Q.   Okay.  Again, you tell this fantastic tale of lies to

2   the reporter.

3   A.   Yes.

4   Q.   Because you want to get acquitted?

5   A.   Yes.

6   Q.   If you can prove to a jury it was an intruder, you go

7   home.  Correct?

8   A.   Yes.

9   Q.   And let's talk about all the other facts and

10  circumstances that you believe helped that version of

11  events.

12         The previous July your house was subject to a

13  home invasion.  Correct?

14  A.   Yes.  We had an intruder, yes.

15  Q.   Intruders broke into your home, tied up your children

16  and your wife and demanded money, and you, and demanded

17  money.

18  A.   Yes.

19  Q.   And when they asked you where the money was, they had

20  a weapon pointed to the head of one of your children.

21  Correct?

22  A.   No.  To me.

23  Q.   And to your children?

24  A.   To me.  Not my children.  To me.

25  Q.   They rustle your children out of bed, though.  Right?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

306

1   And brought them to you?

2   A.   They brought them to me.

3   Q.   To show you:  Hey, we have your children?

4   A.   Was everybody, you know, they bring everybody in

5   where I was sleeping.

6   Q.   And they ask you where the money is?

7   A.   Yes.

8   Q.   And you say what money?

9   A.   Yes.

10  Q.   There was a lot of money in your house that night.

11  Correct?

12  A.   Yes.

13  Q.   Your wife ultimately got that money?

14  A.   Yes.

15  Q.   So just so we are clear.  This is two individuals.

16  Right?

17  A.   Yes.

18  Q.   They rustle your two small children out of bed at gun

19  point?

20  A.   They bring to me, yes.

21  Q.   At gun point.

22  A.   Yes.

23  Q.   It's kind of sending a message:  *You don't want your*

24  *children hurt, tell us where the money is*?

25  A.   And I told my wife, you know, somebody is going to

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

307

1   come down.  And they pick up my wife, and I say, you know:

2   *Honey, show them where they are.*  And she went downstairs

3   and they give to them.

4   Q.   But you told them *what money?*  You were playing dumb?

5   A.   The first one they asked me, that is correct, I say

6   no, I don't have any money.

7            And they tell me where's the money?  And after

8   they say we going to take one down and they pick up my

9   wife, I say:  *Honey, you know, show them where's the*

10  *money.*

11  Q.   How much money did you have that they stole?

12  A.   I don't remember.  I have to make a payment.  I think

13  25 or 35,000.

14  Q.   Thousand?

15  A.   Yes.

16  Q.   So better to keep 35,000 and risk your children and

17  wife being injured by these two armed invaders?

18  A.   That's what I said to my wife:  *Honey, show them*

19  *where's the money.*

20  Q.   Not right away, though?

21  A.   The first time I tell them no.  I'm going to lie.  I

22  say no.  But after they say they going to take up somebody

23  downstairs, take them downstairs, I say honey, show them

24  where's the money.

25  Q.   Now, you would agree with me that the evidence of

308

1   that home invasion was strong evidence in your favor at

2   the trial.  Correct?

3   A.   I don't see it like that.

4   Q.   Well, you got up and yelled and screamed when a

5   number of 9-1-1 calls you had made about possible

6   intruders outside your house was not admitted into

7   evidence.  You remember that, right?

8   A.   Yes.

9   Q.   So let me ask the question again.

10          You thought the fact that 9-1-1 calls were made

11   about intruders, the fact that you had been the victim of

12   a home invasion, that was all strong evidence that showed

13   that it could have been an intruder.  Right?

14   A.   No, I don't see it like that.  I don't know.

15   Q.   Well, tell me how you saw it.  Why would you want

16   those statements before the jury?

17   A.   I don't know.

18   Q.   Well, you got up and yelled and screamed about it.

19   Tell us why you wanted those tapes before the jury.

20   A.   What tapes?

21   Q.   In tapes of you calling 9-1-1, saying I think there

22   is an intruder outside my house.

23   A.   I don't remember that.

24   Q.   I'm having a difficult time with this because you

25   remember with clarity that your accident, you know, that

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

309

1   you're carefully stripping bullets out of a gun and it

2   accidentally shoots your wife.

3   A.   Yes.

4   Q.   But when you get up in open court and you yell and

5   scream about tapes, you now can't tell this court why you

6   were yelling and screaming?

7   A.   I remember that because this was the worst mistake of

8   my life.  I shot the person I love more than anything, so

9   it was a terrible accident.  So all this split second, you

10  know, stay in my head forever.  That's why I remember.

11  Q.   All right.

12          MR. CANTY:  This is Respondent's E for

13  identification.

14          May I present this to the witness?

15          THE COURT:  Surely.

16  BY MR. CANTY:

17  Q.   Sir, do you recognize that picture?

18          THE COURT:  What exhibit is it?

19          MR. CANTY:  This is Respondent's E, your Honor.

20  BY MR. CANTY:

21  Q.   Do you recognize that, sir?

22          Sir, take a look at the picture and tell me if

23  you recognize who's in that picture.  Sir.

24  A.   Yes.

25  Q.   Who is this?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

310

1    A.    That's my wife.

2    Q.    Please answer the question into the microphone, so we

3    can all hear you.

4    A.    That's my wife.

5    Q.    With a bullet hole in her face and two black eyes.

6    Correct?

7    A.    Yes.

8    Q.    Yes?

9          You have to answer, sir.

10   A.    Yes.

11   Q.    The love of your life.  Two black eyes and a bullet

12   hole in the face.

13         Sir, you claim that you had this conversation

14   with Jack Evseroff and he says we're going to go all the

15   way, we are going to go all the way.

16         You had another attorney, correct?

17   A.    Yes.

18   Q.    You never once mentioned anything to Mr. Sarikas

19   about hey, listen, this was an accident.  The gun was on

20   the table, it accidentally went off, and my wife

21   accidentally got shot.  Correct?

22   A.    Yes, I never mention anything.

23   Q.    Never mentioned that to him at all?

24   A.    Because Jack Evseroff was the head lawyer and he was

25   the criminal lawyer.  He was the guy handle it 100 percent

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

311

1    the case.

2    Q.    Sir, you just heard from Mr. Sarikas --

3    A.    Yes, Mr. Sarikas, it was being hired, you know, to

4    help Mr. Evseroff for the Family Court and for the, you

5    know, paperwork or whatever, you know.

6    Q.    Well, you heard him testify he's handled over 100

7    criminal trials?

8    A.    I'm just saying, you know, what he being hired in

9    particular in the case.

10   Q.    Sir, you were on trial for your life --

11   A.    Yes, and the head lawyer was Mr. Evseroff.

12   Q.    We are going to get there.  And you said you were

13   getting a little nervous two to three weeks before the

14   trial.  Right?

15   A.    That is correct.

16   Q.    And you reached out to Mr. Evseroff.  Right?

17   A.    That's correct.

18   Q.    And at this point would it be fair to say that you

19   didn't like the answer Mr. Evseroff gave you?  Correct?

20   You told me you were just going to go along with it?

21   A.    I was surprised, I was kind of lost, because that's

22   the only guy, he's telling me what I supposed to do.  He

23   is my head lawyer and it is a criminal lawyer and that's

24   what he's telling me.  That's what, you know, I did.

25   Q.    And day after day of this trial, after seeing your

312

1    son go through what he went through, you never once

2    reached out to your fellow country man, a fellow Greek,

3    and said I need to talk to you, you know, this was an

4    accident, especially after your son's testimony.

5          You never did that, did you?

6    A.    No, because it, you know --

7    Q.    Sir, isn't it a fact that you never mentioned to

8    anyone that it was an accident until you were convicted?

9    A.    No.

10   Q.    And then you realized that the only way out of this

11   is if I say it was an accident?

12   A.    No.  I mention to Mr. Everoff.

13   Q.    You also testified on direct that you went along with

14   your testimony at trial because that was Jack Everoff's

15   idea.  Right?

16   A.    Say that again?  Excuse me.

17   Q.    You testified at the trial in this home invasion

18   scenario because that was Jack Everoff's idea.  Right?

19   A.    You talking about the intruder?

20   Q.    The intruder.

21   A.    Yes.

22   Q.    Let's call it what it is:  The made-up intruder.

23   A.    Yes.  Whatever you call him.

24          You know, he's tell me exactly don't mention it

25   to anybody.  Just the way we started, the same way we

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

313

1    going to finish, and we going to acquit everything.

2    Q.   I know you keep saying that --

3    A.   That's his exactly words.  I remember like a typing.

4    Q.   My question to you, sir, is you are an adult.  Right?

5    A.   Yes.

6    Q.   You knew you had to swear to tell the truth, correct?

7         And you went along with the story, not that Jack

8    Evseroff made up.  Right?

9         Not that Mr. Sarikas made up or wanted you to

10   tell.  Right?

11        And not a story that would benefit anybody but

12   yourself.  Correct?

13   A.   Yes.

14   Q.   Yes?

15        And that story was created moments after you

16   shot your wife in the face.  Correct?

17   A.   Yes.

18   Q.   I want to talk to you a little bit about your

19   testimony on trial.

20        It is fair to say you lied about the police

21   planting evidence at your house.  Correct?

22   A.   Yes.

23   Q.   It is fair to say you lied about putting your

24   neighborhood on notice that there is a possible home

25   intruder that would be a threat to your neighbors and your

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

314

1    community.  Correct?

2    A.    What's my neighbors?

3    Q.    Well, when you told the police it was a home

4    invasion, there was somebody that broke into my house,

5    that basically put your whole neighborhood on notice that

6    somebody was out there; not only was there a home invader

7    out there, this home invader shot and killed your wife.

8    Correct?

9    A.    Yes.

10   Q.    You didn't care about your neighbors.  Right?  No?

11   A.    I was lying.

12   Q.    You were looking out for yourself.

13   A.    Yes.  I was lying.

14   Q.    In fact you went through in great detail -- let me

15   ask you this.

16           Did you collect money earlier that day on

17   February 4 -- excuse me, on May 4, 2002, before you got

18   home?

19   A.    Yes.  I have some.

20   Q.    And you put that in a safe in your house?

21   A.    Yes.

22   Q.    You collected money from your distribution route.

23   Correct?

24   A.    Yes.

25   Q.    Who did you tell about that money?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

315

1   A.   Who I tell them about the money?

2   Q.   Correct.

3   A.   Nobody.  I don't have to them.

4   Q.   Well, you testified about it, didn't you?

5   A.   About what?  About my money?  I don't understand.

6   Q.   It says, you were asked a question, and I'll read

7   the question to you.  It says:

8         *Question:  Tell me this.  In that safe, when you*

9   *closed it up after you came home on May 4, how much money*

10   *was in that safe?*

11         *Answer:  I have the whole week.*

12         *Question:  Just give me a number.  That's all.*

13         *Answer:  About $35,000 and change.  A couple of*

14   *hundred up and down.*

15         Do you remember testifying to that?

16   A.   Yes.  But I don't give him that.  I don't tell them

17   to anybody.  This is my business.  I collect every day.

18   Q.   Right.  Correct.  You felt that that was important

19   enough to tell a jury, though, correct?

20   A.   Yes, if they ask me.  If you ask me, like before you

21   asked me about how much money, you know, the intruders are

22   taking and I told you.

23   Q.   My question is, you wanted the jury to hear about

24   that money because it went to your theory that a home

25   invader was coming to your house to steal your money.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

316

1   Correct?

2   A.   No, I don't went so far.

3   Q.   Let's just start with, let's just, you know, break

4   this down to get a simplified point.

5        You testified at trial and you lied.  Right?

6   A.   Yes.

7   Q.   And you testified at trial to benefit yourself.

8   Correct?

9   A.   Yes.

10  Q.   We are in agreement with that?

11  A.   Yes.  Because I was scared.  That's the truth.  Can

12  I?

13  Q.   No, you can't.  You can answer my questions.

14  A.   That's fine.

15  Q.   You told the jury about the $35,000 because that fit

16  nicely into the theory that a home invader was breaking

17  into your house to steal money, didn't you?

18  A.   It's money all the way.  It was, I keep the business

19  on my house.  The money all the time was on the safe.

20  Q.   Right.  But you wanted the 12 jurors sitting in that

21  courtroom to hear that so they would think maybe the

22  invader he was describing was going to get the money.

23  Isn't that why you did that?

24  A.   No.

25  Q.   No?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

317

1    A.    No.

2    Q.    Okay.  There was testimony.  This is a question you

3    were asked.

4          Question:  There was some testimony that there

5    was some instructions, for the safety device on the Taurus

6    gun somewhere in the kitchen cabinet.  You heard that

7    testimony here from them, right?  Did you ever see those

8    instructions at any time in any place?

9          You answered no.

10         That was a lie.  Correct?

11   A.    Yes.

12   Q.    That, you knew where that instruction book was,

13   correct?  Because that was your gun.

14   A.    I don't know if I knew exactly where they was.  I

15   knew it was somewhere around the house.

16   Q.    Right.  And then you were asked if somebody else must

17   have put them there.  Do you remember being asked that

18   line of questioning?  Whether somebody else put that

19   there?  Because you claim that gun was not yours, right?

20   A.    Yes.

21   Q.    That was another lie.

22   A.    Yes.

23   Q.    Perjury.

24   A.    Yes, I was lying.  You don't have to go in details.

25   I was lying, and Mr. Everoff tell me the way we started,

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

318

1   the same way, and that's why I went along.

2   Q.   Mr. Evseroff didn't tell you to lie to Detective

3   Urban?

4   A.   He tells me, no.

5   Q.   Sir, answer my question yes or no.  He didn't tell

6   you to lie to the police, right?

7   A.   No.

8   Q.   He didn't tell you to lie to the newspaper reporter?

9   A.   No.

10  Q.   He didn't tell you to lie to Detective O'Leary?

11  A.   No.

12  Q.   He didn't tell you to lie to your children?

13  A.   No.

14  Q.   Correct?

15          He didn't tell you to get up and scream and yell

16  at your son when he was telling the truth, did he?

17  A.   No.

18  Q.   He didn't tell you to jump up during Mr. Schroeder's

19  closing argument -- is this funny, sir?

20  A.   Excuse me?

21  Q.   You seem to be smiling.

22  A.   No.

23  Q.   Is this funny to you?

24  A.   I don't know what you talking about.

25  Q.   I see you smiling when I'm asking these questions.

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

319

1   I'm asking you if these questions are funny.

2           MR. KARTAGENER:  I object, your Honor.  I don't

3   see him smiling.

4   A.   You see things that you're assume things.  That's

5   all.

6           THE COURT:  Sustained.

7   A.   It's all right.  It's okay.  You got your right.

8   BY MR. CANTY:

9   Q.   Sir, my question to you, did Mr. Evseroff tell you to

10  jump up and down about tapes during Mr. Schroeder's

11  closing argument?

12  A.   I was jumping up and down?

13  Q.   Sir, my question was simple.  You got up during the

14  closing argument and said let them hear the tapes, let

15  them hear the tapes.

16          In fact, I'll give you the exact line?

17  A.   You just say I was jumping up and down.  I'm trying

18  to answer your questions.

19  Q.   *I want the tapes.  Let them see the tapes.  Let's*

20  *play the tapes.*

21          *Mr. Schroeder's response he always has to get*

22  *the last word.*

23          Do you remember screaming that in the courtroom?

24  A.   Yes.

25  Q.   Did Mr. Evseroff tell you to do that?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

320

1    A.    No.

2    Q.    Sir, isn't it fair to say this was a gamble you took

3    on your own volition because you wanted to go home you

4    thought that the home invasion theory would be sold to a

5    jury and you would be acquitted.  Isn't that a fact?

6    A.    I was lying.

7    Q.    You wanted that to happen?

8    A.    I was lying.

9    Q.    Sir?

10   A.    Yes.  Yes.

11   Q.    You were lying because you thought that that was a

12   gamble you were willing to take.  Correct?

13   A.    Yes.

14   Q.    Right.  And in fact you knew if you were convicted of

15   anything, you would get deported.  Right?

16   A.    Not at the time.

17   Q.    Well, nobody informed you that, any conviction, you

18   would go back?  After you served your time, you would go

19   back to Greece?

20   A.    No.  Not at the time.

21   Q.    Your attorneys never told you that?

22   A.    No.  At the time, I didn't even knew all these

23   things.

24   Q.    You knew you weren't a citizen of the United States.

25   Correct?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

321

1    A.    I was not.

2    Q.    So you thought after you served your time on whatever

3    conviction you had, they would let you stay here in the

4    United States?

5    A.    I don't even knew it.  At the time, I'm saying I

6    don't even knew it.

7    Q.    Page 1977 of your direct testimony at trial.

8          *Question:  What happened at 7:30?*

9          *Answer:  I walked to go back to sit down, you*

10   *know, just to kill some time, you know, we were expecting*

11   *some people to fix the lamb and my wife was trying to get*

12   *ready, you know, for the lamb, you know, have to put on*

13   *the stick and tie them up because we had to put it on the*

14   *skew.*

15         *Question:  During that time did you ever hit*

16   *your wife?*

17         *Answer:  No.*

18         Your answer under oath, correct?  That's what

19   you answered?

20   A.    Say that again.  Repeat that again.

21   Q.    *Question:  During that period of time did you hit*

22   *your wife?*

23   A.    What period of time?

24   Q.    During the period of time at around 7:30 on May 4,

25   the night you shot your wife in the face?

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

322

1    A.   Yes.

2    Q.   You answered no?

3    A.   Yes.  That's a lie.

4    Q.   Perjury?

5    A.   That's a lie.

6    Q.   You perjured yourself?

7    A.   That's a lie.

8    Q.   Okay.  We talked about perjury.

9    A.   Okay.

10   Q.   That's perjury.  Correct?

11   A.   Okay.

12   Q.   Yes?

13   A.   Yes.

14   Q.   Then you were asked:  *Did you go upstairs to get a*

15   *gun?*

16            *Answer:  No.*

17            That was what you answered.  Correct?

18   A.   Yes.  That was my answer.

19   Q.   That was a lie?

20   A.   That's a lie.

21   Q.   You perjured yourself again.  Correct?

22   A.   Yes.

23   Q.   *Question:  Did you come down and hit her with the gun*

24   *on the head or anywhere else?*

25            *Answer:  No.*

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

323

1          Do you remember giving that answer?

2    A.    That's a lie.

3    Q.    Perjury?

4    A.    Yes.

5    Q.    Okay.

6          *Question:  I want you to tell this court and*

7    *jury exactly what happened from 7:30 that night until 8*

8    *o'clock.  In your own words tell us.*

9          *Answer:  You know, after I sit down on the*

10   *couch --*

11         THE COURT:  Slow down.

12         MR. CANTY:  I apologize, judge.

13   BY MR. CANTY:

14   Q.   *I just, you know, watching TV, reading a book and,*

15   *you know, eating a little bit, you know, watching TV.  And*

16   *my wife, I see her after, you know, going back and forth,*

17   *back and forth with the knife, you know, cutting.  And*

18   *after 10, 15 minutes, you know, I hear some boom, you*

19   *know, like a gun shot.  I jump over.  I ran over there and*

20   *I saw, you know, at the time I jumped over a guy with a*

21   *mask, black gloves, blue shirt, blue pants, dark pants.  I*

22   *ran over there.  I grabbed his hand.  From my left hand, I*

23   *grabbed over here between the sleeve and the glove and*

24   *another hand on, you know, on the arm.  And I pushed him*

25   *like that.  He doesn't, the way I see him, he isn't going*

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

324

1   *to, because he look at me the way I'm running, he isn't*

2   *going to deal with me.  He looked for the door to run out.*

3   *He's got a gun, but I'm holding his hand against the door*

4   *and, you know, he hit boom the knife, I mean the gun, and*

5   *he just fell down and the guy, you know, gone.*

6           Quite a lot of detail in that answer, correct?

7   A.   Yes.

8   Q.   All lies.

9   A.   Yes.

10  Q.   You perjured yourself again?

11  A.   Yes.

12  Q.   You perjured yourself about -- again, I can see you

13  smiling, sir?

14  A.   Who's smiling?

15          MR. KARTAGENER:  Judge, I object.

16          THE COURT:  Sustained.  Please.

17  A.   Who's smiling?

18          THE COURT:  Sustained.  Please refrain from that

19  kind of question.

20  BY MR. CANTY:

21  Q.   *Question:  After that, what's the next thing that*

22  *happened?*

23          *Answer:  After that I grabbed the gun.  I put it*

24  *on the island.  I went to my wife.  I say honey, you know,*

25  *what happened?*

**Kotsopoulos - for the Petitioner - Cross/Mr. Canty**

325

1        *I see my wife down and bleeding.  Honey, what*

2    *happened?  Are you all right?*

3        *The kids in the meantime, you know, they're*

4    *going crazy up and down, up and down.  They are praying*

5    *and all these things.*

6        *I went to call 9-1-1.  I called 9-1-1.  I tell*

7    *them, you know, I don't even, three times I call, you*

8    *know, as a matter of fact, you know, I keep screaming, you*

9    *know, into the phone.*

10       Your testimony, correct?

11   A.   Yes.

12   Q.   Lies?

13   A.   Yes.

14   Q.   Perjury?

15   A.   Yes.

16   Q.   Again, page 1979 of your testimony.

17       *Question:  The gun, did you ever see that gun*

18   *before you picked that gun up as you have described to us?*

19       *Answer:  No.*

20       *Question:  Was that your gun?*

21       *Answer:  No.*

22       *Lie?*

23   A.   Perjury, too.

24   Q.   Perjury?

25   A.   Yes.

Kotsopoulos - for the Petitioner - Cross/Mr. Canty

326

1   Q.   So we can go on and on.

2          It is fair to say that your testimony at that

3   trial is riddled with lies and perjured testimony.

4   Correct?

5   A.   That's correct.

6   Q.   And all that testimony was to your benefit.  Correct?

7   A.   Yes.  I have Mr. Evseroff telling me what I supposed

8   to do.

9   Q.   Sir, I'm not asking you who told you what to do.

10         You took an oath to tell the truth, correct?

11  You're an adult?

12  A.   My lawyer tell me one thing.

13  Q.   Sir, answer my question.

14  A.   To do whatever I do.

15         THE COURT:  If he doesn't answer it, move to

16  strike the answer.

17         MR. CANTY:  Judge, I move to strike that answer.

18         THE COURT:  That motion is granted.  The answer

19  is stricken.

20         Listen to the questions and then please answer

21  them responsibly.

22         THE WITNESS:  I apologize.

23  BY MR. CANTY:

24  Q.   Sir, you took an oath to tell the truth and you

25  testified to benefit yourself by telling lies and giving

327

1   perjured testimony.  Correct?

2   A.   Yes.

3   Q.   Because you believed if a jury bought your story

4   about an intruder you would be acquitted.  Correct?

5   A.   Yes.

6   Q.   And you tried to bolster that story by telling them

7   stories of a prior home invasion.  Correct?

8   A.   Yes.

9   Q.   And by trying to get them to hear 9-1-1 tapes

10  involving calls you made about an intruder that you

11  believe was in your backyard just days before your wife

12  was shot.  Correct?

13  A.   Yes.

14  Q.   Those are the tapes we are talking about where you

15  got up and started yelling and screaming during

16  Mr. Schroeder's closing arguments.  Correct?

17  A.   I was not yelling and screaming, but I just -- yes.

18  Yes.

19  Q.   It is also fair to say, sir, that during Mr.

20  Evseroff's closing arguments and during his, during his

21  opening statements he never introduced any evidence that

22  didn't come from the lies that you had fabricated

23  immediately after you shot your wife in the face.  Isn't

24  that a fact?

25  A.   Excuse me.  Say that again.

328

1   Q.   The arguments that Mr. Evseroff made to a jury during

2   his opening statements and during his closing arguments,

3   all of those statements came from the lies that you told,

4   that you made up immediately after shooting your wife in

5   the face.  Correct?

6   A.   Yes.

7   Q.   That was the story that you consistently told to

8   everybody involved in this case right until the bitter

9   end, except for your one claim where you said you

10  mentioned it to Mr. Evseroff.  Isn't that right?

11  A.   Yes.

12       MR. CANTY:  I have no further questions.

13       THE COURT:  Anything else?

14       MR. KARTAGENER:  Very briefly, judge.

15       THE COURT:  Okay.  Redirect examination.

16

17  REDIRECT EXAMINATION

18  BY MR. KARTAGENER:

19  Q.   Mr. Kotsopoulos, when you came here this morning to

20  court, did you come here fully prepared to testify that

21  you killed your wife?

22  A.   I just came to say the truth what happened.

23  Q.   And the truth is that you killed your wife.  Right?

24  A.   Yes.

25  Q.   And you don't make any bone about that.  You are

Case 2:07-cv-04531-ADS   Document 41   Filed 02/03/10   Page 189 of 219 PageID #: 562

1   responsible for taking your wife's life and for taking the

2   mother of these children away from them.  Correct?

3   A.   Yes.  And I --

4   Q.   That's pretty terrible stuff, isn't it?

5   A.   I regret every night.  Yes.

6   Q.   You know what you did was very wrong to their mother,

7   didn't you?

8   A.   Yes.

9   Q.   Now, at trial you tried to help yourself by telling

10  lies.  Correct?

11  A.   Help myself.  That's correct.

12  Q.   You told lots of lies as Mr. Canty just pointed out.

13  Right?

14  A.   Yes.

15  Q.   We are not making any bones about that in this

16  courtroom, are we?

17  A.   No.  The only reason because at the trial I have

18  Mr. Evseroff exactly to do what he's telling me, and right

19  now what I'm doing, I'm doing exactly what Mr. Carro and

20  Mr. Steve Kartagener tell me.

21          They say tell the truth and nothing but just the

22  truth, and that's what I'm doing.

23  Q.   You, a few weeks before trial, according to your

24  testimony, raised with Mr. Evseroff the question of

25  whether you should adopt a different strategy.  Correct?

330

1   A.   Yes.

2   Q.   And you made the determination at trial to get on the

3   stand and tell lies about your responsibility in this

4   case.  Right?

5   A.   Yes.

6   Q.   Before coming to court at the trial of Nick

7   Kotsopoulos, did you have a conversation with Mr. Evseroff

8   about whether you should tell a false story or do

9   something else?

10       Did that occur?

11  A.   Like the way I saying, you know, I mentioned it two

12  or three weeks what happened exactly to Mr. Evseroff the

13  truth.  And he's telling me, you know, forget about.  The

14  way we started, to have a trust in him, and the way we

15  started, the same way we going to finish and we going to

16  acquit everything.

17  Q.   And it was only after Mr. Evseroff told you that you

18  will finish the way you began --

19  A.   Yes.

20  Q.   -- that you took the stand and provided all that

21  false testimony.  Correct?

22  A.   That's correct.

23  Q.   And that was because you were lying on the advice

24  provided you by Mr. Evseroff?

25  A.   Yes.

**Kotsopoulos - for the Petitioner - Recross/Mr. Canty**

331

1           MR. KARTAGENER:  I don't have any further

2   questions, judge.

3           THE COURT:  Hold it one minute, please.

4           (There was a pause in the proceedings.)

5           MR. KARTAGENER:  I'm done, judge.

6           THE COURT:  Okay.

7           MR. CANTY:  A few questions, if I may.

8

9   RECROSS-EXAMINATION

10  BY MR. CANTY:

11  Q.   You just said you testified during your trial because

12  that is what Mr. Evseroff advised you to do.  Correct?

13  A.   That's correct.

14  Q.   But he didn't advise you to lie to the police?

15  A.   No.

16  Q.   No, sir.  Answer my question.

17  A.   No.

18  Q.   When you first started lying, you did that all on

19  your own.  Is that correct?

20  A.   That's correct.

21  Q.   And you tried to lie during your trial to benefit

22  yourself.  Correct?

23  A.   I have the advice from Mr. Evseroff to testify and to

24  say about an intruder.

25  Q.   Right.  But let's be honest with one another.  You

332

1  weren't going to tell the truth.

2  A.   Yes.

3  Q.   You weren't telling the truth to please Mr. Evseroff.

4  You -- excuse me.  You weren't lying to please

5  Mr. Evseroff.  You were lying to try to help yourself at

6  trial.  Correct?  Yes?

7  A.   That's correct.

8  Q.   Okay.  That's all I need to know.

9       And that strategy failed you, correct?  You were

10  convicted?

11  A.   Hold on a second.

12       I explained to Mr. Evseroff what happened and,

13  you know, he's, I guess, you know, that's what his

14  strategy was.

15       MR. CANTY:  Judge, I'm going to move to strike

16  that answer as not responsive.

17       THE COURT:  Motion granted.  Strike the answer

18  as not being responsive.

19  BY MR. CANTY:

20  Q.   Sir, you told a pack of lies during your trial, and

21  perjured yourself in an attempt to benefit yourself.

22  Correct?

23  A.   The advice, yes, yes, yes, correct.  The advice from

24  Mr. Evseroff, yes.

25  Q.   No, no.  Mr. Evseroff didn't force you to do that.

Kotsopoulos - for the Petitioner - Recross/Mr. Canty

333

1    You did that because you wanted to try to help yourself at

2    trial.  Yes?

3    A.    Mr. Evseroff.

4    Q.    Yes or no, sir?

5    A.    Yes.

6    Q.    Okay.  And that didn't work.  You were convicted.

7    A.    Yes.

8    Q.    And now you are coming in here and you are saying

9    that you are telling the truth.  Correct?

10   A.    Yes.

11   Q.    And if we were to believe you once again these truths

12   you are telling today under oath would be to benefit

13   yourself once again, correct?

14   A.    This is the truth, yes, sir.

15   Q.    Of course, it is.  That's what you say.

16         My point is, if we are to believe you today,

17   once again these truths you are telling under oath would

18   be to benefit yourself.  Correct?

19   A.    That's the truth.

20   Q.    Answer my question.

21   A.    Yes.  Yes.  Yes, this is the truth.

22   Q.    No, sir.  I'm not asking you.  My question is, if we

23   are to believe your testimony, once again this truthful

24   testimony under oath you are giving --

25   A.    Yes.

334

1    Q.    -- would be to benefit yourself.  Yes?

2    A.    Yes.

3             MR. CANTY:  I have no further questions.

4             THE COURT:  Anything else?

5             MR. KARTAGENER:  No, your Honor.

6             THE COURT:  All right.  You may step down.

7             (The witness was excused.)

8

9             THE COURT:  You may proceed.

10            MR. KARTAGENER:  Judge, the Petitioner rests his

11   case at this point in time.

12                       **PETITIONER RESTS**

13

14            THE COURT:  Very well.

15            Any motions at this time?

16            MR. KARTAGENER:  No motions, your Honor.

17            MR. CANTY:  Your Honor, subject to a conference

18   we had this morning, the people do intend to call a

19   witness, Mr. Evseroff.  And based on the court's schedule,

20   I believe we were going to resume on Monday morning.

21            Is that correct?

22            THE COURT:  Did you arrange that?

23            MR. CANTY:  We have reached out to Mr. Evseroff

24   and he will make himself available Monday morning.

25            THE COURT:  He can be available Monday morning?

335

1          MR. CANTY:  That's our understanding.  Yes.

2          THE COURT:  How many witnesses will you have?

3    Anybody besides Mr. Evseroff?

4          MR. WALSH:  I don't believe so, your Honor.  It

5    should be just Mr. Evseroff.

6          THE COURT:  So we should could conclude by

7    Monday?

8          MR. WALSH:  I think so.  Yes.

9          THE COURT:  So we will recess until Monday at

10   9:30.

11          Is that agreeable with you, Mr. Kartagener?

12          MR. KARTAGENER:  Excuse me one second, judge.

13          THE COURT:  Yes.

14          MR. KARTAGENER:  If I might ask the court, and I

15   don't know if this creates a problem for the court.  But

16   in speaking to cocounsel if it were at all possible for us

17   to commence at 10 o'clock rather than 9:30 on Monday

18   because Judge Carro is coming from Rockland County and I'm

19   coming from Staten Island, it would make it a little bit

20   easier for us if you could do it at 10.

21          THE COURT:  No objection to that.

22          MR. WALSH:  No, judge.

23          THE COURT:  10 am.

24          MR. KARTAGENER:  Thank you.

25          THE COURT:  We will recess until Monday which

336

1    is --

2           MR. KARTAGENER:  Actually, judge?  I'm sorry.

3           THE COURT:  Monday, March 30, at 10 am.

4           MR. KARTAGENER:  Here is the question that I

5    have, your Honor, in anticipation of continuing on Monday.

6           Will you permit us, at the conclusion of the

7    testimony, to submit written submissions just so we can

8    bring it together, we can spread it out over a few days,

9    rather than making an oral argument at the conclusion of

10   evidence?

11          THE COURT:  If you want to do that, yes, I will

12   permit it.

13          MR. KARTAGENER:  Thank you, judge.

14          THE COURT:  All right?  We'll see you Monday,

15   March 30 at 10 am.  A late time.

16          MR. CANTY:  Judge, if I may, there is the issue

17   with getting the defendant back here.

18          THE COURT:  Where are the officers?  Do you

19   think we can get him here by 10 am on Monday?

20          A SPECTATOR:  On your order we will, sir.

21          THE COURT:  Do I have to sign something?

22          A SPECTATOR:  Yes, sir.

23          THE COURT:  Okay.  Bring it up.

24          (Proceedings adjourned at 2:30 pm.)

25

337

I N D E X


**ANASTASIOS SARIKAS**
DIRECT EXAMINATION                          144
BY MR. KARTAGENER
CROSS-EXAMINATION                           161
BY MR. WALSH
REDIRECT EXAMINATION                        220
BY MR. KARTAGENER
RECROSS-EXAMINATION                         232
BY MR. WALSH

**NIKOLAOS KOTSOPOULOS**
DIRECT EXAMINATION                          234
BY MR. KARTAGENER
CROSS-EXAMINATION                           255
BY MR. CANTY
CROSS-EXAMINATION (Continued)               266
BY MR. CANTY
REDIRECT EXAMINATION                        328
BY MR. KARTAGENER
RECROSS-EXAMINATION                         331
BY MR. CANTY

**PETITIONER RESTS**                        334


E X H I B I T S


Plaintiff Exhibit 2 in evidence             227
Defense Exhibit C in evidence               287
Defense Exhibit D in evidence               287

1

## $

**$100,000** [19] - 147:23, 147:24, 161:21, 161:22, 175:24, 195:14, 222:1, 249:8, 249:13, 249:17, 249:23, 250:1, 250:11, 250:17, 250:20, 251:4, 251:8, 251:12, 251:17
**$23,000** [1] - 214:21
**$25,000** [1] - 214:15
**$35,000** [2] - 315:13, 316:15
**$400,000** [4] - 148:15, 222:2, 250:13, 254:15

## '

**'80** [1] - 237:6

## 1

**1** [4] - 143:14, 143:15, 143:24, 272:6
**10** [9] - 237:17, 323:18, 335:17, 335:20, 335:23, 336:3, 336:15, 336:19
**100** [5] - 172:3, 253:2, 269:19, 310:25, 311:6
**100,000** [1] - 250:3
**11** [3] - 170:6, 172:23, 173:19
**11:20** [1] - 220:9
**11:40** [1] - 220:9
**12** [4] - 228:20, 237:17, 316:20
**12-year-old** [7] - 149:23, 156:2, 187:1, 196:15, 200:14, 200:24, 276:15
**12-year-old-son** [1] - 293:6
**12:30** [1] - 264:15
**12:35** [1] - 265:10
**13** [1] - 228:19
**144** [1] - 337:4
**15** [1] - 323:18
**15-minute** [1] - 220:7
**161** [1] - 337:5
**17** [2] - 293:2, 293:4
**17-year-old** [1] - 293:5
**18** [1] - 293:4
**18(b** [1] - 225:23
**1977** [1] - 321:7
**1979** [1] - 325:16
**1980** [2] - 237:6, 268:15
**1986** [2] - 236:14, 258:15
**1988** [1] - 145:5
**1993** [1] - 235:20
**1996** [1] - 154:13
**1:15** [1] - 265:2
**1:30** [2] - 264:15, 266:2

## 2

**2** [6] - 204:4, 227:9, 227:24, 227:25, 304:1, 337:18

**2000** [1] - 211:5
**2002** [6] - 237:16, 237:19, 246:3, 258:16, 272:9, 314:17
**2003** [7] - 146:5, 151:7, 155:4, 164:24, 168:17, 168:19, 221:7
**2004** [1] - 168:23
**2005** [1] - 169:22
**2006** [21] - 164:20, 164:21, 166:15, 166:16, 170:1, 170:6, 171:10, 171:13, 171:14, 172:16, 172:23, 173:19, 175:11, 175:17, 175:20, 176:9, 221:7, 227:3, 228:4, 232:7, 232:24
**220** [1] - 337:6
**227** [1] - 337:18
**23,000** [1] - 214:17
**232** [1] - 337:7
**234** [1] - 337:9
**25** [2] - 202:14, 307:13
**255** [1] - 337:10
**25th** [1] - 151:12
**26** [4] - 151:7, 155:4, 212:1, 255:7
**266** [1] - 337:11
**27** [7] - 166:15, 166:16, 171:14, 227:3, 228:4, 232:6, 232:24
**287** [2] - 337:19, 337:19
**2:30** [1] - 336:24

## 3

**3** [3] - 264:8, 264:9, 286:6
**30** [2] - 336:3, 336:15
**328** [1] - 337:12
**330** [2] - 163:23, 164:8
**331** [1] - 337:13
**334** [1] - 337:15
**35,000** [2] - 307:13, 307:16
**3:30** [2] - 263:1, 264:9

## 4

**4** [9] - 237:18, 246:2, 246:3, 259:20, 272:9, 314:17, 315:9, 321:24
**440** [9] - 164:12, 164:17, 224:7, 224:11, 224:14, 224:20, 224:23, 226:20, 233:2
**47** [1] - 234:22

## 6

**60s** [1] - 153:9

## 7

**7:15** [1] - 151:14
**7:20** [2] - 151:14, 212:1
**7:30** [1] - 321:8, 321:24, 323:7

## 8

**8** [1] - 323:7

## 9

**9-1-1** [20] - 179:10, 181:3, 181:11, 230:14, 230:16, 241:9, 243:3, 248:15, 258:3, 261:5, 261:12, 290:18, 308:5, 308:10, 308:21, 325:6, 327:9
**9-millimeter** [1] - 192:5
**9:30** [2] - 264:22, 335:10, 335:17

## A

**a.m** [1] - 220:9
**ability** [3] - 177:13, 177:14, 294:21
**able** [6] - 153:21, 208:4, 208:19, 263:13, 270:21, 302:4
**Abraham** [1] - 163:19
**Absolutely** [4] - 156:16, 172:7, 186:20, 231:15
**absolutely** [4] - 143:2, 156:4, 201:3, 213:17
**abuse** [7] - 167:1, 167:4, 167:7, 258:23, 259:12, 259:17
**abused** [3] - 257:14, 258:20, 260:14
**abusing** [2] - 258:8, 259:10
**accept** [1] - 176:11
**accepted** [1] - 155:25
**accident** [9] - 153:20, 191:10, 194:25, 308:25, 309:9, 310:19, 312:4, 312:8, 312:11
**accidental** [2] - 152:9, 216:7
**accidentally** [5] - 242:2, 290:3, 309:2, 310:20, 310:21
**accompanied** [1] - 147:8
**according** [4] - 218:13, 219:10, 225:2, 329:23
**According** [1] - 281:8
**account** [2] - 200:5, 205:23
**accumulated** [2] - 269:2, 269:21
**accurate** [6] - 178:13, 190:4, 190:5, 200:19, 227:14, 289:24
**accusation** [2] - 174:8, 174:10
**accusations** [1] - 167:2
**accused** [4] - 149:24, 153:16, 174:2, 175:23
**accusing** [3] - 167:25, 172:24, 180:17
**acquit** [7] - 248:21, 249:5, 251:5, 253:1, 253:22, 313:1, 330:16
**acquitted** [8] - 251:10, 251:13, 251:16, 258:1, 293:7, 305:4, 320:5, 327:4
**Acquitted** [1] - 251:14
**act** [1] - 214:13
**acted** [1] - 168:1
**acting** [3] - 167:20, 297:10, 297:14

2

**action** [5] - 220:14, 221:6, 221:7, 221:12, 224:9
**actions** [2] - 219:24, 232:7
**active** [1] - 292:5
**actor** [1] - 296:12
**actual** [1] - 230:14
**actuality** [1] - 199:14
**added** [1] - 233:7
**addition** [2] - 184:13, 249:16
**additional** [8] - 175:24, 222:1, 224:1, 249:8, 249:23, 250:1, 250:3, 250:13
**addressed** [1] - 158:24
**adhere** [1] - 173:9
**adhering** [1] - 156:14
**adjourned** [1] - 336:24
**adjusted** [1] - 203:13
**admit** [9] - 151:22, 151:25, 152:1, 187:15, 187:24, 188:1, 241:16, 290:1, 290:2
**admitted** [4] - 244:5, 260:13, 291:19, 308:6
**admitting** [1] - 243:4
**adopt** [1] - 329:25
**adult** [2] - 313:4, 326:11
**advice** [4] - 330:23, 331:23, 332:23
**advise** [1] - 331:14
**advised** [1] - 331:12
**advising** [1] - 195:19
**affected** [1] - 226:4
**affection** [2] - 226:2, 226:3
**affidavit** [12] - 170:6, 170:7, 172:23, 173:2, 173:18, 211:5, 211:17, 211:21, 212:4, 212:11, 212:16, 226:16
**affinity** [1] - 267:6
**affluent** [1] - 269:3
**afraid** [2] - 193:10, 243:13
**afternoon** [4] - 238:22, 255:5, 255:6, 262:11
**aggravated** [1] - 233:21
**aggressive** [2] - 209:7, 209:9
**aggressively** [3] - 204:25, 205:10, 205:15
**agitated** [1] - 242:9
**ago** [8] - 174:7, 215:1, 223:18, 232:20, 247:25, 255:7, 280:6, 304:24
**agree** [12] - 186:3, 204:17, 204:18, 269:24, 270:24, 276:13, 280:16, 282:10, 282:18, 288:10, 292:11, 307:25
**agreeable** [1] - 335:11
**agreed** [2] - 168:16, 209:7
**agreement** [9] - 163:11, 164:10, 164:15, 165:12, 168:7, 170:20, 171:2, 173:1, 316:10
**agreements** [1] - 170:14
**ahead** [5] - 175:1, 271:15, 271:16, 296:4
**alcohol** [3] - 204:3, 239:21, 239:22
**alcoholic** [3] - 203:23, 204:1, 259:16
**alive** [1] - 243:2

**all-or-nothing** [4] - 185:24, 190:11, 191:23, 231:9
**allegation** [1] - 180:8
**allegations** [2] - 167:5, 259:17
**allow** [1] - 263:2
**allowed** [1] - 180:11
**Almost** [2] - 246:7
**almost** [5] - 195:19, 204:9, 215:18, 245:23, 265:6
**alone** [2] - 152:6, 247:10
**alternative** [2] - 157:11, 195:8
**America** [1] - 229:12
**American** [1] - 233:20
**amount** [5] - 148:10, 165:12, 269:21, 269:25, 270:1
**ANASTASIOS** [2] - 144:8, 337:4
**Anastasios** [2] - 158:19, 266:21
**angry** [3] - 147:19, 147:23, 165:6
**announce** [1] - 149:4
**annual** [1] - 263:4
**answer** [45] - 164:11, 166:18, 173:7, 173:10, 181:15, 183:18, 183:19, 186:10, 187:11, 188:25, 189:3, 191:2, 193:19, 195:16, 195:18, 195:23, 196:1, 196:5, 202:25, 215:1, 215:6, 219:17, 235:9, 255:18, 289:10, 291:2, 310:2, 310:9, 311:19, 316:13, 318:5, 319:18, 321:18, 322:18, 323:1, 324:6, 326:13, 326:15, 326:16, 326:17, 326:18, 326:20, 332:16, 332:17
**Answer** [19] - 298:22, 298:25, 299:20, 299:23, 299:25, 300:2, 315:11, 315:13, 321:9, 321:17, 322:16, 322:25, 323:9, 324:23, 325:19, 325:21, 331:16, 333:20
**answered** [6] - 174:12, 268:8, 317:9, 321:19, 322:2, 322:17
**answering** [1] - 166:24
**answers** [3] - 256:15, 256:18, 266:17
**anticipation** [1] - 336:5
**anyway** [1] - 278:23
**apart** [1] - 152:21
**apologize** [7] - 173:11, 173:14, 189:5, 202:10, 203:25, 323:12, 326:22
**Apostolidis** [3] - 145:21, 145:23, 162:7
**appeal** [7] - 201:10, 223:8, 224:7, 224:9, 224:10, 224:13, 224:19
**appeals** [1] - 222:16
**appear** [1] - 211:5
**appearance** [2] - 262:7, 262:9
**appeared** [1] - 153:20
**appellate** [8] - 198:13, 198:20, 200:2, 200:12, 201:8, 201:16, 202:11, 224:4
**application** [4] - 198:20, 199:1, 199:8, 200:3
**appointment** [3] - 262:11, 263:1, 264:6
**appreciate** [3] - 143:4, 264:24, 265:5
**appreciation** [1] - 167:23
**approach** [3] - 190:11, 191:23, 227:4

**appropriate** [2] - 190:25, 205:16
**April** [5] - 146:5, 151:7, 151:13, 155:4, 212:1
**area** [3] - 152:19, 196:22, 215:20
**areas** [1] - 221:4
**arena** [1] - 270:23
**argue** [7] - 191:6, 200:13, 201:9, 222:18, 277:6, 278:6, 298:19
**argued** [5] - 150:13, 194:15, 216:6, 216:21, 277:12
**arguing** [13] - 150:8, 150:9, 164:9, 217:1, 217:6, 240:1, 240:5, 240:6, 241:1, 274:21, 278:9, 281:13
**argument** [21] - 180:13, 188:10, 202:12, 217:2, 231:8, 248:11, 260:4, 272:11, 272:13, 272:23, 273:12, 273:21, 277:12, 277:14, 277:16, 277:21, 281:6, 318:19, 319:11, 319:14, 336:9
**arguments** [8] - 202:17, 260:15, 296:23, 327:16, 327:20, 328:1, 328:2
**arm** [2] - 302:3, 323:24
**Armed** [1] - 149:15
**armed** [22] - 178:22, 179:6, 179:25, 180:19, 181:12, 181:25, 182:2, 182:9, 182:16, 182:22, 183:1, 183:11, 184:16, 184:24, 185:21, 187:9, 187:23, 191:7, 194:8, 194:16, 194:23, 307:17
**arrange** [1] - 334:22
**arrangement** [2] - 163:5, 163:7
**arrangements** [1] - 145:16
**arrest** [1] - 246:6
**arrested** [1] - 153:18
**arrived** [1] - 161:15
**aside** [1] - 221:2
**assault** [1] - 219:3
**assert** [1] - 187:22
**assertion** [1] - 176:11
**assist** [2] - 214:14, 221:12
**assistance** [18] - 163:25, 164:9, 164:13, 168:20, 168:24, 169:20, 169:22, 170:2, 170:4, 170:10, 172:25, 174:3, 174:8, 174:13, 176:5, 221:8, 224:23, 233:3
**assistant** [2] - 145:1, 222:20
**assisted** [3] - 153:2, 154:16, 166:22
**assume** [5] - 210:8, 211:6, 262:6, 274:7, 319:4
**Athens** [1] - 237:3
**attempt** [1] - 332:21
**attention** [2] - 151:6, 237:18
**attorney** [9] - 144:24, 145:2, 190:5, 190:20, 222:20, 266:19, 266:21, 296:17, 310:16
**attorneys** [4] - 169:18, 222:24, 266:14, 320:21
**Attorneys** [1] - 222:16
**Aunt** [2] - 208:5, 208:13
**aunt** [1] - 208:20
**authority** [2] - 214:2, 215:3

Case 2:07-cv-04531-ADS   Document 41   Filed 02/03/10   Page 200 of 219 PageID #: 573

3

**Authority** [1] - 215:5
**automatics** [1] - 192:8
**available** [6] - 182:25, 263:15, 263:24, 264:21, 334:24, 334:25
**avoid** [1] - 296:4
**aware** [1] - 170:13
**awareness** [2] - 224:12, 224:17

## B

**backed** [1] - 182:15
**background** [1] - 177:17
**backyard** [1] - 327:11
**bad** [2] - 203:24, 208:21
**badly** [1] - 211:12
**baggage** [2] - 177:9, 177:22
**balance** [1] - 256:12
**bang** [1] - 301:21
**bank** [2] - 143:22, 143:23
**bark** [1] - 183:14
**barrel** [1] - 279:17
**Barry** [5] - 223:12, 223:13, 223:14, 223:15, 224:1
**based** [8] - 151:19, 152:6, 157:9, 170:13, 172:25, 216:5, 221:9, 334:19
**basic** [1] - 159:23
**basing** [1] - 154:22
**basis** [2] - 160:12, 216:11
**bat** [1] - 217:23
**bathroom** [2] - 229:19, 229:21
**battered** [3] - 258:25, 259:3, 259:7
**beat** [2] - 147:24, 161:22
**beating** [1] - 297:15
**became** [4] - 148:21, 185:15, 185:17, 185:19
**become** [1] - 187:3
**bed** [5] - 150:11, 217:10, 217:13, 305:25, 306:18
**bedroom** [5] - 150:11, 217:8, 217:10, 217:20, 219:11
**beef** [5] - 235:13, 235:14, 268:23, 270:10, 270:22
**beg** [2] - 177:18, 229:23
**began** [1] - 330:18
**begged** [1] - 230:3
**beginning** [20] - 148:23, 149:18, 178:4, 179:2, 184:19, 185:3, 185:6, 185:12, 236:16, 237:6, 243:7, 243:19, 245:8, 245:10, 245:11, 245:14, 246:24, 247:3, 257:5, 290:6
**begun** [1] - 194:5
**behalf** [4] - 163:24, 169:23, 170:3, 202:18
**behavior** [1] - 203:4
**behind** [1] - 223:6
**behind-the-scenes** [1] - 223:6
**behoove** [1] - 151:20
**behooved** [1] - 175:2
**Belfi** [14] - 157:16, 157:21, 157:24,
159:3, 180:5, 180:11, 191:20, 194:14, 210:8, 210:12, 213:2, 213:10, 215:10
**Belfi's** [1] - 158:9
**belief** [3] - 187:14, 215:25, 231:16
**Believable** [1] - 197:10
**belligerent** [1] - 147:20
**bench** [4] - 157:14, 157:18, 157:22, 157:25
**benefit** [18] - 232:21, 256:16, 256:19, 259:17, 271:25, 272:2, 272:4, 293:11, 293:16, 313:11, 316:7, 326:6, 326:25, 331:21, 332:21, 333:12, 333:18, 334:1
**best** [3] - 190:25, 245:1, 247:12
**better** [7] - 156:12, 188:18, 188:24, 193:17, 194:2, 194:3, 307:16
**between** [18] - 145:19, 162:10, 170:5, 170:8, 208:21, 214:14, 221:7, 236:11, 264:9, 272:11, 272:23, 275:25, 288:10, 292:25, 293:10, 293:15, 294:17, 323:23
**Between** [1] - 247:6
**beyond** [1] - 208:3
**big** [7] - 229:14, 229:18, 302:22
**bit** [14] - 235:8, 239:10, 239:12, 244:8, 268:14, 271:3, 274:5, 281:15, 285:16, 289:4, 304:24, 313:18, 323:15, 335:19
**bitter** [1] - 328:8
**black** [5] - 230:1, 260:22, 310:5, 310:11, 323:21
**blaming** [4] - 201:15, 201:17, 201:23, 201:25
**bleed** [6] - 279:23, 280:11, 280:17, 280:22, 299:1, 299:15
**bleeding** [4] - 155:22, 218:22, 241:8, 325:1
**blood** [5] - 204:2, 208:21, 287:24, 288:11, 294:19
**Blue** [1] - 303:6
**blue** [1] - 323:21
**bodies** [1] - 169:7
**body** [11] - 169:3, 169:8, 169:24, 170:3, 170:5, 170:11, 273:2, 276:25, 285:18, 285:23, 287:25
**bolster** [1] - 327:6
**bone** [1] - 328:25
**bones** [1] - 329:15
**bonus** [1] - 195:14
**book** [2] - 317:12, 323:14
**Boom** [2] - 241:3, 248:14
**boom** [6] - 242:21, 242:22, 288:18, 323:18, 324:4
**born** [2] - 177:11, 177:12
**borne** [1] - 204:2
**borrow** [1] - 220:23
**bottom** [3] - 215:7, 227:12, 287:8
**bought** [3] - 183:19, 235:20, 327:3
**box** [4] - 143:18, 217:13, 217:16, 219:11
**boxed** [1] - 151:18
**boy** [8] - 201:5, 202:5, 202:6, 204:16, 205:1, 207:17, 209:8, 230:2
**boy's** [1] - 152:14
**boys** [1] - 237:13
**brain** [1] - 188:19
**break** [4] - 180:6, 180:9, 180:10, 264:15, 316:3
**break-in** [3] - 180:6, 180:9, 180:10
**breaking** [2] - 262:24, 316:16
**breath** [1] - 239:24
**breathing** [1] - 243:3
**brief** [2] - 144:16, 221:1
**briefly** [1] - 328:14
**briefs** [2] - 222:18
**bright** [2] - 268:12, 270:19
**Bring** [1] - 336:23
**bring** [10] - 208:19, 217:20, 241:12, 241:15, 246:16, 246:23, 295:2, 306:4, 306:20, 336:8
**brings** [1] - 219:5
**broke** [3] - 151:23, 305:15, 314:4
**Bronx** [3] - 145:2, 193:24, 222:15
**brought** [10] - 223:25, 224:3, 224:7, 224:11, 265:4, 299:2, 306:1, 306:2
**Brought** [1] - 217:16
**bruises** [2] - 260:20, 260:22
**Buddy** [1] - 193:24
**build** [2] - 285:22, 286:2
**built** [1] - 202:19
**bulk** [1] - 148:16
**bullet** [5] - 219:16, 284:13, 285:5, 310:5, 310:11
**bullets** [33] - 241:1, 241:23, 241:24, 242:1, 242:2, 242:3, 242:6, 242:10, 242:12, 242:14, 242:19, 248:13, 248:25, 278:3, 279:2, 282:16, 282:23, 283:7, 283:18, 284:4, 284:7, 284:12, 298:8, 299:11, 300:10, 300:13, 300:20, 300:24, 301:7, 301:12, 302:14, 303:1, 309:1
**bureau** [1] - 222:16
**burning** [1] - 289:1
**Burroughs** [2] - 235:16, 268:24
**business** [12] - 166:4, 166:13, 222:21, 225:7, 232:14, 269:25, 270:1, 270:9, 270:18, 270:22, 315:17, 316:18
**businessman** [1] - 268:19
**busy** [1] - 263:2
**butt** [4] - 278:13, 279:5, 279:15, 298:25
**buy** [2] - 194:24, 269:2
**BY** [46] - 144:21, 154:2, 159:9, 161:4, 167:16, 173:16, 186:15, 186:24, 189:7, 196:13, 197:22, 199:25, 203:9, 209:20, 215:22, 220:12, 227:7, 228:5, 232:3, 234:16, 251:1, 255:4, 266:12, 283:4, 286:13, 287:4, 287:23, 297:20, 309:16, 309:20, 319:8, 323:13, 324:20, 326:23, 328:18, 331:10, 332:19, 337:5, 337:6, 337:7, 337:8, 337:10, 337:11, 337:12, 337:13, 337:14

Dominick M. Tursi, CM, CSR
Official US District Court Reporter

# C

**cabinet** [1] - 317:6
**cameras** [2] - 183:24, 184:5
**cancel** [1] - 263:4
**candid** [1] - 225:12
**cannot** [1] - 159:23
**CANTY** [44] - 250:21, 254:25, 255:4, 262:16, 263:13, 264:1, 264:16, 266:9, 266:12, 283:1, 283:4, 286:5, 286:9, 286:11, 286:13, 286:19, 287:1, 287:4, 287:16, 287:23, 297:20, 309:12, 309:16, 309:19, 309:20, 319:8, 323:12, 323:13, 324:20, 326:17, 326:23, 328:12, 331:7, 331:10, 332:15, 332:19, 334:3, 334:17, 334:23, 335:1, 336:16, 337:11, 337:12, 337:14
**Canty** [1] - 329:12
**captain** [1] - 220:23
**card** [2] - 235:5, 235:6
**cardiologist** [2] - 262:25, 263:6
**care** [4] - 251:8, 260:6, 294:14, 314:10
**carefully** [5] - 230:19, 230:20, 234:18, 300:21, 309:1
**Carol** [22] - 178:22, 180:20, 183:5, 184:6, 202:24, 203:2, 203:12, 203:22, 203:23, 204:4, 204:11, 206:11, 208:8, 208:13, 217:6, 217:7, 219:1, 219:25, 235:24, 236:13, 237:7
**Carro** [2] - 329:19, 335:18
**case** [138] - 143:18, 145:7, 145:8, 145:11, 145:14, 146:4, 146:22, 148:11, 149:7, 150:1, 151:1, 151:12, 151:21, 152:23, 153:2, 153:6, 153:15, 153:24, 153:25, 154:19, 155:10, 155:12, 156:7, 156:8, 156:17, 156:21, 157:3, 159:4, 160:11, 160:14, 160:20, 166:23, 166:25, 167:1, 167:3, 167:4, 167:8, 167:9, 167:10, 167:14, 168:5, 168:9, 168:12, 168:21, 170:17, 170:19, 174:6, 174:16, 174:19, 174:21, 174:24, 175:1, 175:2, 175:5, 175:22, 175:23, 176:6, 176:21, 178:3, 178:4, 178:14, 178:17, 178:21, 178:24, 179:13, 179:18, 185:3, 185:5, 185:8, 185:10, 185:13, 186:9, 187:7, 187:8, 188:5, 188:6, 190:11, 190:15, 191:1, 191:21, 191:23, 193:6, 193:13, 193:25, 194:7, 194:13, 194:19, 194:24, 195:12, 198:14, 199:9, 199:11, 199:18, 209:3, 210:21, 211:11, 211:13, 211:24, 214:1, 214:2, 214:7, 214:13, 214:18, 214:19, 215:4, 220:19, 220:21, 221:12, 221:14, 222:11, 223:1, 223:4, 225:4, 225:15, 226:17, 226:24, 231:17, 245:8, 245:10, 245:11, 245:14, 246:13, 247:21, 262:13, 264:23, 290:2, 301:7, 301:10, 303:18, 311:1, 311:9, 328:8, 330:4, 334:11
**cases** [24] - 154:17, 159:21, 166:7,
166:8, 166:17, 166:19, 166:20, 169:12, 169:13, 169:15, 170:15, 189:20, 189:22, 190:2, 190:24, 193:12, 193:13, 195:10, 195:11, 222:17, 225:23, 225:24, 226:10
**cash** [2] - 148:16, 222:2
**caused** [2] - 260:25, 279:23
**causing** [1] - 263:21
**CBS** [1] - 179:14
**ceased** [1] - 197:1
**certain** [11] - 168:3, 180:5, 180:9, 189:20, 189:22, 190:24, 195:10, 195:11, 228:6, 267:6, 302:22
**Certainly** [1] - 164:4
**certainly** [8] - 170:24, 181:25, 201:1, 201:19, 202:8, 208:25, 295:3
**chair** [2] - 158:9, 296:25
**chambered** [2] - 152:11, 192:6
**chambers** [8] - 157:21, 158:1, 158:7, 158:16, 159:8, 213:4, 215:10
**chance** [1] - 163:22
**change** [4] - 151:21, 155:11, 211:13, 315:13
**changed** [3] - 162:10, 232:24, 243:21
**Channel** [1] - 304:1
**character** [2] - 192:17, 225:20
**characterization** [2] - 197:5, 207:8
**characterized** [1] - 171:20
**charge** [9] - 146:10, 154:7, 156:22, 157:11, 157:20, 191:22, 194:13, 210:8, 216:5
**charged** [1] - 212:13
**charges** [14] - 146:7, 146:8, 146:11, 146:21, 146:23, 147:25, 156:18, 156:22, 161:23, 248:21, 251:5, 251:14, 252:18, 252:20
**check** [2] - 143:22, 143:23
**cheek** [1] - 273:10
**chief** [7] - 220:20, 220:21, 220:22, 222:17, 224:4, 245:4, 245:6
**child** [1] - 276:15
**children** [20] - 181:10, 181:17, 182:12, 203:21, 230:24, 237:10, 237:12, 261:22, 292:9, 305:15, 305:20, 305:23, 305:24, 305:25, 306:3, 306:18, 306:24, 307:16, 318:12, 329:2
**choice** [6] - 203:24, 253:4, 253:16, 295:15, 295:16, 295:19
**chooses** [1] - 231:12
**circumstances** [2] - 146:15, 305:10
**circumstantial** [2] - 199:10, 199:19
**citizen** [4] - 233:20, 234:23, 235:4, 320:24
**City** [1] - 268:25
**city** [1] - 237:2
**claim** [42] - 161:5, 161:18, 161:25, 165:24, 168:6, 168:20, 168:23, 169:2, 169:18, 169:23, 170:2, 170:4, 170:10, 173:18, 176:6, 178:21, 179:4, 183:1, 185:21, 187:11, 187:22, 189:13,

166:17, 166:19, 166:20, 169:12, 169:13, 169:15, 170:15, 189:20, 189:22, 190:2, 190:24, 193:13, 193:13, 195:10, 195:11, 222:17, 225:23, 225:24, 226:10

202:19, 213:25, 215:9, 216:3, 229:8, 258:6, 281:2, 281:10, 281:16, 282:12, 282:16, 284:11, 289:23, 290:6, 292:8, 294:16, 310:13, 317:19, 328:9
**claimed** [3] - 179:1, 184:2, 229:11
**claiming** [6] - 163:25, 164:13, 170:19, 182:9, 212:11, 233:3
**clarity** [1] - 308:25
**clean** [1] - 189:24
**clear** [8] - 154:11, 212:5, 245:24, 257:9, 277:13, 284:4, 301:16, 306:15
**clearly** [2] - 248:10, 297:11
**client** [13] - 151:17, 163:24, 165:17, 167:20, 168:3, 170:21, 170:25, 171:3, 175:24, 189:14, 191:7, 262:7, 262:9
**clients** [4] - 228:11, 228:14, 232:9, 232:13
**clip** [1] - 188:19
**close** [3] - 279:22, 288:25
**Close** [1] - 283:15
**closed** [1] - 315:9
**closely** [1] - 300:10
**closer** [2] - 148:21, 285:19
**closing** [7] - 296:23, 318:19, 319:11, 319:14, 327:16, 327:20, 328:2
**club** [1] - 217:23
**cocked** [4] - 152:12, 192:5, 192:6, 192:7
**cocounsel** [2] - 220:20, 335:16
**Coincidently** [1] - 293:14
**collate** [1] - 221:3
**colleagues** [1] - 143:19
**collect** [2] - 314:16, 315:17
**collected** [1] - 314:22
**Colorado** [1] - 258:24
**column** [1] - 153:17
**comfortable** [1] - 267:13
**comforts** [1] - 202:21
**coming** [10] - 198:6, 198:10, 199:21, 239:6, 247:8, 315:25, 330:6, 333:8, 335:18, 335:19
**commence** [1] - 335:17
**commenced** [1] - 208:17
**commencement** [1] - 248:2
**comments** [2] - 161:14, 163:21
**committed** [12] - 159:23, 159:24, 160:3, 183:2, 185:22, 187:10, 191:8, 194:23, 199:2, 199:3, 207:7, 207:23
**committee** [4] - 165:2, 171:6, 171:7, 226:5
**committing** [2] - 271:22, 275:14
**Communal** [1] - 156:16
**communities** [1] - 269:3
**community** [1] - 314:1
**company** [2] - 268:24, 270:10
**compelling** [4] - 150:22, 150:24, 196:19
**Compelling** [1] - 200:8
**Competent** [1] - 197:14

5

**complain** [1] - 148:20
**complete** [2] - 227:14, 236:21
**Completely** [1] - 184:22, 206:19
**completely** [4] - 160:17, 165:23, 178:5, 206:5
**complied** [1] - 162:25
**compliment** [1] - 270:16
**concerned** [1] - 183:11
**concerning** [8] - 146:8, 148:25, 220:15, 223:8, 226:16, 249:23, 250:10, 251:3
**concerns** [1] - 230:8
**conclude** [3] - 262:17, 264:2, 335:6
**concluded** [1] - 264:25
**conclusion** [2] - 336:6, 336:9
**conditions** [1] - 251:3
**conduct** [10] - 146:15, 152:14, 152:15, 165:1, 165:24, 166:4, 199:2, 199:3, 203:14, 304:2
**conducted** [1] - 289:14
**conference** [6] - 157:14, 157:20, 191:22, 194:14, 210:8, 334:17
**confession** [1] - 153:19
**confidentially** [1] - 225:14
**confront** [1] - 213:13
**confronted** [1] - 229:5
**connection** [8] - 168:21, 173:18, 176:5, 188:11, 201:9, 202:13, 202:18, 206:10
**consider** [1] - 268:19
**considerable** [2] - 177:8, 177:22
**consistent** [1] - 150:3
**consistently** [1] - 328:7
**contained** [4] - 146:19, 177:8, 177:22, 230:12
**contingency** [11] - 163:10, 164:10, 164:15, 165:12, 168:7, 170:14, 170:20, 171:2, 172:25, 221:9, 226:16
**continue** [7] - 262:21, 262:22, 263:12, 263:15, 264:22, 273:14, 274:14
**Continue** [1] - 298:24
**continued** [23] - 166:4, 166:7, 166:9, 166:13, 166:16, 166:19, 179:4, 179:5, 181:16, 187:9, 187:22, 189:12, 225:7, 225:13, 230:16, 230:17, 232:14, 232:17, 232:20, 244:14, 266:6, 278:6, 304:16
**Continued** [2] - 266:11, 337:11
**continues** [1] - 273:15
**continuing** [1] - 336:5
**contrast** [1] - 206:4
**control** [2] - 226:20, 226:23
**conversation** [20] - 147:13, 147:17, 147:18, 148:3, 155:3, 157:4, 157:8, 157:23, 157:25, 215:9, 221:17, 221:23, 221:25, 225:3, 249:18, 249:21, 252:7, 252:11, 310:13, 330:7
**conversations** [5] - 185:11, 222:1, 245:9, 250:2, 250:6
**convict** [2] - 191:9, 194:25

**convicted** [9] - 154:4, 168:17, 173:25, 175:8, 175:17, 312:8, 320:14, 332:10, 333:6
**conviction** [11] - 161:6, 164:23, 170:5, 170:9, 172:17, 175:10, 198:11, 221:22, 233:15, 320:17, 321:3
**convictions** [1] - 175:14
**convince** [1] - 303:15
**cop** [3] - 252:17, 252:19, 252:20
**copy** [3] - 143:16, 143:20, 227:10
**corner** [1] - 300:8
**Correct** [232] - 144:24, 145:2, 145:3, 150:1, 150:17, 154:6, 156:19, 156:20, 161:8, 161:13, 162:8, 162:11, 162:18, 163:1, 163:15, 164:22, 165:4, 165:13, 166:11, 166:14, 166:17, 168:13, 168:15, 168:21, 169:24, 170:11, 170:22, 171:11, 172:19, 174:1, 174:9, 174:20, 175:11, 176:6, 176:16, 176:19, 176:22, 176:23, 177:4, 178:16, 178:17, 178:18, 178:19, 181:5, 182:10, 182:14, 182:23, 182:24, 183:2, 183:13, 184:17, 184:18, 184:22, 184:23, 184:25, 185:1, 187:11, 187:12, 189:17, 191:19, 193:1, 193:3, 193:9, 194:8, 194:11, 195:25, 197:3, 200:8, 200:9, 204:23, 205:11, 206:12, 206:15, 208:1, 208:21, 209:8, 210:3, 214:23, 215:6, 216:8, 216:22, 216:25, 217:11, 217:17, 217:21, 218:5, 219:7, 219:8, 219:14, 220:3, 223:19, 223:20, 223:22, 225:5, 228:24, 228:25, 230:10, 231:1, 231:9, 231:14, 232:18, 233:5, 237:8, 240:21, 241:18, 243:5, 243:21, 244:15, 246:3, 252:2, 252:5, 253:6, 254:13, 255:25, 256:5, 256:10, 256:13, 256:16, 256:19, 256:24, 257:2, 257:7, 257:10, 257:12, 257:15, 258:3, 258:16, 258:20, 259:5, 259:8, 259:13, 259:18, 259:23, 260:1, 260:14, 260:23, 261:3, 261:13, 266:19, 266:23, 267:4, 267:7, 267:21, 267:25, 268:4, 268:12, 268:15, 268:19, 268:25, 269:4, 269:12, 270:23, 271:4, 271:25, 272:2, 272:6, 272:11, 275:4, 275:14, 275:19, 276:5, 277:25, 279:23, 281:4, 284:15, 287:1, 288:5, 289:5, 289:8, 290:7, 290:16, 292:20, 294:5, 294:10, 294:12, 294:14, 294:17, 294:24, 296:5, 297:21, 298:2, 298:5, 298:13, 300:25, 301:22, 303:9, 304:6, 304:17, 305:7, 305:13, 305:21, 306:11, 308:2, 310:6, 310:21, 311:19, 313:12, 313:16, 313:21, 314:1, 314:8, 314:23, 315:2, 315:18, 316:1, 316:8, 317:10, 318:14, 320:12, 320:25, 322:10, 322:17, 322:21, 326:4, 326:6, 327:1, 327:4, 327:7, 327:12, 327:16, 328:5, 329:2, 329:10, 329:25, 330:21, 331:12, 331:22, 332:6, 332:22, 333:9, 333:18
**correct** [112] - 143:25, 144:25, 145:8,

145:9, 145:11, 146:17, 154:12, 154:24, 154:25, 156:4, 160:18, 161:17, 162:9, 162:12, 162:19, 164:25, 165:10, 165:14, 168:14, 168:18, 168:22, 169:21, 170:12, 170:23, 170:25, 171:16, 172:18, 172:20, 173:20, 173:23, 176:7, 177:1, 178:20, 184:11, 184:21, 186:8, 186:19, 193:2, 193:4, 194:9, 195:24, 198:17, 200:11, 206:7, 206:13, 206:23, 207:15, 208:2, 210:4, 210:6, 211:19, 211:20, 212:9, 216:2, 218:20, 223:3, 223:5, 223:16, 223:23, 224:4, 224:5, 225:6, 225:9, 226:17, 226:25, 227:1, 229:3, 229:4, 232:10, 232:16, 233:13, 233:15, 243:24, 244:12, 244:21, 249:3, 253:24, 257:19, 280:3, 281:22, 281:23, 286:7, 286:12, 287:24, 292:14, 292:24, 294:1, 294:22, 295:6, 307:5, 310:16, 311:15, 311:17, 313:6, 315:19, 317:13, 321:18, 324:6, 325:10, 326:5, 326:10, 329:11, 330:22, 331:13, 331:19, 331:20, 332:7, 332:9, 332:23, 333:13, 334:21
**correctly** [3] - 180:6, 204:4, 213:7
**corridor** [1] - 158:6
**corroborating** [3] - 200:4, 205:22, 206:1
**couch** [3] - 155:19, 301:19, 323:10
**Counsel** [1] - 262:3
**counsel** [30] - 153:2, 164:1, 164:9, 164:14, 168:20, 168:24, 169:20, 169:23, 170:2, 170:4, 170:10, 172:25, 173:15, 174:3, 174:8, 176:6, 189:5, 212:7, 220:21, 220:22, 221:9, 224:1, 224:4, 227:19, 227:21, 233:3, 245:4, 245:6, 286:16
**count** [1] - 231:13
**counter** [2] - 241:4, 301:12
**Countless** [1] - 193:13
**country** [4] - 233:18, 233:23, 234:23, 312:2
**county** [1] - 168:4
**County** [15] - 145:2, 145:14, 147:9, 153:10, 161:8, 163:8, 167:1, 167:5, 170:18, 246:9, 269:3, 269:12, 291:3, 304:8, 335:18
**couple** [4] - 216:14, 221:24, 225:16, 315:13
**coupled** [1] - 216:14
**courage** [2] - 292:12, 293:18
**course** [4] - 143:12, 160:6, 302:25, 333:15
**Court** [2] - 153:7, 311:4
**court** [30] - 144:23, 147:16, 159:16, 164:8, 164:13, 173:11, 173:14, 189:5, 193:14, 203:1, 214:12, 216:12, 225:12, 225:24, 254:9, 271:6, 271:8, 279:5, 289:22, 295:7, 295:24, 296:7, 296:15, 309:4, 309:5, 323:6, 328:20, 330:6, 335:14, 335:15

**COURT** [104] - 143:4, 143:7, 143:10, 143:22, 144:1, 144:5, 144:12, 144:18, 153:10, 158:15, 158:18, 158:22, 160:25, 167:3, 173:5, 173:9, 173:12, 186:11, 186:13, 186:21, 188:22, 188:24, 195:17, 196:1, 196:4, 196:10, 196:12, 197:20, 199:20, 199:23, 203:7, 209:18, 215:17, 220:7, 227:5, 227:19, 227:24, 228:1, 231:21, 231:25, 233:25, 234:2, 234:4, 234:12, 250:24, 254:24, 255:1, 262:3, 262:6, 262:10, 262:15, 262:25, 263:11, 263:16, 263:20, 264:7, 264:12, 264:20, 265:1, 265:9, 266:8, 283:3, 286:8, 286:10, 286:17, 286:21, 286:24, 287:2, 287:19, 287:21, 297:16, 297:19, 309:15, 309:18, 319:6, 323:11, 324:16, 324:18, 326:15, 326:18, 328:13, 328:15, 331:3, 331:6, 332:17, 334:4, 334:6, 334:9, 334:14, 334:22, 334:25, 335:2, 335:6, 335:9, 335:13, 335:21, 335:23, 335:25, 336:3, 336:11, 336:14, 336:18, 336:21, 336:23
 **court's** [1] - 334:19
 **courtroom** [5] - 195:8, 294:21, 316:21, 319:23, 329:16
 **courts** [1] - 159:12
 **cousin** [5] - 229:11, 229:19, 230:3, 293:13, 294:16
 **cousin's** [1] - 229:15
 **cover** [3] - 243:8, 243:10, 296:4
 **crazy** [1] - 325:4
 **create** [3] - 202:8, 270:1, 291:7
 **created** [6] - 267:20, 268:23, 291:15, 302:6, 313:15
 **creates** [1] - 335:15
 **creating** [1] - 261:16
 **credibility** [1] - 191:15
 **credible** [4] - 150:21, 177:3, 197:7
 **Credible** [2] - 197:12, 200:8
 **credit** [2] - 176:25, 230:19
 **crediting** [1] - 176:21
 **Crilly** [3] - 208:7, 208:8, 208:20
 **crime** [10] - 152:1, 183:2, 187:10, 194:24, 207:7, 207:23, 225:23, 228:24, 233:16, 233:20
 **criminal** [7] - 152:19, 170:14, 190:11, 271:2, 310:25, 311:7, 311:23
 **criminally** [1] - 153:23, 154:4, 154:7, 157:13, 233:17
 **Cross** [2] - 160:25, 254:24
 **cross** [29] - 150:16, 173:5, 192:1, 194:17, 195:22, 204:16, 204:21, 204:25, 205:2, 205:10, 205:16, 206:2, 206:9, 206:25, 207:17, 207:20, 207:25, 208:4, 208:11, 209:8, 209:12, 220:13, 221:4, 221:5, 228:18, 230:6, 262:17, 280:1, 296:19
 **CROSS** [6] - 161:3, 255:3, 266:11, 337:5, 337:10, 337:11
  **cross-examination** [16] - 173:5,

194:17, 195:22, 204:16, 207:25, 208:4, 208:11, 209:8, 209:12, 220:13, 221:4, 221:5, 228:18, 230:6, 262:17, 280:1
 **Cross-examination** [2] - 160:25, 254:24
 **CROSS-EXAMINATION** [6] - 161:3, 255:3, 266:11, 337:5, 337:10, 337:11
  **cross-examine** [4] - 206:2, 206:25, 207:17, 296:19
  **cross-examined** [9] - 150:16, 192:1, 204:21, 204:25, 205:2, 205:10, 205:16, 206:9, 207:20
 **crossroads** [1] - 231:18
 **crucial** [1] - 147:18
 **culminated** [1] - 167:11
 **curse** [1] - 277:10
 **curved** [1] - 300:3
 **cutting** [1] - 323:17

# D

 **DA's** [2] - 145:2, 193:24
 **Dad** [3] - 229:24, 229:25
 **dad** [6] - 298:22, 299:20, 299:22, 300:1, 300:2, 300:24
 **damage** [1] - 202:9
 **damaging** [1] - 296:16
 **Damon** [1] - 192:17
 **Dana** [1] - 153:3
 **dared** [1] - 188:7
 **dark** [1] - 323:21
 **date** [9] - 171:14, 237:20, 237:22, 237:24, 238:3, 240:15, 240:22, 246:1, 286:7
 **dated** [1] - 228:4
 **dates** [1] - 302:22
 **days** [9] - 147:11, 161:6, 179:12, 221:24, 303:25, 304:19, 304:22, 327:11, 336:8
 **dead** [1] - 297:15
 **deal** [8] - 214:10, 249:22, 250:9, 250:17, 250:19, 251:3, 253:20, 324:2
  **dealing** [1] - 221:13
 **deals** [1] - 181:22
 **dealt** [1] - 188:8
 **death** [3] - 202:7, 204:3, 289:5
 **deceased** [3] - 153:4, 201:21, 203:25
 **December** [1] - 176:8
 **decided** [9] - 193:16, 224:13, 224:18, 243:23, 256:18, 267:19, 274:8, 280:2, 292:3
 **decision** [14] - 143:5, 160:5, 176:19, 176:21, 176:24, 177:6, 177:19, 177:24, 177:25, 178:1, 190:19, 200:3, 231:13
  **decisions** [4] - 189:20, 270:8, 270:13, 270:18
 **deck** [1] - 299:2
 **defendant** [50] - 153:13, 153:15, 155:14, 160:2, 160:3, 161:8, 161:10,

166:3, 168:16, 169:1, 170:3, 173:24, 175:8, 178:5, 178:15, 179:1, 179:12, 179:13, 179:20, 180:15, 181:2, 182:7, 184:5, 184:19, 185:19, 187:9, 190:19, 192:19, 193:18, 194:22, 199:2, 200:4, 202:14, 202:18, 202:19, 206:6, 207:23, 208:20, 210:20, 216:17, 216:21, 217:7, 217:19, 218:7, 218:24, 219:10, 230:2, 233:15, 262:18, 336:17
 **Defendant's** [4] - 286:15, 287:5, 287:16, 287:18
 **defendant's** [27] - 152:8, 161:6, 162:6, 162:10, 162:17, 164:12, 164:23, 168:8, 170:9, 172:16, 178:23, 182:1, 182:16, 183:1, 184:15, 196:15, 198:2, 198:11, 200:15, 200:25, 201:9, 203:4, 203:14, 216:5, 216:10, 216:15, 219:24
 **Defense** [4] - 287:3, 287:22, 337:19, 337:19
  **defense** [53] - 149:4, 149:7, 149:10, 149:11, 149:14, 149:16, 151:1, 151:2, 151:16, 151:18, 152:23, 154:18, 155:11, 156:22, 157:5, 160:8, 175:4, 178:2, 178:6, 178:7, 178:14, 178:16, 178:21, 178:24, 178:25, 179:25, 180:19, 180:21, 181:23, 184:2, 185:2, 185:21, 185:24, 186:18, 187:1, 187:3, 190:5, 192:13, 194:7, 194:15, 194:16, 196:23, 197:1, 204:15, 205:9, 206:2, 206:25, 210:13, 231:9, 286:15, 303:15
 **defenses** [1] - 231:6
 **defer** [2] - 198:16, 286:11
 **definitely** [2] - 264:10, 264:12
 **degree** [2] - 254:1, 254:3
 **delay** [2] - 263:21
 **delivered** [1] - 205:18
 **demanded** [2] - 305:16
 **demeanor** [1] - 183:15
 **demonstrated** [2] - 258:8, 258:11
 **dentist** [2] - 167:6, 167:14
 **department** [2] - 156:5, 182:9
 **Department** [2] - 156:12, 291:4
 **deportation** [1] - 233:18
 **deported** [2] - 233:23, 320:15
 **depraved** [4] - 146:12, 146:15, 153:22, 157:13
 **Depraved** [1] - 146:13
 **deprived** [1] - 147:5
 **Describe** [2] - 279:5, 282:23
 **describe** [1] - 197:23
 **described** [7] - 177:8, 196:18, 200:14, 204:15, 277:17, 280:19, 325:18
 **describing** [3] - 283:8, 283:17, 316:22
 **description** [2] - 181:20, 302:6
 **descriptions** [1] - 230:24
 **designed** [2] - 218:5, 218:11
 **desk** [1] - 158:9
 **despite** [5] - 165:15, 166:3, 202:22, 226:2, 232:12
 **Despite** [3] - 166:2, 212:10, 212:16

7

**destroyed** [3] - 187:3, 196:23, 204:15
**detail** [3] - 151:16, 314:14, 324:6
**detailed** [1] - 153:19
**details** [5] - 152:7, 291:10, 291:12, 295:13, 317:24
**Detective** [16] - 156:6, 156:11, 182:8, 188:12, 209:1, 209:4, 301:5, 301:11, 301:14, 302:25, 304:15, 304:16, 318:2, 318:10
**detective** [1] - 291:3
**detectives** [1] - 165:22
**determination** [2] - 160:8, 330:2
**determine** [1] - 289:14
**devastating** [1] - 252:14
**developed** [1] - 225:18
**device** [1] - 317:5
**dice** [2] - 160:20, 190:13
**died** [2] - 257:7, 257:9
**differ** [1] - 186:4
**differences** [1] - 186:7
**different** [10] - 148:19, 156:19, 191:13, 210:17, 210:18, 222:8, 228:7, 262:22, 271:3, 329:25
**differently** [1] - 210:16
**difficult** [7] - 191:4, 191:6, 194:20, 222:25, 226:4, 270:13, 308:24
**diminish** [1] - 177:13
**diminished** [1] - 177:14
**diminutive** [1] - 158:20
**diners** [1] - 229:18
**direct** [11] - 151:6, 187:13, 206:4, 224:9, 224:10, 224:21, 237:18, 267:23, 280:1, 312:13, 321:7
**DIRECT** [4] - 144:20, 234:15, 337:4, 337:9
**direction** [4] - 192:12, 211:13, 214:7, 253:14
**directly** [2] - 165:24, 300:4
**disagree** [2] - 189:23, 190:24
**disagreeing** [1] - 190:1
**disagreement** [2] - 171:18, 209:25
**disarm** [1] - 302:4
**discharged** [1] - 285:5
**disciplinary** [2] - 171:7, 226:5
**disclose** [1] - 221:25
**disclosed** [2] - 163:9, 168:6
**discovery** [1] - 221:3
**discredit** [1] - 205:8
**discuss** [2] - 146:1, 246:13
**discussed** [8] - 148:10, 157:15, 157:21, 162:8, 163:6, 202:11, 249:22, 296:24
**discussing** [3] - 162:20, 162:22, 200:1
**Discussion** [2] - 262:5, 264:25
**discussions** [1] - 209:22
**disregarded** [1] - 160:17
**disservice** [1] - 151:17
**distance** [4] - 280:18, 285:8, 285:9, 288:10

**distribute** [1] - 235:14
**distribution** [5] - 235:13, 268:24, 270:10, 270:23, 314:22
**district** [3] - 145:1, 222:20, 222:24
**District** [1] - 222:15
**disturbed** [2] - 165:9, 165:15
**divorce** [2] - 236:9, 236:11
**divorced** [1] - 236:10
**doctor** [2] - 167:6, 167:10
**document** [2] - 143:21, 227:18
**documents** [1] - 174:23
**dog** [3] - 178:8, 178:9, 178:10
**Donald** [1] - 157:16
**Done** [1] - 205:6
**done** [20] - 165:16, 184:24, 187:19, 187:20, 195:24, 196:24, 206:15, 209:10, 210:16, 210:18, 215:8, 215:18, 215:19, 225:3, 231:15, 231:16, 240:10, 270:6, 270:8, 331:5
**door** [2] - 155:21, 302:4, 324:2, 324:3
**down** [38] - 150:12, 156:22, 157:12, 211:15, 214:6, 217:21, 218:12, 234:2, 241:5, 241:15, 242:24, 242:25, 248:10, 278:2, 281:3, 281:15, 283:9, 283:10, 283:25, 284:19, 284:23, 298:23, 307:1, 307:8, 315:14, 316:4, 319:10, 319:12, 319:17, 321:9, 322:23, 323:9, 323:11, 324:5, 325:1, 325:4, 334:6
**downstairs** [5] - 217:17, 219:6, 307:2, 307:23
**dozen** [1] - 207:10
**Dr** [4] - 149:14, 174:25, 175:1, 228:17
**drag** [1] - 299:8
**dragging** [1] - 299:6
**drank** [1] - 204:4
**dressed** [1] - 230:1
**drink** [1] - 274:23
**drinking** [3] - 239:17, 239:21, 274:24
**drive** [1] - 274:23
**driving** [2] - 272:15, 272:19
**dropped** [1] - 242:24
**drops** [1] - 155:20
**drunk** [8] - 202:22, 202:24, 203:3, 203:13, 240:4, 272:16, 272:20, 272:21
**duck** [1] - 163:17
**due** [3] - 164:10, 164:14, 180:22
**duly** [3] - 144:9, 234:9, 266:6
**dumb** [1] - 307:4
**dummy** [2] - 183:24, 184:5
**During** [6] - 179:17, 179:20, 295:18, 321:15, 321:21, 321:24
**during** [32] - 143:11, 145:10, 145:13, 145:17, 157:23, 160:6, 163:1, 163:7, 175:3, 210:7, 217:2, 219:25, 246:8, 247:21, 257:1, 258:18, 258:22, 260:21, 267:2, 296:22, 318:18, 319:10, 319:13, 327:15, 327:19, 327:20, 328:1, 328:2, 331:11, 331:21, 332:20
**duties** [1] - 259:22
**duty** [2] - 171:4, 171:5

# E

**early** [3] - 149:18, 153:9, 263:8
**earn** [1] - 254:1
**ears** [1] - 296:4
**easier** [1] - 335:20
**Easter** [8] - 150:8, 211:3, 211:4, 238:10, 238:19, 238:22, 259:22
**easy** [4] - 195:3, 195:4, 292:17, 292:19
**eating** [1] - 323:15
**edge** [1] - 288:11
**educated** [2] - 267:24, 267:25
**Edward** [1] - 228:17
**effect** [3] - 148:1, 189:10, 229:15
**effective** [1] - 274:4
**effectively** [1] - 191:13
**effort** [1] - 230:23
**eight** [1] - 153:19
**eight-page** [1] - 153:19
**either** [4] - 162:16, 167:5, 209:4, 256:16
**Either** [1] - 152:10
**eject** [3] - 242:3, 278:2, 279:1
**ejected** [5] - 241:23, 241:24, 242:1, 242:9
**ejecting** [4] - 248:12, 248:25, 283:18, 284:12
**elaborate** [2] - 301:4, 302:6
**eldest** [1] - 149:24
**element** [1] - 262:10
**elevator** [1] - 193:25
**emergency** [1] - 230:10
**emotion** [1] - 188:20
**emotional** [4] - 177:7, 177:12, 177:20, 188:16
**emotions** [1] - 188:21
**empowered** [1] - 296:17
**encouraged** [1] - 294:9
**end** [13] - 179:4, 179:6, 181:19, 185:3, 194:13, 224:10, 233:22, 246:25, 273:12, 300:12, 300:16, 328:9
**engaged** [1] - 146:14
**engaging** [1] - 277:21
**English** [1] - 254:6
**ensued** [2] - 262:5, 272:23
**entered** [3] - 145:4, 145:6, 210:11
**entire** [1] - 172:11
**entirely** [3] - 151:21, 199:14, 221:25
**entitled** [1] - 168:10
**episode** [1] - 303:5
**equal** [2] - 146:11, 220:20
**escapes** [1] - 155:21
**especially** [1] - 312:4
**essence** [1] - 149:16
**essentially** [6] - 150:6, 165:11, 171:18, 172:24, 178:25, 194:14
**established** [2] - 175:15, 228:18
**estimating** [1] - 193:12

8

**estimation** [2] - 160:19, 166:4
**evening** [1] - 238:22
**event** [2] - 162:24, 195:7
**events** [4] - 156:1, 301:17, 302:17, 305:11
**eventually** [1] - 243:21
**Eventually** [1] - 165:8
**evidence** [35] - 143:16, 160:2, 160:6, 179:24, 180:20, 181:22, 182:1, 182:6, 182:25, 183:4, 183:10, 184:13, 194:15, 199:11, 215:25, 216:4, 227:18, 227:24, 227:25, 286:18, 286:20, 287:2, 287:3, 287:21, 287:22, 307:25, 308:1, 308:7, 308:12, 313:21, 327:21, 336:10, 337:18, 337:19, 337:19
**evidentiary** [3] - 176:3, 176:13, 176:15
**evinced** [1] - 152:9
**evincing** [1] - 146:15
**Evseroff** [204] - 143:12, 145:8, 146:1, 147:8, 147:14, 147:20, 147:21, 148:10, 148:13, 148:15, 149:1, 149:3, 149:10, 150:4, 150:17, 151:15, 152:5, 152:17, 154:21, 155:1, 155:14, 156:24, 157:2, 157:5, 157:16, 160:16, 161:7, 161:11, 161:15, 161:18, 161:25, 162:2, 162:7, 162:11, 162:15, 163:5, 163:13, 163:21, 164:10, 164:14, 165:7, 165:25, 166:3, 166:5, 166:10, 166:14, 167:1, 167:15, 167:17, 167:19, 168:6, 168:10, 168:20, 168:25, 169:12, 169:16, 169:17, 171:11, 171:15, 171:17, 172:1, 172:15, 172:22, 172:24, 173:22, 174:3, 174:13, 174:22, 175:6, 175:19, 176:15, 176:22, 177:8, 177:21, 178:3, 185:12, 185:13, 187:17, 187:19, 187:21, 188:10, 191:18, 191:24, 192:2, 192:13, 192:19, 192:22, 193:3, 193:6, 193:15, 193:20, 194:3, 194:20, 198:12, 198:18, 200:3, 200:13, 201:8, 201:15, 201:25, 202:12, 204:19, 204:21, 205:25, 206:24, 207:16, 207:22, 208:3, 208:11, 208:19, 210:1, 211:22, 213:13, 213:24, 213:25, 214:2, 214:9, 214:23, 215:3, 220:15, 220:18, 220:22, 220:25, 222:6, 225:8, 225:13, 227:3, 228:4, 228:9, 229:6, 232:6, 232:15, 232:18, 232:21, 233:4, 233:8, 233:12, 245:7, 245:9, 245:15, 245:18, 246:8, 247:8, 247:15, 247:18, 248:7, 249:8, 249:23, 249:24, 250:5, 250:6, 250:10, 250:17, 252:8, 252:21, 253:3, 253:17, 253:18, 254:12, 263:10, 263:14, 266:19, 267:8, 267:18, 290:10, 290:15, 290:19, 291:20, 295:8, 296:8, 297:8, 310:14, 310:24, 311:4, 311:11, 311:16, 311:19, 312:12, 313:8, 317:25, 318:2, 319:9, 319:25, 326:7, 328:1, 328:10, 329:18, 329:24, 330:7, 330:12, 330:17, 330:24, 331:12, 331:23, 332:3, 332:5, 332:12, 332:24, 332:25, 333:3, 334:19, 334:23, 335:3, 335:5

**Evseroff's** [14] - 145:15, 145:19, 145:22, 155:2, 162:6, 162:15, 165:1, 178:16, 204:16, 205:9, 297:24, 312:14, 312:18, 327:20
**exact** [2] - 144:15, 319:16
**exactly** [18] - 148:2, 224:2, 248:9, 248:20, 265:6, 291:23, 295:12, 300:12, 304:11, 304:23, 304:25, 312:24, 313:3, 317:14, 323:7, 329:18, 329:19, 330:12
**Exactly** [4] - 249:4, 252:23, 281:5, 292:6
**Exaggeration** [1] - 200:18
**examination** [20] - 160:25, 173:5, 187:14, 194:17, 195:22, 204:16, 207:25, 208:4, 208:11, 209:8, 209:12, 220:13, 221:4, 221:5, 228:18, 230:6, 254:24, 262:17, 280:1, 328:15
**EXAMINATION** [18] - 144:20, 161:3, 220:11, 232:2, 234:15, 255:3, 266:11, 328:17, 331:9, 337:4, 337:5, 337:6, 337:7, 337:9, 337:10, 337:11, 337:12, 337:13
**examine** [4] - 206:2, 206:25, 207:17, 296:19
**examined** [11] - 144:10, 150:16, 192:1, 204:21, 204:25, 205:2, 205:10, 205:16, 206:9, 207:20, 234:10
**examiner** [2] - 260:22, 288:24
**example** [2] - 201:20, 263:11
**except** [5] - 181:19, 214:20, 253:16, 274:15, 328:9
**Except** [1] - 192:18
**exception** [1] - 194:17
**excessive** [2] - 202:13, 202:19
**excluded** [1] - 180:5
**exculpatory** [1] - 229:2
**excuse** [3] - 301:4, 314:17, 332:4
**Excuse** [5] - 231:19, 312:16, 318:20, 327:25, 335:12
**excused** [2] - 234:3, 334:7
**execute** [1] - 226:16
**Exhibit** [15] - 143:14, 143:15, 143:24, 227:9, 227:24, 227:25, 286:15, 286:24, 287:3, 287:6, 287:17, 287:22, 337:18, 337:19, 337:19
**exhibit** [3] - 143:17, 286:6, 309:18
**Exhibits** [1] - 287:18
**exist** [1] - 197:2
**existed** [1] - 171:2
**expect** [1] - 264:16
**expecting** [2] - 240:3, 321:10
**experience** [8] - 150:19, 152:23, 153:1, 154:23, 170:13, 294:22, 295:1, 295:2
**experienced** [7] - 152:18, 159:10, 160:10, 189:1, 189:16, 191:5, 209:13
**expert** [2] - 192:1, 194:17
**explain** [3] - 203:1, 238:2, 304:2
**Explain** [1] - 271:17
**explained** [8] - 151:15, 159:7, 211:11,

289:23, 295:7, 295:11, 295:12, 332:12
**explanation** [3] - 188:5, 229:6, 230:4
**explanations** [1] - 173:12
**expressed** [1] - 210:12
**expression** [1] - 163:16
**extensive** [1] - 174:24
**extent** [1] - 226:7
**extremely** [1] - 218:10
**eye** [1] - 260:22
**eyes** [8] - 150:21, 150:23, 158:13, 202:8, 225:4, 229:23, 310:5, 310:11
**eyesight** [1] - 159:2

# F

**fabricated** [1] - 327:22
**face** [51] - 150:14, 203:4, 203:15, 203:17, 203:20, 219:14, 219:18, 219:22, 240:9, 240:11, 257:10, 257:24, 258:16, 260:18, 260:23, 261:13, 261:16, 267:21, 273:5, 273:6, 274:2, 274:5, 274:25, 276:3, 276:20, 276:22, 277:5, 277:18, 277:22, 278:6, 278:13, 278:17, 278:20, 279:6, 279:14, 279:20, 280:10, 281:12, 282:21, 284:13, 285:6, 289:1, 292:13, 294:1, 294:4, 310:5, 310:12, 313:16, 321:25, 327:23, 328:5
**fact** [50] - 151:20, 153:4, 153:8, 154:18, 157:15, 162:13, 162:14, 167:12, 168:23, 170:18, 174:6, 182:6, 184:9, 192:3, 194:19, 202:4, 207:20, 208:3, 208:19, 211:14, 212:10, 212:12, 212:16, 213:13, 215:19, 233:19, 233:23, 243:8, 243:10, 252:8, 258:19, 259:15, 274:1, 278:12, 280:14, 281:11, 291:19, 292:7, 295:25, 301:4, 303:9, 308:10, 308:11, 312:7, 314:14, 319:16, 320:5, 320:14, 325:8, 327:24
**facts** [2] - 160:12, 305:9
**failed** [2] - 193:10, 332:9
**failings** [1] - 201:24
**fair** [21] - 160:16, 160:19, 161:24, 165:16, 165:19, 174:22, 179:25, 197:5, 207:8, 223:2, 223:24, 261:15, 284:14, 291:14, 302:24, 311:18, 313:20, 313:23, 320:2, 326:2, 327:19
**Fair** [2] - 176:12, 302:23
**fairly** [2] - 159:14, 171:20
**Falick** [5] - 223:14, 223:15, 224:1, 224:18
**fall** [1] - 283:20
**false** [3] - 245:18, 330:8, 330:21
**familiar** [5] - 159:10, 159:14, 271:5, 271:8, 271:11
**Family** [1] - 311:4
**family** [40] - 145:16, 162:11, 162:17, 162:21, 163:6, 168:8, 182:22, 183:10, 183:11, 184:1, 192:25, 202:20, 202:21, 210:20, 212:12, 212:25, 213:18,

213:22, 214:4, 214:12, 214:18, 214:22, 223:7, 223:22, 223:25, 229:17, 249:9, 249:12, 249:18, 249:21, 250:2, 250:8, 250:9, 254:15, 292:14, 292:17, 292:19, 292:21, 292:23

**family's** [1] - 251:15
**fantastic** [2] - 304:15, 305:1
**far** [4] - 203:22, 236:17, 264:1, 316:2
**fashion** [1] - 229:2
**father** [21] - 150:8, 150:9, 150:10, 201:6, 202:7, 205:18, 206:20, 207:5, 207:6, 207:7, 211:11, 225:18, 228:23, 229:8, 229:24, 243:24, 293:14, 294:3, 298:18
**father's** [4] - 152:15, 205:22, 206:2, 229:12
**favor** [1] - 308:1
**favorable** [1] - 160:2
**February** [1] - 314:17
**federal** [2] - 225:24, 289:21
**fee** [11] - 148:15, 163:6, 163:10, 164:15, 165:12, 168:7, 170:20, 171:2, 173:1, 221:9, 226:16
**feet** [4] - 276:25, 287:13, 288:14, 288:21
**fell** [6] - 288:18, 288:20, 288:23, 302:5, 324:5
**fellow** [3] - 154:3, 312:2
**felony** [1] - 233:21
**felt** [9] - 166:2, 187:23, 200:13, 202:5, 210:5, 210:16, 267:6, 267:13, 315:18
**female** [1] - 304:9
**ferret** [1] - 221:3
**few** [16] - 147:11, 174:6, 215:1, 223:18, 226:12, 231:24, 232:4, 232:20, 247:25, 276:25, 280:6, 284:19, 303:25, 329:23, 331:7, 336:8
**Fiction** [1] - 151:3
**fiction** [1] - 151:3
**fight** [1] - 248:12
**figured** [2] - 194:2, 194:3
**finally** [2] - 280:2, 298:5
**financial** [9] - 145:15, 146:1, 162:8, 162:20, 163:3, 163:4, 163:5, 171:18, 226:7
**financially** [1] - 232:22
**fine** [1] - 316:14
**finish** [20] - 194:10, 211:8, 248:21, 249:5, 249:20, 253:1, 253:21, 263:13, 264:10, 264:12, 264:13, 264:18, 264:23, 291:1, 295:10, 295:15, 299:7, 313:1, 330:15, 330:18
**Finish** [1] - 241:14
**finished** [5] - 144:15, 236:19, 236:24, 241:14, 288:16
**finishing** [1] - 297:1
**firearm** [1] - 241:18
**firm** [1] - 224:18
**first** [38] - 144:9, 149:22, 155:5, 155:6, 159:25, 174:2, 185:13, 190:10, 190:13,

211:10, 217:5, 218:12, 224:7, 224:8, 224:9, 234:9, 235:25, 244:3, 244:5, 244:17, 244:20, 247:1, 247:2, 247:5, 247:12, 247:14, 251:24, 255:21, 256:23, 262:2, 263:1, 286:15, 289:9, 289:13, 307:5, 307:21, 331:18
**fit** [2] - 188:6, 316:15
**Five** [1] - 235:16
**five** [2] - 247:6, 268:24
**fix** [1] - 321:11
**flake** [1] - 156:13
**flaked** [1] - 156:6
**flaky** [4] - 202:22, 202:24, 203:3, 204:7
**flat** [3] - 284:20, 284:21
**flesh** [1] - 294:19
**flexible** [1] - 247:13
**floor** [2] - 155:22, 283:20
**florid** [1] - 201:22
**flourish** [1] - 200:17
**Flourish** [1] - 200:18
**fly** [1] - 151:16
**focus** [1] - 198:19
**follow** [1] - 229:19
**following** [4] - 157:24, 176:18, 221:6, 297:24
**follows** [4] - 144:11, 234:11, 262:5, 266:7
**food** [6] - 238:12, 238:13, 238:17, 238:18, 239:6, 259:24
**foot** [12] - 285:9, 285:11, 285:14, 287:8, 287:11, 287:12, 287:15, 288:12, 288:13, 288:16
**force** [3] - 183:23, 280:25, 332:25
**forcing** [1] - 296:9
**forever** [1] - 309:10
**forget** [5] - 223:12, 223:13, 291:24, 302:23, 330:13
**forgive** [2] - 151:23, 236:16
**forgot** [1] - 278:22
**form** [3] - 158:20, 204:9, 228:22
**formed** [1] - 216:11
**formerly** [1] - 145:1
**forth** [5] - 149:10, 149:17, 182:4, 323:16, 323:17
**fortune** [1] - 202:20
**forward** [1] - 292:18
**foster** [1] - 294:14
**four** [3] - 236:24, 250:12, 288:14
**fourth** [1] - 281:20
**frame** [1] - 201:6
**Frank** [19] - 158:7, 158:8, 158:14, 168:10, 174:7, 174:16, 175:4, 175:10, 175:17, 175:22, 176:6, 179:19, 179:20, 180:3, 180:16, 181:19, 185:4, 185:20, 213:4
**frank** [2] - 190:17, 201:11
**Frank's** [2] - 174:25, 175:1
**frankly** [2] - 193:22, 225:21
**fraud** [7] - 167:8, 167:9, 168:12,

174:19, 175:8, 175:10, 225:24
**free** [1] - 226:10
**freedom** [1] - 256:12
**frequently** [2] - 246:11, 247:4
**Friday** [3] - 151:11, 151:12, 252:4
**friend** [1] - 166:9
**friendly** [1] - 158:25
**friendship** [4] - 166:10, 169:17, 189:13, 232:17
**front** [17] - 146:2, 153:3, 153:7, 157:15, 157:20, 158:14, 162:2, 163:9, 167:11, 202:7, 203:21, 276:15, 276:25, 284:6, 285:24, 300:3, 300:4
**Fugitive** [1] - 149:14
**full** [1] - 143:1
**fully** [5] - 196:5, 224:22, 233:1, 233:5, 328:20
**funny** [3] - 318:19, 318:23, 319:1

### G

**gamble** [2] - 320:2, 320:12
**garbage** [5] - 180:22, 180:24, 180:25, 186:19, 187:2
**general** [1] - 163:20
**generate** [1] - 270:1
**George** [80] - 149:23, 149:25, 150:20, 151:4, 151:11, 151:19, 156:2, 156:10, 182:12, 186:18, 187:1, 188:9, 196:15, 197:7, 197:19, 197:23, 198:1, 199:17, 200:7, 200:14, 200:24, 204:14, 204:21, 204:25, 205:2, 205:8, 205:10, 205:11, 205:16, 205:21, 206:1, 206:9, 206:14, 206:25, 207:4, 207:13, 207:17, 207:20, 208:4, 208:5, 208:12, 208:16, 208:20, 208:23, 208:25, 209:2, 218:13, 219:10, 219:20, 228:19, 229:2, 229:5, 229:13, 229:14, 229:15, 229:17, 229:18, 237:15, 237:17, 243:16, 275:18, 275:24, 279:25, 280:2, 280:3, 280:7, 280:9, 292:11, 292:17, 292:22, 293:18, 294:7, 294:9, 298:2, 298:4, 298:7, 298:10, 298:12, 298:16, 299:10
**George's** [13] - 150:25, 156:15, 157:9, 196:23, 206:5, 208:1, 209:3, 217:18, 217:22, 222:7, 229:24, 292:7, 298:15
**Georgia** [2] - 145:20, 162:7
**German** [2] - 183:12, 183:19
**gesture** [1] - 242:10
**gingerly** [1] - 195:1
**gist** [1] - 148:2
**given** [6] - 159:13, 159:18, 177:7, 194:19, 206:10, 251:12
**Gleeson** [8] - 174:17, 174:18, 176:2, 176:18, 177:2, 177:5, 177:20, 188:17
**glove** [1] - 323:23
**Glover** [1] - 159:22
**gloves** [1] - 323:21
**goal** [1] - 154:16

**God** [2] - 213:10, 214:4
**gong** [2] - 265:1, 299:15
**governing** [2] - 159:11, 159:17
**grab** [2] - 219:2, 302:3
**grabbed** [4] - 243:1, 323:22, 323:23, 324:23
**Graduated** [1] - 268:2
**grand** [4] - 206:10, 206:14, 206:24, 229:1
**granted** [3] - 195:17, 326:18, 332:17
**grapple** [1] - 155:20
**grasp** [1] - 281:19
**great** [7] - 151:16, 214:10, 252:1, 259:15, 261:2, 291:7, 314:14
**greater** [1] - 160:4
**Greece** [11] - 229:11, 234:24, 236:21, 237:1, 237:2, 253:25, 267:7, 267:25, 271:1, 271:6, 320:19
**greedy** [1] - 172:4
**Greek** [16] - 150:7, 177:12, 211:3, 211:4, 235:4, 238:10, 238:19, 238:22, 259:22, 266:23, 266:25, 267:3, 267:14, 295:19, 312:2
**green** [2] - 235:5, 235:6
**Greene** [1] - 159:21
**grievance** [2] - 165:2, 171:6
**ground** [1] - 302:5
**guess** [6] - 224:15, 224:16, 269:7, 269:8, 293:12, 332:13
**guessing** [2] - 176:10, 211:18
**guilt** [1] - 296:25
**guilty** [5] - 147:3, 153:21, 153:23, 228:24, 295:6
**Guilty** [1] - 147:6
**gun** [104] - 155:20, 188:5, 188:6, 192:1, 192:3, 192:5, 192:6, 194:17, 203:16, 203:17, 217:5, 217:14, 217:16, 217:20, 218:1, 218:8, 218:9, 218:10, 218:14, 219:5, 219:10, 219:20, 240:7, 240:9, 240:11, 240:23, 241:20, 241:21, 242:7, 242:8, 242:13, 242:15, 242:18, 242:19, 242:20, 243:1, 248:12, 248:25, 257:9, 273:20, 274:8, 275:1, 275:6, 275:8, 275:21, 276:6, 276:9, 276:19, 276:22, 277:5, 278:1, 278:6, 278:8, 278:12, 278:13, 278:14, 278:20, 279:6, 279:13, 279:15, 279:17, 279:19, 280:9, 282:16, 282:24, 283:10, 283:11, 283:13, 283:14, 283:17, 284:12, 284:14, 285:3, 285:5, 288:19, 298:22, 299:1, 299:14, 300:11, 301:7, 302:5, 302:14, 302:15, 302:16, 303:16, 306:18, 306:21, 309:1, 310:19, 317:6, 317:13, 317:19, 322:15, 322:23, 323:19, 324:3, 324:4, 324:23, 325:17, 325:18, 325:20
**gun's** [1] - 303:21
**gunpoint** [1] - 182:23
**guns** [1] - 218:3
**guy** [8] - 163:3, 163:6, 268:12, 270:19,

310:25, 311:22, 323:20, 324:5
**guys** [1] - 260:3

# H

**habit** [1] - 242:4
**habits** [1] - 284:11
**Half** [1] - 170:1
**half** [8] - 173:3, 207:10, 212:3, 245:19, 245:21, 287:13, 291:20
**hammer** [2] - 192:4, 192:8
**hand** [16] - 191:6, 191:8, 242:9, 255:11, 257:10, 268:7, 276:25, 278:18, 283:8, 283:11, 284:24, 285:2, 323:22, 323:24, 324:3
**hand's** [1] - 283:10
**handed** [2] - 169:9, 169:17
**handgun** [1] - 279:13
**handle** [3] - 223:8, 269:19, 310:25
**handled** [6] - 166:25, 168:5, 179:17, 195:1, 195:4, 311:6
**hands** [2] - 162:10, 226:24
**hanging** [1] - 195:14
**Hanna** [1] - 153:3
**happy** [3] - 161:21, 166:24, 239:9
**hard** [4] - 202:20, 268:17, 280:16, 280:21
**hard-working** [1] - 202:20
**harmed** [3] - 170:21, 171:2, 189:13
**harsh** [1] - 202:9
**head** [16] - 150:13, 163:17, 195:14, 218:14, 219:6, 219:14, 253:17, 267:17, 299:1, 299:14, 305:20, 309:10, 310:24, 311:11, 311:23, 322:24
**healthcare** [4] - 168:12, 174:19, 175:8, 175:10
**heap** [1] - 187:4
**hear** [20] - 175:3, 186:21, 192:20, 230:22, 230:23, 242:21, 262:2, 264:4, 266:17, 288:18, 289:16, 297:2, 298:9, 310:3, 315:23, 316:21, 319:14, 319:15, 323:18, 327:9
**heard** [30] - 148:5, 158:3, 158:10, 163:13, 163:21, 163:22, 165:6, 165:9, 165:11, 221:5, 241:25, 251:9, 260:20, 260:21, 275:18, 285:18, 288:24, 292:22, 298:2, 298:4, 298:7, 301:20, 311:2, 311:6, 317:6
**hearing** [13] - 148:3, 176:2, 176:3, 176:8, 176:13, 176:15, 176:18, 176:19, 176:22, 177:2, 262:17, 289:7, 289:13
**hearsay** [1] - 185:7
**heart** [1] - 263:8
**held** [3] - 176:2, 182:22, 284:14
**hell** [1] - 151:23
**help** [6] - 193:4, 199:11, 311:4, 329:9, 332:5, 333:1
**Help** [1] - 329:11
**helped** [1] - 305:10

**Hempstead** [1] - 259:8
**hiding** [3] - 179:23, 180:17, 297:2
**Higgins** [6] - 246:20, 246:21, 246:23, 247:1, 247:4, 247:15
**high** [6] - 236:19, 236:21, 236:22, 236:23, 253:25, 268:2
**higher** [1] - 159:24
**himself** [4] - 201:13, 207:4, 207:22, 334:24
**hire** [1] - 192:24
**hired** [11] - 192:18, 192:21, 192:25, 193:3, 193:4, 214:11, 214:12, 214:13, 214:22, 311:3, 311:8
**hit** [23] - 150:10, 150:12, 163:17, 218:13, 219:1, 240:15, 240:17, 257:18, 273:2, 273:8, 273:16, 273:18, 278:20, 279:10, 279:12, 280:16, 280:21, 280:24, 298:18, 321:15, 321:21, 322:23, 324:4
**Hits** [1] - 219:6
**hitting** [2] - 217:2, 257:6
**hmm** [1] - 298:14
**hold** [3] - 186:11, 199:20, 205:19
**Hold** [3] - 288:15, 331:3, 332:11
**holding** [8] - 283:10, 283:14, 284:21, 284:22, 284:23, 285:3, 324:3
**hole** [2] - 310:5, 310:12
**holiday** [1] - 240:2
**home** [30] - 151:15, 182:20, 184:10, 212:2, 238:14, 238:21, 238:23, 258:19, 259:7, 272:10, 305:7, 305:13, 305:15, 308:1, 308:12, 312:17, 313:24, 314:3, 314:6, 314:7, 314:18, 315:9, 315:24, 316:16, 320:3, 320:4, 327:7
**homicide** [11] - 146:18, 153:6, 153:24, 154:5, 154:7, 154:14, 154:16, 156:22, 157:13, 170:17, 233:17
**honest** [2] - 190:22, 331:25
**honestly** [1] - 185:14
**honey** [2] - 307:23, 324:24
**Honey** [5] - 241:6, 307:2, 307:9, 307:18, 325:1
**Honor** [34] - 143:3, 143:9, 143:25, 144:3, 144:6, 144:13, 160:24, 161:1, 186:14, 186:23, 196:11, 199:24, 209:17, 215:18, 227:4, 227:22, 231:24, 234:1, 234:6, 234:13, 254:23, 254:25, 262:8, 263:6, 286:5, 286:22, 287:20, 309:19, 319:2, 334:5, 334:16, 334:17, 335:4, 336:5
**hook** [2] - 181:14, 181:16
**hope** [2] - 144:14, 268:13
**horse** [1] - 297:15
**hour** [2] - 212:3, 264:17
**house** [28] - 156:9, 182:21, 183:5, 183:6, 183:8, 183:25, 184:6, 184:10, 184:11, 235:20, 245:12, 269:2, 269:11, 272:10, 286:2, 303:11, 303:19, 305:12, 306:10, 308:6, 308:22, 313:21, 314:4, 314:20, 315:25, 316:17, 316:19, 317:15

11

**How'd** [1] - 279:8
**human** [1] - 146:16
**humble** [1] - 188:3
**hundred** [3] - 190:2, 193:12, 315:14
**hundreds** [1] - 195:24
**hung** [2] - 230:15, 256:12
**hungry** [1] - 172:6
**hurt** [5] - 202:6, 228:11, 232:9, 256:16, 306:24
**hurting** [1] - 232:12
**Hyperbole** [1] - 200:18

## I

**idea** [8] - 179:16, 213:15, 253:20, 290:22, 290:23, 312:15, 312:18
**identification** [5] - 227:9, 286:7, 286:17, 286:19, 309:13
**ignores** [1] - 204:15
**imagine** [1] - 143:11
**immediately** [8] - 147:7, 155:8, 181:2, 181:7, 181:8, 230:8, 327:23, 328:4
**immoral** [1] - 167:22
**impact** [1] - 150:25
**implication** [1] - 177:16
**important** [2] - 263:7, 315:18
**inadmissible** [1] - 180:11
**inadvertently** [2] - 143:16, 143:18
**incarcerated** [1] - 235:11, 246:5
**incarceration** [3] - 233:22, 246:24, 247:5
**incentive** [1] - 226:8
**inches** [2] - 284:19, 285:2
**incidentally** [1] - 204:2
**include** [1] - 261:19
**included** [36] - 146:18, 154:9, 154:10, 156:23, 157:1, 157:6, 157:17, 158:11, 158:23, 159:12, 159:18, 159:20, 160:9, 190:14, 191:18, 209:23, 210:2, 210:14, 210:23, 212:13, 213:1, 213:3, 213:6, 213:9, 213:14, 213:16, 213:17, 213:22, 215:14, 216:1, 216:12, 220:16, 221:10, 231:11, 252:18, 252:20
**includeds** [2] - 158:4, 160:12
**including** [1] - 201:21
**inconsistent** [13] - 150:3, 150:5, 205:3, 205:6, 205:10, 205:25, 206:5, 206:8, 206:19, 207:13, 207:25, 228:23, 231:5
**indeed** [3] - 204:24, 206:3, 209:14
**independent** [2] - 220:14, 224:17
**indicate** [4] - 200:2, 213:2, 229:20, 232:12
**indicated** [9] - 158:6, 177:20, 186:17, 186:25, 199:7, 199:13, 201:7, 211:16, 216:5
**indicates** [1] - 297:11
**indicating** [3] - 176:24, 182:2, 207:6
**indicted** [1] - 168:4

**indictment** [3] - 146:8, 146:19, 154:8
**indifference** [4] - 146:13, 146:16, 147:5, 153:22
**individual** [2] - 302:2, 302:7
**individuals** [2] - 201:21, 306:15
**indulge** [1] - 144:14
**ineffective** [18] - 163:25, 164:9, 164:13, 167:20, 168:19, 168:24, 169:20, 169:22, 170:2, 170:4, 170:9, 172:24, 174:3, 174:8, 174:13, 176:5, 221:8, 233:3
**ineffectiveness** [1] - 224:20
**information** [1] - 163:23
**informed** [1] - 320:17
**injured** [1] - 307:17
**injustice** [2] - 165:16, 166:2
**innocence** [2] - 179:15, 229:8
**innocent** [7] - 178:5, 184:20, 184:22, 191:7, 194:22, 207:6, 229:25
**inquire** [1] - 254:25
**INS** [1] - 233:21
**insatiable** [1] - 228:10
**Insatiable** [1] - 232:8
**inside** [3] - 218:18, 299:2, 299:15
**insisted** [1] - 184:19
**installed** [2] - 183:25, 184:6
**instance** [2] - 167:19, 167:25
**instances** [1] - 162:14
**instead** [2] - 160:16, 267:8
**instructing** [1] - 230:23
**instruction** [1] - 317:12
**instructions** [3] - 297:24, 317:5, 317:8
**intelligently** [1] - 195:2
**intend** [2] - 237:24, 334:18
**intent** [1] - 152:1
**intentional** [4] - 146:10, 147:2, 153:22, 216:7
**Interesting** [1] - 258:14
**interesting** [1] - 225:19
**intern** [1] - 193:23
**internal** [1] - 192:4
**interrupt** [3] - 238:5, 239:3, 283:1
**interrupted** [4] - 179:22, 180:16, 185:4, 185:20
**intervention** [1] - 223:7
**interview** [1] - 304:2
**interviewed** [2] - 291:4, 304:12
**intimidate** [1] - 293:6
**intimidated** [1] - 294:16
**intimidating** [1] - 218:10
**intimidation** [1] - 292:13
**intoxicated** [1] - 272:17
**introduce** [1] - 172:11
**introduced** [1] - 327:21
**intruder** [58] - 149:12, 155:18, 155:19, 178:22, 179:6, 179:25, 180:19, 181:12, 181:25, 182:3, 182:10, 182:16, 183:1, 184:24, 185:21, 187:9, 187:23, 191:8, 194:8, 194:16, 194:23, 196:24, 205:23,

206:15, 207:22, 230:25, 231:1, 231:2, 245:12, 247:24, 253:9, 253:11, 253:12, 261:3, 282:6, 290:6, 290:11, 290:19, 291:5, 291:8, 293:17, 294:10, 295:9, 301:6, 301:8, 301:20, 302:15, 305:6, 305:14, 308:13, 308:22, 312:19, 312:20, 312:22, 313:25, 327:4, 327:10, 331:24
**intruders** [7] - 182:22, 183:11, 184:1, 184:16, 308:6, 308:11, 315:21
**Intruders** [1] - 305:15
**invader** [5] - 314:6, 314:7, 315:25, 316:16, 316:22
**invaders** [1] - 307:17
**invasion** [10] - 182:20, 184:10, 305:13, 308:1, 308:12, 312:17, 314:4, 320:4, 327:7
**investigator** [3] - 207:21, 246:16, 246:17
**involved** [8] - 157:12, 185:8, 185:10, 185:15, 185:18, 185:19, 192:3, 328:8
**involving** [3] - 167:5, 233:20, 327:10
**Island** [2] - 235:18, 335:19
**island** [24] - 281:3, 282:15, 283:13, 283:15, 284:15, 284:20, 285:5, 285:10, 285:14, 285:15, 285:16, 286:3, 287:7, 287:13, 288:4, 288:6, 288:8, 288:17, 299:23, 300:3, 300:4, 300:13, 300:16, 324:24
**island's** [1] - 285:22
**issue** [10] - 159:19, 200:1, 220:15, 221:8, 221:13, 221:18, 224:20, 226:17, 231:3, 336:16
**issued** [1] - 176:18
**issues** [6] - 143:1, 186:4, 186:5, 186:6, 198:19, 223:8
**items** [2] - 216:14, 286:9
**itself** [1] - 152:9

## J

**Jack** [76] - 151:15, 164:14, 165:7, 166:5, 168:1, 168:6, 168:24, 169:11, 169:15, 169:17, 171:11, 171:15, 171:17, 172:15, 172:21, 172:24, 173:21, 174:2, 175:19, 176:15, 176:22, 192:19, 192:22, 193:3, 193:4, 193:6, 193:14, 193:20, 194:3, 198:12, 200:13, 201:8, 201:13, 201:14, 201:15, 201:25, 204:16, 205:9, 205:15, 210:1, 211:22, 213:15, 213:24, 214:2, 214:3, 214:9, 214:14, 215:3, 225:3, 225:13, 226:2, 226:14, 226:19, 232:6, 232:14, 232:17, 232:23, 233:8, 233:12, 245:7, 254:12, 266:19, 290:7, 290:10, 290:14, 290:15, 290:19, 290:24, 310:14, 310:24, 312:14, 312:18, 313:7
**Jack's** [1] - 214:13
**Jacks** [1] - 192:23

**Jacobson** [1] - 193:25

**jail** [8] - 147:9, 161:8, 161:15, 163:9, 168:7, 243:12, 246:9, 289:19

**Jeffrey** [1] - 167:12

**Jennifer** [2] - 179:14, 304:6

**job** [1] - 265:5

**John** [2] - 174:18, 188:17

**joust** [1] - 178:12

**judge** [38] - 143:6, 143:24, 158:2, 158:10, 158:11, 158:12, 158:16, 159:2, 159:7, 160:5, 163:24, 169:6, 203:6, 210:19, 213:2, 213:5, 215:21, 225:13, 227:6, 231:20, 234:17, 238:2, 255:18, 262:14, 262:19, 263:7, 264:6, 268:7, 287:1, 323:12, 328:14, 331:2, 331:5, 335:12, 335:22, 336:2, 336:13

**Judge** [42] - 144:14, 153:4, 153:7, 153:8, 157:16, 157:20, 157:23, 158:9, 159:3, 159:15, 167:11, 174:17, 176:2, 176:18, 177:2, 177:5, 177:20, 180:5, 180:11, 188:17, 191:20, 194:14, 195:15, 210:8, 210:12, 213:2, 213:10, 215:10, 227:17, 231:22, 255:11, 262:16, 266:9, 283:1, 286:20, 324:15, 326:17, 332:15, 334:10, 335:18, 336:16

**judge's** [2] - 158:1, 213:4

**judgement** [1] - 223:8

**judgment** [4] - 193:17, 224:7, 224:13, 224:19

**judicial** [7] - 169:2, 169:8, 169:24, 170:2, 170:5, 170:10, 254:10

**July** [12] - 166:15, 166:16, 171:10, 171:13, 171:14, 172:15, 175:20, 227:3, 228:4, 232:6, 232:24, 305:12

**jump** [3] - 318:18, 319:10, 323:19

**jumped** [1] - 323:20

**jumping** [2] - 319:12, 319:17

**June** [7] - 175:11, 175:17, 208:6, 208:7, 208:8, 208:13, 208:19

**jurors** [1] - 316:20

**jury** [73] - 146:21, 146:24, 147:1, 147:12, 149:1, 149:2, 149:9, 149:17, 149:25, 150:4, 150:6, 150:7, 150:21, 150:23, 153:21, 154:8, 155:24, 155:25, 156:19, 157:4, 159:13, 160:3, 160:9, 160:13, 184:16, 187:8, 191:6, 191:15, 191:19, 194:21, 194:22, 195:9, 196:19, 206:10, 206:14, 206:24, 209:24, 210:2, 210:21, 212:14, 213:3, 215:14, 216:1, 216:13, 229:1, 229:10, 231:6, 231:8, 231:12, 253:8, 257:17, 257:23, 259:2, 259:12, 262:20, 263:23, 267:20, 268:9, 296:25, 297:1, 301:15, 303:16, 305:6, 308:16, 308:19, 315:19, 315:23, 316:15, 320:5, 323:7, 327:3, 328:1

**justice** [1] - 271:2

**justification** [1] - 203:22

**justify** [1] - 203:16

# K

**KARTAGENER** [54] - 143:6, 143:8, 143:11, 143:23, 144:3, 144:13, 144:21, 154:2, 159:9, 160:23, 203:5, 220:12, 227:6, 227:7, 227:17, 227:20, 228:3, 228:5, 231:19, 231:22, 234:1, 234:5, 234:13, 234:16, 251:1, 254:22, 262:8, 262:14, 263:6, 263:17, 264:4, 264:10, 286:22, 287:20, 297:13, 319:2, 324:15, 328:14, 328:18, 331:1, 331:5, 334:5, 334:10, 334:16, 335:12, 335:14, 335:24, 336:2, 336:4, 336:13, 337:5, 337:7, 337:10, 337:13

**Kartagener** [10] - 190:12, 196:4, 196:21, 204:20, 232:5, 232:13, 233:1, 233:4, 329:20, 335:11

**keep** [12] - 144:17, 214:1, 235:8, 240:6, 242:6, 245:17, 247:24, 262:12, 307:16, 313:2, 316:18, 325:8

**kept** [1] - 217:13

**kick** [2] - 214:2, 215:3

**kids** [10] - 238:15, 238:24, 239:15, 272:15, 272:19, 274:23, 292:25, 293:10, 293:15, 325:3

**kill** [6] - 178:15, 194:23, 237:20, 237:22, 237:24, 321:10

**killed** [12] - 149:11, 179:6, 180:20, 181:3, 181:13, 182:10, 182:17, 187:23, 206:6, 314:7, 328:21, 328:23

**Killed** [1] - 153:16

**killing** [4] - 151:25, 203:21, 245:25, 255:24

**Kimble** [1] - 149:14

**kind** [19] - 149:14, 151:18, 157:17, 192:2, 192:17, 194:6, 213:8, 214:4, 214:14, 217:24, 225:17, 239:8, 239:10, 245:20, 300:6, 306:23, 311:21, 324:19

**kitchen** [23] - 155:20, 155:22, 216:24, 217:7, 217:17, 217:21, 218:12, 219:2, 219:7, 219:9, 241:2, 274:10, 274:19, 274:20, 276:8, 276:18, 281:4, 285:21, 285:22, 286:1, 302:3, 317:6

**knife** [2] - 323:17, 324:4

**knock** [2] - 192:17, 193:15

**knowledge** [2] - 224:21

**knows** [1] - 207:7

**KOTSOPOULOS** [3] - 234:8, 266:4, 337:9

**Kotsopoulos** [107] - 143:2, 145:7, 145:14, 145:16, 145:20, 145:22, 146:9, 147:9, 147:14, 147:19, 148:11, 148:14, 148:17, 148:24, 148:25, 149:24, 150:12, 154:1, 154:12, 154:20, 155:12, 155:14, 156:7, 156:11, 156:13, 160:11, 160:21, 163:25, 169:23, 170:21, 178:4, 178:14, 178:23, 179:1, 179:5, 180:20, 182:12, 183:5, 183:10, 183:11, 183:25, 184:7, 186:18, 187:2, 187:16, 189:14,

192:21, 192:25, 193:7, 196:15, 197:7, 197:24, 198:2, 198:13, 199:17, 200:7, 200:14, 200:24, 202:24, 203:2, 203:12, 204:21, 204:25, 205:2, 205:21, 206:1, 206:11, 207:4, 207:13, 207:17, 214:4, 214:22, 217:6, 217:7, 219:1, 219:20, 220:1, 220:19, 221:12, 222:11, 223:4, 223:7, 223:9, 223:22, 224:8, 224:24, 225:15, 228:16, 228:19, 229:16, 229:17, 230:9, 230:23, 234:6, 234:18, 234:21, 236:13, 236:17, 237:8, 254:23, 255:5, 266:13, 278:4, 287:5, 328:19, 330:7

**Kotsopoulos'** [4] - 182:21, 208:14, 222:21, 225:4

**Kotsopoulos's** [6] - 156:1, 156:9, 175:14, 204:14, 205:8, 208:9

# L

**lamb** [2] - 321:11, 321:12

**language** [5] - 147:20, 151:23, 203:24, 228:6, 267:17

**languages** [1] - 254:7

**last** [9] - 143:17, 144:15, 144:23, 163:14, 175:25, 195:16, 195:17, 196:21, 319:22

**late** [2] - 264:13, 336:15

**law** [9] - 154:23, 160:12, 167:24, 168:2, 190:7, 231:4, 231:5, 254:1, 254:3

**lawfully** [1] - 234:25

**laws** [1] - 271:3

**lawyer** [30] - 150:20, 152:19, 159:11, 160:10, 165:18, 170:14, 189:1, 189:16, 190:3, 190:10, 190:14, 191:5, 193:11, 193:17, 209:13, 245:1, 245:3, 253:17, 254:12, 255:16, 267:17, 289:20, 289:21, 310:24, 310:25, 311:11, 311:23, 326:12

**lawyer's** [1] - 249:13

**lawyers** [5] - 167:21, 169:9, 186:7, 189:22, 226:25

**lead** [2] - 153:2, 212:7

**leading** [2] - 158:6, 219:25

**learn** [6] - 224:6, 244:17, 249:11, 251:21, 303:1

**learned** [3] - 249:1, 249:7, 254:10

**least** [3] - 228:11, 228:14, 232:9

**leave** [8] - 162:16, 162:25, 212:21, 264:2, 264:7, 264:9, 275:3

**leaves** [1] - 217:7

**left** [11] - 143:16, 143:17, 181:14, 181:15, 222:22, 242:25, 258:19, 258:24, 288:19, 288:25, 323:22

**legal** [5] - 174:23, 186:3, 186:4, 186:5, 210:22

**legend** [2] - 193:21, 209:11

**lend** [1] - 224:23

lengths [1] - 291:7
less [6] - 147:22, 152:13, 152:16, 214:17, 252:18, 252:20
lesser [39] - 146:18, 154:9, 154:10, 156:22, 156:23, 157:1, 157:6, 157:17, 158:3, 158:11, 158:23, 159:12, 159:18, 159:20, 159:24, 160:4, 160:9, 160:12, 190:14, 191:18, 209:23, 210:2, 210:14, 210:23, 212:13, 213:1, 213:3, 213:6, 213:9, 213:14, 213:16, 213:17, 213:22, 215:14, 216:1, 216:12, 220:16, 221:10, 231:11
lesser-included [31] - 146:18, 154:9, 154:10, 156:23, 157:1, 157:6, 158:11, 159:12, 159:18, 159:20, 160:9, 190:14, 191:18, 209:23, 210:2, 210:14, 210:23, 212:13, 213:1, 213:3, 213:6, 213:9, 213:14, 213:16, 213:22, 215:14, 216:1, 216:12, 220:16, 221:10, 231:11
letter [23] - 171:21, 171:22, 171:24, 171:25, 172:1, 172:3, 172:11, 172:15, 172:21, 173:21, 204:10, 227:2, 227:10, 227:12, 227:15, 228:1, 228:3, 228:7, 228:8, 228:9, 232:6, 289:18
letters [1] - 286:8
level [3] - 204:2, 225:17, 285:4
Levy [1] - 228:17
liaison [1] - 214:14
Lie [1] - 325:22
lie [33] - 243:16, 243:17, 243:19, 244:12, 244:14, 244:18, 247:23, 257:21, 271:7, 284:19, 291:14, 301:13, 301:15, 301:24, 302:11, 302:22, 303:23, 307:21, 317:10, 317:21, 318:2, 318:6, 318:8, 318:10, 318:12, 322:3, 322:5, 322:7, 322:19, 322:20, 323:2, 331:14, 331:21
lied [14] - 245:14, 256:21, 256:23, 256:25, 257:1, 257:6, 257:12, 257:14, 259:5, 271:23, 281:23, 313:20, 313:23, 316:5
Lied [1] - 282:12
Lies [1] - 325:12
lies [16] - 243:24, 257:4, 267:20, 268:9, 292:24, 304:15, 305:1, 324:8, 326:3, 326:25, 327:22, 328:3, 329:10, 329:12, 330:3, 332:20
life [10] - 146:16, 153:12, 200:4, 202:14, 204:5, 256:24, 309:8, 310:11, 311:10, 329:1
light [2] - 160:2, 280:20
likeable [1] - 225:20
likely [1] - 233:17
Lincoln [1] - 163:19
line [6] - 192:14, 192:15, 203:6, 215:7, 317:18, 319:16
list [7] - 200:2, 200:12, 201:7, 201:16, 202:11, 286:10, 286:12
listen [11] - 188:24, 195:21, 214:8, 214:9, 230:19, 230:20, 234:18, 253:17,
287:10, 300:21, 310:19
Listen [3] - 189:3, 248:7, 326:20
listening [2] - 196:4, 296:4
literally [2] - 211:3, 229:23
live [4] - 189:9, 235:17, 235:19, 258:24
living [4] - 193:21, 208:16, 235:12, 301:19
loaded [7] - 203:17, 241:18, 277:17, 277:22, 280:20, 282:19, 282:21
Look [1] - 286:3
look [11] - 160:5, 168:2, 194:21, 242:20, 252:16, 285:21, 286:3, 288:19, 296:4, 309:22, 324:1
looked [8] - 177:24, 193:20, 194:1, 241:4, 242:19, 242:24, 302:7, 324:2
looking [2] - 276:6, 288:7, 314:12
looks [4] - 284:24, 285:1
loose [1] - 151:23
losing [1] - 191:14
lost [3] - 147:23, 161:21, 311:21
loud [6] - 162:3, 163:8, 163:9, 301:21
loudly [3] - 234:19, 239:19, 266:16
love [6] - 258:8, 258:11, 261:22, 292:8, 309:8, 310:11
loved [2] - 201:6, 258:6
luck [1] - 285:8
lunch [1] - 265:1
Lunch [1] - 265:10
lungs [1] - 297:23
lying [17] - 155:21, 156:2, 156:11, 261:19, 275:15, 275:16, 314:11, 314:13, 317:24, 317:25, 320:6, 320:8, 320:11, 330:23, 331:18, 332:4, 332:5

## M

mad [2] - 260:9, 260:10
made-up [1] - 312:22
maintain [5] - 166:13, 179:5, 187:9, 189:13, 232:17
maintained [3] - 166:10, 169:16, 185:2
man [6] - 151:21, 187:22, 189:13, 202:20, 229:25, 312:2
Man [1] - 149:15
man's [2] - 230:4, 246:19
manage [1] - 269:16
managed [2] - 302:2, 302:3
Manhasset [3] - 235:18, 235:19, 269:4
Manhattan [2] - 153:5, 153:7
manipulated [4] - 208:5, 208:12, 208:13, 209:4
manner [1] - 158:25
Manslaughter [1] - 157:12
manslaughter [4] - 153:23, 191:10, 194:25, 233:16
March [2] - 336:3, 336:15
mark [3] - 144:15, 286:12, 287:16
marked [4] - 227:8, 286:6, 286:14, 287:17

marks [1] - 289:1
married [5] - 236:2, 236:7, 237:7, 258:15, 258:18
marry [1] - 236:13
mask [1] - 323:21
master [2] - 209:12
material [4] - 202:21, 214:20, 221:3
mats [1] - 205:7
matter [17] - 151:20, 153:4, 153:8, 154:18, 157:14, 167:12, 170:18, 183:3, 202:4, 203:12, 211:14, 215:19, 221:24, 224:4, 231:5, 291:19, 325:8
matters [5] - 146:2, 162:8, 162:20, 163:4
mattress [4] - 275:9, 275:10, 303:13
maximum [1] - 202:15
McLogan [2] - 179:14, 304:6
meal [1] - 272:18
mean [10] - 163:5, 191:11, 202:3, 252:15, 252:16, 277:7, 281:18, 291:14, 293:9, 324:4
means [4] - 255:14, 255:16, 271:17, 271:18
meant [2] - 205:17, 236:15
meantime [1] - 325:3
measure [1] - 269:24
measured [1] - 201:4
Medicaid [3] - 167:8, 225:24
medical [5] - 260:21, 262:11, 288:24
meet [2] - 247:1, 247:4
meeting [3] - 144:23, 147:14, 210:7
meetings [10] - 145:18, 145:21, 146:1, 162:5, 162:15, 163:1, 229:16, 247:18, 247:22
members [2] - 162:17, 182:9
memo [1] - 221:1
memory [1] - 190:16
mention [8] - 230:21, 248:16, 248:22, 291:24, 295:13, 310:22, 312:12, 312:24
mentioned [8] - 160:13, 171:13, 230:21, 310:18, 310:23, 312:7, 328:10, 330:11
Mercedes [1] - 269:8
merely [2] - 177:19, 201:14
message [1] - 306:23
met [2] - 145:22, 204:8
microphone [2] - 198:4, 310:2
middle [1] - 246:24
might [3] - 144:16, 210:16, 335:14
mind [4] - 147:19, 150:25, 261:16, 262:23
minds [1] - 186:3
mine [1] - 303:21
minute [8] - 158:15, 175:25, 186:11, 205:20, 209:16, 262:3, 278:10, 331:3
minutes [10] - 174:7, 181:9, 181:10, 182:2, 215:1, 215:21, 247:25, 255:7, 280:6, 323:18
mirroring [1] - 201:14

**mis** [1] - 201:24
**misguided** [1] - 167:14
**Misguided** [1] - 167:17
**misguiding** [1] - 167:20
**misled** [1] - 244:8
**miss** [1] - 229:24
**Miss** [1] - 145:23
**mistake** [1] - 309:7
**mistaken** [5] - 164:23, 174:17, 180:12, 208:8, 212:19
**mistakes** [2] - 167:21, 167:23
**mitigate** [1] - 203:3
**model** [1] - 192:5
**Molineaux** [5] - 198:20, 199:1, 199:8, 200:1, 200:3
**mom** [2] - 299:20, 299:22
**moment** [8] - 148:4, 148:7, 231:20, 232:20, 234:17, 239:3, 261:15, 278:11
**moments** [3] - 223:18, 267:21, 313:15
**Monday** [19] - 263:11, 263:16, 263:17, 263:23, 263:24, 263:25, 264:22, 264:23, 334:20, 334:24, 334:25, 335:7, 335:9, 335:17, 335:25, 336:3, 336:5, 336:14, 336:19
**money** [41] - 148:10, 172:6, 214:10, 226:11, 228:10, 232:8, 249:13, 250:14, 250:18, 250:23, 269:16, 305:16, 305:17, 305:19, 306:6, 306:8, 306:10, 306:13, 306:24, 307:4, 307:6, 307:7, 307:10, 307:11, 307:19, 307:24, 314:16, 314:22, 314:25, 315:1, 315:5, 315:9, 315:21, 315:24, 315:25, 316:17, 316:18, 316:19, 316:22
**Money** [1] - 162:10
**month** [4] - 185:17, 247:5, 247:12, 304:24
**months** [11] - 172:21, 173:21, 185:5, 185:9, 185:16, 214:19, 247:2, 247:6, 247:14, 247:16, 247:17
**mood** [1] - 239:8
**moody** [5] - 202:22, 202:24, 203:3, 203:13, 204:7
**moral** [1] - 233:20
**morning** [19] - 143:19, 151:14, 155:3, 162:5, 186:19, 187:13, 196:18, 197:2, 200:7, 212:2, 215:24, 222:7, 268:8, 293:21, 328:19, 334:18, 334:20, 334:24, 334:25
**most** [4] - 160:2, 192:7, 195:23, 269:3
**mother** [20] - 145:23, 150:8, 150:10, 162:7, 162:17, 202:7, 205:23, 206:6, 206:15, 206:22, 211:10, 218:13, 276:2, 293:25, 294:4, 298:12, 298:18, 298:25, 329:2, 329:6
**Motion** [1] - 332:17
**motion** [10] - 163:23, 164:8, 164:13, 164:17, 195:17, 214:20, 221:2, 224:14, 233:2, 326:18
**motions** [4] - 174:23, 174:24, 334:15, 334:16

**motivated** [1] - 200:20
**motivating** [1] - 183:22
**motivations** [2] - 189:24, 189:25
**mouth** [3] - 155:5, 165:7, 198:5
**move** [7] - 192:12, 193:16, 204:13, 252:17, 326:15, 326:17, 332:15
**moved** [1] - 284:19
**MR** [135] - 143:6, 143:8, 143:11, 143:23, 143:25, 144:3, 144:6, 144:13, 144:21, 154:2, 159:9, 160:23, 161:1, 161:4, 167:4, 167:16, 173:16, 186:14, 186:15, 186:23, 186:24, 189:7, 195:15, 196:11, 196:13, 197:21, 197:22, 199:24, 199:25, 203:5, 203:9, 209:16, 209:19, 209:20, 215:18, 215:22, 220:5, 220:12, 227:6, 227:7, 227:17, 227:20, 227:22, 228:3, 228:5, 231:19, 231:22, 231:24, 232:3, 233:24, 234:1, 234:5, 234:13, 234:16, 250:21, 251:1, 254:22, 254:25, 255:4, 262:8, 262:14, 262:16, 263:6, 263:13, 263:14, 263:17, 264:1, 264:4, 264:10, 264:16, 264:18, 266:9, 266:12, 283:1, 283:4, 286:5, 286:9, 286:11, 286:13, 286:19, 286:22, 287:1, 287:4, 287:16, 287:20, 287:23, 297:13, 297:20, 309:12, 309:16, 309:19, 309:20, 319:2, 319:8, 323:12, 323:13, 324:15, 324:20, 326:17, 326:23, 328:12, 328:14, 328:18, 331:1, 331:5, 331:7, 331:10, 332:15, 332:19, 334:3, 334:5, 334:10, 334:16, 334:17, 334:23, 335:1, 335:4, 335:8, 335:12, 335:14, 335:22, 335:24, 336:2, 336:4, 336:13, 336:16, 337:5, 337:6, 337:7, 337:8, 337:10, 337:11, 337:12, 337:13, 337:14
**murder** [28] - 145:14, 146:10, 146:12, 146:13, 147:2, 147:5, 148:23, 148:24, 152:2, 152:16, 153:22, 156:18, 161:7, 168:17, 170:9, 173:25, 183:14, 184:6, 188:7, 191:8, 195:6, 198:11, 199:5, 206:11, 211:4, 233:16, 256:9
**must** [3] - 275:13, 297:10, 317:16
**myriad** [2] - 207:4, 207:8

## N

**name** [13] - 145:20, 153:12, 153:14, 154:4, 158:19, 167:10, 182:13, 223:12, 229:15, 235:23, 236:4, 246:19, 254:12
**named** [2] - 266:19, 266:21
**names** [1] - 237:14
**napkins** [1] - 205:7
**Nassau** [12] - 145:14, 147:9, 156:12, 161:7, 163:8, 167:1, 167:5, 246:9, 269:3, 269:12, 291:3, 304:8
**nasty** [3] - 171:21, 171:24, 172:1
**native** [1] - 267:4
**natives** [1] - 267:7
**near** [1] - 246:24

**Nebraska** [1] - 190:6
**need** [4] - 249:25, 289:10, 312:3, 332:8
**needed** [3] - 199:10, 274:4, 290:10
**neglected** [1] - 236:15
**negligent** [5] - 153:24, 154:4, 154:7, 157:13, 233:17
**neighborhood** [2] - 313:24, 314:5
**neighbors** [3] - 313:25, 314:2, 314:10
**nephew** [2] - 292:25, 293:2
**nervous** [5] - 242:4, 242:10, 248:6, 284:10, 311:13
**Nervous** [1] - 284:9
**neurons** [1] - 188:19
**neurotic** [4] - 202:22, 202:24, 203:2, 204:8
**never** [26] - 153:20, 162:7, 162:10, 163:3, 163:6, 167:10, 178:6, 202:5, 204:8, 233:11, 254:3, 254:9, 257:17, 257:18, 298:7, 298:10, 299:6, 300:9, 301:2, 310:18, 310:22, 312:1, 312:5, 312:7, 320:21, 327:21
**Never** [3] - 146:3, 165:4, 310:23
**new** [3] - 143:15, 289:15, 289:24
**New** [10] - 153:10, 159:11, 165:20, 190:6, 231:4, 231:5, 235:15, 259:8, 268:24, 304:1
**news** [2] - 179:14, 304:3
**News** [1] - 304:1
**newspaper** [2] - 198:4, 318:8
**next** [8] - 157:19, 234:4, 234:5, 240:25, 247:17, 252:17, 272:18, 324:21
**nice** [1] - 172:12
**nicely** [1] - 316:16
**nicest** [1] - 269:12
**Nicholas** [4] - 182:13, 228:16, 237:15, 237:17
**Nick** [6] - 154:1, 155:14, 156:13, 157:10, 230:23, 330:6
**night** [7] - 150:7, 183:14, 240:4, 306:10, 321:25, 323:7, 329:5
**Nikolaos** [1] - 234:6
**NIKOLAOS** [3] - 234:8, 266:4, 337:9
**Nobody** [5] - 188:4, 188:7, 238:23, 290:23, 315:3
**nobody** [4] - 181:18, 225:22, 238:14, 320:17
**noise** [1] - 301:20
**none** [3] - 215:5, 215:6, 215:10
**None** [1] - 155:13
**noninsulting** [1] - 195:9
**nose** [1] - 218:22
**notes** [4] - 205:17, 207:2, 207:4, 207:9, 207:16, 292:22, 292:24, 293:6
**nothing** [19] - 143:5, 156:12, 185:24, 188:13, 190:11, 191:1, 191:23, 202:20, 203:14, 204:6, 231:9, 231:13, 240:3, 252:25, 258:24, 268:15, 268:23, 294:24, 329:21
**Nothing** [4] - 151:3, 203:16, 203:17, 238:25

**notice** [2] - 313:24, 314:5
**notion** [1] - 228:23
**Nowhere** [2] - 273:9, 300:23
**number** [4] - 247:17, 258:19, 308:5, 315:12
**numerous** [1] - 183:7
**NYPD** [1] - 303:5

## O

**o'clock** [2] - 323:16, 335:17
**O'Leary** [13] - 156:6, 156:11, 182:8, 188:12, 188:13, 209:1, 209:4, 301:5, 301:11, 301:14, 302:25, 304:16, 318:10
**oath** [22] - 184:16, 206:10, 206:17, 255:7, 255:22, 255:24, 256:2, 256:5, 256:18, 271:13, 271:18, 281:22, 281:23, 282:4, 282:6, 282:8, 321:18, 326:10, 326:24, 333:12, 333:17, 333:24
**object** [6] - 203:5, 250:21, 297:13, 297:15, 319:2, 324:15
**objection** [6] - 143:20, 227:23, 286:21, 286:23, 287:19, 335:21
**obligated** [1] - 255:18
**obligation** [1] - 193:6
**obtained** [1] - 227:20
**obvious** [1] - 218:2
**obviously** [2] - 275:24, 277:24
**occasion** [3] - 147:8, 166:7, 198:1
**occasions** [4] - 148:9, 148:21, 183:7, 258:19
**occur** [7] - 151:7, 164:19, 244:1, 245:25, 252:11, 280:14, 330:10
**occurred** [12] - 145:19, 146:1, 154:12, 155:3, 164:24, 176:8, 184:11, 191:22, 194:14, 238:3, 243:7, 275:25
**occurring** [2] - 277:14, 280:7
**offense** [12] - 154:9, 154:10, 159:12, 159:18, 159:24, 159:25, 185:22, 210:14, 210:23, 216:1, 216:12, 231:12
**offenses** [22] - 146:18, 156:23, 157:1, 157:6, 158:11, 159:20, 190:14, 191:19, 209:23, 210:2, 212:13, 213:1, 213:3, 213:6, 213:9, 213:14, 213:16, 213:17, 213:22, 215:15, 220:16, 221:10
**offer** [2] - 227:17, 286:20
**office** [13] - 143:18, 145:2, 145:19, 145:22, 145:25, 162:6, 162:15, 165:22, 193:24, 222:16, 222:22, 222:25, 263:1
**officers** [3] - 265:3, 265:4, 336:18
**old** [8] - 149:13, 214:8, 214:11, 214:15, 228:19, 234:21, 237:16, 293:3
**older** [2] - 293:13, 294:16
**omnibus** [1] - 214:20
**once** [11] - 214:6, 217:10, 246:12, 298:7, 310:18, 312:1, 333:11, 333:13, 333:17, 333:23
**one** [52] - 146:12, 147:21, 148:21, 153:16, 154:17, 156:5, 158:15, 159:22,

176:3, 179:21, 181:25, 189:21, 191:6, 191:16, 192:23, 195:5, 195:8, 198:19, 202:17, 207:3, 207:16, 209:16, 211:3, 211:4, 214:5, 215:20, 226:25, 230:18, 231:3, 231:19, 233:14, 238:5, 239:3, 248:7, 269:2, 269:12, 273:10, 280:2, 285:17, 288:15, 294:20, 295:4, 304:16, 305:20, 307:5, 307:8, 326:12, 328:9, 331:3, 331:25, 335:12
**One** [5] - 143:8, 149:15, 159:21, 225:17, 300:18
**One-Armed** [1] - 149:15
**open** [5] - 149:1, 149:2, 295:24, 296:15, 309:4
**Opened** [1] - 217:13
**opened** [2] - 150:4, 151:12
**opening** [3] - 149:4, 327:21, 328:2
**opinion** [22] - 150:19, 150:20, 150:25, 151:2, 160:10, 172:2, 186:8, 186:25, 187:18, 187:20, 188:2, 188:3, 188:8, 189:22, 196:24, 197:1, 203:2, 210:22, 213:1, 228:11, 232:7
**opportunities** [3] - 225:21, 225:25, 226:12
**opportunity** [5] - 196:6, 225:22, 267:3, 284:3, 295:4
**opposed** [1] - 210:1
**oral** [1] - 336:9
**order** [6] - 155:24, 155:25, 205:8, 219:1, 290:2, 336:20
**original** [2] - 154:8, 249:2
**originally** [1] - 227:15
**otherwise** [2] - 210:5, 217:25
**ought** [1] - 230:25
**outside** [11] - 192:8, 195:7, 218:18, 219:7, 238:4, 251:6, 299:2, 302:3, 303:16, 308:6, 308:22
**outstanding** [1] - 209:13
**Outward** [1] - 284:17
**outward** [1] - 279:19
**over-and-out** [2] - 171:22, 171:25
**Overruled** [3] - 203:7, 250:25, 297:19
**own** [7] - 184:15, 201:24, 207:21, 320:3, 323:8, 331:19

## P

**pack** [1] - 332:20
**page** [3] - 153:19, 198:12, 325:16
**Page** [1] - 321:7
**paid** [4] - 214:10, 214:15, 214:17, 254:15
**pains** [2] - 259:15, 261:2
**paint** [1] - 259:15
**Palpably** [1] - 201:4
**panel** [1] - 154:16
**pants** [1] - 323:21
**paper** [1] - 289:18
**paperwork** [1] - 311:5

**parallel** [1] - 284:15
**pardon** [2] - 177:18, 263:8
**parents** [3] - 192:23, 211:3, 229:12
**part** [18] - 147:18, 159:25, 164:9, 164:14, 166:21, 168:24, 171:18, 171:19, 200:23, 204:11, 235:14, 279:13, 292:5, 297:23, 299:10, 302:11, 303:15, 304:21
**participate** [1] - 233:2
**participated** [3] - 174:21, 178:17, 178:19
**particular** [11] - 148:7, 167:25, 175:23, 186:9, 190:15, 191:25, 192:5, 192:11, 203:6, 223:1, 311:9
**partner** [2] - 153:3, 154:15
**parts** [1] - 200:5
**passed** [2] - 153:8, 223:12, 223:24
**past** [5] - 190:23, 222:13, 240:10, 240:12, 242:8
**path** [2] - 154:15, 191:25
**pause** [3] - 186:12, 199:22, 331:4
**pay** [1] - 270:16
**payment** [1] - 307:12
**peanuts** [1] - 249:14
**pendency** [3] - 209:3, 257:1, 267:2
**penned** [2] - 227:3, 227:15
**people** [15] - 165:20, 185:7, 198:21, 199:1, 199:8, 199:14, 199:21, 211:10, 218:4, 230:10, 239:6, 240:3, 269:24, 321:11, 334:18
**People** [4] - 155:12, 159:21, 159:22, 170:17
**percent** [4] - 172:3, 253:2, 269:19, 310:25
**perfectly** [4] - 188:6, 190:17, 190:25, 201:11
**Perforated** [1] - 153:17
**performing** [1] - 259:22
**perhaps** [5] - 201:12, 220:22, 228:20, 239:6
**period** [10] - 185:17, 223:25, 236:10, 244:14, 245:17, 245:22, 247:12, 321:21, 321:23, 321:24
**perjured** [2] - 322:6, 322:21, 324:10, 324:12, 326:3, 327:1, 332:21
**perjury** [8] - 268:4, 268:10, 271:3, 271:22, 275:14, 282:10, 322:8, 322:10
**Perjury** [7] - 268:6, 317:23, 322:4, 323:3, 325:14, 325:23, 325:24
**permission** [1] - 235:3
**permit** [2] - 336:6, 336:12
**permitted** [3] - 179:24, 196:5, 196:7
**perpetrated** [2] - 182:21
**person** [6] - 203:13, 221:20, 270:21, 294:20, 295:4, 309:8
**personal** [5] - 169:17, 172:8, 225:17, 225:18, 226:3
**Petitioner** [4] - 144:9, 234:9, 266:5, 334:10
**petitioner** [1] - 234:6

**PETITIONER** [2] - 334:12, 337:15
**petitioner's** [1] - 145:23
**Philip** [7] - 168:10, 174:7, 174:16, 175:10, 175:17, 175:22, 176:6
**phone** [7] - 181:14, 181:16, 212:3, 230:15, 258:5, 325:9
**photograph** [1] - 286:25
**phrase** [6] - 163:19, 177:23, 211:15, 213:12, 214:5, 220:23
**physical** [2] - 258:23, 260:4
**physically** [5] - 240:20, 258:8, 258:20, 260:14, 260:17
**pick** [4] - 258:5, 274:12, 307:1, 307:8
**picked** [5] - 167:14, 181:19, 201:22, 211:16, 325:18
**picking** [1] - 263:23
**picture** [9] - 259:16, 285:25, 287:8, 288:4, 288:8, 288:11, 309:17, 309:22, 309:23
**pictures** [2] - 300:19, 300:20
**piece** [2] - 181:20, 289:18
**pin** [1] - 219:2
**pistol** [6] - 150:11, 150:12, 150:13, 218:14, 248:24, 294:3
**pistol-whip** [1] - 218:14
**pistol-whipped** [1] - 294:3
**place** [5] - 205:7, 224:9, 268:20, 270:15, 299:24, 317:8
**placing** [1] - 156:7
**Plaintiff** [2] - 227:25, 337:18
**Plaintiff's** [5] - 143:14, 143:15, 143:24, 227:9, 227:24
**planning** [1] - 201:9
**planted** [2] - 188:12, 303:18
**planting** [1] - 313:21
**plate** [1] - 274:12
**play** [2] - 179:22, 319:20
**playing** [1] - 307:4
**plea** [1] - 167:11
**pled** [1] - 295:5
**plenty** [1] - 180:20
**pm** [3] - 265:10, 266:2, 336:24
**point** [30] - 147:21, 151:23, 157:18, 159:3, 160:17, 185:18, 191:21, 204:4, 207:3, 209:21, 211:21, 218:22, 270:18, 273:12, 273:21, 274:17, 275:3, 275:6, 278:12, 280:10, 281:2, 281:12, 296:3, 297:14, 306:19, 306:21, 311:18, 316:4, 333:16, 334:11
**Pointed** [1] - 219:14
**pointed** [7] - 219:18, 241:13, 241:16, 277:17, 277:22, 305:20, 329:12
**pointing** [5] - 277:7, 279:19, 281:10, 282:18, 285:3
**points** [9] - 198:13, 198:20, 200:2, 200:12, 201:8, 201:16, 202:11, 219:11, 229:22
**Police** [2] - 156:12, 291:3
**police** [24] - 156:5, 180:10, 181:7, 181:11, 181:12, 181:21, 182:1, 182:4,

182:8, 182:9, 182:15, 183:4, 183:6, 183:21, 205:11, 205:14, 205:22, 261:19, 301:5, 303:19, 313:20, 314:3, 318:6, 331:14
**poor** [1] - 156:13
**popping** [1] - 284:7
**porch** [1] - 218:18
**portion** [2] - 195:16, 195:18, 232:5
**positive** [1] - 253:2
**possession** [1] - 230:7
**possibility** [1] - 191:16
**possible** [4] - 198:7, 308:5, 313:24, 335:16
**post** [1] - 223:8
**post-judgement** [1] - 223:8
**postpone** [1] - 263:4
**potential** [4] - 198:12, 200:2, 202:12, 209:23
**power** [1] - 214:3
**Power** [1] - 215:5
**practical** [2] - 152:22, 154:23
**Practically** [1] - 156:3
**practice** [2] - 145:4, 145:7
**practiced** [1] - 190:7
**praying** [1] - 325:4
**prejudiced** [1] - 200:4
**preliminarily** [1] - 157:15
**preparation** [5] - 238:12, 238:17, 249:15, 260:5, 272:14
**Preparation** [1] - 259:24
**preparations** [1] - 260:7
**prepare** [3] - 221:1, 259:25, 260:3
**prepared** [10] - 144:4, 174:23, 224:22, 226:15, 233:1, 233:5, 238:25, 240:3, 272:18, 328:20
**preparing** [2] - 238:18, 239:5
**presence** [3] - 162:8, 162:11, 244:23
**present** [13] - 145:10, 145:18, 145:21, 175:2, 195:5, 195:8, 213:20, 275:24, 276:2, 276:5, 276:8, 280:7, 309:14
**presented** [6] - 154:18, 160:6, 160:7, 173:2, 173:4, 194:15
**presenting** [2] - 152:23, 287:5
**presume** [1] - 219:15
**pretty** [10] - 174:24, 180:18, 268:12, 269:14, 270:12, 270:19, 296:12, 297:10, 302:22, 329:4
**prevent** [2] - 294:21, 295:4
**previous** [2] - 286:7, 305:12
**previously** [4] - 144:22, 159:15, 207:21, 266:5
**primarily** [1] - 150:8
**prime** [1] - 183:22
**principles** [1] - 159:17
**prison** [1] - 243:13
**private** [4] - 145:4, 145:6, 204:9, 246:17
**privately** [1] - 229:20
**problem** [5] - 143:2, 223:1, 225:15,

263:17, 335:15
**problems** [1] - 263:9
**proceed** [8] - 144:4, 144:12, 186:13, 199:23, 234:12, 268:6, 268:9, 334:9
**proceeding** [1] - 143:3
**Proceedings** [1] - 336:24
**proceedings** [3] - 186:12, 199:22, 331:4
**processed** [1] - 163:23
**professed** [1] - 179:15
**professional** [4] - 172:8, 177:21, 222:12, 222:22
**proffered** [1] - 152:4
**proffering** [1] - 152:22
**profoundly** [3] - 228:11, 232:9, 232:12
**program** [2] - 296:8, 297:7
**properly** [1] - 230:15
**prosecution** [4] - 149:19, 149:23, 153:25, 160:7
**prosecution's** [1] - 230:7
**prosecutor** [5] - 158:8, 179:18, 179:19, 190:5, 230:20
**protect** [3] - 183:25, 243:17, 261:17
**protection** [2] - 183:13, 183:20
**prove** [2] - 199:11, 305:6
**provided** [5] - 149:25, 228:22, 229:7, 330:20, 330:24
**prowlers** [5] - 183:7, 183:12, 183:20, 184:1, 184:10
**prudent** [1] - 211:12
**psychological** [1] - 202:9
**psychotic** [10] - 197:18, 197:23, 198:2, 200:5, 200:10, 200:15, 200:25, 201:1, 202:6, 202:9
**Psychotic** [2] - 197:20, 197:21
**pull** [2] - 242:16, 283:17
**pulling** [1] - 283:6
**pun** [1] - 263:8
**punched** [3] - 217:5, 294:3, 298:12
**punching** [1] - 217:6
**purposes** [1] - 233:21
**pursue** [3] - 151:17, 169:18, 250:24
**pursuing** [1] - 222:8
**pushed** [1] - 323:24
**put** [16] - 149:10, 149:16, 151:21, 155:14, 187:14, 239:8, 263:18, 263:20, 294:14, 314:5, 314:20, 317:17, 317:18, 321:12, 321:13, 324:23
**Put** [1] - 270:21
**putting** [4] - 182:4, 295:1, 301:6, 313:23

## Q

**quarter** [1] - 264:8
**Queens** [1] - 167:12
**questioning** [2] - 143:12, 317:18
**questions** [29] - 160:23, 172:13, 173:6, 174:12, 189:3, 195:21, 198:24,

204:20, 212:22, 221:5, 231:23, 232:4, 254:22, 255:17, 255:18, 258:23, 291:2, 298:17, 300:21, 316:13, 318:25, 319:1, 319:18, 326:20, 328:12, 331:2, 331:7, 334:3

**quick** [1] - 143:8
**quiet** [1] - 214:1
**quite** [9] - 148:4, 155:6, 158:25, 193:22, 209:9, 229:22, 231:15, 285:8, 302:6
**Quite** [1] - 324:6
**quote** [4] - 155:9, 156:6, 193:5, 261:7
**quote-unquote** [2] - 156:6, 193:5
**quoting** [1] - 148:1

## R

**raise** [2] - 255:11, 268:7
**raised** [1] - 329:24
**raising** [1] - 224:19
**ran** [3] - 270:22, 323:19, 323:22
**rather** [4] - 147:20, 201:22, 335:17, 336:9
**rationale** [1] - 226:4
**reached** [3] - 311:16, 312:2, 334:23
**reacted** [1] - 157:18
**reaction** [7] - 148:3, 152:8, 158:13, 216:6, 216:11, 216:14, 216:15
**read** [5] - 221:2, 232:5, 297:18, 300:16, 315:6
**reading** [1] - 323:14
**ready** [3] - 157:3, 248:6, 321:12
**real** [2] - 201:4
**realistic** [1] - 188:3
**realized** [2] - 192:2, 312:10
**really** [4] - 191:10, 215:8, 229:14, 267:15
**reason** [2] - 201:5, 329:17
**reasonable** [6] - 160:1, 183:23, 186:3, 189:23, 190:18, 216:4
**Reasonable** [1] - 186:7
**reasons** [3] - 214:5, 225:16, 226:6
**recap** [1] - 144:16
**receive** [1] - 202:14
**received** [1] - 148:15
**recent** [1] - 152:22
**recently** [2] - 153:4, 153:8
**recess** [5] - 220:8, 265:1, 265:10, 335:9, 335:25
**Recess** [1] - 220:9
**recite** [1] - 181:20
**reckless** [3] - 146:12, 146:14, 147:4
**recklessness** [2] - 157:12, 157:13
**recognize** [4] - 227:10, 309:17, 309:21, 309:23
**recollection** [3] - 147:13, 198:9, 198:25
**recollections** [1] - 161:24
**recommendation** [1] - 154:21

**recommended** [1] - 192:23
**reconstruction** [1] - 195:7
**record** [9] - 154:11, 159:16, 215:11, 215:13, 245:24, 276:24, 285:1, 297:11, 297:18
**records** [1] - 302:21
**RECROSS** [4] - 232:2, 331:9, 337:7, 337:13
**RECROSS-EXAMINATION** [4] - 232:2, 331:9, 337:7, 337:13
**REDIRECT** [4] - 220:11, 328:17, 337:6, 337:12
**Redirect** [1] - 328:15
**reduced** [1] - 205:1
**refer** [4] - 166:7, 171:22, 171:25, 201:20
**reference** [5] - 227:2, 228:14, 230:6, 230:13, 247:25
**referred** [7] - 158:17, 166:8, 180:4, 190:12, 198:1, 229:13, 231:9
**referring** [6] - 166:23, 180:16, 228:13, 228:16, 229:2, 245:10
**refers** [1] - 165:23
**reflect** [2] - 276:24, 285:1
**refrain** [1] - 324:18
**refresh** [1] - 198:9
**refreshes** [1] - 198:24
**refrigerator** [6] - 285:19, 285:23, 285:24, 286:1, 286:4, 287:9
**Regarding** [1] - 215:9
**regarding** [5] - 167:2, 183:7, 199:1, 209:22, 230:25
**regret** [2] - 204:10, 329:5
**regular** [1] - 247:18
**relating** [1] - 143:18
**relation** [3] - 152:8, 163:20, 166:23
**relationship** [15] - 166:13, 171:11, 171:15, 171:17, 172:9, 172:22, 175:19, 177:7, 177:21, 222:12, 225:18, 232:21, 258:14, 266:14, 290:9
**relevance** [1] - 203:5
**religion** [1] - 238:8
**reliving** [1] - 188:19
**remember** [71] - 149:13, 153:12, 153:13, 154:4, 167:9, 176:10, 177:10, 177:23, 180:3, 180:4, 198:7, 198:8, 198:15, 198:16, 198:18, 198:22, 198:23, 201:12, 201:14, 205:13, 205:15, 213:10, 213:12, 246:19, 255:9, 277:9, 277:11, 283:21, 283:22, 283:23, 284:2, 289:2, 289:3, 289:21, 290:12, 293:19, 293:23, 297:3, 299:3, 301:9, 302:9, 302:17, 302:18, 302:19, 302:20, 302:21, 303:3, 303:7, 304:4, 304:7, 304:9, 304:10, 304:12, 304:13, 304:25, 307:12, 308:7, 308:23, 308:25, 309:7, 309:10, 313:3, 315:15, 317:17, 319:23, 323:1
**Remember** [2] - 147:23, 161:21
**remiss** [1] - 226:1

**rendered** [2] - 147:12, 177:25
**repeat** [1] - 297:16
**Repeat** [1] - 321:20
**repeatedly** [3] - 201:13, 220:14, 301:24
**repetitive** [1] - 234:17
**report** [4] - 165:1, 171:4, 171:6, 204:6
**Reporter** [1] - 297:16
**reporter** [7] - 179:14, 198:4, 304:9, 304:12, 304:14, 305:2, 318:8
**reporters** [1] - 304:23
**represent** [7] - 170:25, 192:18, 192:21, 193:1, 214:11, 214:12, 214:16
**representation** [2] - 148:16, 168:25
**represented** [1] - 199:9
**representing** [1] - 193:17
**request** [5] - 162:25, 214:13, 215:14, 230:3, 231:11
**requests** [1] - 156:21
**requiring** [1] - 199:19
**research** [2] - 221:1, 222:17
**resembling** [1] - 300:10
**respect** [18] - 147:1, 147:4, 153:21, 159:20, 160:20, 167:20, 167:23, 168:20, 168:25, 171:11, 180:10, 180:22, 205:13, 220:15, 220:18, 221:8, 224:8, 230:24
**respond** [1] - 183:7
**responded** [1] - 161:18
**Respondent** [1] - 287:21
**Respondent's** [2] - 309:12, 309:19
**respondents** [1] - 287:17
**response** [3] - 155:2, 184:9, 319:21
**responsibility** [4] - 170:24, 259:25, 262:16, 330:3
**responsible** [4] - 201:23, 260:6, 289:5, 329:1
**responsibly** [1] - 326:21
**responsive** [2] - 332:16, 332:18
**responsively** [1] - 188:25
**rest** [3] - 168:19, 213:10, 262:13
**restaurants** [2] - 205:7, 229:18
**rests** [1] - 334:10
**RESTS** [2] - 334:12, 337:15
**result** [5] - 152:12, 165:17, 167:14, 183:20, 223:6
**resulted** [1] - 233:18
**resume** [1] - 334:20
**retain** [1] - 223:7
**retained** [1] - 223:21
**retrieve** [3] - 217:20, 218:25, 219:21
**retrieved** [2] - 150:11, 219:11
**review** [1] - 209:17
**rhetorical** [1] - 200:16
**Richard** [2] - 149:14, 170:17
**riddled** [1] - 326:3
**ripped** [1] - 294:12
**risk** [2] - 191:14, 307:16
**road** [1] - 187:16

**robbery** [2] - 182:20, 184:10
**rock** [1] - 163:18
**Rockland** [1] - 335:18
**role** [3] - 220:18, 220:24, 220:25
**rolled** [2] - 158:13, 283:25
**rolling** [3] - 160:20, 190:13, 219:2
**room** [6] - 162:16, 162:25, 163:1, 195:5, 210:11, 301:19
**round** [2] - 152:10, 192:6
**Rounds** [1] - 167:12
**route** - 314:22
**rubble** [2] - 187:4, 197:3
**rule** [3] - 159:20, 159:23, 159:25
**ruled** [1] - 180:11
**rules** [1] - 159:11
**run** [5] - 230:17, 241:6, 270:9, 270:22, 324:2
**running** [3] - 226:5, 302:3, 324:1
**Runyon** [1] - 192:17
**rustle** [2] - 305:25, 306:18

---

**S**

---

**sad** [1] - 153:9
**Sad** [1] - 239:9
**safe** [7] - 156:8, 188:7, 299:24, 314:20, 315:8, 315:10, 316:19
**safety** [1] - 317:5
**Sally** [3] - 236:3, 236:4, 236:11
**Sam** [1] - 149:10
**Sarikas** [42] - 144:5, 144:22, 161:5, 163:24, 164:17, 170:8, 170:19, 173:5, 173:17, 174:4, 177:19, 178:14, 182:19, 184:4, 185:25, 186:16, 188:14, 188:22, 192:18, 196:14, 200:1, 204:13, 209:21, 212:22, 215:13, 218:2, 220:5, 220:13, 228:1, 228:4, 231:23, 232:4, 233:14, 266:21, 266:23, 267:3, 267:9, 267:13, 310:18, 311:2, 311:3, 313:9
**SARIKAS** [3] - 144:6, 144:8, 337:4
**sat** [4] - 154:15, 159:15, 281:3, 296:15
**Saturday** [8] - 151:7, 151:14, 212:1, 222:7, 238:4, 238:5, 259:22, 260:18
**saw** [12] - 158:12, 202:6, 221:13, 261:15, 267:10, 276:11, 294:7, 299:20, 299:22, 303:5, 308:15, 323:20
**scare** [16] - 218:9, 219:1, 240:8, 240:12, 241:10, 248:12, 248:24, 273:20, 273:23, 273:24, 274:6, 274:15, 274:16, 274:20, 275:2, 277:24
**scared** [3] - 243:12, 274:17, 316:11
**scaring** [1] - 274:2
**scenario** [1] - 312:18
**scenes** [1] - 223:6
**schedule** [1] - 334:19
**school** [8] - 236:19, 236:22, 236:23, 253:25, 256:4, 268:2, 294:12
**schooling** [1] - 236:18
**Schroeder** [13] - 158:8, 179:17,

179:21, 179:22, 185:20, 209:2, 209:5, 210:9, 210:10, 230:20, 296:24, 297:12, 298:20
**Schroeder's** [7] - 179:20, 180:17, 185:4, 318:18, 319:10, 319:21, 327:16
**scream** [2] - 309:5, 318:15
**screamed** [2] - 308:4, 308:18
**screaming** [6] - 297:12, 309:6, 319:23, 325:8, 327:15, 327:17
**search** [1] - 190:16
**second** [15] - 154:15, 158:5, 180:1, 189:4, 204:11, 231:19, 238:5, 254:6, 279:3, 283:1, 284:10, 288:15, 309:9, 332:11, 335:12
**Second** [1] - 236:1
**second-sat** [1] - 154:15
**security** [2] - 183:24, 184:5
**see** [37] - 158:2, 159:1, 161:16, 175:3, 188:18, 192:4, 192:8, 198:9, 198:24, 223:16, 225:1, 241:5, 242:25, 243:3, 249:12, 252:13, 263:2, 264:1, 267:8, 268:20, 283:2, 288:4, 308:3, 308:14, 317:7, 318:25, 319:3, 319:4, 319:19, 323:16, 323:25, 324:12, 325:1, 325:17, 336:14
**See** [1] - 188:16
**seeing** [2] - 241:7, 300:10, 311:25
**seeking** [1] - 157:5
**seem** [2] - 183:23, 318:21
**selecting** [1] - 263:24
**selection** [1] - 262:21
**semi** [1] - 192:8
**semi-automatics** [1] - 192:8
**semiautomatic** [1] - 152:11
**seminal** [1] - 159:21
**sending** [1] - 306:23
**sense** [1] - 222:22
**sent** [2] - 198:12, 201:8
**sentence** [7] - 164:12, 202:13, 202:14, 202:19, 221:11, 223:18, 228:7
**sentenced** [1] - 226:21
**sentencing** [5] - 164:5, 164:6, 164:7, 224:24, 230:22
**September** [3] - 170:6, 172:23, 173:19
**series** [1] - 298:16
**serious** [2] - 212:5, 280:24
**served** [2] - 320:18, 321:2
**services** [1] - 230:10
**serving** [1] - 222:15
**set** [1] - 221:2
**settled** [1] - 199:21
**several** [2] - 154:17, 214:19
**severely** [1] - 170:21
**sex** [4] - 167:1, 167:4, 167:7
**sex-abuse** [2] - 167:1, 167:4
**shelter** [3] - 258:25, 259:3, 259:8
**Shepard** [1] - 149:11
**Shepherd** [2] - 183:12, 183:20
**ship** [1] - 220:23

**shirt** [1] - 323:21
**shocked** [1] - 163:15
**shoot** [7] - 178:15, 194:22, 218:4, 218:11, 299:20, 299:22, 302:16
**shooting** [23] - 151:22, 152:8, 152:10, 153:16, 181:7, 182:2, 182:7, 203:4, 203:15, 203:18, 203:19, 206:11, 216:6, 216:7, 216:11, 216:16, 216:18, 216:21, 217:19, 219:25, 230:9, 267:21, 328:4
**shoots** [2] - 155:19, 309:2
**short** [5] - 144:17, 186:10, 193:19, 202:25, 236:10
**shortly** [4] - 182:7, 221:11, 223:18, 249:6
**shot** [49] - 150:14, 153:16, 178:22, 179:6, 179:10, 180:19, 181:2, 181:13, 182:3, 182:10, 182:16, 183:6, 184:17, 187:15, 187:24, 202:7, 205:23, 206:6, 206:22, 211:15, 214:6, 219:21, 243:5, 243:10, 253:8, 257:10, 257:24, 258:5, 258:16, 260:18, 261:7, 261:10, 261:13, 261:16, 288:25, 290:3, 290:6, 290:19, 293:25, 294:4, 301:21, 309:8, 310:21, 313:16, 314:7, 321:25, 323:19, 327:12, 327:23
**show** [11] - 152:15, 227:8, 261:2, 286:14, 286:15, 301:5, 306:3, 307:2, 307:9, 307:18, 307:23
**Show** [4] - 227:19, 276:21, 288:7, 300:19
**showed** [4] - 151:2, 308:12
**showing** [1] - 218:9
**shows** [2] - 263:8, 286:10
**shrewd** [1] - 268:19
**sic** [1] - 298:12
**side** [4] - 167:13, 279:18, 280:20, 304:2
**sidebar** [4] - 262:4, 262:5, 262:7, 264:25
**sidetracked** [1] - 194:6
**sign** [3] - 172:23, 173:17, 336:21
**signature** [2] - 227:12, 227:13
**signed** [3] - 153:19, 170:6, 173:3
**significance** [1] - 238:8
**similar** [5] - 152:23, 152:24, 154:24, 175:23, 271:2
**simple** [2] - 260:17, 319:13
**simplified** [1] - 316:4
**simply** [4] - 200:22, 201:19, 291:8, 296:8
**single** [2] - 153:19, 207:16
**single-space** [1] - 153:19
**sister** [3] - 201:21, 208:9, 208:14
**sit** [4] - 241:22, 278:2, 321:9, 323:9
**sitting** [7] - 155:18, 158:8, 243:4, 299:11, 299:23, 301:19, 316:20
**situation** [4] - 154:24, 190:21, 262:12, 292:3
**six** [1] - 247:6
**Six** [1] - 265:8

**Sixth** [1] - 291:3
**skew** [1] - 321:14
**skilled** [1] - 209:13
**slapped** [4] - 273:3, 273:5, 273:6
**sleeping** [1] - 306:5
**sleeve** [1] - 323:23
**slight** [1] - 230:23
**slow** [1] - 248:10
**Slow** [1] - 323:11
**slowly** [5] - 234:19, 238:2, 239:18, 248:10
**smack** [4] - 274:25, 275:2, 279:20, 299:14
**smacked** [6] - 274:1, 276:2, 278:13, 280:10, 281:11, 282:21
**smacking** [1] - 274:5
**small** [2] - 158:6, 306:18
**smart** [5] - 270:12, 270:14, 270:15, 270:18, 293:5
**smarts** [1] - 268:21
**smell** [2] - 239:20, 239:21
**smelled** [2] - 239:17, 239:22
**smiling** [6] - 318:21, 318:25, 319:3, 324:13, 324:14, 324:17
**so-called** [1] - 160:20
**sober** [1] - 203:13
**sold** [1] - 320:4
**Someone** [2] - 164:16, 164:17
**someone** [2] - 194:1, 218:9
**Sometimes** [1] - 167:22
**sometimes** [2] - 190:25, 240:19
**Somewhat** [3] - 182:18, 280:18
**somewhat** [1] - 177:12
**somewhere** [4] - 264:7, 275:13, 317:6, 317:15
**son** [39] - 149:24, 152:6, 152:7, 196:15, 198:2, 200:15, 200:25, 201:1, 217:4, 230:2, 243:16, 243:19, 244:6, 244:10, 244:12, 244:17, 251:25, 252:8, 252:16, 271:25, 275:18, 284:7, 293:1, 293:25, 294:19, 295:1, 295:2, 295:5, 295:19, 295:24, 296:3, 296:16, 296:19, 298:2, 299:3, 300:9, 300:14, 312:1, 318:16
**son's** [4] - 182:13, 200:5, 300:23, 312:4
**sons** [2] - 261:20, 293:22
**sorry** [23] - 156:25, 167:4, 167:17, 172:14, 173:15, 184:3, 186:1, 186:21, 186:23, 188:15, 188:23, 191:3, 192:20, 200:23, 208:10, 211:7, 226:19, 241:13, 244:9, 253:3, 264:4, 289:9, 336:2
**sort** [3] - 163:22, 185:11, 260:11
**soul** [1] - 213:11
**sound** [2] - 185:24, 280:19
**source** [1] - 148:19
**space** [1] - 153:19
**Spatt** [2] - 159:15, 255:11
**spattering** [2] - 287:24, 288:11

**speaking** [1] - 335:16
**special** [1] - 238:13
**specific** [5] - 156:7, 156:8, 166:22, 166:24, 221:18
**specifically** [5] - 154:19, 171:14, 189:21, 217:20, 272:13
**SPECTATOR** [3] - 265:8, 336:20, 336:22
**spinal** [1] - 153:17
**split** [1] - 309:9
**sport** [1] - 269:11
**spread** [1] - 336:8
**Squad** [1] - 291:3
**squeeze** [1] - 175:24
**stamp** [2] - 143:16, 143:17
**stand** [10] - 143:13, 144:22, 151:22, 151:25, 152:1, 155:15, 187:15, 294:20, 330:3, 330:20
**standing** [3] - 180:3, 288:16, 298:19
**standpoint** [1] - 153:25
**stands** [1] - 147:18
**start** [9] - 194:10, 248:6, 257:4, 265:7, 282:16, 282:25, 283:18, 284:7, 316:3
**started** [30] - 179:21, 238:24, 239:16, 240:1, 240:5, 241:1, 241:7, 248:19, 248:20, 249:4, 249:7, 252:24, 252:25, 253:21, 261:16, 272:11, 280:11, 291:1, 295:9, 295:14, 297:11, 298:19, 299:1, 302:14, 312:25, 317:25, 327:15, 330:14, 330:15, 331:18
**starting** [1] - 196:22
**starts** [1] - 299:14
**State** [2] - 159:11, 165:20
**state** [2] - 159:15, 159:16
**statement** [1] - 241:14
**statements** [18] - 182:8, 204:7, 205:3, 205:6, 205:11, 205:13, 205:14, 205:22, 206:1, 206:4, 206:9, 228:22, 229:7, 229:24, 308:16, 327:21, 328:2, 328:3
**Staten** [1] - 335:19
**States** [13] - 168:10, 174:7, 175:22, 234:25, 235:3, 237:5, 254:4, 254:6, 254:9, 256:5, 267:24, 320:24, 321:4
**stay** [2] - 264:13, 309:10, 321:3
**steal** [2] - 315:25, 316:17
**step** [5] - 234:2, 244:4, 244:8, 251:23, 334:6
**Steve** [1] - 329:20
**stick** [2] - 249:2, 321:13
**sticking** [1] - 198:4
**still** [6] - 157:10, 169:11, 169:15, 169:22, 170:1, 263:10
**stippling** [1] - 288:25
**stole** [1] - 307:11
**stop** [6] - 239:3, 243:23, 274:24, 278:1, 278:9, 281:12
**stopped** [6] - 192:2, 278:10, 279:1, 281:6, 281:14
**stories** [1] - 327:7
**story** [22] - 167:15, 182:5, 228:12,

245:18, 249:2, 253:9, 253:10, 253:12, 253:15, 253:19, 261:17, 261:19, 291:8, 294:10, 304:3, 313:7, 313:11, 313:15, 327:3, 327:6, 328:7, 330:8
**straight** [2] - 282:1, 296:4
**strange** [1] - 153:13
**strategic** [1] - 270:8
**strategy** [16] - 149:5, 151:21, 155:12, 156:15, 186:6, 186:8, 186:16, 189:20, 189:23, 190:1, 190:18, 191:1, 222:8, 329:25, 332:9, 332:14
**street** [2] - 225:23, 268:21
**stricken** [3] - 195:16, 195:18, 326:19
**Strike** [1] - 332:17
**strike** [7] - 272:25, 278:17, 279:14, 285:6, 326:16, 326:17, 332:15
**strikes** [2] - 284:13, 298:25
**striking** [1] - 260:13
**stripping** [2] - 298:8, 309:1
**strong** [2] - 308:1, 308:12
**stronger** [1] - 153:25
**strongly** [1] - 153:24
**struck** [6] - 219:16, 250:10, 257:17, 260:17, 276:15, 279:6
**stuck** [1] - 202:22
**stuff** [1] - 329:4
**stumbled** [1] - 288:22
**stupid** [3] - 156:16, 270:21
**subject** [2] - 305:12, 334:17
**submission** [3] - 210:21, 215:14, 216:1
**submissions** [1] - 336:7
**submit** [2] - 160:9, 336:7
**submitted** [11] - 154:8, 154:10, 187:8, 191:19, 200:13, 202:12, 209:23, 210:2, 213:3, 213:14, 213:23
**submitting** [1] - 216:12
**subsequent** [3] - 148:8, 222:19, 223:21
**subsequently** [3] - 155:11, 224:6
**substance** [3] - 155:17, 161:19, 230:12
**substantial** [2] - 202:21, 223:25
**substitute** [1] - 144:1
**success** [1] - 269:24
**sudden** [2] - 163:8, 242:15
**suddenly** [1] - 241:3
**suggest** [2] - 208:4, 253:18
**suggested** [3] - 202:17, 208:11, 252:21
**suggesting** [1] - 198:18
**suggestion** [4] - 151:24, 152:17, 154:21, 209:6
**suggestions** [1] - 160:17
**suggests** [1] - 208:25
**suicide** [1] - 156:16
**sum** [1] - 194:21
**summarized** [1] - 213:8
**summary** [4] - 161:24, 198:12, 198:19,

20

199:7

**summation** [4] - 179:20, 179:22, 180:17, 185:4
**summations** [1] - 185:20
**summer** [1] - 193:23
**summoned** [1] - 292:11
**summons** [1] - 293:18
**Sunday** [3] - 211:3, 211:4, 252:12
**supervised** [1] - 229:16
**supervision** [1] - 222:20
**supplied** [3] - 174:12, 174:13, 202:21
**support** [8] - 181:23, 182:25, 184:2, 187:16, 205:9, 206:25, 216:3, 216:4
**supported** [2] - 179:24, 215:25
**supporting** [1] - 207:5
**supportive** [1] - 229:7
**supports** [1] - 160:3
**supposed** [10] - 147:24, 161:22, 172:25, 188:20, 188:21, 231:1, 231:2, 238:18, 311:22, 326:7
**Supreme** [1] - 153:7
**Surely** [4] - 144:18, 209:18, 283:3, 309:15
**surprise** [5] - 149:19, 210:13, 244:24, 245:1, 252:2
**surprised** [6] - 195:20, 250:12, 250:13, 250:15, 250:16, 311:21
**Sustained** [3] - 319:6, 324:16, 324:18
**swallow** [1] - 292:4
**sway** [1] - 214:3
**swear** [2] - 268:6, 313:6
**Swede** [1] - 177:11
**swore** [1] - 256:2
**sworn/affirmed** [3] - 144:10, 234:10, 266:6
**system** [3] - 254:10, 271:2, 271:8

---

# T

**table** [20] - 192:13, 241:2, 241:5, 241:22, 242:25, 248:13, 278:2, 279:1, 279:3, 283:23, 285:10, 287:10, 287:11, 287:12, 288:15, 288:16, 299:11, 310:20
**tail** [3] - 178:8, 178:10
**tale** [2] - 304:15, 305:1
**tap** [1] - 280:20
**tape** [9] - 181:18, 230:6, 230:13, 230:16, 230:18, 230:22
**tapes** [19] - 179:23, 180:5, 180:10, 180:13, 180:15, 297:2, 308:19, 308:20, 308:21, 309:5, 319:10, 319:14, 319:15, 319:19, 319:20, 327:9, 327:14
**taught** [1] - 222:17
**Taurus** [2] - 192:6, 317:5
**tears** [2] - 205:1, 229:23
**Tejada** [3] - 153:4, 153:7, 153:8
**telephone** [2] - 155:3, 230:7
**television** [1] - 179:14
**ten** [1] - 215:21

**tended** [1] - 152:15
**term** [11] - 193:15, 197:2, 197:23, 201:12, 201:13, 201:22, 205:16, 207:3, 209:11, 229:13
**terminated** [3] - 171:14, 171:17, 175:19
**terminating** [1] - 172:22
**terms** [3] - 163:9, 189:19, 201:22
**terrible** [2] - 309:9, 329:4
**testified** [55] - 144:10, 144:23, 149:22, 151:5, 151:11, 151:12, 156:17, 157:10, 161:5, 161:10, 162:5, 176:13, 176:15, 179:8, 184:18, 187:10, 189:17, 191:17, 196:22, 206:14, 207:14, 210:1, 211:17, 215:23, 215:24, 216:20, 219:20, 226:15, 229:1, 232:20, 234:10, 244:11, 251:22, 252:4, 252:9, 253:5, 254:18, 267:19, 275:12, 275:21, 278:5, 280:6, 280:9, 290:14, 298:10, 298:12, 300:14, 312:13, 312:17, 315:4, 316:5, 316:7, 326:25, 331:11
**testifies** [1] - 300:9
**testify** [11] - 155:15, 176:14, 206:18, 253:18, 292:18, 293:14, 293:18, 298:2, 311:6, 328:20, 331:23
**testifying** [5] - 244:23, 266:6, 295:5, 299:3, 315:15
**testimony** [89] - 149:25, 150:3, 150:15, 150:25, 151:19, 151:20, 152:6, 152:7, 152:14, 154:22, 155:17, 155:23, 156:15, 157:9, 163:14, 174:12, 175:3, 176:22, 176:25, 177:3, 177:7, 177:20, 179:13, 184:15, 186:17, 187:1, 188:9, 196:14, 196:18, 196:23, 197:5, 197:24, 201:3, 204:14, 205:5, 205:9, 206:5, 206:9, 206:19, 206:24, 208:1, 208:12, 209:4, 217:4, 217:18, 217:22, 217:25, 222:7, 223:18, 224:22, 225:2, 243:14, 244:2, 252:15, 260:21, 275:18, 277:20, 280:12, 285:4, 285:18, 287:7, 288:2, 288:24, 289:2, 292:7, 296:16, 298:15, 299:13, 299:16, 300:23, 312:4, 312:14, 313:19, 317:2, 317:4, 317:7, 321:7, 325:10, 325:16, 326:2, 326:3, 326:6, 327:1, 329:24, 330:21, 333:23, 333:24, 336:7
**THE** [118] - 143:4, 143:7, 143:10, 143:22, 144:1, 144:5, 144:12, 144:18, 153:10, 153:11, 158:15, 158:17, 158:18, 158:19, 158:22, 158:24, 160:25, 167:3, 173:5, 173:8, 173:9, 173:11, 173:12, 173:14, 186:11, 186:13, 186:21, 188:22, 188:23, 188:24, 189:4, 195:17, 195:25, 196:1, 196:3, 196:4, 196:9, 196:10, 196:12, 197:20, 199:20, 199:23, 203:7, 209:18, 215:17, 220:6, 220:7, 227:5, 227:19, 227:24, 228:1, 231:21, 231:25, 233:25, 234:2, 234:4, 234:12, 250:24, 254:24, 255:1, 262:3, 262:6, 262:10, 262:15,

262:25, 263:11, 263:16, 263:20, 264:7, 264:12, 264:20, 265:1, 265:9, 266:8, 283:3, 286:8, 286:10, 286:17, 286:21, 286:24, 287:2, 287:19, 287:21, 297:16, 297:19, 309:15, 309:18, 319:6, 323:11, 324:16, 324:18, 326:15, 326:18, 326:22, 328:13, 328:15, 331:3, 331:6, 332:17, 334:4, 334:6, 334:9, 334:14, 334:22, 334:25, 335:2, 335:6, 335:9, 335:13, 335:21, 335:23, 335:25, 336:3, 336:11, 336:14, 336:18, 336:21, 336:23
**theories** [2] - 156:19, 195:8
**theory** [20] - 146:14, 149:7, 151:1, 151:2, 151:16, 152:4, 152:21, 157:11, 187:3, 194:7, 194:8, 194:16, 196:23, 197:1, 290:11, 292:4, 301:6, 315:24, 316:16, 320:4
**therefore** [1] - 199:10
**thinking** [1] - 262:23
**thinks** [1] - 196:5
**thirst** [2] - 228:10, 232:8
**Thousand** [1] - 307:14
**threat** [1] - 313:25
**threaten** [1] - 274:25
**threatened** [1] - 299:13
**threats** [1] - 222:5
**three** [26] - 170:8, 172:16, 173:24, 175:13, 185:5, 185:9, 185:15, 185:17, 189:10, 198:12, 225:7, 226:21, 232:14, 233:11, 245:19, 245:21, 247:14, 248:1, 248:5, 250:22, 288:21, 291:20, 311:13, 325:7, 330:12
**Three** [2] - 189:12, 286:9
**three-month** [1] - 185:17
**three-page** [1] - 198:12
**throat** [1] - 153:17
**throughout** [3] - 191:21, 203:24, 209:3
**Throughout** [1] - 194:7
**throw** [1] - 226:12
**Thursday** [1] - 157:20
**tick** [1] - 284:9
**tie** [1] - 321:13
**tied** [2] - 182:22, 305:15
**timing** [1] - 223:16
**today** [12] - 262:20, 262:24, 263:13, 264:2, 264:11, 264:18, 281:2, 284:12, 291:25, 299:6, 333:12, 333:16
**today's** [1] - 143:12
**together** [8] - 166:17, 166:19, 166:20, 166:25, 168:9, 169:12, 222:21, 336:8
**Tom** [6] - 158:3, 158:16, 158:17, 158:20, 158:22, 213:11
**tomorrow** [1] - 262:21
**tone** [1] - 212:4
**tongue** [1] - 267:4
**Took** [1] - 217:16
**took** [21] - 158:5, 187:16, 199:18, 219:20, 220:14, 221:6, 221:7, 224:9, 230:18, 255:7, 255:24, 278:12, 279:5, 280:9, 282:23, 292:5, 302:14, 320:2,

21

326:10, 326:24, 330:20
**top** [8] - 146:8, 146:10, 146:11, 146:23, 156:18, 231:13, 283:11
**Totally** [1] - 150:5
**toughen** [1] - 292:3
**toward** [4] - 147:20, 161:14, 194:16, 199:3
**towards** [1] - 267:6
**town** [1] - 237:2
**towns** [1] - 269:12
**toxicology** [1] - 204:6
**traumatized** [1] - 296:3
**travesty** [1] - 188:20
**tremendous** [2] - 214:3, 269:21
**trial** [146] - 145:11, 145:13, 145:17, 146:4, 147:7, 148:8, 148:14, 148:24, 149:18, 149:19, 150:20, 152:19, 153:3, 154:12, 154:20, 159:10, 160:7, 160:10, 163:7, 163:8, 163:24, 164:8, 166:21, 170:14, 175:3, 178:19, 179:17, 184:15, 185:6, 185:9, 185:16, 185:18, 186:6, 186:8, 186:16, 189:1, 189:16, 189:19, 189:22, 189:23, 190:1, 190:20, 191:5, 193:17, 194:10, 195:6, 204:16, 204:19, 205:5, 206:2, 206:5, 206:20, 207:14, 207:18, 208:1, 208:17, 209:13, 214:18, 220:21, 222:21, 229:5, 229:7, 230:5, 230:8, 244:2, 244:7, 244:19, 244:20, 244:23, 245:6, 245:20, 245:22, 246:6, 247:17, 248:2, 248:6, 249:6, 249:7, 249:15, 249:16, 249:25, 251:21, 251:24, 253:5, 255:24, 256:2, 256:9, 256:12, 256:15, 256:25, 257:1, 257:17, 258:22, 259:2, 259:12, 260:21, 262:19, 262:20, 263:12, 267:2, 267:19, 271:23, 275:12, 280:4, 282:4, 282:6, 285:18, 288:24, 289:15, 289:24, 290:15, 291:17, 292:4, 292:5, 295:12, 295:18, 296:22, 298:5, 303:25, 304:17, 304:19, 304:22, 304:25, 308:2, 311:10, 311:14, 311:25, 312:14, 312:17, 313:19, 316:5, 316:7, 321:7, 326:3, 329:9, 329:17, 329:23, 330:2, 330:6, 331:11, 331:21, 332:6, 332:20, 333:2
**trial's** [1] - 148:9
**trials** [1] - 311:7
**tried** [15] - 159:4, 159:7, 167:10, 174:16, 175:1, 190:3, 191:23, 191:24, 191:25, 193:11, 240:8, 243:8, 327:6, 329:9, 331:21
**trigger** [2] - 152:12, 242:16
**true** [11] - 163:10, 179:3, 199:14, 200:22, 202:23, 204:12, 227:14, 232:19, 232:23, 232:25, 246:14
**Truly** [2] - 180:22, 194:2
**truly** [3] - 190:4, 202:4, 202:5
**trust** [4] - 252:24, 252:25, 253:3, 330:14
**truth** [49] - 177:13, 177:15, 179:23, 180:17, 188:1, 188:4, 201:5, 233:11,

247:22, 248:23, 253:8, 253:10, 255:8, 255:12, 256:7, 268:6, 268:8, 271:13, 271:18, 278:18, 280:3, 282:13, 292:12, 293:14, 295:19, 295:25, 296:1, 296:11, 296:20, 297:2, 298:5, 299:4, 313:6, 316:11, 318:16, 326:10, 326:24, 328:22, 328:23, 329:21, 329:22, 330:13, 332:1, 332:3, 333:9, 333:14, 333:19, 333:21
**Truthful** [1] - 197:16
**truthful** [4] - 172:2, 172:3, 200:7, 333:23
**truthfully** [1] - 255:19
**truths** [2] - 333:11, 333:17
**try** [11] - 159:6, 166:19, 169:13, 174:25, 191:1, 221:12, 261:2, 293:7, 303:15, 332:5, 333:1
**Try** [1] - 166:20
**trying** [21] - 153:6, 154:14, 167:9, 169:12, 174:21, 175:23, 178:12, 180:6, 190:21, 192:12, 217:3, 240:8, 241:10, 248:12, 248:24, 270:16, 278:2, 281:19, 319:17, 321:11, 327:9
**turn** [1] - 259:20
**turned** [3] - 186:19, 187:2, 197:3
**turpitude** [1] - 233:21
**TV** [3] - 238:24, 323:14, 323:15
**two** [47] - 146:7, 146:8, 146:11, 146:23, 153:18, 156:18, 159:21, 172:21, 173:3, 185:15, 185:17, 228:11, 228:14, 232:9, 232:13, 236:23, 245:19, 245:21, 246:12, 247:2, 247:5, 247:6, 247:12, 247:14, 247:16, 248:1, 266:14, 272:23, 280:6, 285:2, 287:13, 288:21, 291:20, 292:25, 293:10, 293:15, 294:17, 295:11, 306:15, 306:18, 307:17, 310:5, 311:13, 330:11
**Two** [6] - 173:21, 236:22, 236:24, 237:13, 248:5, 310:11
**two-and-a-half** [5] - 245:19, 245:21, 287:13, 291:20
**two-month** [1] - 247:12
**type** [6] - 149:11, 152:9, 192:3, 199:18, 222:12, 270:22
**typing** [1] - 313:3

**U**

**ultimately** [2] - 195:5, 306:13
**Um-hmm** [1] - 298:14
**under** [18] - 146:15, 156:18, 184:16, 206:10, 220:20, 231:4, 231:5, 256:18, 275:9, 281:22, 281:23, 282:4, 282:6, 282:8, 321:18, 333:12, 333:17, 333:24
**Under** [1] - 206:17
**Underneath** [1] - 275:9
**underneath** [5] - 150:11, 217:10, 217:13, 275:10, 303:13
**understood** [7] - 224:3, 250:19, 251:2,

256:5, 256:7, 256:9, 256:15
**unethical** [7] - 163:10, 164:15, 165:12, 166:3, 167:22, 170:15, 170:20
**unethically** [1] - 168:1
**Unfortunately** [3] - 165:3, 202:23, 262:11
**unfortunately** [8] - 167:13, 177:11, 177:12, 202:23, 203:23, 204:1, 204:11, 226:4
**union** [1] - 163:20
**United** [13] - 168:10, 174:7, 175:22, 234:25, 235:3, 237:5, 254:4, 254:6, 254:9, 256:5, 267:24, 320:24, 321:4
**unlawfully** [1] - 235:1
**unless** [1] - 264:8
**unofficial** [2] - 286:10, 286:12
**unpleasant** [1] - 161:14
**unquote** [2] - 156:6, 193:5
**unstable** [1] - 259:16
**untruthful** [1] - 256:18
**up** [84] - 152:1, 155:20, 167:14, 168:3, 179:21, 180:3, 180:16, 180:21, 181:19, 182:15, 182:22, 185:3, 185:4, 185:19, 188:5, 191:21, 193:20, 194:1, 194:21, 201:22, 211:16, 217:5, 217:19, 219:25, 230:15, 235:8, 243:8, 243:10, 245:17, 258:5, 259:17, 262:4, 264:2, 264:18, 264:19, 264:20, 274:12, 275:21, 278:4, 284:23, 285:22, 286:2, 286:6, 288:16, 290:22, 292:3, 292:11, 293:18, 295:24, 296:12, 296:24, 296:25, 297:1, 297:11, 301:4, 301:5, 301:13, 302:2, 305:15, 307:1, 307:8, 307:22, 308:4, 308:18, 309:4, 312:22, 313:8, 313:9, 315:9, 315:14, 318:15, 318:18, 319:10, 319:12, 319:13, 319:17, 321:13, 325:4, 325:18, 327:15, 328:4, 336:23
**upset** [8] - 147:22, 161:11, 165:6, 239:10, 239:11, 239:13, 240:1, 240:5, 259:21, 260:10, 260:11, 260:16, 272:14
**upstairs** [15] - 150:10, 217:8, 217:23, 218:1, 218:7, 218:24, 219:5, 219:21, 240:7, 240:22, 273:19, 275:3, 276:5, 298:22, 322:14
**upstate** [2] - 208:16, 229:18
**Urban** [3] - 301:14, 304:15, 318:3
**US** [1] - 174:16
**useful** [1] - 175:4
**utensil** [1] - 219:2
**utility** [1] - 269:11
**utterly** [2] - 196:23, 204:15

**V**

**valid** [1] - 160:12
**various** [1] - 201:21
**vast** [1] - 148:15
**vehicle** [1] - 269:11
**venture** [1] - 188:8

**verdict** [4] - 147:11, 221:2, 221:7, 221:11
**version** [7] - 156:1, 182:16, 227:14, 281:20, 301:17, 302:17, 305:10
**versions** [2] - 281:21, 281:22
**versus** [2] - 155:12, 174:16
**victim** [1] - 308:11
**view** [4] - 160:1, 190:18, 216:4, 233:19
**viewed** [2] - 156:23, 214:4
**violent** [1] - 199:2
**virtue** [1] - 219:15
**visit** [5] - 147:8, 161:8, 246:8, 247:15, 263:4
**visits** [1] - 209:1
**voice** [2] - 212:5, 235:8
**volition** [1] - 320:3

## W

**wag** [1] - 178:9
**wagged** [2] - 178:8, 178:10
**Wait** [1] - 262:3
**waiving** [1] - 203:16, 262:6, 262:8
**walk** [3] - 271:6, 272:9, 282:15
**walked** [2] - 158:10, 321:9
**walking** [1] - 158:1
**WALSH** [36] - 143:25, 161:1, 161:4, 167:4, 167:16, 173:16, 186:14, 186:15, 186:23, 186:24, 189:7, 195:15, 196:11, 196:13, 197:21, 197:22, 199:24, 199:25, 203:9, 209:16, 209:19, 209:20, 215:18, 215:22, 220:5, 227:22, 231:24, 232:3, 233:24, 263:14, 264:18, 335:4, 335:8, 335:22, 337:6, 337:8
**Walsh** [1] - 228:18
**watched** [1] - 294:3
**watching** [3] - 238:24, 323:14, 323:15
**wave** [5] - 240:8, 276:20, 276:22, 276:23
**waved** [1] - 240:11
**waving** [5] - 276:24, 277:4, 278:1, 278:5, 278:8
**wealth** [3] - 269:2, 269:22, 269:25
**weapon** [22] - 152:11, 156:8, 188:7, 192:11, 217:24, 241:10, 273:22, 275:13, 277:17, 277:22, 277:24, 280:20, 281:10, 284:4, 298:8, 300:24, 303:1, 303:9, 303:11, 303:13, 305:20
**weapons** [1] - 277:8
**wearing** [1] - 302:7
**week** [4] - 226:21, 246:12, 263:18, 315:11
**weeks** [12] - 153:18, 245:19, 245:22, 246:12, 248:1, 248:5, 291:20, 291:21, 295:11, 311:13, 329:23, 330:12
**weight** [2] - 146:12, 152:12
**well-adjusted** [1] - 203:13
**Westchester** [1] - 170:18
**whence** [1] - 233:23

**whip** [1] - 218:14
**whipped** [1] - 294:3
**whoever's** [1] - 178:21
**whole** [8] - 253:20, 276:11, 278:18, 301:6, 301:13, 301:15, 314:5, 315:11
**wholly** [1] - 199:18
**wide** [2] - 285:16, 287:10
**wife** [112] - 149:11, 151:22, 151:25, 153:16, 155:19, 155:21, 178:15, 178:23, 179:7, 179:10, 181:2, 181:13, 182:3, 182:10, 182:17, 184:17, 187:15, 187:23, 187:25, 194:23, 199:3, 203:17, 216:21, 217:1, 219:3, 219:6, 219:12, 235:22, 235:25, 237:8, 237:20, 238:15, 238:20, 238:24, 240:15, 241:5, 241:18, 242:22, 243:5, 243:11, 248:12, 248:24, 253:9, 255:25, 257:6, 257:9, 257:15, 257:18, 257:24, 258:5, 258:6, 258:15, 258:18, 259:21, 259:22, 259:25, 260:17, 261:10, 261:13, 261:16, 267:21, 272:2, 272:11, 274:6, 275:25, 276:16, 277:8, 278:13, 278:17, 279:6, 279:23, 280:10, 281:3, 281:11, 282:19, 284:13, 285:6, 285:8, 287:25, 288:22, 290:3, 290:6, 290:19, 299:7, 299:13, 301:21, 305:16, 306:13, 306:25, 307:1, 307:9, 307:17, 307:18, 309:2, 310:1, 310:4, 310:20, 313:16, 314:7, 321:11, 321:16, 321:22, 321:25, 323:16, 324:24, 325:1, 327:11, 327:23, 328:4, 328:21, 328:23
**wife's** [9] - 174:25, 175:2, 235:23, 240:11, 277:18, 285:18, 289:1, 289:5, 329:1
**willing** [2] - 244:18, 320:12
**Winkler** [1] - 170:17
**winter** [1] - 176:10
**withdraw** [7] - 162:13, 169:14, 175:16, 181:8, 186:2, 209:25, 245:4
**Withdrawn** [1] - 251:23
**witness** [25] - 149:19, 149:21, 149:22, 150:21, 150:23, 150:24, 160:24, 195:20, 197:8, 199:15, 208:22, 227:4, 229:13, 229:17, 234:3, 234:4, 234:5, 244:20, 250:22, 251:24, 264:2, 283:2, 309:14, 334:7, 334:19
**WITNESS** [14] - 153:11, 158:17, 158:19, 158:24, 173:8, 173:11, 173:14, 188:23, 189:4, 195:25, 196:3, 196:9, 220:6, 326:22
**witnesses** [1] - 335:2
**woman** [4] - 145:20, 236:4, 259:16, 303:25
**women's** [3] - 258:25, 259:3, 259:8
**word** [7] - 150:22, 153:20, 200:21, 202:9, 212:18, 251:9, 319:22
**words** [15] - 148:1, 155:5, 155:6, 163:13, 186:18, 187:24, 189:9, 201:18, 229:14, 232:8, 238:3, 248:20, 249:4, 313:3, 323:8

**world** [4] - 169:5, 269:25, 270:9, 270:19
**worry** [1] - 252:25
**worst** [1] - 309:7
**wound** [1] - 168:3
**write** [5] - 200:20, 222:18, 228:9, 229:23, 293:6
**writing** [3] - 172:21, 202:1, 204:10
**Written** [2] - 205:4, 205:6
**written** [16] - 172:1, 172:16, 173:21, 176:19, 176:21, 176:24, 177:6, 202:10, 205:17, 207:5, 207:17, 214:20, 228:22, 232:6, 292:23, 336:7
**wronged** [1] - 228:15
**wrote** [12] - 171:20, 172:15, 177:5, 200:6, 201:15, 201:19, 201:20, 202:2

## Y

**year** [13] - 145:4, 168:23, 173:3, 211:4, 211:5, 236:13, 237:4, 238:9, 245:23, 246:7, 246:8, 260:5
**year-and-a-half** [1] - 173:3
**years** [20] - 158:21, 170:8, 172:16, 173:3, 173:24, 175:13, 189:10, 189:12, 221:6, 222:24, 225:7, 226:22, 228:19, 232:14, 233:11, 236:22, 236:23, 236:24, 293:2
**yell** [5] - 295:19, 296:21, 296:22, 309:4, 318:15
**yelled** [6] - 295:24, 296:15, 297:1, 297:5, 308:4, 308:18
**yelling** [8] - 179:21, 180:3, 296:5, 296:21, 297:11, 309:6, 327:15, 327:17
**yes-or-a-no** [1] - 173:7
**yes-or-no** [1] - 195:23
**York** [10] - 153:10, 159:11, 165:20, 190:6, 231:4, 231:5, 235:15, 259:8, 268:25, 304:1
**young** [6] - 167:13, 202:5, 204:14, 206:9, 229:2, 230:4
**yourself** [22] - 256:19, 259:18, 261:17, 268:19, 269:6, 313:12, 314:12, 316:7, 322:6, 322:21, 324:10, 324:12, 326:25, 329:9, 331:22, 332:5, 332:21, 333:1, 333:13, 333:18, 334:1
**Yourself** [1] - 272:7

## Z

**zealously** [1] - 170:25