338

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
                              :
NIKOLAOS KOTSOPOULOS,          07-CV-4531
                              :
              Petitioner,
                                 US Courthouse
      -against-          :     Central Islip, NY

SUPERINTENDENT,

              Respondent.:     March 30, 2009
                               10:15 a.m.
- - - - - - - - - - - - - X

        TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE ARTHUR D. SPATT
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Petitioner:   STEVEN R. KARTAGENER, ESQ.
                      JOHN CARRO, ESQ.
                      JASON YANG, ESQ.
                      225 Broadway, Suite 21700
                      New York, New York 10007

For the Respondent:   NASSAU COUNTY DISTRICT ATTORNEY
                      262 Old Country Road
                      Mineola, New York 11501
                      BY:  MICHAEL WALSH, ESQ.
                           ILISA FLEISCHER, ESQ.

Court Reporter:       Dominick M. Tursi, CM, CSR
                      US District Courthouse
                      1180 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6108 Fax:  712-6124
                      DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

339

1          (Call to Order of the Court.)

2          THE COURT:  Appearances.

3          MR. WALSH:  For the Nassau County District

4  Attorneys Office Michael Walsh, 262 Old Country Road,

5  Mineola, New York.

6          MS. FLEISCHER:  And Ilisa Fleischer.

7          MR. KARTAGENER:  For petitioner, Steven R

8  Kartagener.

9          To my extreme right is cocounsel, former judge

10  John Carro.  To my immediate right is Mr. Kotsopoulos. And

11  my associate to my left Jason Yang.

12          We are prepared to proceed.

13          THE COURT:  Are you ready to proceed with

14  respondent's case, Mr. Walsh?

15          MR. WALSH:  Yes, your Honor.

16          THE COURT:  You may proceed.

17

18                    **EVIDENCE FOR RESPONDENT**

19          MR. WALSH:  We would call Mr. Jack Evseroff.

20

21  **JACOB R. EVSEROFF**

22          called by the Respondent, having been first duly

23          sworn/affirmed, was examined and testified as

24          follows:

25          THE COURT:  You may proceed.

340

1    MR. WALSH:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. WALSH:

4    Q.   Good morning, Mr. Evseroff.

5    A.   Good morning.

6    Q.   Mr. Evseroff, would you first tell us how old you

7    are, please.

8    A.   Next Tuesday I will be 84 years old, judge.

9    Q.   And Mr. Evseroff, are you an attorney, licensed to

10   practice law in New York State?

11   A.   That's correct.

12   Q.   How long have you been practicing law, Mr. Evseroff?

13   A.   On June 22 it will be 60 years that I am admitted to

14   practice law in the State of New York.

15   Q.   And your educational background?

16   A.   I grew up in Brooklyn.  I attended Abraham Lincoln

17   High School.  I attended Brooklyn College for one year.  I

18   then went into service.

19            When I came out of service, I went back to --

20   well, while I was in college I went to Clemson College, in

21   South Carolina, for a while.  I came out, I was back at

22   Brooklyn College.

23            I then went to St. John's Law School and

24   graduated from there.

25   Q.   And would you tell us a little bit about your

341

1   background as far as your career is concerned.

2          Where have you worked since you were admitted to

3   the bar?

4   A.   Well, I worked for a civil lawyer on 40th Street in

5   Manhattan for a while when I got out of law school.

6          I then worked on Wall Street for a negligence

7   lawyer, who was a judge in New Jersey.  A fellow by the

8   name of Harold Halpern, an aircraft negligence guy.

9          And in 1951 I was hired by the District Attorney

10  of Kings County as a criminal law investigator.  And after

11  being in that job for a while, I was promoted to a junior

12  Assistant District Attorney.  And thereafter I was

13  promoted to a full Assistant District Attorney.  And my

14  tenure in the DA's office was a total of 10 years.

15         When I left the DA's office, I went into private

16  practice.  I established a law firm in Brooklyn.  I had

17  two associates:  A fellow by the name of Gus Newmann.  A

18  fellow by the name of William Sonnenschein.  We were

19  partners for many years.  And we were separated

20  ultimately.

21         Mr. Sonnenschein passed away.  And Gus Newmann

22  is still in practice in Manhattan.

23  Q.   After leaving the District Attorneys office, what was

24  essentially the focus of your practice?

25         What type of practice did you have?

Evseroff - for the Respondent - Direct/Mr. Walsh

342

1   A.   Primarily, criminal defense work.

2   Q.   In your career would you be able to estimate about

3   how many criminal cases you have tried?

4   A.   As a prosecutor and as a defense lawyer, I would have

5   to say literally thousands.

6   Q.   How many homicides?  About how many homicides?

7   A.   I would estimate that I have participated in the

8   trial of about 50 homicide cases over the years, both

9   prosecution and defense.

10  Q.   Mr. Evseroff, did there come a time when you were

11  retained to represent the defendant Mr. Kotsopoulos?

12  A.   Yes.

13  Q.   In connection with this case?

14  A.   Yes.

15  Q.   Do you recall when it was that you were retained to

16  represent the defendant?

17  A.   I think it was around June of '02.

18  Q.   And who was it that retained you, Mr. Evseroff, to

19  represent the defendant?

20  A.   His parents.  His parents came to me.  They were

21  brought to me by a man who I had represented previously

22  who apparently knew them from Greece.

23  Q.   Now, when you met with Mr. Kotsopoulos's parents, did

24  you quote them a fee to represent Mr. Kotsopoulos?

25  A.   I did.

Evseroff - for the Respondent - Direct/Mr. Walsh

343

1   Q.    What was the fee that you quoted the Kotsopoulos

2   family?

3   A.    Well, I got a fee of $40,000.  And the reason I only

4   got $40,000 is because they had given some $90,000,

5   $95,000 to some lawyers who had been in the case before me

6   and they couldn't get their money back and they claimed

7   that they didn't have any money.  The money was tied up in

8   safe deposit boxes and in real estate.

9   Q.    Now, with the court's permission, I'm going to show

10  you what we have had marked as Plaintiff's Exhibit or

11  Petitioner's Exhibit 1.

12          THE COURT:  Could you just hold it a minute.

13          MR. WALSH:  Sure, your Honor.

14          (There was a pause in the proceedings.)

15          THE COURT:  I'm sorry.  What is this exhibit?

16          MR. WALSH:  This is Plaintiff's Exhibit, or

17  Petitioner's Exhibit 1 in evidence.

18          THE COURT:  Okay.

19  BY MR. WALSH:

20  Q.    Could you take a look at that, Mr. Evseroff.

21  A.    I did.

22  Q.    I ask whether you recognize that.

23  A.    I do.

24  Q.    What do you recognize that to be?

25  A.    This is the check that they gave me in payment of the

344

1   fee in this case.

2           I had them make out the check to my son Paul,

3   who was starting a web site at that time and wanted to

4   borrow some money.  They made out a check for $41,000 to

5   him.  He paid me back within two months, and it was

6   deposited in my firm account.

7   Q.    Okay.  Mr. Evseroff, during the course of your

8   representation of Mr. Kotsopoulos, did you ever request

9   any additional payment from the Kotsopoulos family over

10  and above the fee that you have just described that you

11  had negotiated with his parents?

12  A.    No, I did not.

13  Q.    Did you ever request from the Kotsopoulos family or

14  Mr. Kotsopoulos himself any bonus or reward in the event

15  that you were able to win an acquittal for the defendant

16  at trial?

17  A.    No.  I never requested it.

18  Q.    Did either the defendant Mr. Kotsopoulos or any

19  members of his family ever offer you any type of a bonus

20  or reward in the event that you were able to win an

21  acquittal for the defendant?

22  A.    They offered me, after I was in the case and not too

23  happy about the fact that the previous lawyers had gotten

24  some $95,000 and I got $41,000, they offered me another

25  $100,000 at the conclusion of the case, not conditioned on

Evseroff - for the Respondent - Direct/Mr. Walsh

345

1   winning the case but when the case was over.

2   Q.   Tell us when that occurred, when that conversation

3   between yourself and the Kotsopoulos family occurred, if

4   you recall.

5   A.   I can estimate that it was sometime in the fall of

6   '02.

7   Q.   And how did that come about?

8        Can you tell us how the offer that you have just

9   described came about.

10  A.   Well, of course, any conversations I had was always

11  had through an interpreter because Mr. and Mrs.

12  Kotsopoulos didn't speak one word of English.

13       What happened was, I was putting in a tremendous

14  amount of time and effort in connection with the

15  preparation of this case.  From the time I met the

16  defendant until the time he went to trial, I had to have

17  gone to see him at least 50 times in the jail in Nassau

18  County.

19       In addition to which, I had his family and the

20  witnesses in connection with this case in my office at

21  least once or twice a week for a period of over a year.

22       In addition to which, I worked along with an

23  investigator and we did things such as go to the scene of

24  the crime several times, twice or three times, take

25  pictures there, measure things.

Evseroff - for the Respondent - Direct/Mr. Walsh

346

1          In addition to which -- what else did we do?

2     Q.   Well, did you interview witnesses in connection with

3     the case as well?

4     A.   Sure.  They would be brought to my office.  I

5     interviewed witnesses.

6          Oh, yes.  The most important part.  I forgot.

7     Excuse me.

8          On or about October of '02, pursuant to a

9     request that we made, we conducted an interview of his son

10    in the office of a lawyer by the name of Mr. Flood who had

11    been appointed by the court to represent the son.

12    Q.   And when you say his son, you are referring to

13    Mr. Kotsopoulos's son?

14    A.   Yes.

15    Q.   And that would be his son George?

16    A.   Correct.

17    Q.   We will get into this in a little while, but George

18    ultimately testified at the trial of Mr. Kotsopoulos, is

19    that correct?

20    A.   Oh, he sure did.

21    Q.   All right.  Let me get back to this bonus or reward

22    that you had indicated was offered by Mr. Kotsopoulos's

23    family.

24         Did that offer from the Kotsopoulos family in

25    any way affect your representation of the defendant?

Evseroff - for the Respondent - Direct/Mr. Walsh

347

1    A.    No.

2    Q.    Did it in any way affect your trial strategy in this

3    case?

4    A.    Not at all.

5    Q.    I'm going to ask you about what your trial strategy

6    was; what your defense was in this case.

7          Can you explain to the court essentially what

8    the defense was in this case.

9    A.    Sure.

10         If your Honor please, the defense in this case

11   was one of an individual who was wrongfully charged with a

12   homicide that he did not commit; that this was a case

13   where the homicide was committed by an intruder.

14         And I think that I would like, if I may, to

15   explain the facts of the case as I understood them at that

16   time, if I may, with the court's permission.

17   Q.    I would like you to basically tell the court at this

18   time what the defense was based on.

19   A.    It was based on the fact that, No. 1, the defendant

20   at all times, start to finish, denied that he ever shot or

21   killed his wife.  No. 1.

22         No. 2, it was based upon the fact that his son

23   George had stated to the police, two or three different

24   policemen, right after the occurrence, and to neighbors,

25   that there was an intruder who did this.

Evseroff - for the Respondent - Direct/Mr. Walsh

348

1      No. 3, it was based on the fact that the

2  defendant and his wife and his children some eight months

3  before this murder had been held up at gunpoint in their

4  home.  They had been tied up, his safe had been rifled,

5  and some $48,000, as best I remember the amount, was taken

6  from the safe.

7      And that after this occurrence, from the time of

8  that robbery to the time of the homicide, which was, as

9  best I can recall, in May or so of '02, from the summer of

10  '01 to '02 there had been some 20 or 25 prowlers seen in

11  his backyard which the police had been notified about, to

12  a point where immediately before the homicide, a few days

13  before, there had been a prowler right close to the house

14  when a 9-1-1 call was made by the defendant and his wife

15  speaking to the police in fear that there was a prowler

16  trying to break in.

17      The defense also was based upon the fact that

18  although a gun case was found in the safe of his house,

19  his fingerprints were not on the gun case.

20      It was also based on the fact that the gun that

21  was recovered here had his fingerprints on the barrel

22  where he claimed he picked up the gun after it was left

23  there, but on the handle of the gun, his fingerprints were

24  not there.  And when DNA samples were taken, the first set

25  of DNA seemed to indicate the presence of some unknown

Evseroff - for the Respondent - Direct/Mr. Walsh

349

1   male, which is corrected later on in the second and third

2   DNA test.

3           THE COURT:  Excuse me one moment.  You say that

4   prior to this occurrence, the murder, that the petitioner

5   and his wife are held up at gunpoint?

6           THE WITNESS:  Absolutely.

7           THE COURT:  When is that?

8           THE WITNESS:  In the summer of '01, as best I

9   can recall, your Honor.  They were held up.  They were

10  tied up.

11          THE COURT:  And when did the trial take place?

12          THE WITNESS:  The trial took place, as best I

13  can recall, in May of '03.  As best I can remember, your

14  Honor.

15  BY MR. WALSH:

16  Q.   You had mentioned a number of calls to the police

17  from the Kotsopoulos family as a result of prowlers being

18  seen on the property.  Is that correct?

19  A.   Yes.

20  Q.   Do you recall whether or not there was any other

21  evidence that the Kotsopoulos family had taken any other

22  security measures?

23  A.   Oh, they had.

24          I recall that they had security cameras that

25  they had put up in the vicinity of the house, around the

Evseroff - for the Respondent - Direct/Mr. Walsh

350

1    house.

2              And I'm a little vague on whether these cameras

3    were working or not, I don't think they were working, but

4    I didn't put too much stock in that aside from the fact

5    that they were trying to protect themselves because

6    obviously they had been held up, they were tied up, the

7    police were there, they were freed of $48,000, whatever it

8    was, was taken from his safe.

9    Q.    Mr. Evseroff, after Carol Kotsopoulos had been shot

10   and killed, did Mr. Kotsopoulos, the defendant, make a

11   9-1-1 call to the police?

12   A.    Yes.

13   Q.    And did he shortly thereafter speak to the police and

14   give statements to the police about what had happened to

15   his wife?

16   A.    Absolutely.

17   Q.    And essentially what did Mr. Kotsopoulos tell the

18   police?

19   A.    He exculpated himself.

20   Q.    How?

21   A.    And he said that there was an intruder who did this,

22   and his son backed him up.

23   Q.    That was my next question.  His son George?

24   A.    Told the same thing, as I recall, to two different

25   police officers and to a neighbor.

351

1      And I think he got on the phone when the initial

2   call was made.  On the initial 9-1-1 call, I think the son

3   was on the phone with the father, as best I can recall.

4   Q.   Now, Mr. Evseroff, did you discuss this defense

5   strategy with Mr. Kotsopoulos, the defendant?

6   A.   Only about 50 times.

7   Q.   Did Mr. Kotsopoulos approve of this defense strategy?

8   A.   Absolutely.

9   Q.   Did he ever express any reservation about pursuing

10  that defense strategy?

11  A.   No.

12  Q.   Did he participate in the defense of his case?

13  A.   Sure, he did.

14  Q.   How so?

15  A.   Well, as this case was going on and I went to see the

16  evidence in the case -- that's another thing we did here.

17      I went to the DA's office, and Mr. Schroeder,

18  who was the assistant assigned, showed us the evidence in

19  this case.  And I got to speaking to Mr. Schroeder and we

20  made the applicable motions; A, for bail three times,

21  everything else, and motion to inspect the grand jury

22  minutes and to dismiss once.

23      But in speaking to Mr. Schroeder, after speaking

24  to the defendant, I tried to get a lie detector test given

25  to the defendant because he wanted to take one, and I

Evseroff - for the Respondent - Direct/Mr. Walsh

352

1    tried to make a deal with the DA that if he took the lie

2    detector test, irrespective of the results, they would be

3    admitted in evidence, even though that is not the law in

4    New York, your Honor.

5         Mr. Schroeder did not want to go along with it,

6    but the defendant was all in favor of taking the lie

7    detector test.

8         Also, during the course of the trial,

9    immediately before he testified he wanted to make a

10   statement to the public.  And I agreed with it.  And I set

11   it up.

12        And CBS-TV, Jennifer McLogan, came to the Nassau

13   County jail, and this is immediately before he testified,

14   and he made a statement in which he exculpated himself.

15   Q.   What did he say to Jennifer McLogan from CBS News?

16   A.   He said that this had to be committed by an intruder

17   and it wasn't he who committed the murder.

18        I'm capsulizing it now.  The interview took

19   about 45 minutes.

20   Q.   This was how long before he actually testified in his

21   own defense?

22   A.   Best I can recall, it was a few days before he took

23   the stand during the trial.

24   Q.   Did the defendant Mr. Kotsopoulos ever object or

25   express any reservations about giving this interview to

Evseroff - for the Respondent - Direct/Mr. Walsh

353

1    CBS-TV?

2    A.    Not at all.  He encouraged me to do it.  And he spoke

3    to them in the jail.

4    Q.    Mr. Kotsopoulos did end up testifying in his own

5    defense at trial?

6    A.    He did.

7    Q.    Essentially, what did he testify to?

8    A.    Essentially, he testified in a nature of a general

9    denial.  He did not do it.

10          He was on the stand, as I recall, the better

11   part of four days or so.

12          I wasn't too happy with the testimony because I

13   thought it was very restrictive.

14   Q.    There came a time --

15   A.    I'm talking about the cross.

16   Q.    I understand.

17          THE COURT:  Talking about what?

18          THE WITNESS:  The cross-examination of him was

19   very restrictive.

20          The District Attorney was questioning him in

21   terms of answering yes or no.  And he tried to explain and

22   the trial judge, Judge Belfi, would not allow him to do

23   it.

24          And I objected innumerable times because of the

25   restriction when he tried to explain.

354

1    BY MR. WALSH:

2    Q.   Mr. Evseroff, I'm going to ask you a couple of more

3    questions about some of the things the defendant did

4    during the trial.

5             There came a point in the trial during the

6    people's case when his son George was called upon to

7    testify as a witness.  Correct?

8    A.   He was the first witness in the case.

9    Q.   During George's testimony -- by the way, George was

10   12 years old at the time?

11   A.   I thought he was 13 or 14.  I could be wrong.

12   Q.   During George's testimony, did the defendant do or

13   say anything during the course of his testimony with

14   respect to his son?

15   A.   Well, when he heard his son get up and inculpate him,

16   at one point during the testimony he had an outburst.  He

17   jumped up and he screamed at the son, in words or

18   substance:  *Why don't you tell the truth?*

19             Now, this is the same son who had exculpated him

20   previously all over the place.

21   Q.   We will get into that in a little bit, Mr. Evseroff.

22   A.   Sure.

23   Q.   The defendant also had another outburst during the

24   trial; if I'm not mistaken, I believe during

25   Mr. Schroeder's summation.  If you recall.

Evseroff - for the Respondent - Direct/Mr. Walsh

355

1   A.   I don't recall.

2   Q.   All right.  At any time, Mr. Evseroff, during your

3   representation of Mr. Kotsopoulos, did he ever tell you or

4   admit to you that he in fact had shot his wife?

5   A.   Never.

6   Q.   Either intentionally or accidentally.

7   A.   He never said to me in words or substance that he

8   ever shot his wife.  At all times he denied shooting his

9   wife and claimed that it was done by some intruder.

10  Q.   When you say at all times, that is both before and

11  during the course of his trial?

12  A.   That's correct.

13  Q.   And after trial?

14  A.   And after the trial as well.

15  Q.   Were you ever offered, Mr. Evseroff, a plea in this

16  case?

17  A.   Never.

18  Q.   Or an offer from the District Attorneys office of a

19  sentence recommendation if the defendant were to plead

20  guilty?

21  A.   Never.

22  Q.   Did you ever ask for a plea, of the District

23  Attorneys office?

24  A.   No, I did not.

25        I had a client who claimed he was innocent, and

Evseroff - for the Respondent - Direct/Mr. Walsh

356

1   all the facts as we developed them seemed to indicate that

2   he was.

3   Q.   I want to get back to George Kotsopoulos, the

4   defendant's son.

5        I believe you said he was the first witness who

6   testified for the people?

7   A.   Yes.

8   Q.   Now, am I correct that George Kotsopoulos, when he

9   testified at trial, told the jury that his father,

10  Mr. Kotsopoulos, in fact shot Mrs. Kotsopoulos in the

11  kitchen of the home?

12  A.   Yes.

13  Q.   At that point in time -- let me ask you this -- did

14  that come as a surprise to you?

15  A.   Surprise?  It is what I characterize as trial by

16  ambush.

17  Q.   What do you mean by that?

18  A.   What I mean by that is, we were never given any

19  discovery material with respect to his statements.  All we

20  had was exculpatory material from this young man that we

21  were given, the exculpatory statement that he made to the

22  police around the time of the shooting.

23       Plus, we had the fact that we had a one-hour

24  interview with him.

25       Plus, we had exculpatory material in the grand

Evseroff - for the Respondent - Direct/Mr. Walsh

357

1    jury when he testified.

2           And, lo and behold, we come to court, and the

3    first witness is this young man who testifies that for the

4    first time he surfaced with this three months before the

5    trial, which would be three months after I had interviewed

6    him.

7           So I characterize it as trial by ambush.

8    Q.   Well, Mr. Evseroff, after George testified at trial

9    against his father, did you explore the possibility of a

10   plea offer at that point in time?

11   A.   No.

12   Q.   Wasn't George's testimony a significant blow to the

13   defense, to the defense strategy?

14   A.   It was.  But I saw George's testimony in the nature

15   of a recent fabrication, because in addition to all the

16   prior statements that George had made inculpating his

17   father -- that is, the grand jury, the interview I had

18   with him, the statements made to the police around the

19   time of the occurrence, and statements made to a

20   neighbor -- in addition to all of that, which had been

21   turned over to us during the pendency of the case, George

22   had been put into the custody of his aunt, the mother's

23   sister.  And during that period of time, he had been

24   visited by the defendant's family, defendant's mother, his

25   father, brother, his nephew.  And George had been writing

Evseroff - for the Respondent - Direct/Mr. Walsh

358

1  notes to these people exculpating his father, wishing him

2  well.  And those notes had been turned over to me and I

3  had used those during the cross-examination of George.

4  Q.  That is what I want to ask you about.

5       Obviously, you cross-examined George

6  Kotsopoulos, the defendant's son.  Correct?

7  A.  That would be a massive understatement.

8  Q.  All right.  What was essentially the basis of -- what

9  did you use to cross-examine George Kotsopoulos?

10  A.  All of the prior statements that he had made in the

11  various places that I have articulated to you, as well as

12  the notes that he wrote.

13  Q.  Statements to the police?

14  A.  Statements to the police.  Statements to a neighbor.

15  Statements to me and to our investigator.  Statements in

16  the grand jury.

17       Notes that he had written to the family.  I

18  think I put some ten of them into evidence.

19       I don't think that the testimony was the

20  controlling factor in the conviction in the case.

21  Q.  What do you mean by that?

22  A.  I don't think that that -- because I think that the

23  jury went into the room seeing that this was in the nature

24  of a recent fabrication.  The absence of any discovery

25  material, any Rosario material.

359

1    That is not what I think did it in connection

2  with the case.

3  Q.   Well, let me ask you, since you brought it up, what

4  is it that you thought did it?

5  A.   What did it, in my judgment, was the restrictive

6  nature of the defendant's testimony himself.  The fact

7  that the court sustained all the objections made by the

8  District Attorney, not allowing him to explain his

9  answers.  Just answer yes or no, yes or no, yes or no.

10    I think that is what did it.

11  Q.   Did your position or your strategy, Mr. Evseroff,

12  change in any way after George Kotsopoulos testified?

13  A.   No.

14  Q.   And is that for the reasons that you just stated?

15  A.   Sure.  I thought it was fairly apparent that this was

16  a recent fabrication in light of everything he had said

17  before.

18  Q.   Now, you had another lawyer working with you during

19  the course of this case.  Is that right?

20  A.   Talking about Sarikas?

21  Q.   That's what I'm talking about.

22    What was Mr. Sarikas's role in the defense of

23  Mr. Kotsopoulos?

24  A.   Well, I met Sarikas for the first time in my life at

25  the Nassau County jail on maybe my fifth or sixth visit to

360

1   see the defendant, because I went to see him regularly,

2   every week, sometimes twice a week, and one day Sarikas

3   came in.  I'd never seen him before.

4           I think I'd seen him, but I never spoke to this

5   man.  You know, in so many years of practice, you run into

6   everybody sooner or later in every county.

7           And Sarikas came in there.  He said to me that

8   he had been retained by the family to pursue some rights

9   for the children in the Family Court.  And he sat there

10  and he introduced himself.

11          And he seemed to be a very knowledgeable man,

12  told me he had a history of having been in the District

13  Attorneys office in The Bronx County for a while.  And he

14  sat there and listened to my conversations with the

15  defendant.

16          And he came back to my office to see me in my

17  office.  And after a few visits he said, listen.  Would it

18  be okay if I worked along with you with the criminal case?

19  The family would like me to do it.

20          I said fine.  I like help wherever I can get it,

21  so I told him yes, sure.

22  Q.   Did he then go on to some degree to assist you in

23  connection with the investigation of the case as well as

24  the trial of the case?

25  A.   Not so much with the investigation, but with the

Everoff - for the Respondent - Direct/Mr. Walsh

361

1    trial.

2            On occasion he was present when I would see a

3    witness.  I don't remember if he went to the scene with

4    me.  I know that when I interviewed George he was not

5    there.  He could not make it for some reason.  He was not

6    there.

7    Q.   What was Mr. Sarikas's role during the course of the

8    trial?

9    A.   He assisted me and he made motions in connection with

10   it.  He was a very, very good and a very competent motion

11   guy.

12   Q.   Now, after George Kotsopoulos testified, the

13   defendant's son, did you have any conversations with

14   Mr. Sarikas regarding George's testimony?  That you

15   recall.

16   A.   Well, we didn't like his testimony.  We thought this

17   was a recent fabrication, that this was trial by ambush.

18   We had had no discovery material, no Rosario material,

19   although, we had Rosario material for everything else in

20   the case.

21           The fact that he had made statements not to

22   Mr. Schroeder but to some woman, who in turn notified the

23   District Attorneys office three months before the trial

24   and there were no notes of it, we couldn't live with that.

25           So we considered this a fabrication.  We didn't

Evseroff - for the Respondent - Direct/Mr. Walsh

362

1   like his testimony and we thought that the jury

2   understood, based on the cross-examination, that this is

3   what it was, because his direct was about an hour or an

4   hour-and-a-half and the rest of the day was

5   cross-examination; by me, not by Sarikas.

6   Q.    Mr. Evseroff, after George's testimony did

7   Mr. Sarikas ever call you and indicate to you that in his

8   opinion, based on George's testimony, that you needed to

9   change your defense strategy?

10  A.    No.

11  Q.    Did he ever, at any time during the course of the

12  trial, indicate to you that it was his belief that based

13  on George's testimony you needed to pursue a different

14  strategy?

15  A.    No.

16        He did participate in the trial to the extent

17  that I let him examine one of the character witnesses

18  because he wanted participation.  And that didn't come

19  down too well, but we got it in.

20  Q.    After George's testimony, did the defendant

21  Mr. Kotsopoulos continue to maintain the same position

22  that he had maintained all along, that an intruder had

23  shot his wife?

24  A.    Mr. Kotsopoulos still maintained his innocence in

25  connection with this case.  Before, during, and after that

363

1    trial.

2    Q.    Now, Mr. Evseroff, at the conclusion of the evidence

3    in the trial, I take it there was a charge conference held

4    with the court before the case was submitted to the jury?

5    A.    A rather short one.  We approached the bench.

6    Q.    During the course of that charge conference, did you

7    at any time request that the court submit to the jury any

8    lesser-included offenses?

9    A.    I did not.

10   Q.    Now, the defendant had been indicted for two counts

11   of murder.  Is that correct?

12   A.    Intentional murder and depraved indifference.

13   Q.    You did not request the submission of any

14   lesser-included offenses to the jury?

15   A.    No.  I had a man who claimed he was innocent.

16   Q.    Did Mr. Schroeder request for the submission of any

17   lesser-included offenses to the jury?

18   A.    No.

19   Q.    Did Mr. Sarikas at any time ask the court for

20   submission of lesser-included offenses to the jury?

21   A.    Not only did he not, but he agreed that it should be

22   all or nothing since we had a client that claimed he was

23   innocent.

24   Q.    Did you believe that there was a reasonable view of

25   the evidence at trial that would have supported the

Evseroff - for the Respondent - Direct/Mr. Walsh

364

1    submission of any lesser-included offenses, either

2    manslaughter in the first degree, manslaughter in second

3    degree, or even criminally negligent homicide?

4    A.    No, I didn't.

5    Q.    Now, the defendant was convicted by the jury of Count

6    Two, which was depraved indifference to murder.  Is that

7    correct?

8    A.    Yes.  And acquitted of the intentional murder.

9    Q.    After the defendant's conviction, Mr. Evseroff, did

10   you go out to the Nassau County jail to visit the

11   defendant?

12   A.    Sure, I did.

13   Q.    How long after the defendant's conviction would you

14   say you went out to the jail to see the defendant?

15   A.    I don't recall.  It was pretty close, I guess.

16   Q.    Did Mr. Sarikas go with you?

17   A.    He went there with me once.  I think I went there

18   once or twice without Sarikas and once he was there.

19   Q.    Now let's talk the time that you went to visit the

20   defendant, after his conviction, with Mr. Sarikas.

21         What was the defendant's demeanor when you went

22   out to visit him?

23   A.    He was tremendously upset.  *How could I be convicted?*

24   *I'm not guilty.  I didn't do anything.*

25   Q.    Well, did you respond to that?

Evseroff - for the Respondent - Direct/Mr. Walsh

365

1    A.    I told him I thought we had a very good and viable

2    appeal with a lot of issues.

3    Q.    When you went to the jail to visit the defendant

4    after the conviction, with Mr. Sarikas, did the defendant

5    ever express to you any displeasure with your

6    representation of him?

7    A.    Not to me.

8    Q.    Did you ever say to the defendant in substance the

9    words:

10        *Well, how do I think I feel?  Do you think I'm*

11   *happy?  I just lost $100,000.  And don't you remember, I*

12   *was supposed to get another hundred thousand dollars if I*

13   *beat all the charges?*

14   A.    Never said anything like that.  Never.

15   Q.    After your first visit to the jail to see the

16   defendant after his conviction, did you continue to go out

17   to the jail to see the defendant?

18   A.    Yes.

19   Q.    In between the conviction and the sentence?

20   A.    Yes.

21   Q.    Even after the defendant was sentenced did you

22   continue?

23   A.    As best I can recall, I continued visiting him until

24   he was shipped upstate.

25   Q.    From the time the defendant was convicted until the

366

1    time he was shipped upstate, about how many times would

2    you say you went out to visit him?

3    A.   A number of times, but I don't have an independent

4    recollection of it.

5              There are records of that in the Nassau County

6    jail.  You sign in every time you are there.  I was there

7    a number of times.  I can't remember exactly how many

8    there were.

9    Q.   Well, what was the defendants's demeanor during the

10   course of those visits, Mr. Evseroff?

11   A.   He was upset by the fact that he was convicted.

12   Q.   Did he ever stop talking to you?

13   A.   No.

14   Q.   Or tell you he didn't want to speak with you any

15   more?

16   A.   No.

17   Q.   Let me get back to Mr. Sarikas.

18             After the trial of this case, did you continue

19   to have a professional relationship as well as a personal

20   relationship with Mr. Sarikas?

21   A.   Yes.

22   Q.   Explain that for us, please.

23   A.   Well, after the trial of this case, for the next few

24   years I referred to Sarikas at lest ten different cases in

25   which he made fees.

Evseroff - for the Respondent - Direct/Mr. Walsh

367

1    Q.    Both civil and criminal cases?

2    A.    Civil and criminal cases.

3    Q.    For how long a period of time after the Kotsopoulos

4    trial did you refer cases to Mr. Sarikas?

5    A.    Up until '06.

6    Q.    Did you work on any cases during that period of time;

7    from the trial of this defendant until '06, did you work

8    on any cases together with Mr. Sarikas?

9    A.    Sure.

10   Q.    Tell us about those.

11   A.    Well, we had an assault case in Brooklyn where I put

12   him into the case.  I had a defendant in the case, and

13   then they arrested the defendant's son, and I put

14   Mr. Sarikas into that case.

15            And when it came time to make motions,

16   Mr. Sarikas, although he was paid, never came to court so

17   I covered for him.  And I got the case dismissed on a

18   motion.  That was one that I can think of.

19            We had a case together involving a dentist who

20   was charged with Medicaid fraud.  And he did the paperwork

21   in this case and did a very good job.  And he went to

22   court with me a number of times with that.  He got a very

23   substantial fee in that case.

24            And there was a case in Nassau County involving

25   a larceny involving Chinese people.  And there were

Evseroff - for the Respondent - Direct/Mr. Walsh

368

1    defendants in the case and I referred one to him.

2            And I'm thinking off the top of my head now.

3    There were a lot of other cases, the last case of which

4    was one involving a dentist in which I retained him to

5    make the motions.  I paid him $10,000 to make motions.

6            And when the case was over and the defendant was

7    convicted in the case, he managed to take those people and

8    to have them turn against me and make motions against me.

9    This was in '06.

10   Q.   This is United States versus Philip Frank?

11   A.   You got it.  In front of Judge Gleeson.

12   Q.   That was a case that was tried in front of Judge

13   Gleeson?

14   A.   That's correct.  I tried it.

15   Q.   And am I correct that following the defendant's

16   conviction in that case there was an evidentiary hearing

17   held in connection with that case, similar to the one

18   we're having here today?

19   A.   Yes.

20           What happened in connection with that is,

21   Mr. Sarikas told me at all times that he had had a very

22   close relationship with the counsel here in court, and he

23   recommended him for the appeal.  And I had no problem with

24   that.  I think he is a very good appeal lawyer.  I tried

25   to send him some business, myself, over the years,

Evseroff - for the Respondent - Direct/Mr. Walsh

369

1    Mr. Kartagener.

2          The next think I knew in connection with the

3    Frank case, Frank was sentenced by Judge Gleeson and they

4    then made a motion to set it aside attacking me, which was

5    all news to me.  And we held a hearing and I testified in

6    connection with that.

7    Q.    And Mr. Sarikas testified as well.  Is that correct?

8    A.    Yes.  I found out later.  I wasn't there when he

9    testified.

10   Q.    From the time that this defendant, Mr. Evseroff, was

11   convicted of murder, until 2006, did Mr. Sarikas ever

12   express to you any displeasure or any reservations about

13   the way that you handled the Kotsopoulos case?

14   A.    No.

15   Q.    Did he criticize, to you, your trial strategy in any

16   way?

17   A.    No.

18   Q.    Or the fact that you didn't seek a plea bargain in

19   the case?

20   A.    No.

21   Q.    Did he at any time during that period indicate to you

22   you should have pursued lesser-included offenses?

23   A.    Oh, no.

24   Q.    Now, you say that your relationship with Sarikas

25   continued until some point of time in 2006.  What happened

Evseroff - for the Respondent - Direct/Mr. Walsh

370

1   to your relationship in 2006?

2   A.   Well, I hardly think that I'm going to continue

3   giving business to some guy who I bring into a case and

4   who sees fit after the case to take the client away, refer

5   it to his friend, and attack me.  Doesn't make too much

6   sense.

7            Plus the fact that there were things in

8   Mr. Sarikas's private life which had come to my attention

9   which I didn't like and I didn't cotton to, if you know

10  what I mean.

11  Q.   So how did your relationship with Sarikas end?

12  A.   He wrote me a nasty letter.

13  Q.   Saying what?

14  A.   Attacking me in the letter.

15  Q.   When was that, Mr. Evseroff?  Do you recall?

16  A.   It was in the summer of '06.

17  Q.   Since then, I take it, you haven't worked on any

18  cases with Mr. Sarikas?

19  A.   I won't even speak to him.

20  Q.   So you have had no relationship, either business or

21  personal, with Mr. Sarikas since you received that letter

22  in the summer of '06?

23  A.   That's correct.

24            MR. WALSH:  Okay.  Thank you, Mr. Evseroff.

25            THE COURT:  Cross-examination.

371

1    CROSS-EXAMINATION

2    BY MR. KARTAGENER:

3    Q.   As we begin, just to clear up one thing you made

4    reference to in your last little bit of testimony.

5              You have never sent me a case, have you,

6    Mr. Evseroff?

7    A.   I tried.

8    Q.   Mr. Evseroff, we haven't done any business together

9    where you have sent me a case?  Yes or no?  Yes or no?

10   A.   Sent you a case?

11   Q.   Have you ever referred a client to me where I handled

12   an appeal or anything else, where you sent them to me?

13   A.   I referred a client to you who you did not handle the

14   appeal because you didn't want to handle it.

15   Q.   That's not true.  But we will proceed.

16             Mr. Evseroff, you are a pretty busy

17   practitioner, aren't you?

18   A.   Not any more.

19   Q.   Well, back in 2002, 2003, you were pretty busy,

20   weren't you?

21   A.   No, I wasn't too busy at the time because, you see,

22   in 2001 I had been very sick.  I had had triple pneumonia.

23   I had a fractured hip.  I nearly died.  So my practice had

24   fallen off considerably.  By 2002 I had a very limited

25   practice.

372

1   Q.   Well, in that limited practice, you managed to pick

2   up at least, I believe you testified, in the next couple

3   of years, at least ten substantial cases that you referred

4   to Mr. Sarikas.  Is that correct?

5   A.   That is correct, because I wasn't in a position

6   physically to handle them, myself.

7   Q.   You were sick in 2002, 2003?

8   A.   No.

9   Q.   You were physically able in 2002, 2003.

10  A.   Yes.

11  Q.   And when you tried cases back in those years --

12  A.   What years?

13  Q.   2002, 2003.

14       -- did you also bill your clients on a lump sum

15  or did you ever take hourly fees in any of the cases?

16  A.   Never took hourly fees in 60 years.

17  Q.   So you would take a lump sum from the clients.

18  Correct?

19  A.   A fixed fee.

20  Q.   Fixed fee.  Fine.

21       Now, you made reference in your direct testimony

22  to the Kotsopoulos family supposedly offering you $100,000

23  at the conclusion of the case.

24       Is that what you said?

25  A.   They didn't offer it to me at the conclusion of the

Evseroff - for the Respondent - Cross/Mr. Kartagener

373

1    case.

2    Q.   What did they offer to you at the outset in the fall

3    of 2002?

4    A.   As best I can recall -- and they didn't offer it to

5    me directly.  They offered it to me through the man who

6    sent the case to me, Lioumis.

7    Q.   We'll get to Mr. Lioumis in a few moments.

8    A.   Sure.

9    Q.   But let's talk about the $100,000 that they offered

10   to you.  Okay?

11   A.   Sure.

12   Q.   Had you already done a lot of work on the case?

13   A.   Yes.

14   Q.   And did you solicit that hundred thousand or did they

15   just offer it to you at the outset of the case?

16   A.   They just offered it.  I solicited nothing.

17   Q.   And you had been working very hard, is that right, on

18   that case?  The Kotsopoulos case.

19   A.   Yes.

20   Q.   Did you get the hundred thousand dollars?

21   A.   No.

22   Q.   You decided you didn't want it?

23   A.   I was more concerned with the outcome of the case

24   than with any money, because, you see, I felt then that I

25   had an innocent client.

374

1    And you want to know something?  I'm not sure

2    now if he's guilty as we sit here now.

3    Q.    All right.  But you were offered a hundred thousand

4    dollars on a case on which you had been working very, very

5    hard.

6         Is that your testimony?

7    A.    Yes.

8    Q.    And you did not take it from the people who offered

9    it to you?

10   A.    They never gave it to me.

11   Q.    Well, did you tell them you didn't want it?

12        Did you tell them you were more concerned about

13   Mr. Kotsopoulos's innocence?

14   A.    I told them nothing.  I think I laughed it off.

15   Q.    You laughed off the fact that they offered you a

16   hundred thousand dollars?

17   A.    Yes.

18   Q.    Okay.  Now, you say that you charged a fee -- well,

19   let's step back for a moment.  I just want to understand

20   your testimony.

21        You said in your direct testimony that you saw

22   Nick Kotsopoulos at lest 50 times while he was locked up

23   at the Nassau County jail.

24   A.    Oh, yes.

25   Q.    May it have been more than 50 times?

375

1    A.    Possibly.

2    Q.    Maybe a hundred times?

3    A.    Couldn't be a hundred times.

4    Q.    75, perhaps?

5    A.    I saw him roughly on a period of once a week from the

6    summer of '02 until the time the case was tried, in May of

7    '03.  Roughly once a week.  Maybe twice a week on

8    occasion.

9    Q.    Once or twice a week over ten months you would see

10   him.  Correct?

11   A.    Mostly once a week.

12   Q.    By the way, you saw him in the Nassau County jail,

13   which was located out in Nassau County.  Correct?

14   A.    Usually, yes.

15   Q.    Right.  And your offices, as I understand, were not

16   in Nassau County; they were back in Brooklyn.  Correct?

17   A.    That's correct.

18   Q.    How did you go from Brooklyn to visit Mr. Kotsopoulos

19   at the Nassau County jail?

20   A.    I drove my car.

21   Q.    When you went on these trips to the Nassau County

22   jail, about how much time would you spend with

23   Mr. Kotsopoulos?

24   A.    Usually my visit with him would be about an hour.

25   And I'm estimating now.

Evseroff - for the Respondent - Cross/Mr. Kartagener

376

1  Q.   So in doing these trips, these many trips, to Nassau

2  County, you would drive from Brooklyn.  What's that?  An

3  hour, an hour-and-a-half drive sometimes?

4  A.   No.  About 45 minutes.

5  Q.   45 minutes going and 45 minutes coming back,

6  depending upon the traffic.  Right?

7  A.   Yes.

8  Q.   And then it takes some time when you get to the

9  prison for them, or to the jail, takes some time for them

10  to produce him.  Right?

11  A.   Five or ten minutes.

12  Q.   And then you would spend at least an hour speaking

13  with him?

14  A.   Right.

15  Q.   Once or twice a week?

16  A.   Sure.

17  Q.   Now, you said also in your direct testimony that you

18  would meet with Mr. Kotsopoulos's family, once or twice a

19  week they would come to your office.  Is that right?

20  A.   Correct.

21  Q.   And that was over how long a period of time?

22  A.   From June of '02 until the trial started, in '03.

23  Q.   Almost an year?

24  A.   Close to it.

25  Q.   Eleven months, let's say.

Evseroff - for the Respondent - Cross/Mr. Kartagener

377

1    A.    Sure.

2    Q.    Once or twice a week they would come into your office

3    and spend time talking to you about the case.  Is that

4    right?

5    A.    They would.  His brother came from Greece.  His

6    nephew came from Greece.

7          They would come, they would discuss the case

8    with me, always with an interpreter, because they didn't

9    speak English.  And they would give me, they would bring

10   witnesses.  They brought those notes to me in the office.

11   Q.    So you would spend a lot of time speaking to his

12   family, investigating the case, going places to

13   investigate the case, looking at the scene of the crime.

14   Correct?

15   A.    Yes.

16   Q.    And in doing all of this work, 50 to 75 times you saw

17   Mr. Kotsopoulos, 50 to 75 times or more you saw members of

18   his family in your office, so they took up a lot of your

19   time over that ten months, didn't they?

20   A.    Yes.

21   Q.    And the total fee that you were going to take for

22   doing all of this work and trying the case that went for

23   three or three-and-a-half weeks was going to be the

24   $41,000 in the check made out to your son.  Is that

25   correct?  Yes or no?

378

1    A.   Absolutely.

2         You want to know why?

3    Q.   No.  I want to ask you --

4    A.   You don't want to know why?

5    Q.   I want to ask you if you're telling this court that

6    you did all of this work, and yet you only got and

7    intended to get $40,000, as you said in direct testimony.

8         Is that your testimony?  Yes or no?

9    A.   I would have done it for nothing because I thought he

10   was innocent.  Yes.

11   Q.   So when you believe clients are innocent, you ignore

12   business and you will do it pro bono.  Is that correct?

13   A.   Absolutely.

14   Q.   Now, this case was sent to you, as you said, by a

15   fellow who you had represented before, by the name of

16   Lioumis.  Correct?

17   A.   Yes.  I represented him before, yes.

18   Q.   Did you have a good relationship with him?

19   A.   I did at the time.

20   Q.   Well, he sent you an number of cases, didn't he?

21   A.   A number of cases?

22   Q.   Yes.  More than one.

23   A.   I don't remember any other one.

24   Q.   This is the only case he ever sent you?

25   A.   I have no recollection of him sending me any other

Evseroff - for the Respondent - Cross/Mr. Kartagener

379

1    case, except the cases that he, himself, was involved in,

2    in which I wouldn't represent him.

3    Q.   Are you aware --

4    A.   Do you want to know why?

5    Q.   No.  And the question --

6    A.   I'll tell you if you want to know.

7         THE COURT:  Excuse me.  I'm going to be like

8    Judge Belfi.  Listen to the question.

9         THE WITNESS:  Yes, your Honor.

10        THE COURT:  Answer responsively.

11        THE WITNESS:  Yes, your Honor.

12        THE COURT:  All right?

13        THE WITNESS:  I will.

14        THE COURT:  Now, who was this who you

15   represented?

16        THE WITNESS:  A man by the name of Anthony

17   Lioumis.

18        THE COURT:  Go ahead.

19   BY MR. KARTAGENER:

20   Q.   Are you aware that Mr. Lioumis submitted an affidavit

21   to the court, this court, in connection with this habeas

22   corpus proceeding?

23   A.   I was told that there was such an affidavit.

24   Q.   And are you aware that Mr. Lioumis has informed this

25   court under oath that you had conversations with him when

380

1  he was trying to send you this case and that you told him

2  you wanted a $500,000 retainer?

3  A.   No, I don't know that he said that.

4  Q.   Are you aware that Mr. Lioumis has told this court

5  that when they couldn't come up with the $500,000, the

6  Kotsopoulos family, you said you would be willing to take

7  400,000 in cash?

8  A.   I don't know what he said.  I never saw the

9  affidavit.

10 Q.   And is it your testimony then that Mr. Lioumis, a man

11 whom you knew and whom you had represented on a number of

12 occasions, is lying and saying that you told him you

13 wanted 400,000 in cash?

14 A.   If he said that, he is lying completely.

15      And I did not represent him on a number of

16 occasions.

17 Q.   Now, you said twice, I believe, or three times, that

18 whenever the Kotsopoulos family members would come and

19 meet with you, they would have to bring an interpreter

20 because they didn't speak any English.  Is that correct?

21 A.   Yes.

22 Q.   Do you know a woman by the name of Georgia

23 Apostolidis?

24      Does that name ring a bell?

25 A.   Yes.

381

1   Q.   Is it not a fact that Georgia Apostolidis was a young

2   woman from the Astoria community who would come with the

3   Kotsopouloses and serve as their interpreter?

4        Is that correct?

5   A.   She was a woman whose parents owned a restaurant

6   where the Kotsopouloses used to be every day.  She was a

7   friend of the Kotsopouloses.  She had a restaurant across

8   the street from Sarikas's office.  Right around the

9   corner.

10  Q.   It's Miss Apostolidis' parents who own the

11  restaurant.  Correct?

12  A.   As far as I knew.

13  Q.   And she agreed to come with them, as you understood

14  it, to interpret for them.  Correct?

15  A.   Yes.  Her father was a witness.

16  Q.   Yes or no?  She agreed to come and interpret for

17  them, is that correct?

18  A.   I don't know what agreement she made with them, but

19  she did come and interpret.

20  Q.   She interpreted what you told them and what they told

21  you.  She acted as the interpreter.  Correct?

22  A.   I assume that to be the case.

23  Q.   On many, many occasions.  Correct?

24  A.   On a few occasions.

25  Q.   Well, how few?

382

1        You said that the family would come to you

2   between 50 and 75 times during the year between the arrest

3   and trial.  Of that 50 to 75 times, about how many times

4   was it Georgia Apostolidis who served as the interpreter,

5   approximately?

6   A.    Maybe 10 times.

7   Q.    Who acted as the interpreter on other occasions?

8   A.    Lioumis.

9   Q.    So Lioumis would be there in your office perhaps 50

10  times serving as the interpreter, and Miss Apostolidis

11  only 10 times?

12        Is that your testimony?

13  A.    Best recollection.  I didn't make notes of this.

14  Q.    And -- so Miss Apostolidis, by your testimony, was in

15  your office at least 10 times.  Correct?

16  A.    Yes.

17  Q.    And served as an interpreter.  Correct?

18  A.    Yes.

19  Q.    Are you aware that Miss Apostolidis has informed this

20  court under oath that she was present when you demanded

21  cash from the Kotsopoulos family, that she was present

22  when they provided large amounts of cash to you, and that

23  you also refused to give them a receipt in connection with

24  that cash payment?

25        Are you aware that she's testified to this in

Evseroff - for the Respondent - Cross/Mr. Kartagener

383

1    this court?

2    A.    I don't know what she said.  I wasn't here.  I didn't

3    hear it.

4    Q.    But if she did say that, she is lying.  Is that

5    correct?

6    A.    That's untrue if she said that.

7    Q.    All right.  Now, are you aware that Mrs. Kotsopoulos,

8    the defendant's mother, testified that you took

9    approximately $400,000 in cash from the Kotsopoulos family

10   over a period of time?

11   A.    I don't know what she said.

12   Q.    And if she said that, she would be a liar too.  Is

13   that correct?

14   A.    Untrue.

15   Q.    And are you aware that Mr. Sarikas has testified

16   before this court -- withdrawn.

17          Now, when you set this fee for the

18   Kotsopouloses, you said on direct it was $40,000.

19   Correct?

20   A.    40,000.  41,000.

21   Q.    Well, that is what I would like to find out.  Did you

22   set a fee of 40 or did you set a fee of 41,000?

23   A.    I think the fee was 40 and I think there was $1,000

24   of disbursements in there, somewhere in there.

25   Q.    So you had already had disbursements before you were

384

1    retained.  Is that what you are saying?

2    A.    Yes.  We had to get some records in connection with

3    this.  I had to buy some records.  I don't recall what it

4    was.

5    Q.    But didn't they give you this check for $41,000 the

6    first time they ever came to see you?

7    A.    No.

8    Q.    It was not.  When -- what -- when did they give this

9    $41,000?  Was it their first visit?  Third visit?  Fifth

10   visit?  What visit?

11   A.    It was not the first visit.  It was a visit

12   subsequent to the first.  Exactly which one, I don't

13   recall.

14   Q.    How did you come up with the number 41,000?

15        You say 40,000 would be your fee.  Is that your

16   testimony?

17        And 1,000 were going to be disbursements,

18   correct?

19   A.    My recollection was that it was 40,000 for the fee.

20   And there was 1,000, it had to do so with some kind of

21   disbursements that had been incurred in connection with

22   some of the proceedings here.  Maybe in the Family Court

23   or someplace else.  I don't recall where.  But the fee was

24   40.

25   Q.    And yet you got a check made out to your son for

Evseroff - for the Respondent - Cross/Mr. Kartagener

385

1   41,000.  Correct?

2   A.   That's correct.

3   Q.   And, by the way, your son is not a lawyer.  Correct?

4   A.   Correct.  And the money --

5   Q.   Excuse me, Mr. Evseroff.  You've answered the

6   question.

7   A.   Sure.

8   Q.   Now, you accepted retention in the year 2002, in the

9   spring.  Correct?

10  A.   June.

11  Q.   June of 2002.  Did you give or create for the

12  Kotsopoulos family something known as a retainer

13  agreement?

14  A.   No.

15  Q.   Are you aware that in May of 2002 an attorney was

16  obligated to create either a letter of engagement or a

17  retainer agreement in any case in which he was going to

18  accept retention in a criminal case?

19          Are you aware of that?

20  A.   No.

21  Q.   You never knew that?

22  A.   No.

23  Q.   Did you give any of your clients retainer agreements?

24          MR. WALSH:  Objection.

25          THE COURT:  Overruled.

386

1    A.    No.

2    BY MR. KARTAGENER:

3    Q.    So you, in your 60 years of practice, have never had

4    a retainer agreement with your clients.  Is that correct?

5    A.    Not that I can recall.

6    Q.    Now, back in 2002, 2003, you had a pretty good

7    incentive not to show income.  Isn't that true?

8    A.    No.

9    Q.    Well, weren't you having a lot of problems back in

10   2002, 2003?  Financial problems?

11   A.    No.

12   Q.    Well, let me ask you a question.

13         Starting back in 1999 and extending into 2001,

14   2002, 2003, isn't it true that you were involved in very,

15   very intense litigation with the Internal Revenue Service?

16   A.    Yes.  Having to do with a tax shelter.

17   Q.    And isn't it a fact that the Internal Revenue

18   Service, prior to June of 2002, had already seized bank

19   accounts of yours and had already filed liens against the

20   property you owned in Florida and also filed liens against

21   the house that you owned in Manhattan Beach?

22   A.    Yes.

23   Q.    So you had money coming into your firm.  If it went

24   into a checking account, the government was seizing those

25   accounts.  Correct?

Evseroff - for the Respondent - Cross/Mr. Kartagener

387

1    A.    Never seized anything from my business.  Ever.

2    Q.    Your accounts were frozen, weren't they?

3    A.    No.

4    Q.    Were there liens on your home?

5    A.    Yes.

6    Q.    So you are saying that while the IRS did file liens

7    against your properties, they didn't file a lien against

8    you as a business?

9    A.    No.

10   Q.    But they did personally.  Correct?

11   A.    Yes.

12   Q.    All right.  Now, when you were, back in 2002, 2003,

13   how much income did you show on your income taxes for

14   those years?

15   A.    I don't recall.

16   Q.    Do you have copies of those -- did you file --

17   withdrawn.

18         Did you file income tax returns for the years

19   2002, 2003?

20   A.    Yes.

21   Q.    And was this $41,000 payment from the Kotsopoulos

22   family reflected in those tax returns?

23   A.    Absolutely.

24   Q.    And do you have those tax returns available should

25   the court ask you to produce them?

**Evseroff - for the Respondent - Cross/Mr. Kartagener**

388

1  A.   I guess I could get them.  They were filed.  I don't

2  have them here.

3  Q.   Now, you were aware that if you took cash in excess

4  of $10,000, you would have been required to file something

5  called an 8300 form.  Correct?

6  A.   Of course.

7  Q.   You didn't file any 8300 forms in these cases, did

8  you?

9  A.   No.  I never got cash.

10  Q.   But -- all right.  But had you gotten cash and not

11  filed the 8300 form, you would be admitting to a crime,

12  correct?

13        If you said that you had gotten cash and didn't

14  file the form.  Right?

15  A.   I guess so, yes.

16        THE COURT:  I think we will take a 10-minute

17  recess at this time.

18        MR. KARTAGENER:  Yes, your Honor.

19        (Recess taken from 11:30 to 11:40 am.)

20        THE COURT:  You may proceed.

21        MR. KARTAGENER:  Thank you, your Honor.

22  BY MR. KARTAGENER:

23  Q.   I'm going to try to make this quick, Mr. Evseroff.

24  So would you try, as we continue the examination, to limit

25  your answers to a yes or no.  And if you can't answer it

389

1    with a yes or no, please tell me and I'll try to rephrase

2    the question.

3    A.    Sure.

4    Q.    Thank you.

5          Mr. Evseroff, just a little bit to recap here.

6          It is your testimony that you spent

7    approximately 50 to 75 occasions speaking with Nick

8    Kotsopoulos at the Nassau County jail.  Correct?

9    A.    Yes.

10   Q.    And approximately between 50 and 75 occasions you had

11   the Kotsopoulos family in your office meeting with you.

12   Correct?

13   A.    I don't think it was that many with them in the

14   office.  I don't think they were there, because they went

15   to Greece in between.

16   Q.    On how many occasions did you meet with the

17   Kotsopouloses in your office, approximately?

18   A.    Best estimate, maybe 30 times.

19   Q.    30 times?

20   A.    Yes.

21   Q.    And when you would go out to the Nassau County jail,

22   it would chew up a good chunk of the day; perhaps half a

23   day.  Right?

24   A.    Yes.  Sure.

25   Q.    And you agreed to do all of this for $40,000.  Is

390

1    that your testimony?

2    A.    Yes.

3    Q.    And anyone -- from Miss Apostolidis, Mr. Sarikas, to

4    Mrs. Kotsopoulos, to Mr. Lioumis, anyone who says that you

5    got cash in connection with the Kotsopoulos case is not

6    telling the truth.

7            Is that your testimony?

8    A.    Absolutely.

9    Q.    And it is also your testimony that -- excuse me for

10   one second, judge.

11           It is your testimony in this case that you never

12   got $400,000 cash or anything close to that.  Correct?

13   A.    That is correct.

14   Q.    Now, when they offered, when the Kotsopoulos family

15   offered to give you more money, you laughed it off because

16   you thought to the client was innocent.

17           Is that your testimony?

18   A.    Among other things.

19           They weren't offering to give me the money at

20   that point.  They said after the case they would give it

21   to me.

22   Q.    Well, you say after the case they offered you a

23   hundred thousand dollars.

24           Is that your testimony?

25   A.    No, I didn't say they offered me a hundred thousand

Evseroff - for the Respondent - Redirect/Mr. Walsh

391

1   dollars after the case.  I said they offered me a hundred

2   thousand dollars which they said they would give me when

3   the case had concluded and they had liquidated other

4   assets.

5   Q.   And at any time, at any time, did you believe that it

6   was necessary to file any kind of documents in connection

7   with the acceptance of fees in this case, whether it be

8   the form of a retainer agreement or an 8300 form?

9   A.   No.

10  Q.   You filed not a single document that would reflect

11  how much money you took in this case other than the

12  41,000.  Correct?

13  A.   That's correct.

14          MR. KARTAGENER:  Excuse me for just one second,

15  judge.

16          (Counsel conferring.)

17          MR. KARTAGENER:  Judge, I have nothing further

18  with respect to Mr. Evseroff.

19          THE COURT:  Any redirect?

20          MR. WALSH:  Just a few questions, your Honor,

21  please.

22

23  REDIRECT EXAMINATION

24  BY MR. WALSH:

25  Q.   Mr. Evseroff, did you -- this offer by the

Evseroff - for the Respondent - Redirect/Mr. Walsh

392

1   Kotsopoulos family, this hundred thousand dollars to be

2   paid at the conclusion of the trial, did you ever take

3   that offer seriously?

4   A.   No.

5   Q.   Could you explain that.

6   A.   I didn't because I thought they didn't have money

7   because they complained they paid $90,000, $95,000, to

8   another lawyer, they had to get money from safe deposit

9   boxes, they had to sell property.  I didn't think they had

10  it.  I think they were just talking.

11  Q.   The only other area I want to ask you about is with

12  respect to Mr. Lioumis.  All right?

13       Would you tell us what Mr. Lioumis' background

14  is, please?

15  A.   Sure.

16       Mr. Lioumis was a man who I had met many, many

17  years ago.  And I had met him through clients that I had

18  represented who were organized crime people, mafia people,

19  if you will, and he was affiliated with them.

20       And I got to know his family.  He had a very,

21  very nice wife, who divorced him while he was in jail.  He

22  had three daughters, one of whom was a naval officer, the

23  other of whom was a Navy SEAL, and the wife lived in

24  Dallas.  And I knew them when they lived in California.

25       And he was arrested in a major drug trafficking

393

1   case, at which point he solicited me.  And I represented

2   him in part for nothing, pro bono, and tried to negotiate

3   a deal with the DEA where he would cooperate.  And when I

4   had to go in, he backed out at the last minute, so that

5   didn't work.

6           And I knew him on a social level because I knew

7   his wife and his children.  And there came a time when he

8   got arrested here in the Southern District, and that case

9   had to do with an extortion where he was involved with

10  some Muslim people who were travel agents and there were

11  some overtones of terrorism, if you will, and he was

12  collecting money for them.  And I would not represent him

13  in connection with that case.

14          He was ultimately convicted, or pled guilty, and

15  he was deported.  And then he came back.  And he used to

16  come back and forth, and back and forth, because he

17  claimed that he had a connection in the American Embassy

18  in Athens with somebody.  And he also claimed that he was

19  an informer with respect to terrorism matters.  And he was

20  coming back and going back and forth with regularity.

21          And he introduced me to the Kotsopoulos people,

22  who I never knew.  All I knew about this case was what I

23  read in the paper when it happened.  And he said he was

24  very friendly with Mrs. Kotsopoulos, the defendant's

25  mother, that she was a neighbor, and that she was a very

394

1   active woman in Athens, and he brought them to me.

2   Q.   What if anything is your relationship now with

3   Lioumis?

4   A.   Well, I don't see him at all and I don't talk to him.

5   He tried to shake me down for money in connection with

6   this case, which I wouldn't give him.

7   Q.   How so?  Tell us about that.

8   A.   Well, he wanted $10,000 from me and he said that the

9   Kotsopoulos people, this is after the trial, that they

10  want to kill me.  Which I found very strange.  I mean, I

11  worked very hard for them.  And, of course, I had nothing

12  to do with them.

13          And then he was, he went back to Greece and they

14  wouldn't let him back in the country.  And I have nothing

15  to do with him really since the end of this case.

16          MR. WALSH:  All right.  Thank you, Mr. Evseroff.

17          THE COURT:  Anything else?

18          MR. KARTAGENER:  I have nothing further, judge.

19          THE COURT:  You may step down.

20          (The witness was excused.)

21          You may proceed, Mr. Walsh.

22          MR. WALSH:  We have no further witnesses in

23  connection with our case.

24          Just prior to resting, I just want to be make

25  sure, and I spoke to Mr. Kartagener about this this

395

1  morning.

2          Prior to the beginning of the evidentiary

3  hearings, your Honor had ordered that Mr. Schroeder be

4  deposed in connection with these hearings.  He was to be

5  out of the country for a week or two.  I believe that we

6  have submitted to the court as evidence the transcript of

7  that deposition.

8          I want to make sure that was done before I rest,

9  and if not, I do have a copy of the transcript that I can

10 hand up to the court.

11          THE COURT:  I don't think I ever received that.

12          MR. WALSH:  I know we talked about it before --

13          THE COURT:  Wait just one minute now.

14          MR. KARTAGENER:  I thought we handed you a copy,

15 judge.

16          THE COURT:  Wait a minute.  I do have it.  That

17 was a deposition taken February 2, 2009?

18          MR. WALSH:  Yes.

19          THE COURT:  I do have a copy.  Are you offering

20 this?

21          MR. WALSH:  Yes.

22          THE COURT:  Any objection to that?

23          MR. KARTAGENER:  No, judge.

24          MR. WALSH:  And if you don't have it, your

25 Honor, I do have the copy that is signed by Mr. Schroeder.

396

1          THE COURT:  Were there any changes made?

2          MR. WALSH:  I don't believe so.

3          No, your Honor.

4          THE COURT:  If there are no changes, I don't

5    need a signed copy.

6          MR. WALSH:  In that case, we rest.

7          THE COURT:  I'm going to mark this as a

8    Respondent's Exhibit F.

9          (Respondent Exhibit F in evidence.)

10          THE COURT:  Any objection to that?

11          MR. KARTAGENER:  No objection, judge.

12          THE COURT:  Okay.

13          MR. WALSH:  That being the case, your Honor, we

14    would rest.

15                    **RESPONDENT RESTS**

16          THE COURT:  Petitioner?

17          MR. KARTAGENER:  We have nothing further, judge.

18          THE COURT:  Now, you mentioned, petitioner, that

19    you wanted some time to submit a writing?

20          MR. KARTAGENER:  I thought it might be useful to

21    the court, since this has been a truncated hearing, judge,

22    to allow us to pull together the facts from the different

23    days and make argument based on that in written form.

24          THE COURT:  I certainly have no objection to

25    that.

1          How much time do you want?

2          MR. KARTAGENER:  I'm in the middle of another

3     thing right now, judge.  Would three weeks be too much to

4     ask for?

5          THE COURT:  No.  That's all right.

6          A date for a post-hearing memorandum, right?

7          MR. KARTAGENER:  Yes.

8          And I have spoken to the people in the District

9     Attorneys office.  I believe they would like to have an

10    opportunity to submit also.

11         THE COURT:  Of course, if you are going to

12    submit one, they will too.

13         What date?  He wants three weeks.

14         MS. FLEISCHER:  Would I then be able to get

15    another three weeks in response to their papers, your

16    Honor?

17         THE COURT:  If I'm kindly disposed, you will.

18         THE COURTROOM DEPUTY:  Date for petitioner will

19    be April 20.  Respondents, May 11.

20         THE COURT:  Reply?

21         MR. KARTAGENER:  A week to get our reply.

22         THE COURT:  A week for reply.  What date is

23    that?

24         THE COURTROOM DEPUTY:  May 18.

25         MR. KARTAGENER:  Thank you, judge.

1    THE COURT:  I'm going to put this on for either

2  closing arguments or oral arguments on motion or decision.

3    MR. KARTAGENER:  There is also, judge, an

4  outstanding procedural question, and I would like to know.

5    The District Attorneys office had raised an

6  issue about the timeliness of the petition, originally.

7  We had prepared a response.  Didn't submit it, but if it

8  would be okay, if we could just file it by ECF, judge,

9  because we have documentary evidence showing certain

10  things, stamps of the clerk and all of that.

11    THE COURT:  Yes, you can submit it.

12    MR. KARTAGENER:  Thanks.

13    THE COURT:  Submit it by the same time, April

14  20.

15    MR. KARTAGENER:  Yes.  In fact, I'll do that.

16  It is all done, so we will do it, judge.

17    THE COURT:  You can respond to that at the time

18  that you make your response.

19    MR. KARTAGENER:  Thank you.

20    THE COURT:  We are going to set the date for

21  either oral argument or decision, or whatever, on

22  Thursday, July 9.

23    Is everybody available at that time?

24    MR. KARTAGENER:  That is okay with us, judge.

25    MR. WALSH:  Yes, sir.

399

1        THE COURT:  We will make it at 9:30 because they

2   have to bring in Mr. Kotsopoulos.

3        MR. KARTAGENER:  Fine, judge.

4        THE COURT:  Anything else at this time?

5        MR. KARTAGENER:  No, judge.

6        MR. WALSH:  No.  Thank you, your Honor.

7        THE COURT:  Very well.

8        (Proceedings concluded at 12 pm.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

400

1                        I N D E X

2

     **EVIDENCE FOR RESPONDENT**                    339
3
     **JACOB R. EVSEROFF**                           339
4    DIRECT EXAMINATION                         340
     BY MR. WALSH
5    CROSS-EXAMINATION                          371
     BY MR. KARTAGENER
6    REDIRECT EXAMINATION                       391
     BY MR. WALSH
7
     **RESPONDENT RESTS**                            396
8

9

10                       E X H I B I T S

     Respondent Exhibit F in evidence             396
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                  Dominick M. Tursi, CM, CSR
                Official US District Court Reporter

1

## $

**$1,000** [1] - 383:23
**$10,000** [3] - 368:5, 388:4, 394:8
**$100,000** [4] - 344:25, 365:11, 372:22, 373:9
**$40,000** [5] - 343:3, 343:4, 378:7, 383:18, 389:25
**$400,000** [2] - 383:9, 390:12
**$41,000** [6] - 344:4, 344:24, 377:24, 384:5, 384:9, 387:21
**$48,000** [2] - 348:5, 350:7
**$500,000** [2] - 380:2, 380:5
**$90,000** [2] - 343:4, 392:7
**$95,000** [3] - 343:5, 344:24, 392:7

## '

**'01** [2] - 348:10, 349:8
**'02** [7] - 342:17, 345:6, 346:8, 348:9, 348:10, 375:6, 376:22
**'03** [3] - 349:13, 375:7, 376:22
**'06** [5] - 367:5, 367:7, 368:9, 370:16, 370:22

## 1

**1** [4] - 343:11, 343:17, 347:19, 347:21
**1,000** [2] - 384:17, 384:20
**10** [4] - 341:14, 382:6, 382:11, 382:15
**10-minute** [1] - 388:16
**11** [1] - 397:19
**11:30** [1] - 388:19
**11:40** [1] - 388:19, 399:8
**12** [2] - 354:10, 399:8
**13** [1] - 354:11
**14** [1] - 354:11
**18** [1] - 397:24
**1951** [1] - 341:9
**1999** [1] - 386:13

## 2

**2** [2] - 347:22, 395:17
**20** [3] - 348:10, 397:19, 398:14
**2001** [2] - 371:22, 386:13
**2002** [15] - 371:19, 371:24, 372:7, 372:9, 372:13, 373:3, 385:8, 385:11, 385:15, 386:6, 386:10, 386:14, 386:18, 387:12, 387:19
**2003** [9] - 371:19, 372:7, 372:9, 372:13, 386:6, 386:10, 386:14, 387:12, 387:19
**2006** [3] - 369:11, 369:25, 370:1
**2009** [1] - 395:17
**22** [1] - 340:13
**25** [1] - 348:10

## 3

**3** [1] - 348:1
**30** [2] - 389:18, 389:19
**339** [2] - 400:2, 400:3
**340** [1] - 400:4
**371** [1] - 400:5
**391** [1] - 400:6
**396** [2] - 400:7, 400:10

## 4

**40** [3] - 383:22, 383:23, 384:24
**40,000** [3] - 383:20, 384:15, 384:19
**400,000** [2] - 380:7, 380:13
**40th** [1] - 341:4
**41,000** [5] - 383:20, 383:22, 384:14, 385:1, 391:12
**45** [4] - 352:19, 376:4, 376:5

## 5

**50** [12] - 342:8, 345:17, 351:6, 374:22, 374:25, 377:16, 377:17, 382:2, 382:3, 382:9, 389:7, 389:10

## 6

**60** [3] - 340:13, 372:16, 386:3

## 7

**75** [7] - 375:4, 377:16, 377:17, 382:2, 382:3, 389:7, 389:10

## 8

**8300** [4] - 388:5, 388:7, 388:11, 391:8
**84** [1] - 340:8

## 9

**9** [1] - 398:22
**9-1-1** [3] - 348:14, 350:11, 351:2
**9:30** [1] - 399:1

## A

**able** [5] - 342:2, 344:15, 344:20, 372:9, 397:14
**Abraham** [1] - 340:16
**absence** [1] - 358:24
**Absolutely** [7] - 349:6, 350:16, 351:8, 378:1, 378:13, 387:23, 390:8

**accept** [1] - 385:18
**acceptance** [1] - 391:7
**accepted** [1] - 385:8
**accidentally** [1] - 355:6
**account** [2] - 344:6, 386:24
**accounts** [3] - 386:19, 386:25, 387:2
**acquittal** [2] - 344:15, 344:21
**acquitted** [1] - 364:8
**acted** [2] - 381:21, 382:7
**active** [1] - 394:1
**addition** [5] - 345:19, 345:22, 346:1, 357:15, 357:20
**additional** [1] - 344:9
**admit** [1] - 355:4
**admitted** [3] - 340:13, 341:2, 352:3
**admitting** [1] - 388:11
**affect** [2] - 346:25, 347:2
**affidavit** [3] - 379:20, 379:23, 380:9
**affiliated** [1] - 392:19
**agents** [1] - 393:10
**ago** [1] - 392:17
**agreed** [5] - 352:10, 363:21, 381:13, 381:16, 389:25
**agreement** [5] - 381:18, 385:13, 385:17, 386:4, 391:8
**agreements** [1] - 385:23
**ahead** [1] - 379:18
**aircraft** [1] - 341:8
**allow** [2] - 353:22, 396:22
**allowing** [1] - 359:8
**Almost** [1] - 376:23
**ambush** [3] - 356:16, 357:7, 361:17
**American** [1] - 393:17
**amount** [2] - 345:14, 348:5
**amounts** [1] - 382:22
**answer** [2] - 359:9, 388:25
**Answer** [1] - 379:10
**answered** [1] - 385:5
**answering** [1] - 353:21
**answers** [2] - 359:9, 388:25
**Anthony** [1] - 379:16
**Apostolidis** [7] - 380:23, 381:1, 382:4, 382:10, 382:14, 382:19, 390:3
**Apostolidis'** [1] - 381:10
**apparent** [1] - 359:15
**appeal** [5] - 365:2, 368:23, 368:24, 371:12, 371:14
**applicable** [1] - 351:20
**appointed** [1] - 346:11
**approached** [1] - 363:5
**approve** [1] - 351:7
**April** [2] - 397:19, 398:13
**area** [1] - 392:11
**argument** [2] - 396:23, 398:21
**arguments** [2] - 398:2
**arrest** [1] - 382:2
**arrested** [3] - 367:13, 392:25, 393:8
**articulated** [1] - 358:11
**aside** [2] - 350:4, 369:4

2

**assault** [1] - 367:11
**assets** [1] - 391:4
**assigned** [1] - 351:18
**assist** [1] - 360:22
**Assistant** [2] - 341:12, 341:13
**assistant** [1] - 351:18
**assisted** [1] - 361:9
**associates** [1] - 341:17
**assume** [1] - 381:22
**Astoria** [1] - 381:2
**Athens** [2] - 393:18, 394:1
**attack** [1] - 370:5
**attacking** [1] - 369:4
**Attacking** [1] - 370:14
**attended** [2] - 340:16, 340:17
**attention** [1] - 370:8
**Attorney** [5] - 341:9, 341:12, 341:13, 353:20, 359:8
**attorney** [2] - 340:9, 385:15
**Attorneys** [7] - 341:23, 355:18, 355:23, 360:13, 361:23, 397:9, 398:5
**aunt** [1] - 357:22
**available** [2] - 387:24, 398:23
**aware** [11] - 379:3, 379:20, 379:24, 380:4, 382:19, 382:25, 383:7, 383:15, 385:15, 385:19, 388:3

**B**

**backed** [2] - 350:22, 393:4
**background** [3] - 340:15, 341:1, 392:13
**backyard** [1] - 348:11
**bail** [1] - 351:20
**bank** [1] - 386:18
**bar** [1] - 341:3
**bargain** [1] - 369:18
**barrel** [1] - 348:21
**based** [10] - 347:18, 347:19, 347:22, 348:1, 348:17, 348:20, 362:2, 362:8, 362:12, 396:23
**basis** [1] - 358:8
**Beach** [1] - 386:21
**beat** [1] - 365:13
**begin** [1] - 371:3
**beginning** [1] - 395:2
**behold** [1] - 357:2
**Belfi** [2] - 353:22, 379:8
**belief** [1] - 362:12
**bell** [1] - 380:24
**bench** [1] - 363:5
**best** [8] - 348:5, 349:8, 349:8, 349:12, 349:13, 351:3, 365:23, 373:4
**Best** [3] - 352:22, 382:13, 389:18
**better** [1] - 353:10
**between** [6] - 345:3, 365:19, 382:2, 389:10, 389:15
**bill** [1] - 372:14
**bit** [4] - 340:25, 354:21, 371:4, 389:5

**blow** [1] - 357:12
**bono** [2] - 378:12, 393:2
**bonus** [3] - 344:14, 344:19, 346:21
**borrow** [1] - 344:4
**boxes** [2] - 343:8, 392:9
**break** [1] - 348:16
**bring** [4] - 370:3, 377:9, 380:19, 399:2
**Bronx** [1] - 360:13
**Brooklyn** [8] - 340:16, 340:17, 340:22, 341:16, 367:11, 375:16, 375:18, 376:2
**brother** [2] - 357:25, 377:5
**brought** [5] - 342:21, 346:4, 359:3, 377:10, 394:1
**business** [7] - 368:25, 370:3, 370:20, 371:8, 378:12, 387:1, 387:8
**busy** [3] - 371:16, 371:19, 371:21
**buy** [1] - 384:3
**BY** [12] - 340:3, 343:19, 349:15, 354:1, 371:2, 379:19, 386:2, 388:22, 391:24, 400:4, 400:5, 400:6

**C**

**California** [1] - 392:24
**cameras** [2] - 349:24, 350:2
**capsulizing** [1] - 352:18
**car** [1] - 375:20
**career** [2] - 341:1, 342:2
**Carol** [1] - 350:9
**Carolina** [1] - 340:21
**case** [100] - 342:13, 343:5, 344:1, 344:22, 344:25, 345:1, 345:15, 345:20, 346:3, 347:3, 347:6, 347:8, 347:10, 347:12, 347:15, 348:18, 348:19, 351:12, 351:15, 351:16, 351:19, 354:6, 354:8, 355:16, 357:21, 358:20, 359:2, 359:19, 360:18, 360:23, 360:24, 361:20, 362:25, 363:4, 366:18, 366:23, 367:11, 367:12, 367:14, 367:17, 367:19, 367:21, 367:23, 367:24, 368:1, 368:3, 368:6, 368:7, 368:12, 368:16, 368:17, 369:3, 369:13, 369:19, 370:3, 370:4, 371:5, 371:9, 371:10, 372:23, 373:1, 373:6, 373:12, 373:15, 373:18, 373:23, 374:4, 375:6, 377:3, 377:7, 377:12, 377:13, 377:22, 378:14, 378:24, 379:1, 380:1, 381:22, 385:17, 385:18, 390:5, 390:11, 390:20, 390:22, 391:1, 391:3, 391:7, 391:11, 393:1, 393:8, 393:13, 393:22, 394:6, 394:15, 394:23, 396:6, 396:13
**cases** [17] - 342:3, 342:8, 366:24, 367:1, 367:2, 367:4, 367:6, 367:8, 368:3, 370:18, 372:3, 372:11, 372:15, 378:20, 378:21, 379:1, 388:7
**cash** [12] - 380:7, 380:13, 382:21, 382:22, 382:24, 383:9, 388:3, 388:9, 388:10, 388:13, 390:5, 390:12
**CBS** [3] - 352:12, 352:15, 353:1

**CBS-TV** [2] - 352:12, 353:1
**certain** [1] - 398:9
**certainly** [1] - 396:24
**change** [2] - 359:12, 362:9
**changes** [2] - 396:1, 396:4
**character** [1] - 362:17
**characterize** [2] - 356:15, 357:7
**charge** [2] - 363:3, 363:6
**charged** [3] - 347:11, 367:20, 374:18
**charges** [1] - 365:13
**check** [6] - 343:25, 344:2, 344:4, 377:24, 384:5, 384:25
**checking** [1] - 386:24
**chew** [1] - 389:22
**children** [3] - 348:2, 360:9, 393:7
**Chinese** [1] - 387:25
**chunk** [1] - 389:22
**Civil** [1] - 367:2
**civil** [2] - 341:4, 367:1
**claimed** [8] - 343:6, 348:22, 355:9, 355:25, 363:15, 363:22, 393:17, 393:18
**clear** [1] - 371:3
**Clemson** [1] - 340:20
**clerk** [1] - 389:22
**client** [7] - 355:25, 363:22, 370:4, 371:11, 373:13, 373:25, 390:16
**clients** [6] - 372:14, 372:17, 378:11, 385:23, 386:4, 392:17
**Close** [1] - 376:24
**close** [4] - 348:13, 364:15, 368:22, 390:12
**closing** [1] - 398:2
**collecting** [1] - 393:12
**College** [3] - 340:17, 340:20, 340:22
**college** [1] - 340:20
**coming** [3] - 376:5, 386:23, 393:20
**commit** [1] - 347:12
**committed** [3] - 347:13, 352:16, 352:17
**community** [1] - 381:2
**competent** [1] - 361:10
**complained** [1] - 392:7
**completely** [1] - 380:14
**concerned** [3] - 341:1, 373:23, 374:12
**concluded** [2] - 391:3, 399:8
**conclusion** [5] - 344:25, 363:2, 372:23, 372:25, 392:2
**conditioned** [1] - 344:25
**conducted** [1] - 346:9
**conference** [2] - 363:3, 363:6
**conferring** [1] - 391:16
**connection** [23] - 342:13, 345:14, 345:20, 346:2, 359:1, 360:23, 361:9, 362:25, 368:17, 368:20, 369:6, 379:21, 382:23, 384:2, 384:21, 390:5, 391:6, 393:13, 393:17, 394:5, 394:23, 395:4
**considerably** [1] - 371:24
**considered** [1] - 361:25

**continue** [6] - 362:21, 365:16, 365:22, 366:18, 370:2, 388:24
**continued** [2] - 365:23, 369:25
**controlling** [1] - 358:20
**conversation** [1] - 345:2
**conversations** [4] - 345:10, 360:14, 361:13, 379:25
**convicted** [7] - 364:5, 364:23, 365:25, 366:11, 368:7, 369:11, 393:14
**conviction** [8] - 358:20, 364:9, 364:13, 364:20, 365:4, 365:16, 365:19, 368:16
**cooperate** [1] - 393:3
**copies** [1] - 387:16
**copy** [5] - 395:9, 395:14, 395:19, 395:25, 396:5
**corner** [1] - 381:9
**corpus** [1] - 379:22
**Correct** [28] - 346:16, 354:7, 358:6, 372:18, 375:10, 375:13, 375:16, 376:20, 377:14, 378:16, 381:11, 381:14, 381:21, 381:23, 382:15, 382:17, 383:19, 385:1, 385:3, 385:4, 385:9, 386:25, 387:10, 388:5, 389:8, 389:12, 390:12, 391:12
**correct** [27] - 340:11, 346:19, 349:18, 355:12, 356:8, 363:11, 364:7, 368:14, 368:15, 369:7, 370:23, 372:4, 372:5, 375:17, 377:25, 378:12, 380:20, 381:4, 381:17, 383:5, 383:13, 384:18, 385:2, 386:4, 388:12, 390:13, 391:13
**corrected** [1] - 349:1
**cotton** [1] - 370:9
**counsel** [1] - 368:22
**Counsel** [1] - 391:16
**Count** [1] - 364:5
**country** [2] - 394:14, 395:5
**counts** [1] - 363:10
**county** [1] - 360:6
**County** [17] - 341:10, 345:18, 352:13, 359:25, 360:13, 364:10, 366:5, 367:24, 374:23, 375:12, 375:13, 375:16, 375:19, 375:21, 376:2, 389:8, 389:21
**couple** [2] - 354:2, 372:2
**course** [13] - 344:7, 345:10, 352:8, 354:13, 355:11, 359:19, 361:7, 362:11, 363:6, 366:10, 388:6, 394:11, 397:11
**Court** [2] - 360:9, 384:22
**COURT** [45] - 343:12, 343:15, 343:18, 349:3, 349:7, 349:11, 353:17, 370:25, 379:7, 379:10, 379:12, 379:14, 379:18, 385:25, 388:16, 388:20, 391:19, 394:17, 394:19, 395:11, 395:13, 395:16, 395:19, 395:22, 396:1, 396:4, 396:7, 396:10, 396:12, 396:16, 396:18, 396:24, 397:5, 397:11, 397:17, 397:20, 397:22, 398:1, 398:11, 398:13, 398:17, 398:20, 399:1, 399:4, 399:7
**court** [23] - 346:11, 347:7, 347:17, 357:2, 359:7, 363:4, 363:7, 363:19, 367:16, 367:22, 368:22, 378:5, 379:21,

379:25, 380:4, 382:20, 383:1, 383:16, 387:25, 395:6, 395:10, 396:21
**court's** [2] - 343:9, 347:16
**COURTROOM** [2] - 397:18, 397:24
**covered** [1] - 367:17
**create** [2] - 385:11, 385:16
**crime** [4] - 345:24, 377:13, 388:11, 392:18
**criminal** [7] - 341:10, 342:1, 342:3, 360:18, 367:1, 367:2, 385:18
**criminally** [1] - 364:3
**criticize** [1] - 369:15
**cross** [7] - 353:15, 353:18, 358:3, 358:5, 358:9, 362:2, 362:5
**Cross** [1] - 370:25
**CROSS** [2] - 371:1, 400:5
**cross-examination** [4] - 353:18, 358:3, 362:2, 362:5
**Cross-examination** [1] - 370:25
**CROSS-EXAMINATION** [2] - 371:1, 400:5
**cross-examine** [1] - 358:9
**cross-examined** [1] - 358:5
**custody** [1] - 357:22

## D

**DA** [1] - 352:1
**DA's** [3] - 341:14, 341:15, 351:17
**Dallas** [1] - 392:24
**date** [4] - 397:6, 397:13, 397:22, 398:20
**Date** [1] - 397:18
**daughters** [1] - 392:22
**days** [4] - 348:12, 352:22, 353:11, 396:23
**DEA** [1] - 393:3
**deal** [2] - 352:1, 393:3
**decided** [1] - 373:22
**decision** [2] - 398:2, 398:21
**defendant** [40] - 342:11, 342:16, 342:19, 344:15, 344:18, 344:21, 345:16, 346:25, 347:19, 348:2, 348:14, 350:10, 351:5, 351:24, 351:25, 352:6, 352:24, 354:3, 354:12, 354:23, 355:19, 360:1, 360:15, 362:20, 363:10, 364:5, 364:11, 364:14, 364:20, 365:3, 365:4, 365:8, 365:16, 365:17, 365:21, 365:25, 367:7, 367:12, 368:6, 369:10
**defendant's** [13] - 356:4, 357:24, 358:6, 359:6, 361:13, 364:9, 364:13, 364:21, 367:13, 368:15, 383:8, 393:24
**defendants** [1] - 368:1
**defendants's** [1] - 366:9
**defense** [18] - 342:1, 342:4, 342:9, 347:6, 347:8, 347:10, 347:18, 348:17, 351:4, 351:7, 351:10, 351:12, 352:21, 353:5, 357:13, 359:22, 362:9
**degree** [3] - 360:22, 364:2, 364:3

**demanded** [1] - 382:20
**demeanor** [2] - 364:21, 366:9
**denial** [1] - 353:9
**denied** [2] - 347:20, 355:8
**dentist** [2] - 367:19, 368:4
**deported** [1] - 393:15
**deposed** [1] - 395:4
**deposit** [2] - 343:8, 392:8
**deposited** [1] - 344:6
**deposition** [2] - 395:7, 395:17
**depraved** [2] - 363:12, 364:6
**DEPUTY** [2] - 397:18, 397:24
**described** [2] - 344:10, 345:9
**detector** [3] - 351:24, 352:2, 352:7
**developed** [1] - 356:1
**died** [1] - 371:23
**different** [5] - 347:23, 350:24, 362:13, 366:24, 396:22
**DIRECT** [2] - 340:2, 400:4
**direct** [6] - 362:3, 372:21, 374:21, 376:17, 378:7, 383:18
**directly** [1] - 373:5
**disbursements** [4] - 383:24, 383:25, 384:17, 384:21
**discovery** [3] - 356:19, 358:24, 361:18
**discuss** [2] - 351:4, 377:7
**dismiss** [1] - 351:22
**dismissed** [1] - 367:17
**displeasure** [2] - 365:5, 369:12
**disposed** [1] - 397:17
**District** [13] - 341:9, 341:12, 341:13, 341:23, 353:20, 355:18, 355:22, 359:8, 360:12, 361:23, 393:8, 397:8, 398:5
**divorced** [1] - 392:21
**DNA** [3] - 348:24, 348:25, 349:2
**document** [1] - 391:10
**documentary** [1] - 398:9
**documents** [1] - 391:6
**dollars** [8] - 365:12, 373:20, 374:4, 374:16, 390:23, 391:1, 391:2, 392:1
**done** [6] - 355:9, 371:8, 373:12, 378:9, 395:8, 398:16
**down** [3] - 362:19, 394:5, 394:19
**drive** [2] - 376:2, 376:3
**drove** [1] - 375:20
**drug** [1] - 392:25
**During** [3] - 354:9, 354:12, 363:6
**during** [22] - 344:7, 352:8, 352:23, 354:4, 354:5, 354:13, 354:16, 354:23, 354:24, 355:2, 355:11, 357:21, 357:23, 358:3, 359:18, 361:7, 362:11, 362:25, 366:9, 367:6, 369:21, 382:2

## E

**ECF** [1] - 398:8
**educational** [1] - 340:15
**effort** [1] - 345:14
**eight** [1] - 348:2

4

**Either** [1] - 355:6
**either** [6] - 344:18, 364:1, 370:20, 385:16, 398:1, 398:21
**Eleven** [1] - 376:25
**Embassy** [1] - 393:17
**encouraged** [1] - 353:2
**end** [3] - 353:4, 370:11, 394:15
**engagement** [1] - 385:16
**English** [3] - 345:12, 377:9, 380:20
**essentially** [4] - 341:24, 347:7, 350:17, 358:8
**Essentially** [2] - 353:7, 353:8
**established** [1] - 341:16
**estate** [1] - 343:8
**estimate** [4] - 342:2, 342:7, 345:5, 389:18
**estimating** [1] - 375:25
**event** [2] - 344:14, 344:20
**EVIDENCE** [1] - 400:2
**evidence** [12] - 343:17, 349:21, 351:16, 351:18, 352:3, 358:18, 363:2, 363:25, 395:6, 396:9, 398:9, 400:10
**evidentiary** [1] - 368:16, 395:2
**Evseroff** [32] - 340:4, 340:6, 340:9, 340:12, 342:10, 342:18, 343:20, 344:7, 350:9, 351:4, 354:2, 354:21, 355:2, 355:15, 357:8, 359:11, 362:6, 363:2, 364:9, 366:10, 369:10, 370:15, 370:24, 371:6, 371:8, 371:16, 385:5, 388:23, 389:5, 391:18, 391:25, 394:16
**EVSEROFF** [1] - 400:3
**Exactly** [1] - 384:12
**exactly** [1] - 366:7
**EXAMINATION** [6] - 340:2, 371:1, 391:23, 400:4, 400:5, 400:6
**examination** [6] - 353:18, 358:3, 362:2, 362:5, 370:25, 388:24
**examine** [2] - 358:9, 362:17
**examined** [1] - 358:5
**except** [1] - 379:1
**excess** [1] - 388:3
**exculpated** [3] - 350:19, 352:14, 354:19
**exculpating** [1] - 358:1
**exculpatory** [3] - 356:20, 356:21, 356:25
**excuse** [1] - 390:9
**Excuse** [5] - 346:7, 349:3, 379:7, 385:5, 391:14
**excused** [1] - 394:20
**Exhibit** [7] - 343:10, 343:11, 343:16, 343:17, 396:8, 396:9, 400:10
**exhibit** [1] - 343:15
**explain** [6] - 347:7, 347:15, 353:21, 353:25, 359:8, 392:5
**Explain** [1] - 366:22
**explore** [1] - 357:9
**express** [4] - 351:9, 352:25, 365:5, 369:12

**extending** [1] - 386:13
**extent** [1] - 362:16
**extortion** [1] - 393:9

## F

**fabrication** [5] - 357:15, 358:24, 359:16, 361:17, 361:25
**fact** [19] - 342:3, 347:19, 347:22, 348:1, 348:17, 348:20, 350:4, 355:4, 356:10, 356:23, 359:6, 361:21, 366:11, 369:18, 370:7, 374:15, 381:1, 386:17, 398:15
**factor** [1] - 358:20
**facts** [3] - 347:15, 356:1, 396:22
**fairly** [1] - 359:15
**fall** [2] - 345:5, 373:2
**fallen** [1] - 371:24
**family** [29] - 343:2, 344:9, 344:13, 344:19, 345:3, 345:19, 346:23, 346:24, 349:17, 349:21, 357:24, 358:17, 360:8, 360:19, 372:22, 376:18, 377:12, 377:18, 380:6, 380:18, 382:1, 382:21, 383:9, 385:12, 387:22, 389:11, 390:14, 392:1, 392:20
**Family** [2] - 360:9, 384:22
**far** [2] - 341:1, 381:12
**father** [7] - 351:3, 356:9, 357:9, 357:17, 357:25, 358:1, 381:15
**favor** [1] - 352:6
**fear** [1] - 348:15
**February** [1] - 395:17
**fee** [17] - 342:24, 343:1, 343:3, 344:1, 344:10, 367:23, 372:19, 372:20, 374:18, 377:21, 383:17, 383:22, 383:23, 384:15, 384:19, 384:23
**fees** [4] - 366:25, 372:15, 372:16, 391:7
**fellow** [4] - 341:7, 341:17, 341:18, 378:15
**felt** [1] - 373:24
**few** [8] - 348:12, 352:22, 360:17, 366:23, 373:7, 381:24, 381:25, 391:20
**Fifth** [1] - 384:9
**fifth** [1] - 359:25
**file** [9] - 387:6, 387:7, 387:16, 387:18, 388:4, 388:7, 388:14, 391:6, 398:8
**filed** [5] - 386:19, 386:20, 388:1, 388:11, 391:10
**Financial** [1] - 386:10
**Fine** [2] - 372:20, 399:3
**fine** [1] - 360:20
**fingerprints** [3] - 348:19, 348:21, 348:23
**finish** [1] - 347:20
**firm** [3] - 341:16, 344:6, 386:23
**first** [13] - 340:6, 348:24, 354:8, 356:5, 357:3, 357:4, 359:24, 364:2, 365:15, 384:6, 384:9, 384:11, 384:12

**fit** [1] - 370:4
**Five** [1] - 376:11
**fixed** [1] - 372:19
**Fixed** [1] - 372:20
**FLEISCHER** [1] - 397:14
**Flood** [1] - 346:10
**Florida** [1] - 386:20
**focus** [1] - 341:24
**following** [1] - 368:15
**FOR** [1] - 400:2
**forgot** [1] - 346:6
**form** [6] - 388:5, 388:11, 388:14, 391:8, 396:23
**forms** [1] - 388:7
**forth** [3] - 393:16, 393:20
**four** [1] - 353:11
**fractured** [1] - 371:23
**Frank** [3] - 368:10, 369:3
**fraud** [1] - 367:20
**freed** [1] - 350:7
**friend** [2] - 370:5, 381:7
**friendly** [1] - 393:24
**front** [2] - 368:11, 368:12
**frozen** [1] - 387:2
**full** [1] - 341:13

## G

**general** [1] - 353:8
**George** [18] - 346:15, 346:17, 347:23, 350:23, 354:6, 354:9, 356:3, 356:8, 357:8, 357:16, 357:21, 357:25, 358:3, 358:5, 358:9, 359:12, 361:4, 361:12
**George's** [9] - 354:9, 354:12, 357:12, 357:14, 361:14, 362:6, 362:8, 362:13, 362:20
**Georgia** [2] - 380:22, 381:1, 382:4
**given** [4] - 343:4, 351:24, 356:18, 356:21
**Gleeson** [3] - 368:11, 368:13, 369:3
**government** [1] - 386:24
**graduated** [1] - 340:24
**grand** [4] - 351:21, 356:25, 357:17, 358:16
**Greece** [5] - 342:22, 377:5, 377:6, 389:15, 394:13
**grew** [1] - 340:16
**guess** [3] - 364:15, 388:1, 388:15
**guilty** [4] - 355:20, 364:24, 374:2, 393:14
**gun** [5] - 348:18, 348:19, 348:20, 348:22, 348:23
**gunpoint** [2] - 348:3, 349:5
**Gus** [2] - 341:17, 341:21
**guy** [3] - 341:8, 361:11, 370:3

## H

**habeas** [1] - 379:21
**half** [4] - 362:4, 376:3, 377:23, 389:22
**Halpern** [1] - 341:8
**hand** [1] - 395:10
**handed** [1] - 395:14
**handle** [4] - 348:23, 371:13, 371:14, 372:6
**handled** [2] - 369:13, 371:11
**happy** [3] - 344:23, 353:12, 365:11
**hard** [3] - 373:17, 374:5, 394:11
**hardly** [1] - 370:2
**Harold** [1] - 341:8
**head** [1] - 368:2
**hear** [1] - 383:3
**heard** [1] - 354:15
**hearing** [4] - 368:16, 369:5, 396:21, 397:6
**hearings** [2] - 395:3, 395:4
**held** [7] - 348:3, 349:5, 349:9, 350:6, 363:3, 368:17, 369:5
**help** [1] - 360:20
**High** [1] - 340:17
**himself** [6] - 344:14, 350:19, 352:14, 359:6, 360:10, 379:1
**hip** [1] - 371:23
**hired** [1] - 341:9
**history** [1] - 360:12
**hold** [1] - 343:12
**home** [3] - 348:4, 356:11, 387:4
**homicide** [6] - 342:8, 347:12, 347:13, 348:8, 348:12, 364:3
**homicides** [2] - 342:6
**Honor** [17] - 340:1, 343:13, 347:10, 349:9, 349:14, 352:4, 379:9, 379:11, 388:18, 388:21, 391:20, 395:3, 395:25, 396:3, 396:13, 397:16, 399:6
**hour** [7] - 356:23, 362:3, 362:4, 375:24, 376:3, 376:12
**hour-and-a-half** [2] - 362:4, 376:3
**hourly** [2] - 372:15, 372:16
**house** [5] - 348:13, 348:18, 349:25, 350:1, 386:21
**hundred** [11] - 365:12, 373:14, 373:20, 374:3, 374:16, 375:2, 375:3, 390:23, 390:25, 391:1, 392:1

## I

**ignore** [1] - 378:11
**immediately** [3] - 348:12, 352:9, 352:13
**important** [1] - 346:6
**incentive** [1] - 386:7
**included** [6] - 363:8, 363:14, 363:17, 363:20, 364:1, 369:22
**income** [4] - 386:7, 387:13, 387:18

**inculpate** [1] - 354:15
**inculpating** [1] - 357:16
**incurred** [1] - 384:21
**independent** [1] - 366:3
**indicate** [5] - 348:25, 356:1, 362:7, 362:12, 369:21
**indicated** [1] - 346:22
**indicted** [1] - 363:10
**indifference** [2] - 363:12, 364:6
**individual** [1] - 347:11
**informed** [2] - 379:24, 382:19
**informer** [1] - 393:19
**initial** [2] - 351:1, 351:2
**innocence** [2] - 362:24, 374:13
**innocent** [7] - 355:25, 363:15, 363:23, 373:25, 378:10, 378:11, 390:16
**innumerable** [1] - 353:24
**inspect** [1] - 351:21
**intended** [1] - 378:7
**intense** [1] - 386:15
**Intentional** [1] - 363:12
**intentional** [1] - 364:8
**intentionally** [1] - 355:6
**Internal** [2] - 386:15, 386:17
**interpret** [3] - 381:14, 381:16, 381:19
**interpreted** [1] - 381:20
**interpreter** [9] - 345:11, 377:8, 380:19, 381:3, 381:21, 382:4, 382:7, 382:10, 382:17
**interview** [6] - 346:2, 346:9, 352:18, 352:25, 356:24, 357:17
**interviewed** [3] - 346:5, 357:5, 361:4
**introduced** [2] - 360:10, 393:21
**intruder** [6] - 347:13, 347:25, 350:21, 352:16, 355:9, 362:22
**investigate** [1] - 377:13
**investigating** [1] - 377:12
**investigation** [2] - 360:23, 360:25
**investigator** [3] - 341:10, 345:23, 358:15
**involved** [3] - 379:1, 386:14, 393:9
**involving** [4] - 367:19, 367:24, 367:25, 368:4
**irrespective** [1] - 352:2
**IRS** [1] - 387:6
**issue** [1] - 398:6
**issues** [1] - 365:2

## J

**JACOB** [1] - 400:3
**jail** [18] - 345:17, 352:13, 353:3, 359:25, 364:10, 364:14, 365:3, 365:15, 365:17, 366:6, 374:23, 375:12, 375:19, 375:22, 376:9, 389:8, 389:21, 392:21
**Jennifer** [2] - 352:12, 352:15
**Jersey** [1] - 341:7
**job** [2] - 341:11, 367:21
**John's** [1] - 340:23

**Judge** [6] - 353:22, 368:11, 368:12, 369:3, 379:8, 391:17
**judge** [19] - 340:8, 341:7, 353:22, 390:10, 391:15, 394:18, 395:15, 395:23, 396:11, 396:17, 396:21, 397:3, 397:25, 398:3, 398:8, 398:16, 398:24, 399:3, 399:5
**judgment** [1] - 359:5
**July** [1] - 398:22
**jumped** [1] - 354:17
**June** [6] - 340:13, 342:17, 376:22, 385:10, 385:11, 386:18
**junior** [1] - 341:11
**jury** [13] - 351:21, 356:9, 357:1, 357:17, 358:16, 358:23, 362:1, 363:4, 363:7, 363:14, 363:17, 363:20, 364:5

## K

**Kartagener** [2] - 369:1, 394:25
**KARTAGENER** [26] - 371:2, 379:19, 386:2, 388:18, 388:21, 388:22, 391:14, 391:17, 394:18, 395:14, 395:23, 396:11, 396:17, 396:20, 397:2, 397:7, 397:21, 397:25, 398:3, 398:12, 398:15, 398:19, 398:24, 399:3, 399:5, 400:5
**kill** [1] - 394:10
**killed** [2] - 347:21, 350:10
**kind** [2] - 384:20, 391:6
**kindly** [1] - 397:17
**Kings** [1] - 341:10
**kitchen** [1] - 356:11
**knowledgeable** [1] - 360:11
**known** [1] - 385:12
**Kotsopoulos** [58] - 342:11, 342:24, 343:1, 344:8, 344:9, 344:13, 344:14, 344:18, 345:3, 345:12, 346:18, 346:24, 349:17, 349:21, 350:9, 350:10, 350:17, 351:5, 351:7, 352:24, 353:4, 355:3, 356:3, 356:8, 356:10, 358:6, 358:9, 359:12, 359:23, 361:12, 362:21, 362:22, 363:7, 369:13, 372:22, 373:18, 374:22, 375:18, 375:23, 377:17, 380:6, 380:18, 382:21, 383:7, 383:9, 385:12, 387:21, 389:8, 389:11, 390:4, 390:5, 390:14, 392:1, 393:21, 393:24, 394:9, 399:2
**Kotsopoulos's** [5] - 342:23, 346:13, 346:22, 374:13, 376:18
**Kotsopouloses** [5] - 381:3, 381:6, 381:7, 383:18, 389:17

## L

**larceny** [1] - 367:25
**large** [1] - 382:22
**last** [3] - 368:3, 371:4, 393:4
**laughed** [3] - 374:14, 374:15, 390:15
**law** [7] - 340:10, 340:12, 340:14,

341:5, 341:10, 341:16, 352:3
**Law** [1] - 340:23
**lawyer** [8] - 341:4, 341:7, 342:4, 346:10, 359:18, 368:24, 385:3, 392:8
**lawyers** [2] - 343:5, 344:23
**least** [6] - 345:17, 345:21, 372:2, 372:3, 376:12, 382:15
**leaving** [1] - 341:23
**left** [2] - 341:15, 348:22
**lesser** [6] - 363:8, 363:14, 363:17, 363:20, 364:1, 369:22
**lesser-included** [6] - 363:8, 363:14, 363:17, 363:20, 364:1, 369:22
**lest** [2] - 366:24, 374:22
**letter** [4] - 370:12, 370:14, 370:21, 385:16
**level** [1] - 393:6
**liar** [1] - 383:12
**licensed** [1] - 340:9
**lie** [3] - 351:24, 352:1, 352:6
**lien** [1] - 387:7
**liens** [4] - 386:19, 386:20, 387:4, 387:6
**life** [2] - 359:24, 370:8
**light** [1] - 359:16
**limit** [1] - 388:24
**limited** [2] - 371:24, 372:1
**Lincoln** [1] - 340:16
**Lioumis** [14] - 373:6, 373:7, 378:16, 379:17, 379:20, 379:24, 380:4, 380:10, 382:8, 382:9, 390:4, 392:12, 392:16, 394:3
**Lioumis'** [1] - 392:13
**liquidated** [1] - 391:3
**listen** [1] - 360:17
**Listen** [1] - 379:8
**listened** [1] - 360:14
**literally** [1] - 342:5
**litigation** [1] - 386:15
**live** [1] - 361:24
**lived** [2] - 392:23, 392:24
**lo** [1] - 357:2
**located** [1] - 375:13
**locked** [1] - 374:22
**look** [1] - 343:20
**looking** [1] - 377:13
**lost** [1] - 365:11
**lump** [2] - 372:14, 372:17
**lying** [3] - 380:12, 380:14, 383:4

## M

**mafia** [1] - 392:18
**maintain** [1] - 362:21
**maintained** [2] - 362:22, 362:24
**major** [1] - 392:25
**male** [1] - 349:1
**man** [10] - 342:21, 356:20, 357:3, 360:5, 360:11, 363:15, 373:5, 379:16, 380:10, 392:16

**managed** [2] - 368:7, 372:1
**Manhattan** [3] - 341:5, 341:22, 386:21
**manslaughter** [2] - 364:2
**mark** [1] - 396:7
**marked** [1] - 343:10
**massive** [1] - 358:7
**material** [8] - 356:19, 356:20, 356:25, 358:25, 361:18, 361:19
**matters** [1] - 393:19
**McLogan** [2] - 352:12, 352:15
**mean** [5] - 356:17, 356:18, 358:21, 370:10, 394:10
**measure** [1] - 345:25
**measures** [1] - 349:22
**Medicaid** [1] - 367:20
**meet** [3] - 376:18, 380:19, 389:16
**meeting** [1] - 389:11
**members** [3] - 344:19, 377:17, 380:18
**memorandum** [1] - 397:6
**mentioned** [2] - 349:16, 396:18
**met** [5] - 342:23, 345:15, 359:24, 392:16, 392:17
**middle** [1] - 397:2
**might** [1] - 396:20
**minute** [4] - 343:12, 393:4, 395:13, 395:16
**minutes** [6] - 351:22, 352:19, 376:4, 376:5, 376:11
**Miss** [5] - 381:10, 382:10, 382:14, 382:19, 390:3
**mistaken** [1] - 354:24
**moment** [2] - 349:3, 374:19
**moments** [1] - 373:7
**money** [14] - 343:6, 343:7, 344:4, 373:24, 385:4, 386:23, 390:15, 390:19, 391:11, 392:6, 392:8, 393:12, 394:5
**months** [8] - 344:5, 348:2, 357:4, 357:5, 361:23, 375:9, 376:25, 377:19
**morning** [3] - 340:4, 340:5, 395:1
**most** [1] - 346:6
**Mostly** [1] - 375:11
**mother** [3] - 357:24, 383:8, 393:25
**mother's** [1] - 357:22
**motion** [5] - 351:21, 361:10, 367:18, 369:4, 398:2
**motions** [5] - 351:20, 361:9, 367:15, 368:5, 368:8
**MR** [50] - 340:1, 340:3, 343:13, 343:16, 343:19, 349:15, 354:1, 370:24, 371:2, 379:19, 385:24, 386:2, 388:18, 388:21, 388:22, 391:14, 391:17, 391:20, 391:24, 394:16, 394:18, 394:22, 395:12, 395:14, 395:18, 395:21, 395:23, 395:24, 396:2, 396:6, 396:11, 396:13, 396:17, 396:20, 397:2, 397:7, 397:21, 397:25, 398:3, 398:12, 398:15, 398:19, 398:24, 398:25, 399:3, 399:5, 399:6, 400:4, 400:5, 400:6
**MS** [1] - 397:14
**murder** [8] - 348:3, 349:4, 352:17,

363:11, 363:12, 364:6, 364:8, 369:11
**Muslim** [1] - 393:10

## N

**name** [8] - 341:8, 341:17, 341:18, 346:10, 378:15, 379:16, 380:22, 380:24
**Nassau** [1] - 345:17, 352:12, 359:25, 364:10, 366:5, 367:24, 374:23, 375:12, 375:13, 375:16, 375:19, 375:21, 376:1, 389:8, 389:21
**nasty** [1] - 370:12
**nature** [4] - 353:8, 357:14, 358:23, 359:6
**naval** [1] - 392:22
**Navy** [1] - 392:23
**nearly** [1] - 371:23
**necessary** [1] - 391:6
**need** [1] - 396:5
**needed** [2] - 362:8, 362:13
**negligence** [2] - 341:6, 341:8
**negligent** [1] - 364:3
**negotiate** [1] - 393:2
**negotiated** [1] - 344:11
**neighbor** [4] - 350:25, 357:20, 358:14, 393:25
**neighbors** [1] - 347:24
**nephew** [2] - 357:25, 377:6
**never** [14] - 344:17, 355:7, 356:18, 360:3, 360:4, 367:16, 371:5, 374:10, 380:8, 385:21, 386:3, 388:9, 390:11, 393:22
**Never** [7] - 355:5, 355:17, 355:21, 365:14, 372:16, 387:1
**New** [4] - 340:10, 340:14, 341:7, 352:4
**Newmann** [2] - 341:17, 341:21
**News** [1] - 352:15
**news** [1] - 369:5
**next** [4] - 350:23, 366:23, 369:2, 372:2
**Next** [1] - 340:8
**nice** [1] - 392:21
**Nick** [2] - 374:22, 389:7
**notes** [6] - 358:1, 358:2, 358:12, 361:24, 377:10, 382:13
**Notes** [1] - 358:17
**nothing** [10] - 363:22, 373:16, 374:14, 378:9, 391:17, 393:2, 394:11, 394:14, 394:18, 396:17
**notified** [2] - 348:11, 361:22
**number** [9] - 349:16, 366:3, 366:7, 367:22, 378:20, 378:21, 380:11, 380:15, 384:14

## O

**oath** [2] - 379:25, 382:20
**object** [1] - 352:24
**objected** [1] - 353:24

7

**Objection** [1] - 385:24
**objection** [4] - 395:22, 396:10, 396:11, 396:24
**objections** [1] - 359:7
**obligated** [1] - 385:16
**Obviously** [1] - 358:5
**obviously** [1] - 350:6
**occasion** [2] - 361:2, 375:8
**occasions** [8] - 380:12, 380:16, 381:23, 381:24, 382:7, 389:7, 389:10, 389:16
**occurred** [2] - 345:2, 345:3
**occurrence** [4] - 347:24, 348:7, 349:4, 357:19
**October** [1] - 346:8
**offenses** [6] - 363:8, 363:14, 363:17, 363:20, 364:1, 369:22
**offer** [11] - 344:19, 345:8, 346:24, 355:18, 357:10, 372:25, 373:2, 373:4, 373:15, 391:25, 392:3
**offered** [15] - 344:22, 344:24, 346:22, 355:15, 373:5, 373:9, 373:16, 374:3, 374:8, 374:15, 390:14, 390:15, 390:22, 390:25, 391:1
**offering** [3] - 372:22, 390:19, 395:19
**office** [25] - 341:14, 341:15, 341:23, 345:20, 346:4, 346:10, 351:17, 355:18, 355:23, 360:13, 360:16, 360:17, 361:23, 376:19, 377:2, 377:10, 377:18, 381:8, 382:9, 382:15, 389:11, 389:14, 389:17, 397:9, 398:5
**officer** [1] - 392:22
**officers** [1] - 350:25
**offices** [1] - 375:15
**old** [3] - 340:6, 340:8, 354:10
**once** [9] - 345:21, 351:22, 364:17, 364:18, 375:6, 375:7, 375:11, 376:18
**Once** [3] - 375:9, 376:15, 377:2
**one** [23] - 340:17, 345:12, 347:11, 349:3, 351:25, 354:16, 356:23, 360:2, 362:17, 363:5, 367:18, 368:1, 368:4, 368:17, 371:3, 378:22, 378:23, 384:12, 390:10, 391:14, 392:22, 395:13, 397:12
**one-hour** [1] - 356:23
**opinion** [1] - 362:8
**opportunity** [1] - 397:10
**oral** [2] - 398:2, 398:21
**ordered** [1] - 395:3
**organized** [1] - 392:18
**originally** [1] - 398:6
**outburst** [2] - 354:16, 354:23
**outcome** [1] - 373:23
**outset** [2] - 373:2, 373:15
**outstanding** [1] - 398:4
**Overruled** [1] - 385:25
**overtones** [1] - 393:11
**own** [3] - 352:21, 353:4, 381:10
**owned** [3] - 381:5, 386:20, 386:21

## P

**paid** [5] - 344:5, 367:16, 368:5, 392:2, 392:7
**paper** [1] - 393:23
**papers** [1] - 397:15
**paperwork** [1] - 367:20
**parents** [6] - 342:20, 342:23, 344:11, 381:5, 381:10
**part** [3] - 346:6, 353:11, 393:2
**participate** [2] - 351:12, 362:16
**participated** [1] - 342:7
**participation** [1] - 362:18
**partners** [1] - 341:19
**passed** [1] - 341:21
**Paul** [1] - 344:2
**pause** [1] - 343:14
**payment** [4] - 343:25, 344:9, 382:24, 387:21
**pendency** [1] - 357:21
**people** [11] - 356:6, 358:1, 367:25, 368:7, 374:8, 392:18, 393:10, 393:21, 394:9, 397:8
**people's** [1] - 354:6
**perhaps** [3] - 375:4, 382:9, 389:22
**period** [8] - 345:21, 357:23, 367:3, 367:6, 369:21, 375:5, 376:21, 383:10
**permission** [2] - 343:9, 347:16
**personal** [2] - 366:19, 370:21
**personally** [1] - 387:10
**petition** [1] - 398:6
**petitioner** [3] - 349:4, 396:18, 397:18
**Petitioner** [1] - 396:16
**Petitioner's** [2] - 343:11, 343:17
**Philip** [1] - 368:10
**phone** [2] - 351:1, 351:3
**physically** [2] - 372:6, 372:9
**pick** [1] - 372:1
**picked** [1] - 348:22
**pictures** [1] - 345:25
**place** [3] - 349:11, 349:12, 354:20
**places** [2] - 358:11, 377:12
**Plaintiff's** [2] - 343:10, 343:16
**plea** [4] - 355:15, 355:22, 357:10, 369:18
**plead** [1] - 355:19
**pled** [1] - 393:14
**Plus** [3] - 356:23, 356:25, 370:7
**pm** [1] - 399:8
**pneumonia** [1] - 371:22
**point** [8] - 348:12, 354:5, 354:16, 356:13, 357:10, 369:25, 390:20, 393:1
**police** [14] - 347:23, 348:11, 348:15, 349:16, 350:7, 350:11, 350:13, 350:14, 350:18, 350:25, 356:22, 357:18, 358:13, 358:14
**policemen** [1] - 347:24
**position** [3] - 359:11, 362:21, 372:5

**possibility** [1] - 357:9
**Possibly** [1] - 375:1
**post** [1] - 397:6
**post-hearing** [1] - 397:6
**practice** [11] - 340:10, 340:14, 341:16, 341:22, 341:24, 341:25, 360:5, 371:23, 371:25, 372:1, 386:3
**practicing** [1] - 340:12
**practitioner** [1] - 371:17
**preparation** [1] - 345:15
**prepared** [1] - 398:7
**presence** [1] - 348:25
**present** [3] - 361:2, 382:20, 382:21
**pretty** [4] - 364:15, 371:16, 371:19, 386:6
**previous** [1] - 344:23
**previously** [2] - 342:21, 354:20
**Primarily** [1] - 342:1
**prison** [1] - 376:9
**private** [2] - 341:15, 370:8
**pro** [2] - 378:12, 393:2
**problem** [1] - 368:23
**problems** [2] - 386:9, 386:10
**procedural** [1] - 398:4
**proceed** [3] - 371:15, 388:20, 394:21
**proceeding** [1] - 379:22
**proceedings** [2] - 343:14, 384:22
**Proceedings** [1] - 399:8
**produce** [2] - 376:10, 387:25
**professional** [1] - 366:19
**promoted** [2] - 341:11, 341:13
**properties** [1] - 387:7
**property** [3] - 349:18, 386:20, 392:9
**prosecution** [1] - 342:9
**prosecutor** [1] - 342:4
**protect** [1] - 350:5
**provided** [1] - 382:22
**prowler** [2] - 348:13, 348:15
**prowlers** [2] - 348:10, 349:17
**public** [1] - 352:10
**pull** [1] - 396:22
**pursuant** [1] - 346:8
**pursue** [2] - 360:8, 362:13
**pursued** [1] - 369:22
**pursuing** [1] - 351:9
**put** [7] - 349:25, 350:4, 357:22, 358:18, 367:11, 367:13, 398:1
**putting** [1] - 345:13

## Q

**questioning** [1] - 353:20
**questions** [2] - 354:3, 391:20
**quick** [1] - 388:23
**quote** [1] - 342:24
**quoted** [1] - 343:1

8

# R

**raised** [1] - 398:5
**rather** [1] - 363:5
**read** [1] - 393:23
**real** [1] - 343:8
**really** [1] - 394:15
**reason** [2] - 343:3, 361:5
**reasonable** [1] - 363:24
**reasons** [1] - 359:14
**recap** [1] - 389:5
**receipt** [1] - 382:23
**received** [2] - 370:21, 395:11
**recent** [4] - 357:15, 358:24, 359:16, 361:17
**recess** [1] - 388:17
**Recess** [1] - 388:19
**recognize** [2] - 343:22, 343:24
**recollection** [4] - 366:4, 378:25, 382:13, 384:19
**recommendation** [1] - 355:19
**recommended** [1] - 368:23
**records** [3] - 366:5, 384:2, 384:3
**recovered** [1] - 348:21
**redirect** [1] - 391:19
**REDIRECT** [2] - 391:23, 400:6
**refer** [2] - 367:4, 370:4
**reference** [2] - 371:4, 372:21
**referred** [5] - 366:24, 368:1, 371:11, 371:13, 372:3
**referring** [1] - 346:12
**reflect** [1] - 391:10
**reflected** [1] - 387:22
**refused** [1] - 382:23
**regarding** [1] - 361:14
**regularity** [1] - 393:20
**regularly** [1] - 360:1
**relationship** [9] - 366:19, 366:20, 368:22, 369:24, 370:1, 370:11, 370:20, 378:18, 394:2
**remember** [6] - 348:5, 349:13, 361:3, 365:11, 366:7, 378:23
**rephrase** [1] - 389:1
**Reply** [1] - 397:20
**reply** [2] - 397:21, 397:22
**represent** [8] - 342:11, 342:16, 342:19, 342:24, 346:11, 379:2, 380:15, 393:12
**representation** [4] - 344:8, 346:25, 355:3, 365:6
**represented** [7] - 342:21, 378:15, 378:17, 379:15, 380:11, 392:18, 393:1
**request** [5] - 344:8, 344:13, 346:9, 363:7, 363:13, 363:16
**requested** [1] - 344:17
**required** [1] - 388:4
**reservation** [1] - 351:9
**reservations** [2] - 352:25, 369:12
**respect** [5] - 354:14, 356:19, 391:18,

**respond** [2] - 364:25, 398:17
**Respondent** [2] - 396:9, 400:10
**RESPONDENT** [3] - 396:15, 400:2, 400:7
**Respondent's** [1] - 396:8
**Respondents** [1] - 397:19
**response** [3] - 397:15, 398:7, 398:18
**responsively** [1] - 379:10
**rest** [4] - 362:4, 395:8, 396:6, 396:14
**restaurant** [3] - 381:5, 381:7, 381:11
**resting** [1] - 394:24
**restriction** [1] - 353:25
**restrictive** [3] - 353:13, 353:19, 359:5
**RESTS** [2] - 396:15, 400:7
**result** [1] - 349:17
**results** [1] - 352:2
**retained** [6] - 342:11, 342:15, 342:18, 360:8, 368:4, 384:1
**retainer** [6] - 380:2, 385:12, 385:17, 385:23, 386:4, 391:8
**retention** [2] - 385:8, 385:18
**returns** [3] - 387:18, 387:22, 387:24
**Revenue** [2] - 386:15, 386:17
**reward** [3] - 344:14, 344:20, 346:21
**rifled** [1] - 348:4
**rights** [1] - 360:8
**ring** [1] - 380:24
**robbery** [1] - 348:8
**role** [2] - 359:22, 361:7
**room** [1] - 358:23
**Rosario** [3] - 358:25, 361:18, 361:19
**roughly** [1] - 375:5
**Roughly** [1] - 375:7
**run** [1] - 360:5

# S

**safe** [6] - 343:8, 348:4, 348:6, 348:18, 350:8, 392:8
**samples** [1] - 348:24
**Sarikas** [29] - 359:20, 359:24, 360:2, 360:7, 361:14, 362:5, 362:7, 363:19, 364:16, 364:18, 364:20, 365:4, 366:17, 366:20, 366:24, 367:4, 367:8, 367:14, 367:16, 368:21, 369:7, 369:11, 369:24, 370:11, 370:18, 370:21, 372:4, 383:15, 390:3
**Sarikas's** [4] - 359:22, 361:7, 370:8, 381:8
**sat** [2] - 360:9, 360:14
**saw** [7] - 357:14, 374:21, 375:5, 375:12, 377:16, 377:17, 380:8
**scene** [3] - 345:23, 361:3, 377:13
**School** [2] - 340:17, 340:23
**school** [1] - 341:5
**Schroeder** [8] - 351:17, 351:19, 351:23, 352:5, 361:22, 363:16, 395:3, 395:25

**Schroeder's** [1] - 354:25
**screamed** [1] - 354:17
**SEAL** [1] - 392:23
**second** [4] - 349:1, 364:2, 390:10, 391:14
**security** [2] - 349:22, 349:24
**see** [14] - 345:17, 351:15, 360:1, 360:16, 361:2, 364:14, 365:15, 365:17, 371:21, 373:24, 375:9, 384:6, 394:4
**seeing** [1] - 358:23
**seek** [1] - 369:18
**sees** [1] - 370:4
**seized** [2] - 386:18, 387:1
**seizing** [1] - 386:24
**sell** [1] - 392:9
**send** [2] - 368:25, 380:1
**sending** [1] - 378:25
**sense** [1] - 370:6
**sent** [7] - 371:5, 371:9, 371:12, 373:6, 378:14, 378:20, 378:24
**Sent** [1] - 371:10
**sentence** [2] - 355:19, 365:19
**sentenced** [2] - 365:21, 369:3
**separated** [1] - 341:19
**seriously** [1] - 392:3
**serve** [1] - 381:3
**served** [2] - 382:4, 382:17
**Service** [2] - 386:15, 386:18
**service** [2] - 340:18, 340:19
**serving** [1] - 382:10
**set** [7] - 348:24, 352:10, 369:4, 383:17, 383:22, 398:20
**several** [1] - 345:24
**shake** [1] - 394:5
**shelter** [1] - 386:16
**shipped** [2] - 365:24, 366:1
**shooting** [2] - 355:8, 356:22
**short** [1] - 363:5
**shortly** [1] - 350:13
**shot** [6] - 347:20, 350:9, 355:4, 355:8, 356:10, 362:23
**show** [3] - 343:9, 386:7, 387:13
**showed** [1] - 351:18
**showing** [1] - 398:9
**sick** [2] - 371:22, 372:7
**sign** [1] - 366:6
**signed** [2] - 395:25, 396:5
**significant** [1] - 357:12
**similar** [1] - 388:17
**single** [1] - 391:10
**sister** [1] - 357:23
**sit** [1] - 374:2
**site** [1] - 344:3
**sixth** [1] - 359:25
**social** [1] - 393:6
**solicit** [1] - 373:14
**solicited** [2] - 373:16, 393:1
**someplace** [1] - 384:23
**sometime** [1] - 345:5

9

**sometimes** [2] - 360:2, 376:3
**somewhere** [1] - 383:24
**son** [22] - 344:2, 346:9, 346:11, 346:12, 346:13, 346:15, 347:22, 350:22, 350:23, 351:2, 354:6, 354:14, 354:15, 354:17, 354:19, 356:4, 358:6, 361:13, 367:13, 377:24, 384:25, 385:3
**Sonnenschein** [2] - 341:18, 341:21
**sooner** [1] - 360:6
**sorry** [1] - 343:15
**South** [1] - 340:21
**Southern** [1] - 393:8
**speaking** [7] - 348:15, 351:19, 351:23, 376:12, 377:11, 389:7
**spend** [4] - 375:22, 376:12, 377:3, 377:11
**spent** [1] - 389:6
**spoken** [1] - 397:8
**spring** [1] - 385:9
**St** [1] - 340:23
**stamps** [1] - 398:10
**stand** [2] - 352:23, 353:10
**start** [1] - 347:20
**started** [1] - 376:22
**Starting** [1] - 386:13
**starting** [1] - 344:3
**State** [2] - 340:10, 340:14
**statement** [3] - 352:10, 352:14, 356:21
**statements** [7] - 350:14, 356:19, 357:16, 357:18, 357:19, 358:10, 361:21
**Statements** [5] - 358:13, 358:14, 358:15
**States** [1] - 368:10
**step** [2] - 374:19, 394:19
**still** [2] - 341:22, 362:24
**stock** [1] - 350:4
**stop** [1] - 366:12
**strange** [1] - 394:10
**strategy** [10] - 347:2, 347:5, 351:5, 351:7, 351:10, 357:13, 359:11, 362:9, 362:14, 369:15
**Street** [2] - 341:4, 341:6
**street** [1] - 381:8
**submission** [4] - 363:13, 363:16, 363:20, 364:1
**Submit** [1] - 398:13
**submit** [6] - 363:7, 396:19, 397:10, 397:12, 398:7, 398:11
**submitted** [3] - 363:4, 379:20, 395:6
**subsequent** [1] - 384:12
**substance** [3] - 354:18, 355:7, 365:8
**substantial** [2] - 367:23, 372:3
**sum** [2] - 372:14, 372:17
**summation** [1] - 354:25
**summer** [5] - 348:9, 349:8, 370:16, 370:22, 375:6
**supported** [1] - 363:25
**supposed** [1] - 365:12
**supposedly** [1] - 372:22

**surfaced** [1] - 357:4
**surprise** [1] - 356:14
**Surprise** [1] - 356:15
**sustained** [1] - 359:7

## T

**tax** [4] - 386:16, 387:18, 387:22, 387:24
**taxes** [1] - 387:13
**ten** [6] - 358:18, 366:24, 372:3, 375:9, 376:11, 377:19
**tenure** [1] - 341:14
**terms** [1] - 353:21
**terrorism** [2] - 393:11, 393:19
**test** [4] - 349:2, 351:24, 352:2, 352:7
**testified** [18] - 346:18, 352:9, 352:13, 352:20, 353:8, 356:6, 356:9, 357:1, 357:8, 359:12, 361:12, 369:5, 369:7, 369:9, 372:2, 382:25, 383:8, 383:15
**testifies** [1] - 357:3
**testify** [2] - 353:7, 354:7
**testifying** [1] - 353:4
**testimony** [35] - 353:12, 354:9, 354:12, 354:13, 354:16, 357:12, 357:14, 358:19, 359:6, 361:14, 361:16, 362:1, 362:6, 362:8, 362:13, 362:20, 371:4, 372:21, 374:6, 374:20, 374:21, 376:17, 378:7, 378:8, 380:10, 382:12, 382:14, 384:16, 389:6, 390:1, 390:7, 390:9, 390:11, 390:17, 390:24
**THE** [55] - 343:12, 343:15, 343:18, 349:3, 349:6, 349:7, 349:8, 349:11, 349:12, 353:17, 353:18, 370:25, 379:7, 379:9, 379:10, 379:11, 379:12, 379:13, 379:14, 379:16, 379:18, 385:25, 388:16, 388:20, 391:19, 394:17, 394:19, 395:11, 395:13, 395:16, 395:19, 395:22, 396:1, 396:4, 396:7, 396:10, 396:12, 396:16, 396:18, 396:24, 397:5, 397:11, 397:17, 397:18, 397:20, 397:22, 397:24, 398:1, 398:11, 398:13, 398:17, 398:20, 399:1, 399:4, 399:7
**themselves** [1] - 350:5
**thereafter** [2] - 341:12, 350:13
**thinking** [1] - 368:2
**third** [1] - 349:1
**Third** [1] - 384:9
**thousand** [9] - 365:12, 373:14, 373:20, 374:3, 374:16, 390:23, 390:25, 391:2, 392:1
**thousands** [1] - 342:5
**three** [13] - 345:24, 347:23, 351:20, 357:4, 357:5, 361:23, 377:23, 380:17, 392:22, 397:3, 397:13, 397:15
**three-and-a-half** [1] - 377:23
**Thursday** [1] - 398:22
**tied** [4] - 343:7, 348:4, 349:10, 350:6

**timeliness** [1] - 398:6
**today** [1] - 368:18
**together** [4] - 367:8, 367:19, 371:8, 396:22
**took** [9] - 349:12, 352:1, 352:18, 352:22, 372:16, 377:18, 383:8, 388:3, 391:11
**top** [1] - 368:2
**total** [2] - 341:14, 377:21
**traffic** [1] - 376:6
**trafficking** [1] - 392:25
**transcript** [2] - 395:6, 395:9
**travel** [1] - 393:10
**tremendous** [1] - 345:13
**tremendously** [1] - 364:23
**trial** [42] - 342:8, 344:16, 345:16, 346:18, 347:2, 347:5, 349:11, 349:12, 352:8, 352:23, 353:5, 353:22, 354:4, 354:5, 354:24, 355:11, 355:13, 355:14, 356:9, 356:15, 357:5, 357:7, 357:8, 360:24, 361:1, 361:8, 361:17, 361:23, 362:12, 362:16, 363:1, 363:3, 363:25, 366:18, 366:23, 367:4, 367:7, 369:15, 376:22, 382:3, 392:2, 394:9
**tried** [13] - 342:3, 351:24, 352:1, 353:21, 353:25, 368:12, 368:14, 368:24, 371:7, 372:11, 375:6, 393:2, 394:5
**triple** [1] - 371:22
**trips** [3] - 375:21, 376:1
**true** [3] - 371:15, 386:7, 386:14
**truncated** [1] - 396:21
**truth** [2] - 354:18, 390:6
**try** [3] - 388:23, 388:24, 389:1
**trying** [4] - 348:16, 350:5, 377:22, 380:1
**Tuesday** [1] - 340:8
**turn** [2] - 361:22, 368:8
**turned** [1] - 357:21, 358:2
**TV** [2] - 352:12, 353:1
**twice** [10] - 345:21, 345:24, 360:2, 364:18, 375:7, 375:9, 376:15, 376:18, 377:2, 380:17
**two** [6] - 341:17, 344:5, 347:23, 350:24, 363:10, 395:5
**Two** [1] - 364:6
**type** [2] - 341:25, 344:19

## U

**ultimately** [3] - 341:20, 346:18, 393:14
**under** [2] - 379:25, 382:20
**understatement** [1] - 358:7
**understood** [3] - 347:15, 362:2, 381:13
**United** [1] - 368:10
**unknown** [1] - 348:25
**untrue** [1] - 383:6
**Untrue** [1] - 383:14

**up** [25] - 340:16, 343:7, 348:3, 348:4, 348:22, 349:5, 349:9, 349:10, 349:25, 350:6, 350:22, 352:11, 353:4, 354:15, 354:17, 359:3, 371:3, 372:2, 374:22, 377:18, 380:5, 384:14, 389:22, 395:10
**Up** [1] - 367:5
**upset** [2] - 364:23, 366:11
**upstate** [2] - 365:24, 366:1
**useful** [1] - 396:20

## V

**vague** [1] - 350:2
**various** [1] - 358:11
**versus** [1] - 368:10
**viable** [1] - 365:1
**vicinity** [1] - 349:25
**view** [1] - 363:24
**visit** [15] - 359:25, 364:10, 364:19, 364:22, 365:3, 365:15, 366:2, 375:18, 375:24, 384:9, 384:10, 384:11
**visited** [1] - 357:24
**visiting** [1] - 365:23
**visits** [2] - 360:17, 366:10

## W

**Wait** [2] - 395:13, 395:16
**Wall** [1] - 341:6
**Walsh** [1] - 394:21
**WALSH** [24] - 340:1, 340:3, 343:13, 343:16, 343:19, 349:15, 354:1, 370:24, 385:24, 391:20, 391:24, 394:16, 394:22, 395:12, 395:18, 395:21, 395:24, 396:2, 396:6, 396:13, 398:25, 399:6, 400:4, 400:6
**wants** [1] - 397:13
**web** [1] - 344:3
**week** [14] - 345:21, 360:2, 375:5, 375:7, 375:9, 375:11, 376:15, 376:19, 377:2, 395:5, 397:21, 397:22
**weeks** [4] - 377:23, 397:3, 397:13, 397:15
**wife** [12] - 347:21, 348:2, 348:14, 349:5, 350:15, 355:4, 355:8, 355:9, 362:23, 392:21, 392:23, 393:7
**William** [1] - 341:18
**willing** [1] - 380:6
**win** [2] - 344:15, 344:20
**winning** [1] - 345:1
**wishing** [1] - 358:1
**withdrawn** [2] - 383:16, 387:17
**witness** [7] - 354:7, 354:8, 356:5, 357:3, 361:3, 381:15, 394:20
**WITNESS** [8] - 349:6, 349:8, 349:12, 353:18, 379:9, 379:11, 379:13, 379:16
**witnesses** [6] - 345:20, 346:2, 346:5, 362:17, 377:10, 394:22

**woman** [5] - 361:22, 380:22, 381:2, 381:5, 394:1
**word** [1] - 345:12
**words** [3] - 354:17, 355:7, 365:9
**writing** [2] - 357:25, 396:19
**written** [2] - 358:17, 396:23
**wrongfully** [1] - 347:11
**wrote** [2] - 358:12, 370:12

## Y

**year** [5] - 340:17, 345:21, 376:23, 382:2, 385:8
**years** [17] - 340:8, 340:13, 341:14, 341:19, 342:8, 354:10, 360:5, 366:24, 368:25, 372:3, 372:11, 372:12, 372:16, 386:3, 387:14, 387:18, 392:17
**York** [3] - 340:10, 340:14, 352:4
**young** [3] - 356:20, 357:3, 381:1
**yourself** [1] - 345:3